## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL COUNCIL OF NONPROFITS,<br>1001 G Street NW, Suite 700 East<br>Washington, D.C. 20001,<br><br>AMERICAN PUBLIC HEALTH ASSOCIATION,<br>800 I Street NW<br>Washington, D.C. 20001,<br><br>MAIN STREET ALLIANCE,<br>909 Rose Avenue<br>North Bethesda, Md. 20852,<br><br>and<br><br>SAGE,<br>305 7th Avenue, 15th Floor<br>New York, N.Y. 10001,<br><br>*Plaintiffs*,<br><br>v.<br><br>OFFICE OF MANAGEMENT AND BUDGET,<br>725 17th Street, N.W.<br>Washington, D.C. 20503,<br><br>and<br><br>MATTHEW VAETH, in his official capacity as Acting Director, Office of Management and Budget<br>725 17th Street, N.W.<br>Washington, D.C. 20503,<br><br>*Defendants*. | Case No. |

## COMPLAINT

Just yesterday evening, reports surfaced that the Acting Director of the Office of Management and Budget issued a memorandum entitled "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs." Memo M-25-13 (hereinafter "the Memo").[1] The Memo purports to require every federal agency to temporarily pause "all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by [President Trump's] executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal"—effective **today** at 5:00 p.m. Memo M-25-13 at 2. In practice, the Memo purports to eradicate essentially all federal grant programs. Acting Director Vaeth's only stated basis for doing so is his belief that "[f]inancial assistance should be dedicated to advancing Administration priorities," and that "[t]he use of Federal resources to advance Marxist equity, transgenderism, and green new deal social engineering policies is a waste of taxpayer dollars that does not improve the day-to-day lives of those we serve." *Id.* at 1.

This Memo—made public only through journalists' reporting, with barely twenty-four hours' notice, devoid of any legal basis or the barest rationale—will have a devastating impact on hundreds of thousands of grant recipients who depend on the inflow of grant money (money already obligated and already awarded) to fulfill their missions, pay their employees, pay their rent—and, indeed, improve the day-to-day lives of the many people they work so hard to serve.

---

[1] A copy of the Memo is available online at: https://www.washingtonpost.com/documents/deb7af80-48b6-4b8a-8bfa-3d84fd7c3ec8.pdf.

Although the Trump Administration is at liberty to "advanc[e] [its] priorities," it must do so within the confines of the law. It has not. The Memo fails to explain the source of OMB's purported legal authority to gut every grant program in the federal government; it fails to consider the reliance interest of the many grant recipients, including those to whom money had already been promised; and it announces a policy of targeting grant recipients based in part on those recipients' First Amendment rights and with no bearing on the recipients' eligibility to receive federal funds.

Given the few hours that remain before federal grantees are thrown into disarray, Plaintiffs file this Complaint and seek a temporary restraining order to maintain the status quo until the Court has an opportunity to more fully consider the illegality of OMB's actions.

## Parties

1.     **Plaintiff National Council of Nonprofits** ("NCN") is the largest network of nonprofit organizations in North America, with more than 30,000 organizational members. National Council of Nonprofits ("NCN") supports nonprofits in advancing their missions by identifying emerging trends, sharing proven practices, and promoting solutions that benefit charitable nonprofits and the communities they serve.

2.     **Plaintiff American Public Health Association** ("APHA") is a nonpartisan, non-profit organization that champions the health of all people and all communities; strengthens the profession of public health; shares the latest research and information; promotes best practices; and advocates for public health issues and policies grounded in scientific research. APHA represents more than 23,000 individual members, who reside in all 50 states, the District of Columbia, and Puerto Rico, and also has 52

state and regional affiliates. APHA is the only organization that combines a 150-year perspective, a broad-based member community, and the ability to influence federal policy to improve the public's health.

3.      **Plaintiff Main Street Alliance** ("MSA") is a national network of small businesses, which represents approximately 30,000 small businesses across the United States. MSA helps small business owners realize their full potential as leaders for a just future that prioritizes good jobs, equity, and community through organizing, research, and policy advocacy on behalf of small businesses. MSA also seeks to amplify the voices of its small business membership by sharing their experiences with the aim of creating an economy where all small business owners have an equal opportunity to succeed. MSA's small business members compete for and receive various forms of what is broadly defined as "federal financial assistance," including funding in the form of grants, loans, and loan guarantees. Members also benefit directly from other recipients of federal financial assistance being able to purchase goods and services from them as a result of federal programs.

4.      **Plaintiff SAGE** is a New York nonprofit corporation. SAGE is dedicated to improving the lives of lesbian, gay, bisexual, and transgender adults.

