## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL COUNCIL OF NONPROFITS, 1001 G Street NW, Suite 700 East Washington, D.C. 20001, AMERICAN PUBLIC HEALTH ASSOCIATION, 800 I Street NW Washington, D.C. 20001, MAIN STREET ALLIANCE, 909 Rose Avenue North Bethesda, Md. 20852, and SAGE, 305 7th Avenue, 15th Floor New York, N.Y. 10001, *Plaintiffs*, v. OFFICE OF MANAGEMENT AND BUDGET, 725 17th Street, N.W. Washington, D.C. 20503, and MATTHEW VAETH, in his official capacity as Acting Director, Office of Management and Budget 725 17th Street, N.W. Washington, D.C. 20503, *Defendants*. | Case No. 25-cv-239 |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

Just yesterday evening, reports surfaced that the Acting Director of the Office of Management and Budget had issued a memorandum entitled "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs." Memo M-25-13 (hereinafter "the Memo").[1] The Memo purports to require every federal agency to temporarily pause "all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by [President Trump's] executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal"—effective **today** at 5:00 p.m. Memo M-25-13 at 2. In practice, the Memo purports to eradicate essentially all federal grant, loan, and other financial assistance programs. Acting Director Vaeth's only stated basis for doing so is his belief that "[f]inancial assistance should be dedicated to advancing Administration priorities," and that "[t]he use of Federal resources to advance Marxist equity, transgenderism, and green new deal social engineering policies is a waste of taxpayer dollars that does not improve the day-to-day lives of those we serve." *Id.* at 1.

This memo—made public only through journalists' reporting, with barely twenty-four hours' notice, devoid of any legal basis or the barest rationale—will have a devastating impact on thousands of grant and subgrant recipients who depend on the inflow of grant money (money already obligated, awarded, and funding ongoing work) to fulfill their missions, pay their employees, pay their rent—and, indeed, improve the day-to-day lives of the many people they work so hard to serve.

---

[1] A copy of the Memo is available online at:
https://www.washingtonpost.com/documents/deb7af80-48b6-4b8a-8bfa-3d84fd7c3ec8.pdf.

Although the Trump Administration is at liberty to "advanc[e] [its] priorities," *id.*, it must do so within the confines of the law.  It has not.  The Memo fails to explain the source of OMB's purported legal authority to gut every grant program in the federal government; it fails to consider the reliance interest of the many grant recipients, including those to whom money had already been promised; and it announces a policy of targeting grant recipients based on those recipients' exercise of their First Amendment rights and for reasons having no bearing on their eligibility to receive federal funds.

Given the few hours that remain before federal grantees, loan recipients, and countless others are thrown into disarray, a temporary restraining order is critical to maintain the status quo until the Court has an opportunity to more fully consider the illegality of OMB's actions.

## BACKGROUND

On January 27, 2025, Matthew J. Vaeth, Acting Director of the Office of Management and Budget, issued Memo M-25-13, titled "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs." The Memo directs each federal agency to "complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders." *Id.* at 2.

The category of "Federal financial assistance programs" covered by the memo is sweeping. *Id.* at 1 n.1. It includes all "[a]ssistance that recipients or subrecipients receive or administer in the form of" federal grants, loans, loan guarantees, and insurance, among other things (but not Medicare or Social Security benefits). *See* 2 C.F.R. 200.1.

The Memo provides that all agencies must cease "all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal." Memo at 2. The sweep of the executive orders referenced is staggering, from all "equity"-related grants, to all foreign aid, to funding appropriated through the Inflation Reduction Act and the Infrastructure Investment and Jobs Act, and beyond. *See id.* at 1-2. The Memo orders that this "pause" will take effect on January 28, 2025 at 5:00 p.m. *Id.* at 2. It does not provide an end date for the pause.