5.      **Defendant OMB** is a federal agency with responsibility for overseeing the management of federal financial assistance, including by establishing policies and requirements. *See* 31 U.S.C. §§ 503(a), 504. It is a component of the Executive Office of the President and maintains a headquarters in Washington, D.C.

6.      **Defendant Matthew Vaeth** is the Acting Director of OMB. He is sued in his official capacity.

**Jurisdiction and Venue**

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under federal law, specifically the Administrative Procedure Act, 5 U.S.C. § 701, *et seq*.

8.      Venue is proper in this district pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e), because at least one of Defendants is headquartered in Washington, D.C. and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred here.

**Legal Framework**

9.      The Office of Management and Budget has the authority to "establish governmentwide financial management policies for executive agencies." 31 U.S.C. §§ 503(a), 504. That authority, given by Congress to the Deputy Director for Management and the Office of Federal Financial Management, includes the authority to "[p]rovide overall direction and leadership to the executive branch on financial management matters by establishing financial management policies and requirements." *Id.* § 503(a)(2).

10.      Pursuant to that authority, OMB published in 2013 a notice of proposed rulemaking to revise and streamline guidance related to federal financial assistance.

11.      In 2014, it published what is now known as the OMB Guidance for Federal Financial Assistance ("OMB Guidance" or "Guidance") at title 2 of the Code of Federal Regulations ("CFR"). 79 Fed. Reg. 75867.

12.      The Guidance specifically requires federal agencies to "implement" the Guidance "in codified regulations unless different provisions are required by Federal statute or are approved by OMB." 2 C.F.R. § 200.106.

13.     Since 2014, OMB has twice updated its Guidance—both times after providing a notice and comment period. *See* 85 Fed. Reg. 49506 (2020); 89 Fed. Reg. 30046 (2024).

## Factual Allegations

14.     On January 27, 2025, Matthew J. Vaeth, Acting Director of the Office of Management and Budget, issued the Memo, titled "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs."

15.     The Memo directs each federal agency to "complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders."

16.     The Memo states that, during their assessment, all federal agencies "**must temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency actions that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal" (emphasis in original).

17.     According to the Memo, "Federal financial assistance includes: (i) all forms of assistance listed in paragraphs (1) and (2) of the definition of this term at 2 CFR 200.1; and (ii) assistance received or administered by recipients or subrecipients of any type except for assistance received directly by individuals."

18.     The relevant portions of 2 C.F.R. 200.1 defining "federal financial assistance" broadly encompass all "[a]ssistance that recipients or subrecipients receive or

administer in the form of" "grants," "loans," "loan guarantees," and "insurance," among

other things.

19.     The Memo specifically carves out Medicare or Social Security benefits.

20.     Agencies are also directed to "pause all activities associated with open

NOFOs, such as conducting merit review panels." NOFO stands for "notice of funding

opportunity" and refers to a formally issued announcement of the availability of federal

funding.

21.     The OMB Memo orders that the "pause" take effect on January 28, 2025

at 5 p.m. The OMB Order does not provide an end date for the pause.

22.     Agencies are required to report by February 10, 2025 to OMB "detailed

information on any programs, projects or activities subject to this pause. Each agency

must pause (i) issuance of new awards; (ii) disbursement of Federal funds under all open

awards; and (iii) other relevant agency actions that may be implicated by the executive

orders, to the extent permissible by law, until OMB has reviewed and provided guidance

to your agency with respect to the information submitted."

23.     Agencies are also directed to "for each Federal financial assistance

program: (i) assign responsibility and oversight to a senior political appointee to ensure

Federal financial assistance conforms to Administration priorities; (ii) review currently

pending Federal financial assistance announcements to ensure Administration priorities

are addressed, and, subject to program statutory authority, modify unpublished Federal

financial assistance announcements, withdraw any announcements already published,

and, to the extent permissible by law, cancel awards already awarded that are in conflict

with Administration priorities, and; (iii) ensure adequate oversight of Federal financial

assistance programs and initiate investigations when warranted to identify underperforming recipients, and address identified issues up to and including cancellation of awards."