## LEGAL STANDARD

To obtain a temporary restraining order, "the moving party must show: (1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable injury if the [temporary restraining order] were not granted; (3) that [such an order] would not substantially injure other interested parties; and (4) that the public interest would be furthered" by the order. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citations omitted); *see also Hall v. Johnson*, 559 F. Supp. 2d 1, 3 n.2 ("[T]he same standard applies to both temporary restraining orders and to preliminary injunctions." (citation omitted)). "When the movant seeks to enjoin the government, the final two TRO factors—balancing the equities and the public interest—merge." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (citing *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

Courts in this Circuit continue to apply a "sliding scale" approach, wherein "a strong showing on one factor could make up for a weaker showing on another." *Changji*

*Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (internal quotation marks and citation omitted) (noting potential tension in case law but reserving the question of "whether the sliding-scale approach remains valid"); *National Railroad Passenger Corp. (Amtrak) v. Sublease Interest Obtained Pursuant to an Assignment and Assumption of Leasehold Interest Made as of Jan. 25, 2007*, Case. No. 22-1043 (2024 WL 34443596, at *1-2 (D.D.C. July 15, 2024) (recognizing that district courts remain bound by sliding-scale precedent).

## ARGUMENT

All three factors favor Plaintiffs here. OMB has likely violated the Administrative Procedure Act through its cursory reasoning, which fails to acknowledge the deep detrimental impact that will likely result from the Memo's precipitous enactment, is not authorized by law, and is contrary to the Constitution.  As a result, the Memo purports that Plaintiffs will immediately lose access to promised funding, throwing their own finances and operations into havoc.  And the public has no interest in a violation of the law.  A temporary restraining order should issue to prevent Plaintiffs from suffering these harms until this Court has the opportunity to further consider the case.

**I.    Plaintiffs are likely to succeed on the merits.**

The Memo is replete with APA violations: it is in excess of OMB's statutory authority, it is arbitrary and capricious, and it is contrary to law, namely the First Amendment of the United States Constitution. Plaintiffs are therefore likely to prevail on the merits of their claim.

As an initial matter, the Memo constitutes final agency action and is thus subject to review by this Court. Final agency actions are those (1) that "mark the consummation of

the agency's decisionmaking process" and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted). The OMB Memo meets both prongs of this test. It conclusively directs the immediate suspension of the obligation or disbursement of all federal financial assistance, aside from some limited carveouts, as of 5:00 p.m. on Tuesday, January 28, 2025—a move that will likely have legal consequences for thousands (and likely far more) of grant recipients, including Plaintiffs, who have built business plans, made hiring decisions, and set organizational priorities based on an understanding that they would receive the grants that the federal government awarded them. The Memo is thus susceptible to review under the APA, through which a court shall "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

The Memo is in excess of OMB's statutory authority. That authority permits it to provide "overall direction and leadership," "review agency budget requests for financial management systems and operations," "oversee, periodically review, and make recommendations to heads of agencies," "provide advice to agency heads," "settle differences that arise among agencies regarding the implementation of financial management policies," and "communicate with" State and local governments and "foster the exchange . . . of information concerning financial management standards, techniques, and processes." 31 U.S.C. § 503(a). That authority does not, however, extend so far as to allow OMB to unilaterally, without notice or process, purport to effectively stop all grant programs across the entire federal government via a two-page Memo. Indeed, OMB acknowledges the limitations of its authority to direct federal financial management, as its

own Grants Guidance specifies that agencies must take independent action to implement that Guidance via rules and regulations, 2 C.F.R. § 200.106—a position wholly at odds with this Memo, which itself renders null and void federal grant programs government-wide.

The Memo is also arbitrary and capricious. Under arbitrary-and-capricious review, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted). "Normally, an agency rule would be arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem . . . or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* In considering an agency's action, the reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* (internal quotation marks and citation omitted).

Here, the Memo fails to articulate any reasoning that could support OMB's decision to purport to unilaterally halt all grant programs across the federal government without notice. At best, it employs some empty platitudes about "a stronger and safer America," "eliminating the financial burden of inflation for citizens," and "Making America Healthy Again," while "ensur[ing] that Federal funds are used to support hardworking American families." M-25-13 at 1-2. But the Memo does not discuss how halting all federal grant programs without notice will accomplish any of those goals. Nor could it, in a mere two

pages, have explained how halting grants for cancer research[2] will make America stronger and healthier, or how halting grants that support fiscal education[3] will reduce financial burdens; or how gutting the fiscal stability of grant recipients[4] will support the hardworking American families employed by them.