24.    The scope of paused funds includes any "implicated by" six executive orders issued by President Trump since January 20:

a.    Executive Order, "Ending Radical and Wasteful Government DEI Programs and Preferencing" (January 20, 2025), which provides for termination of all "equity-related" grants. *See* https://www.whitehouse.gov/presidential-actions/2025/01/ending-radical-and-wasteful-government-dei-programs-and-preferencing/

b.    Executive Order "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (January 20, 2025), which provides that "[f]ederal funds shall not be used to promote gender ideology. Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *See* https://www.whitehouse.gov/presidential-actions/2025/01/defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal-government/.

c.    Executive Order, "Protecting the American People Against Invasion," (January 20, 2025), which directs the Attorney General and the Secretary of Homeland Security to review all "contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services" to immigrants without legal status, and to pause

disbursement of funds pending the results of the review. *See*

https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-american-people-against-invasion/.

d.  Executive Order "Reevaluating and Realigning United States Foreign Aid,"

(January 20, 2025), which pauses all disbursements of development assistance

funds to foreign countries and implementing organizations for 90 days. *See*

https://www.whitehouse.gov/presidential-actions/2025/01/reevaluating-and-realigning-united-states-foreign-aid/.

e.  Executive Order "Unleashing American Energy" directs all agencies to pause

the disbursement of funds appropriated through the Inflation Reduction Act of

2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act

(Public Law 117-58). *See* https://www.whitehouse.gov/presidential-actions/2025/01/unleashing-american-energy/. Further guidance issued by

OMB clarified this only applied to funds related to energy policy. *See*

https://www.whitehouse.gov/briefings-statements/2025/01/omb-memo-m-25-11/

f.  Executive Order "Enforcing the Hyde Amendment" states that "it is the policy

of the United States, consistent with the Hyde Amendment, to end the forced

use of Federal taxpayer dollars to fund or promote elective abortion" and

revokes two previous executive orders. *See*

https://www.whitehouse.gov/presidential-actions/2025/01/enforcing-the-hyde-amendment/. This order directs the Director of OMB promulgate guidance

implementing the order. *Id.*

25.    The Memo's stated justification for the cessation of funding is that "[f]inancial assistance should be dedicated to advancing Administration priorities," and that "[t]he use of Federal resources to advance Marxist equity, transgenderism, and green new deal social engineering policies is a waste of taxpayer dollars that does not improve the day-to-day lives of those we serve."

**Memo M-25-13 Is Final Agency Action Subject to the Court's Review**

26.    The Administrative Procedure Act authorizes judicial review of final agency action. 5 U.S.C. § 704.

27.    Final agency actions are those (1) that "mark the 'consummation' of the agency's decisionmaking process" and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).

28.    The Memo marks the consummation of OMB's decisionmaking process because it announces the agency's decision to immediately suspend the obligation or disbursement of all federal financial assistance.

29.    The Memo is an action by which rights or obligations have been determined or from which legal consequences will flow because it purports to stop lawfully authorized obligations and disbursements that would be paid pursuant to valid federal grants.

30.    Memo M-25-13 therefore is final agency action subject to this Court's review under the APA.

**Plaintiffs' Injuries**

31.     Plaintiff NCN is committed to pursuing a more civil and just society, embedding diversity, equity, and inclusion throughout its organization and in the ways that it carries out its mission. One of the ways it works towards that mission is by providing nonprofit organizations with the resources needed to operate more effectively, efficiently, and ethically, including by advising nonprofits on available grant programs and advocating for increases in federal funding of such programs. For example, NCN has successfully advocated for a mandate requiring governments to cover the indirect costs for nonprofits delivering community services with federal funding, and for $50 billion in forgivable Paycheck Protection Program loans for nonprofits' COVID-19 relief, resulting in more than 200,000 nonprofits receiving funding and the protection of an estimated 6.2 million jobs in the sector.

32.     Many of NCN's members rely on federal grants and financial assistance to serve their missions, from supporting research and services to those with cancer and other serious diseases, to assisting people in escaping domestic violence, to providing mental health care and suicide hotlines. Federal grants and financial assistance are the lifeblood of operations and programs for many of these nonprofits, and even a short pause in funding—which, for many NCN members, is already in the pipeline—could deprive people and communities of their life-saving services. Nonprofits often make budget decisions two to five years in advance, and they make business decisions based on expected cash inflow just as any for-profit enterprise would: making staffing decisions, setting organizational priorities, providing essential services and programs, and identifying and working towards fundraising goals. They rely on federal funds to fund

entire programs, including salaries. Halting this funding would lead to pauses of important community programs, food and safety assistance, and lifesaving research, among other things: even a short pause could be devastating, decimating organizations, costing lives, and leaving neighbors without the services they need.

33.    Plaintiff APHA has long received federal grants and funds to carry out its mission and to ensure that the federal government has the benefit of APHA's and its members' expertise and research. APHA also often receives federal funds to regrant funds to provide technical and other assistance to essential community-based programs. For example, one of APHA's programs established The National Council for Environmental Health and Equity, which provides community-based organizations working to advance environmental justice with grants, and is supported by the CDC. APHA's members also rely on a range of federal grants and financial assistance: for example, the Prevention and Public Health Fund is a federal program that provides sustained investments in prevention and public health programs to improve health and reduce public and private health care costs.