The Memo makes no attempt to quantify, or even articulate, the catastrophic practical consequences that will follow from immediately halting all federal grant programs:  to understate it, "an important aspect of the problem," 463 U.S. at 43; *see also Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995) (explaining that "[t]he requirement that agency action not be arbitrary and capricious includes a requirement that the agency adequately explain its result" and holding invalid agency action where agency "failed to provide anything approaching a reasoned explanation for its decisions").  Nor does the Memo explain why it failed to provide meaningful notice to grant recipients of an impending pause (so that they could plan accordingly), nor explain the urgency that seems to motivate the agency action.

---

[2] *See* "Apply for Cancer Control Grants," National Cancer Institute Division of Cancer Control and Population Sciences, available at https://cancercontrol.cancer.gov/funding/funding-opportunities (last viewed Jan. 28, 2025) ("The Division of Cancer Control and Population Sciences funds a large portfolio of grants and contracts. The portfolio currently includes over 700 grants, valued at over $500 million.").

[3] As of July 2019, the Department of Treasury estimated that the federal government spent $273 million each year on financial literacy and education programs and activities. *See* "Federal Financial Literacy Reform: Coordinating and Improving Financial Literacy Efforts," U.S. Department of the Treasury, available at https://files.eric.ed.gov/fulltext/ED611168.pdf (last viewed Jan. 28, 2025).

[4] To illustrate the breadth of the Memo's effect: according to GAO, federal grants comprised approximately 19 percent of total federal spending in Fiscal Year 2022. Federal grant spending to tribal, state, local, and territorial governments *alone* totaled approximately $1.2 trillion. "Grants Management: HHS Has Taken Steps to Modernize Government-wide Grants Management," Government Accountability Office, available at https://www.gao.gov/products/gao-24-106008 (last viewed Jan. 28, 2025).

Moreover, the Memo utterly fails to account for the significant reliance interests that attach to grant recipients. "When an agency changes course, as [OMB] did here, it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (internal quotation marks and citations omitted). Here, the reliance interests are as obvious as they are serious: a grant recipient that has already been awarded a grant, and that reasonably expects grant disbursements on a certain timetable, has organized its organizational priorities, its spending, its hiring, and the obligations it has made to clients and creditors accordingly. Pulling the rug out from under an organization that this same federal government already deemed worthy of funding is not only cruel, it is obtuse and unreasoned. Whatever the new administration's feelings about the policy priorities of its predecessors, it does not have carte blanche to ignore the consequences of those prior agency actions.

The Memo's purported limitation of "to the extent permissible under applicable law," M-25-13 at 2, does not render it any less unlawful. Applicable law for federal financial assistance is complex, with specific terms and requirements that vary across grant programs and individual awards. Such an assessment is simply impossible to do across all federal financial assistance programs accurately and completely within the twenty-four hours permitted for implementation. This clause cannot save the Memo, but instead reinforces its wholesale lack of reasoning.

Plaintiffs are also likely to succeed on their claim that the Memo is unlawful and must be set aside under the APA because it violates the First Amendment. Although the Memo purports to pause federal disbursements across the board, it makes clear that the

ultimate purpose and objective of that pause is to identify and punish certain disfavored speakers who, as the Memo describes it, "advance Marxist equity, transgenderism, and green new deal social engineering policies," M-25-13 at 1, or, in the words of the Executive Order "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (January 20, 2025), the Memo cites, "promote gender ideology." The Memo does not disguise that it is an effort to punish certain recipients of federal financial assistance based on their speech, political affiliation, and exercise of their right of association.

"It is . . . a basic First Amendment principle that freedom of speech prohibits the government from telling people what they must say." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013) (quotation marks omitted). This rule applies both to direct prohibitions on speech and to speech-related conditions imposed on benefits that would otherwise be available. *See id.* at 214 ("[T]he Government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit.'") (quoting *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 59 (2006)). In particular, the Supreme Court has made clear that conditions on federal funding "that seek to leverage funding to regulate speech outside the contours of the federal program itself"—that is, conditions that do more than simply define the kinds of activities Congress wants to subsidize—are regulated by the First Amendment. *Id.* at 206.