34.    Should the Memo take effect, it would take a wrecking ball to APHA's public health programs that receive federal financial assistance and grants, as well as to the thousands of programs across the nation on which APHA's members rely.

35.    The Memo also harms APHA by seeking to force it to abandon, as a condition of federal funding, its viewpoints and beliefs that working to achieve equity in health status is essential not only to APHA's own mission but to the discipline of public health itself. The Memo therefore chills APHA's research, work, expression, and speech.

36.     Plaintiff MSA helps small business owners realize their full potential as leaders for a just future that prioritizes good jobs, equity, and community through organizing, research, and policy advocacy on behalf of small businesses. The Memo's language about equity, however, makes clear that continued receipt of federal financial assistance will hinge on what position small businesses take on politically charged issues such as gender and environmental policy—chilling that speech and curtailing MSA's mission.

37.     MSA's small business members compete for and receive various forms of federal financial assistance, including funding in the form of grants, loans, and loan guarantees. In fact, the majority of MSA's members receive some form of this assistance.

38.     The Memo's halt to the funding on which MSA's members rely will harm them significantly. As one example, MSA has members that operate child care centers in reliance on the Child Care & Development Block Grant program administered by the Office of Child Care within the Department of Health and Human Services, which is the primary federal funding source to help families with low incomes access child care. Halting payments under that program will significantly harm not only those MSA members, but also customers who will no longer be able to afford to pay for child care absent the grant program.

39.     For another example, some MSA members rely on loans administered by the Small Business Administration under Section 7(a) of the Small Business Act, which provides SBA-guaranteed loans to small businesses that lack adequate access to capital on reasonable terms and conditions. The continued availability of these funds, and the disbursement of loan proceeds already committed, is vital for the continued financial

well-being of the recipients. Halting this funding would throw small businesses into chaos, with a direct harm to their bottom lines, and, in some cases, resulting in the closure of the business.

40.     Plaintiff SAGE operates through a variety of programs, including, for example, the National Resource Center on LGBTQ+ Aging, which has as its goal to provide ongoing and sustainable resource development, technical assistance, education, and training that supports networks in providing services to LGBTQ+ older adults and their caregivers. The National Resource Center on LGBTQ+ Aging was established in 2010 through a grant from the Department of Health and Human Services Administration for Community Living ("ACL"), which provided approximately 74% of the project's funding.

41.     SAGE also receives additional grant funds from ACL to build a new online hub, SAGEYou, which is funded exclusively through this federal appropriation. SAGEYou will centralize LGBTQ+-friendly and elder-accessible content addressing disparities such as social isolation, mental health challenges, physical health disparities, and financial insecurity, to improve aging outcomes for LGBTQ+ older adults. SAGEYou is scheduled for a soft launch in May 2025 and a hard launch in June 2025. If this funding is lost, the project will no longer exist. This have a detrimental impact on the mental health and overall well-being of millions of LGBTQ+ older adults across the United States (particularly those residing in rural and underserved areas who already face significant barriers to accessing critical services and supports). Further, the cutoff of funding for SAGEYou jeopardizes multiple staff positions and SAGE's ability to continue meeting its obligations to contractors which it has already retained.

42.     SAGE reasonably fears that its future receipt of federal financial assistance will depend on SAGE's past and future exercise of its First Amendment rights of free speech and association rather than on neutral criteria.

### Claims for Relief

**Count One**
**Violation of the Administrative Procedure Act—706(2)(A)**
**Arbitrary and capricious**

43.     Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

44.     Under the APA, a court shall "hold unlawful and set aside agency action … found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

45.     The OMB Order is arbitrary and capricious in multiple respects.

46.     First, the Order fails even to acknowledge the catastrophic practical consequences that an immediate, across-the-board freeze on federal grant programs will produce, let alone to provide a reasonable explanation why those consequences could possibly be warranted merely to conduct a review of which ones "may be implicated by any of the President's executive orders." To say that the OPM Order "entirely failed to consider an important aspect of the problem," *see Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), where it did not even recognize the obvious and immediate nationwide harm and disruption it will occasion is to dramatically understate the extent to which the Order is arbitrary and capricious.

47.     Second, and relatedly, the Order fails to account for the substantial reliance interests in the ordinary processes of federal grantmaking that the Order wipes

away in an effort to freeze all financial assistance. "When an agency changes course … it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account,'' and the failure to do so is arbitrary and capricious. *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020) (internal quotation marks and citation omitted).