The Memo seeks to leverage federal funding in just this way. It calls time on all federal grant and loan disbursements and makes explicit that only recipients who adopt the Trump administration's preferred position on charged political issues such as gender

equality, trans rights, and environmental justice—or at least keep quiet their own contrary views—can hope to receive federal funding again. Particularly given that the Memo purports to apply across the board to all federal grant programs, the government could not possibly hope to claim that its conditions on speech and association rights have any legitimate relevance to grantees' continued receipt of funds under specific federal grant programs. And it is hard to imagine a more coercive means the government could employ to impose its preferred viewpoint on others than to hold hostage billions of dollars or more in federal funds.

Because the Memo's conditioning of federal financial assistance on toeing the government's preferred line on matters of deep personal, moral, and political conviction directly implicates the First Amendment, and because it could not possibly satisfy strict scrutiny as a viewpoint-based restriction on core political speech, Plaintiffs are likely to prevail on the merits of this claim. *See generally Vidal v. Elster*, 602 U.S. 286, 293 (2024) ("As a general matter, a content-based regulation is presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests." (quotation marks omitted)).

## II.    Plaintiffs will suffer immediate, irreparable injury should the Memo take effect.

Should the Memo's purported halt to grant funding take effect at 5:00 p.m. today, Plaintiffs will be irreparably harmed.  "An irreparable harm is an imminent injury that is both great and certain to occur, and for which legal remedies are inadequate." *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 9 (D.D.C. 2009). "Economic harm may constitute irreparable injury . . . when the loss threatens the very existence of the movant's business." *Air Transp.*

*Ass'n of Am., Inc. v. Export-Import Bank of the U.S.*, 840 F. Supp. 2d 327, 336 (D.D.C. 2012) (quotation omitted).

As to imminence and certainty of occurrence: By its own terms, the Memo will be effective *later today*—within hours. This exigency is, of course, of OMB's own creation: It could have chosen an effective date that would have left adequate time for grant recipients to plan, and for judicial review. But it did not.

The harms that will take effect later today will be both significant and irreparable. First, the Memo threatens immediate and irremediable constitutional harm by coercing grant and loan recipients' exercise of their First Amendment rights of speech and association into conformity with the administration's preferred views. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)); *accord Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)*.*

Second, as detailed in the accompanying declarations, Plaintiffs will also suffer concrete, and indeed existential injuries to their mission, as entire programs will simply disappear. For example, SAGE's new online hub, SAGEYou, is funded exclusively through federal appropriations. A funding cutoff jeopardizes multiple staff positions, SAGE's ability to continue meeting its obligations to contractors which it has already retained, and, most importantly, will have a detrimental effect on the mental health and overall well-being of millions of LGBTQ+ older adults across the United States, particularly those residing in rural and underserved areas who already face significant barriers to accessing critical services and supports. *See* Tax Decl. (Ex. A) at ¶¶ 8-10.

This is just one discrete example of the harm that will reverberate through every project funded by the federal government.  Members of APHA, MSA, and NCN receive and otherwise directly benefit from federal financial assistance including grants and loans, and halting those expenditures will likewise halt the services they are able to provide in their communities, while risking their own financial viability. *See* Yentel Decl. (Ex. B) at ¶¶ 8, 10-12, 15-17; Benjamin Decl. (Ex. C) ¶¶ 21-24; Phetteplace Decl. (Ex. D) at ¶¶ 3-5. And Plaintiffs likewise are harmed in their missions to promote equity, particularly because the Memo seeks to chill expression of precisely that goal.

Another court in this district's decision in *Chef Time 1520 LLC v. Small Business Administration* is instructive. In that case, a restaurant owner applied for a grant from a fund established through the American Rescue Plan Act "to help restaurants and other eligible businesses pay 'expenses incurred as a direct result of, or during, the COVID-19 pandemic.'" 646 F. Supp. 3d 101, 105 (D.D.C. 2022) (quoting 15 U.S.C. § 9009c(c)(5)). The Small Business Administration approved the grant, but prior to sending the award, the SBA notified the owner that recent court rulings precluded SBA from paying nearly 3,000 applicants—including the owner. *Id.* at 108. Meanwhile, the SBA continued paying other, unaffected grant applicants out of the fund. *Id.*

Ultimately, the restaurant owner filed suit against SBA for incorrectly interpreting the relevant court rulings—and, accordingly, that declining to disburse his award was arbitrary and capricious in violation of the APA. *Id.* By the time the restaurant owner moved for a temporary restraining order, only enough money remained to fund two final applicants. *Id.* at 109. In the time that it would take to reach a decision on the merits, the restaurant owner argued, the last of the remaining grant funds would be gone. *Id.* at 115.