48.     Third, the Order fails to articulate why the review of existing grant programs that it envisions requires an immediate cessation of all grant programs, notwithstanding the immense disruption that will cause, and why that review could not simply be conducted while existing obligations and disbursements continue as normal.

**Count Two**
**Administrative Procedure Act–706(2)(B)**
**Contrary to the First Amendment**

49.     Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

50.     Under the APA, a court shall "hold unlawful and set aside agency action … found to be … contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

51.     The Memo purports to pause all disbursements through federal financial assistance programs pending a "review" to determine whether they are "consistent with the President's policies" as expressed in several executive orders, such as one announcing that "[f]ederal funds shall not be used to promote gender ideology." The Memo further indicates that the review should identify recipients of federal funding that "advance Marxist equity, transgenderism, and green new deal social engineering policies."

52.     Memo M-25-13 makes clear that recipients of federal funding who are determined to have expressed or advocated for—or perhaps even merely associated themselves with—political, personal, and moral viewpoints disfavored by the administration will not receive further funding through federal financial assistance programs. For them, the "pause" is anything but.

53.     Because Memo M-25-13 conditions the continued receipt of billions of dollars or more in federal funding on recipient's exercise of their First Amendment rights of free expression and association, it is regulated by the First Amendment.

54.     Because Memo M-25-13's conditions burden core political speech and association rights, and expressly discriminates based on viewpoint, it is subject to strict scrutiny.

55.     Because Memo M-25-13 is not "the least restrictive means of achieving a compelling state interest," *see Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (internal quotation marks and citation omitted), it flunks strict scrutiny.

## Count Three
### Administrative Procedure Act–706(2)(C)
### In Excess of Statutory Authority

56.     Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

57.     Under the APA, a court shall "hold unlawful and set aside agency action … found to be … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(D).

58.     Pursuant to statute, OMB's is directed to provide "overall direction and leadership," "review agency budget requests for financial management systems and

operations," "oversee, periodically review, and make recommendations to heads of agencies," "provide advice to agency heads," "settle differences that arise among agencies regarding the implementation of financial management policies," and "communicate with" State and local governments and "foster the exchange … of information concerning financial management standards, techniques, and processes." 31 U.S.C. § 503(a).

59.     OMB instead directs federal agencies to implement its guidance.  *See* 2 C.F.R. § 200.106.

60.     OMB's direct statutory authority does not allow it to unilaterally terminate all federal financial assistance programs across the entire government.

61.     OMB's action was therefore in excess of its statutory authority and unlawful.

## <u>Prayer for Relief</u>

WHEREFORE, plaintiffs pray that this Court:

a.     Declare unlawful and set aside Memo M-25-13 as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A), contrary to constitutional right, power, privilege, or immunity under 5 U.S.C. 706(2)(B), and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. 706(2)(C);

b.     Issue a temporary restraining order and preliminary injunction barring the OMB and all of its officers, employees, and agents from taking any steps to implement, apply, or enforce Memo M-25-13;

c.    Order Defendants to file a status report with the Court within 24 hours of entry of a temporary restraining order, and at regular intervals thereafter, confirming the regular disbursement and obligation of federal financial assistance funds and reporting all steps that OMB and its officers, employees, and agents have taken to comply with the Court's temporary restraining order;

d.    Issue a permanent injunction barring the OMB and all of its officers, employees, and agents from taking any steps to implement, apply, or enforce the Memo;

e.    Award Plaintiffs their costs, reasonable attorney's fees, and other disbursements as appropriate; and

f.    Grant such other relief as the Court deems necessary, just, and proper.

19

Dated: January 28, 2025                           Respectfully submitted,

                                                  /s/ *Jessica Anne Morton*

                                                  Jessica Anne Morton (DC Bar No. 1032316)
                                                  Kevin E. Friedl* (Admitted only in New
                                                  York; practice supervised by D.C. Bar
                                                  members)
                                                  Kaitlyn Golden (DC Bar No. 1034214)
                                                  Robin F. Thurston (DC Bar No. 1531399)
                                                  Skye L. Perryman* (D.C. Bar No. 984573)
                                                  Will Bardwell (D.C. Bar No. 90006120)
                                                  Democracy Forward Foundation
                                                  P.O. Box 34553
                                                  Washington, D.C. 20043
                                                  (202) 448-9090
                                                  jmorton@democracyforward.org
                                                  kfriedl@democracyforward.org
                                                  kgolden@democracyforward.org
                                                  rthurston@democracyforward.org
                                                  sperryman@democracyforward.org
                                                  wbardwell@democracyforward.org.

                                                  *motion to appear *pro hac vice* forthcoming