13

This, the Court held, would be an irreparable injury. *Id.* at 115-16 (citing *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2f 34, 52 (D.D.C. 2011) ("[I]f a movant seeking a preliminary injunction will be unable to sue to recover any monetary damages against' a government agency in the future because of, among other things, sovereign immunity, financial loss can constitute irreparable injury.") (quotation omitted)).

If the injury to one restaurant in *Chef Time* was irreparable, so much more so an equivalent injury to every federal grantee. Untold grantee organizations—which, as of this filing, are relying on grant funding *that the federal government approved and awarded*— may shut their doors, and the essential services that they provide will go unprovided.

## III. The balance of equities and the public interest favor Plaintiffs.

"It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (internal quotation marks and citations omitted). Likewise, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Open Communities Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws—such as the APA, as well as regulations . . .—that govern their existence and operations." *Id.* (internal quotation marks and citations omitted). Thus, for the same reasons that Plaintiffs are likely to succeed on the merits, equity requires relief.

But even if this Court were to balance the Government's interests as if it were a private party, the scales tip heavily towards Plaintiffs: in one pan, the Government continuing its regular expenditures of a relatively small portion of the federal budget that has already been obligated, a routine practice that has not caused the Government injury

yet in the months and years it has been doing so; in the other, Plaintiffs (and the many, many grant recipients not currently before this Court) staring down imminent financial harm, with the follow-on consequences to their employees, landlords, creditors, subgrantees, and the people who rely on their services—without the privilege the government invokes of simply stopping payment without notice or consequence. The Memo's thin rationale of "advancing Administration priorities" cannot support a finding otherwise.

## IV.  Relief must extend to all recipients of federal financial assistance.

This Circuit's precedents "hold that '[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'" *D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 47 (D.D.C. 2020) (quoting *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)). "The same reasoning has force in the preliminary injunction context." *Id.* at 49 (collecting cases). "Nationwide preliminary injunctive relief guarantees that a rule shown likely to be proven unlawful does not become effective, providing complete relief to the plaintiffs while the rule's legality is finally adjudicated" and "ensur[ing] that complete relief remains available to the plaintiffs after that final adjudication." *Id.*; *see also, e.g., Doe 2 v. Mattis*, 344 F. Supp. 3d 16, 23 (D.D.C. 2018) ("Plaintiffs were injured by a rule of broad applicability, so the Court acted properly in granting systemwide [preliminary] relief, even if that relief has the consequence of protecting the rights of other [parties] individuals not before the Court.").

There is no reason to depart from that default rule here. To the contrary, the unprecedented breadth, speed, and complexity of OMB's action in freezing all federal

financial assistance across the board and with just hours' notice makes it all but impossible that party-limited relief would be practicable in this case even if it were appropriate. Moreover, because the "nationwide impact" of the Memo ensures that it will "cause injuries of sufficient similarity to the plaintiff[s'] to other states and individuals throughout the country," a nationwide remedy is appropriate. *Id.* at 51.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion and enter a temporary restraining order enjoining OMB and its Acting Director from implementing or enforcing Memo M-25-13 until further order of this Court. Plaintiffs also request that the Court order Defendants to file a status report within twenty-four hours of the issuance of any temporary restraining order, and every two weeks thereafter for twelve weeks, confirming the regular disbursement and obligation of federal financial assistance funds.

Dated: January 28, 2025                    Respectfully submitted,

*/s/ Jessica Anne Morton*

Jessica Anne Morton (DC Bar No. 1032316)
Kevin E. Friedl* (Admitted only in New York;
practice supervised by D.C. Bar members)
Kaitlyn Golden (DC Bar No. 1034214)
Robin F. Thurston (DC Bar No. 1531399)
Skye L. Perryman* (D.C. Bar No. 984573)
Will Bardwell* (D.C. Bar No. 90006120)
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
jmorton@democracyforward.org
kfriedl@democracyforward.org
kgolden@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org
wbardwell@democracyforward.org.

*motion to appear *pro hac vice* forthcoming