IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


NATIONAL COUNCIL OF NONPROFITS,
et al.,

                                      Civil Action
        Plaintiffs,                No. 1:25-cv-00239-LLA

     vs.                       January 28, 2025
                                  4:10 p.m.
Office of Management and Budget,
et al.,

        Defendants.
_____


TRANSCRIPT OF THE EMERGENCY HEARING
HELD VIA ZOOM
BEFORE THE HONORABLE LOREN L. ALIKHAN
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:     Jessica Anne Morton, Esq.
                        DEMOCRACY FORWARD FOUNDATION
                        P.O. Box 34553
                        Washington, DC 20043

For the Defendants     Daniel Stephen Garrett Schwei, Esq.
                        U.S. DEPARTMENT OF JUSTICE
                        P.O. Box 883
                        Washington, DC 20044


Court Reporter:  Stacy Johns, RPR, RCR
                 Official Court Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription

1    <u>**P R O C E E D I N G S**</u>

2

3        DEPUTY CLERK:  Your Honor, we're now on the record for

4    National Council of Nonprofits, et al., versus Office of

5    Management and Budget, et al.  Civil Action 25-cv-239.

6        Counsel, at this time could you please enter your

7    appearance for the record, beginning with the plaintiff.

8        MS. MORTON:  Good afternoon, Your Honor.  Jessica

9    Morton for plaintiffs.

10       THE COURT:  Good afternoon.

11       MR. SCHWEI:  And good afternoon, Your Honor.  This is

12   Daniel Schwei from the Department of Justice on behalf of the

13   United States.

14       THE COURT:  Good afternoon.  Thanks to you both for

15   appearing on very short notice, and thanks to everybody for

16   their patience while Ms. Pham was getting the Zoom set up and

17   getting everybody let in.

18       I understand that this agency action goes into effect

19   at 5 p.m.  I am in receipt of the motion for a temporary

20   restraining order from the plaintiffs.  I have the brief

21   response that the Justice Department filed saying that they

22   don't think a TRO was warranted but proposing an expedited

23   briefing schedule.

24       And so I'm not prepared at this time to conduct a full

25   TRO and PI hearing.  I would prefer to have full briefing

1    before we do that.  So my purpose in having this conversation

2    today is to get an understanding of the scope of the order --

3             UNIDENTIFIED SPEAKER:  Oh my God.  The cool, calm,

4    collected --

5             THE COURT:  If everybody could please mute if they're

6    not a party to this case.

7             UNIDENTIFIED SPEAKER:  Oh, my god.  I'm obsessed with

8    him.  I don't know if he looks like he's 13.  I think he looks

9    even younger.

10            DEPUTY CLERK:  Ma'am, you're online right now.

11   Please, ma'am.

12            UNIDENTIFIED SPEAKER:  That's exactly what I was going

13   to guess.  He's so cute.  I'm obsessed.

14            THE COURT:  All right.  Are the parties unmuted?

15            Ms. Morton and Mr. Schwei, can you hear us and can you

16   please speak?

17            DEPUTY CLERK:  Ms. Morton, can you hear us?

18            MS. MORTON:  Your Honor, if you are saying something,

19   I'm afraid that I didn't hear.  I believe you're on mute.

20            THE COURT:  Can you hear us now?

21            MS. MORTON:  I apologize if this is a difficulty just

22   for myself, but the screen is showing that Your Honor is on

23   mute right now.  So I'm not able to hear anything from the

24   courtroom.

25            MR. SCHWEI:  Yes, and that is true for me as well.

```
 1              DEPUTY CLERK:  Can counsel hear me now?

 2              THE COURT:  It seems like no.

 3              DEPUTY CLERK:  I apologize, Your Honor.

 4         (Off-the-record discussion.)

 5              THE COURT:  So the parties still cannot hear us?

 6              DEPUTY CLERK:  No, I don't think so, Your Honor.

 7         (Off-the-record discussion.)

 8              THE COURT:  It looks like we're going to have to take

 9    a brief recess while we reset the system.  So, Ms. Pham, if you

10    could message the parties so that they know.

11         (Brief pause)

12              DEPUTY CLERK:  Counsel, can you hear us now?

13              MS. MORTON:  We can, Your Honor.

14              MR. SCHWEI:  Yes, Your Honor.

15              THE COURT:  All right.  Thank you very much, and thank

16    you very much to our staff for fixing that technical issue.  I

17    apologize for the technical difficulties.  Our court technology

18    has gotten better over the years but it still sometimes has its

19    issues.

20              So to start again, I understand that this rule goes

21    into effect in a mere half an hour, and I haven't yet had the

22    opportunity to hear from the government, other than their

23    one-page filing today opposing the TRO.

24              So my questions for you today are not going to be

25    targeted at the full-blown TRO/PI analysis but, instead,
```

```
1   whether there is a basis at this point for me to enter either
2   an administrative stay or a stay under APA Section 705 while we
3   brief this on an expedited basis.
4          So I do have some questions for each of the parties,
5   and I'm also very cognizant that we have limited time, but I
6   would like to give each party a few minutes to present whatever
7   arguments they would like.
8          And so I will start with you, Ms. Morton.
9          MS. MORTON:  Yes, Your Honor.
10         In half an hour this order takes effect and it will
11  pause activities related to obligation disbursement of federal
12  financial assistance that will create unequivocal, imminent and
13  serious harm for the plaintiffs, their members, grant
14  recipients across the country and the people they serve.
15         Because the agency action directing this halt violates
16  the APA, there is no countervailing consideration.  This is
17  precisely the sort of action that merits a temporary pause or
18  stay that's harm -- that's halted while the Court has time to
19  consider these arguments in more detail.
20         I understand from Mr. Schwei's notice the government
21  takes the position that there is no harm here.  But the
22  government has not addressed one of the harms articulated in
23  plaintiff's complaint in TRO motion, which is a First Amendment
24  harm of conditioning billions in federal grant money on
25  adopting government's political positions.  Even a short harm
```

1    here is irreparable injury to the plaintiffs and to the grant
2    recipients.

3           Our clients have tens of thousands of members and it
4    is unclear that in half an hour the OMB is able to work with
5    the agencies to sort through which of the many, many grant
6    programs across the country fall within the guidance that's
7    issued by OMB just this afternoon and which are not.  And even
8    those that are clearly within the guidance of OMB are going to
9    affect our clients.

10          The Q&A from OMB purports to limit the memorandum but
11   it still suggests -- it still states clearly that the executive
12   orders are the watchword for how OMB plans to interpret what is
13   or is not advanced administrative priorities.  And that
14   includes woke gender ideology, in their words, and diversity,
15   equity and inclusion.

16          The plaintiffs here have equity as a focus to their
17   mission, and some of their grants are dependent on that focus.
18   SAGE, for example, described from the declaration a SAGEYou
19   website that is all about advancing outreach to LGBTQ+ elders
20   who are isolated, who do not have access to services and who
21   desperately rely on lifelines.

22          This is the end of the month.  Nonprofits and grant
23   recipients are facing down payroll, they're facing down rent
24   payments, and there are people who depend on these services;
25   not just my clients and their members but also members of the

1    public who are downstream from this.

2            The chaos caused by the complexity and the ambiguity

3    of OMB's supposed guidance has already caused questions in the

4    public.  There's been reporting that there are conflicting

5    questions about whether or not Head Start is going to have

6    funding tomorrow.  Seniors are wondering if Meals on Wheels

7    will deliver meals to them.  And there's no reason to be in

8    this situation because OMB created any exigency itself.

9            OMB issued its memo yesterday.  It was publicized only

10   through journalism late last night.  The guidance came out this

11   afternoon.  OMB hasn't articulated any reason whatsoever that

12   it must pause this completely quotidian disbursement of funding

13   at 5 p.m. today or how they could possibly be harmed by

14   continuing this for another few days while this Court takes the

15   time to consider the arguments more carefully.

16           I'm happy to answer any further questions the Court

17   has.

18           THE COURT:  All right, thank you.  I'll hear some

19   opening remarks from Mr. Schwei before I dig in with my

20   questions.

21           MR. SCHWEI:  Thank you, Your Honor.  Fundamentally

22   there is no established need in the record for relief from this

23   Court on the timeline that plaintiffs request.  And that is

24   their burden to prove under D.C. Circuit precedent, and their

25   obligation is to prove that they would suffer irreparable harm

1    during the short time frame needed for full briefing and

2    consideration of the weighty issues and expansive relief that

3    their TRO motion presents.

4         So what's specifically missing from the record here

5    is, number one, they have not established that any particular

6    grant program involving their particular plaintiffs is actually

7    subject to the pause.  And that's particularly true in light of

8    the guidance providing further information about the scope of

9    the clause -- of the pause.

10        The TRO motion portrays the OMB memo as

11   across-the-board pauses, which the guidance makes clear is not

12   correct.  And many of the plaintiffs here do not actually

13   directly receive federal grants.  Their members may receive

14   federal grants but there are very few identified members and

15   identified grants in the record.

16        And even if one of these plaintiffs' grant programs

17   did temporarily get paused, the plaintiffs haven't shown that

18   that would actually cause irreparable harm during the relevant

19   time frame.

20        For example, although my friend talks about it being

21   the end of the month and obligations coming due, I don't think

22   that's in any of the declarations that I've read attached to

23   the TRO motion.  None of the organizations, to my knowledge, in

24   the limited time I've had to review the declarations, say, for

25   example, that they expect a payment tomorrow, that any delay as

1    a matter of days in receiving that payment tomorrow will force

2    them to shutter the doors or lay off staff or incur any of the

3    other harms that the plaintiffs allege.

4        And so that's really the time frame that we're talking

5    about here is just is relief needed over the next several days

6    or a week or however long to litigate the TRO motion.  And I

7    don't think the record establishes that, nor do I think that an

8    administrative stay would be appropriate.  I think an

9    administrative stay is not a substitute for satisfying the

10   four-factor equitable test that the Supreme Court has made

11   clear is mandatory for granting emergency equitable relief.

12       And so far this is all focused on the harm, but I also

13   do want to say there are serious merits arguments and flaws in

14   the plaintiffs' claims.  They bring their claims subject to the

15   APA, but the OMB memo, itself, does not appear to be a final

16   agency action that itself determines rights or consequences.

17   It tells agencies to exercise their own authorities to the

18   extent permissible by law.

19       And so any subsequent action involving a particular

20   funding program, theoretically, maybe there would be some final

21   agency action there, but the OMB memo itself does not grant any

22   rights or obligations.

23       And then on the First Amendment, there is a long line

24   of Supreme Court cases making clear that the government can

25   subsidize the programs that it prefers.  For example, *Rust v.*

1   *Sullivan* and the *USAID* case from a few years ago, the

2   government is not required to fund all programs evenhandedly.

3   And I think that disposes of plaintiff's First Amendment claim

4   here.  There's no direction restriction on speech contained in

5   the OMB memo, and they don't point to any.

6          So there are weighty merits arguments here.  They

7   request sweeping relief against the memo as a whole, not

8   tethered to any identified grant programs.  And I think that's

9   because the record here is absent of the specific harms that

10  would be attributable to the OMB memo, especially if viewed in

11  the short time frame needed to litigate the TRO motion.

12         So for all those reasons we think there's no basis for

13  relief now and it would be appropriate to allow these issues to

14  be addressed on a more orderly time frame.

15         THE COURT:  All right.  Thank you very much.  So

16  Mr. Schwei, I'll start with a few questions for you.  So as I

17  understand the memo it is a directive that federal agencies --

18  and it's here in bold:  Must temporarily pause all activities

19  related to obligation or disbursement of federal financial

20  assistance.

21         How is that not agency action?  I mean, it's a

22  directive to the agencies to cease doing what they're doing.

23         MR. SCHWEI:  Well, a couple of responses, Your Honor.

24  One is there's a preceding phrase to what the Court just read,

25  which is:  To the extent permissible under applicable law.

1          And that preceding phrase is important both, you know,

2     for ensuring that any individual action or decision to pause

3     complies with the law, but also it necessarily requires that

4     there be a subsequent determination by the agency, itself, that

5     they think, pursuant to their organic statutes and the relevant

6     funding schemes and everything else, that a temporary pause

7     would be consistent with the law.

8          And so this is an instruction of a general nature, but

9     it still requires some individual agency determination that a

10    particular grant program or funding notice or whatever be

11    temporarily paused.

12         THE COURT:  All right.  My understanding is that this

13    was not meant to apply to things like Medicaid, but I am seeing

14    news reports that Medicaid portals are down.  So I take your

15    argument that the TRO is treating this as quite broad and

16    you're actually limiting it to certain programs that are the

17    subject of these executive orders, but that doesn't seem to be

18    the way that this is rolling out.

19         MR. SCHWEI:  I think the Medicaid issue, there's

20    nothing in the record that I'm aware of about that and I

21    hesitate to comment on news reports that I haven't seen.

22         I think what is in the record is the guidance that was

23    filed at ECF 11-1, which makes clear that any program that

24    provides direct benefits to Americans is explicitly excluded

25    from the pause and exempted from the review process.  And then

1    it goes on to list several, including Social Security and

2    Medicare, and also mandatory programs like Medicaid and SNAP

3    will continue without pause.

4            So I think just the record here would not allow for a

5    conclusion that those potential harms require relief.

6            THE COURT:  And my understanding from the memo is that

7    the agencies need to submit to the Office of Management and

8    Budget the list of programs that are affected by

9    February 10th.  So it seems like the federal government

10   currently doesn't actually know the full scope of the programs

11   that are going to be subject to the pause; is that correct?

12           MR. SCHWEI:  I can only speak for myself, which is

13   just based on the limited time frame here.  I do not have a

14   comprehensive list.  I think not knowing the full scope would

15   be consistent with the fact that the OMB memo, itself, is not

16   the final agency action and is instead instructions provided to

17   other agencies about how they should implement their

18   authorities.  And so I think it's natural for, perhaps, even

19   OMB to require agencies to report on the pause.

20           THE COURT:  And do you have an understanding as to the

21   timeline on which these funds are disbursed?  I would assume

22   the government funds quite a lot of things, and so it's not

23   like they're making payroll every two weeks.  Could you

24   enlighten me about how the money is flowing from the Treasury

25   to the various grantees?

1          MR. SCHWEI:  I think my understanding is that it

2     depends on the particular grant or program and the statutes and

3     regulations and contracts that may be involved in each

4     individual grant or program, which I think highlights a

5     fundamental problem here, which is just the abstract level of

6     generality at which the plaintiffs have presented their claims.

7          I think the answer is it just depends on the type of

8     program at issue as to how often and frequently money is

9     actually disbursed.

10          THE COURT:  All right.  Thank you.

11          And Ms. Morton, have you identified within the

12     plaintiff group someone who is expecting money to come in in

13     the next few days that is going to be affected?

14          MS. MORTON:  I do not believe we have a specific

15     allegation of income as to a particular program.  But I do know

16     that our clients' members have reported that they are extremely

17     concerned about having to shutter if there's even a brief pause

18     in activities because of their reliance.

19          I also would point out that if it's going to take

20     until February 10th for the agencies to undertake this

21     analysis, that that is more than a brief pause for many of the

22     grant recipients involved here.

23          THE COURT:  And are you seeking a temporary

24     administrative stay or a stay under the APA as it applies to

25     the issuance of new awards or -- and I'm going to guess -- get

1    the acronym wrong, but the open NOFOs, which I guess are

2    Notices of Federal Opportunities or something of that nature,

3    or are you only seeking to temporarily halt the disbursement of

4    federal funds that are under the open awards?

5        MS. MORTON:  Your Honor, we would certainly take the

6    position that, from conditioning, that would bring NOFOs on

7    adherence to preferred speech is a violation of the First

8    Amendment, contrary to my friend's argument.  I'll point the

9    Court to the cases we cite on Page 10.

10        But at the very minimum, it is critical to our clients

11    that the funds that have already been awarded continue to be

12    disbursed as expected.  These are businesses and nonprofits

13    that plan their fiscal responsibilities around their cash

14    inflow, and even a short disruption can cause significant

15    follow-on disruptions.

16        THE COURT:  All right.  And Mr. Schwei, I take your

17    point that you don't think that plaintiffs can meet the

18    Four-Factor Test under Nken but in the context of an

19    administrative stay, the Supreme Court and Court of Appeals

20    judges, District Court judges have talked about how it's not --

21    it may be a preview of the analysis of the Four-Factor Test but

22    that really the Court is trying to preserve the status quo for

23    the few days it takes for full briefing to come in and for a

24    decision to be made on the TRO.

25        So what is your argument against -- I think you said

1    you're available for a hearing on Friday -- a temporary

2    administrative stay through 5 p.m. on Friday to allow the

3    parties to brief this and to make an informed decision as to

4    whether or not a TRO or a PI should issue?

5              MR. SCHWEI:  I am aware of administrative stays in the

6    context of a final judgment being entered and then an

7    administrative stay being entered to allow a higher authority,

8    like the Court of Appeals and potentially the Supreme Court,

9    to -- an opportunity to weigh in on issues.

10             I am not aware of a practice of District Courts

11    granting administrative stays to postpone agency action without

12    satisfying the Four-Factor Test.  I think that would threaten

13    to gut the Four-Factor Test.

14             My understanding is that other offices within DOJ have

15    taken the position that it is not appropriate for District

16    Courts to enter administrative stays of that nature.  The

17    plaintiffs here haven't requested it, so I think it would be --

18    I think the Court should remain faithful to the Four-Factor

19    Test that is well established governing requests for emergency

20    relief, particularly when it is the plaintiffs' burden to

21    establish the need for that relief and they have not even

22    requested an administrative stay.

23             THE COURT:  Well, my sense is that the administrative

24    stay -- and I think Justice Barrett talks about this in *Texas*

25    *versus Biden* -- that it's really for the Court's benefit; it's

1    for the Court to be able to have full briefing and receive the

2    information on the four factors.

3         And so, you know, I think that there is some basis for

4    it under Section 705 of the APA, which permits a Court, and

5    doesn't specify whether it's District, Court of Appeals or

6    Supreme Court, to issue all necessary and appropriate process

7    to postpone the effective date of agency action or to preserve

8    status or rights pending conclusion of the review proceedings.

9         So I do think to issue a stay of some duration under

10   the APA or under the TRO and PI standards, one would need to go

11   through the Four Factor Nken test.  I don't see the APA or the

12   TRO or PI standards as limiting a brief few-day administrative

13   stay.

14        I think I would point you to cases like *Texas versus*

15   *Biden* from the Northern District of Texas, or I believe there's

16   also *Texas versus Homeland Security*, also coming from the

17   Eastern District of Texas.

18        There seem to have been several cases that I've been

19   able to find in just the few short, I guess, two hours that

20   I've had this case before me where District Courts were giving

21   just a quick pause to allow typically the government defendant

22   in these cases to file their opposition and then to allow for a

23   full hearing on the merits of the Four-Factor Test.

24        MR. SCHWEI:  My understanding is that with respect to

25   Section 705 and the APA, specifically, courts have said that

1    Section 705 stays are appropriate only when the Four-Factor

2    Test is necessary and that is met.  And that's consistent with

3    the statutory text of Section 705, itself, which says that a

4    stay may be entered, quote, "to the extent necessary to prevent

5    irreparable injury," end quote.

6            And so I think at a minimum the Court would still need

7    to make a finding of irreparable injury during that brief

8    window when the administrative stay or 705 stay would be in

9    effect.  And I think my friend on the other side essentially

10   conceded that there is no basis in the record of a payment

11   going out the door in the next several days that would be

12   temporarily delayed that could threaten irreparable harm.

13           And so I think the record here does not support a

14   showing of irreparable injury, and I think there are other

15   problems under the Four-Factor Test, all of which counsel

16   squarely against intruding on the executive's implementation of

17   these measures.

18           THE COURT:  I am very sympathetic to your argument

19   that Ms. Morton has not identified a particular grantee that is

20   going to be missing a paycheck from the federal government

21   tomorrow.  But I think that's in part from the government's own

22   making.  I mean, it seems like this was only announced through

23   the press this morning and it takes a while to marshal your

24   plaintiffs and to get affidavits on both sides.

25           And so I agree that in order to get a temporary

1    restraining order or a preliminary injunction, Ms. Morton would

2    certainly need to show irreparable harm and irreparable harm

3    that goes beyond just sort of mere economic harm because that's

4    typically not recognized.  It needs to go to something that's

5    sort of economically catastrophic.

6         But it strikes me as hard that in the last 12 or

7    14 hours she would have been in a position to survey the

8    various plaintiffs and to get that kind of documentation, which

9    I think comes back to all the more reason to potentially have

10   an administrative stay at least through Friday, so that we can

11   get information and affidavits on both sides of the V to make a

12   more informed decision.

13        MR. SCHWEI:  Respectfully, Your Honor, I think that

14   just highlights how speculative it is, the claimed harms, to

15   excuse the plaintiffs of the obligation of saying this

16   particular grant is due for payment within the next couple of

17   days and without that payment we will suffer X-Y-Z harms.

18        I think that that just allows plaintiffs to come into

19   court early, before establishing the requisite harms, and flips

20   the presumption on its head.  It is the plaintiffs' burden to

21   establish the need for the type of emergency equitable relief

22   they're seeking.  And I don't think that filing suit before the

23   effective date and saying we don't know how we will be harmed

24   yet should be enough to satisfy that Four-Factor Test.

25        I think the proper course in that scenario is to deny

1    the request for emergency relief, and if after 5:00 today one

2    of their programs gets temporarily paused and they can identify

3    some immediate harms flowing from that, then, you know, the

4    parties are here and available to come back before the Court.

5    But I think it would be preemptive for the Court to enter

6    relief just based on a suspicion that there might be some harm

7    at some point.

8           And notably, the relief that they're seeking is

9    incredibly expansive.  So really, what they are asking the

10   Court to do is enter the most expansive relief possible,

11   precisely because they cannot identify the specific

12   identifiable harm that would allow the Court to tailor relief

13   into a more particularized manner, as bedrock principles of

14   equity require.

15          THE COURT:  Ms. Morton, what is your response to that,

16   that you're putting the cart before the horse when you can't

17   identify someone who will be irreparably injured?

18          MS. MORTON:  Not at all, Your Honor.  Three points.

19   First, the memo is expansive.  And the fact that my friend has

20   explained that the agency has only until February 10th to

21   understand exactly what all encompasses underscores the breadth

22   of harm that it will cause and the irrationality of setting a

23   pause for 5 p.m. today, before the agencies have even been able

24   to undertake that analysis.

25          As to irreparable harm, because it will affect these

1  vast swaths of people and grantees before the agencies have

2  even undertaken that analysis, our clients have tens of

3  thousands of members.  It is not speculative to think that they

4  are going to lose grant money whenever the spigot cuts off at

5  5 p.m. in 10 minutes.

6         Third, even setting aside the question of economic

7  injury, plaintiffs still do allege a First Amendment injury

8  because the OMB memo and the Q&A guidance both state that

9  decision will be made on the base of compliance.  The executive

10 orders that require (inaudible due to unstable Zoom connection)

11 and discrimination.

12        My clients have equity at the center of their missions

13 and that First Amendment harm of knowing that they are likely

14 to lose -- as I understand it, going to lose funding in

15 10 minutes because they support transgender equality instead of

16 supporting something that the administration deems more

17 palatable, after the grant funding has already been awarded, is

18 an irreparable imminent harm and that qualifies under this

19 analysis.

20        THE COURT:  And then how do you deal with *Rust v.*

21 *Sullivan* and the notion that the government is allowed to pick

22 and choose its preferences in what it elects to fund?

23        MS. MORTON:  The government absolutely is allowed to

24 choose what to fund, but the Supreme Court has made clear in

25 the *USAID* case that we cite at Page 10 on our TRO memo that

1    conditions that seek to leverage funding to regulate speech

2    outside the contours of the program itself does more than that.

3         And our clients are groups that have equity as part of

4    their mission, even if it's not part of necessarily every grant

5    program.  For example, Main Street Alliance really cares about

6    equity, as they explain in their declaration, even if every

7    grant doesn't necessarily include that.

8         But the OMB memo and the executive orders have shown

9    that if an organization is supporting these concepts the

10   administration has deemed divisive, that they are suspect.  And

11   that is precisely the harm that we're looking at here, that

12   because of our clients and viewpoints, even separate from an

13   individual decision to revoke a grant or not, is going to have

14   a chilling effect on them and their First Amendment rights.

15        THE COURT:  All right.  Thank you very much.

16        Mr. Schwei, if I were to impose an administrative

17   stay, what do you -- what would be your view on the duration of

18   that?

19        MR. SCHWEI:  Again, I want to preface by saying we

20   oppose the entry of such a stay.

21        THE COURT:  I take your point that the duration is

22   zero in your preferred world.  I'm just wondering in a world in

23   which zero is not it, what would you think is appropriate.

24        MR. SCHWEI:  If the Court's goal is to enter an

25   administrative stay and allow for briefing and full

consideration of whether the typical Four-Factor Test for

equitable relief is warranted, then I think I would turn back

to our proposal in the notice that we filed this afternoon,

where the government could file a response, a written response

to plaintiff's motion for a temporary restraining order by

5:00 p.m. on Thursday, January 30th, and then we would be

available for a hearing either on that Friday or at any time

thereafter.

I think -- you know, obviously, that still requires

prompt action from everyone involved, but if the administrative

stay is halting the executive's ability to implement their

priorities, then I think it needs to be as short as possible.

THE COURT:  Thank you.  I share your view that any

administrative stay would need to be of a very short duration.

Ms. Morton, what is your response as to a schedule on

the administrative stay -- or on a potential administrate stay,

I should say?

MS. MORTON:  Your Honor, if an administrative stay is

entered then, of course, we're happy to abide by whatever

schedule the Court deems appropriate.  The suggestion by

Mr. Schwei that he have until Thursday at 5 p.m. is fine with

us.  If a stay is in effect, we would appreciate the

opportunity to file a reply, perhaps by the end of the day on

Friday.

If administrative stay does not issue, we request a

1    shorter timetable.

2          THE COURT:  And if I were to grant an administrative

3    stay, would you agree that it should be limited to disbursement

4    of federal funds under open programs and not go to the issuance

5    of new awards, or I think the third prong is other relevant

6    agency actions that may be implicated by the executive orders,

7    because that would be narrowly tailored to the harm that you

8    are worried about with your members and plaintiffs not getting

9    the money they need to stay afloat while this is being decided?

10          MS. MORTON:  We would be very grateful for that

11    administrate stay, Your Honor.

12          THE COURT:  One that exempts the issuance of new

13    awards?

14          MS. MORTON:  We would be grateful for any

15    administrative stay.  Of course, on the legal infirmities and

16    the guidance and memo we think apply also to the NOFOs.  But to

17    the extent that the Court seeks to even more narrowly tailor to

18    the precise harms, we understand that as a reasonable line to

19    draw.  But I would, of course, note that the First Amendment

20    chilling effect does apply to the open NOFOs as well.

21          THE COURT:  All right.  Thank you very much.  Given

22    that we have four minutes before 5:00, I am going to announce

23    my ruling on the bench and I will endeavor to get it into a

24    written order in the next several minutes, if not hours.

25          I am going to enter a brief administrative stay.  I

1  share the understanding of administrative stays of my various

2  colleagues, including Justice Barrett and Judge Kacsmaryk, that

3  it is a way of preserving the status quo such that the Court

4  has the opportunity to review the full Four-Factor Test with

5  the briefing and argument of the parties.

6        I do think it is a remedy that is obviously going to

7  halt the executive function and I think it should be of a very

8  limited duration.  Therefore, I am proposing to -- or I guess

9  I'm ordering, because that's the authority that I have, to

10  administratively stay just the -- let's see, let me make this

11  precise.  To administratively stay the pause on disbursement of

12  federal funds under all open awards until 5 p.m. on Monday,

13  February 3rd.  I'm going to order the government to file

14  their response on Thursday by 5 p.m. and for plaintiffs to file

15  a reply by Friday at 5 p.m.

16        I am going to, if we could look at our calendars,

17  schedule a hearing on the full TRO and PI for early in the day

18  on February 3rd.  You-all are in luck that I had a trial that

19  got moved.  So would the parties be available to come in for a

20  TRO and PI hearing at 11 a.m. on Monday, February 3rd?

21        MS. MORTON:  Yes, Your Honor.

22        MR. SCHWEI:  Yes, Your Honor.

23        THE COURT:  Thank you.  And I'll put this more in an

24  order but in doing so I'm guided by, one, my ability under the

25  All Writs Act to take actions that allow me to preserve my

1    docket.  And I think this is a preview of the Four-Factor Test

2    but not ultimately an application of the Four-Factor Test.

3         I do think there are significant questions here.  I

4    think there is the specter of irreparable harm.  Certainly, if

5    we get to Monday and we don't have an affidavit from a

6    plaintiff that has lost their funding, I would terminate the

7    administrative stay and let this carry out.  I also do think

8    there is authority for a temporary stay under Section 706 of

9    the Administrative Procedure Act.

10        So I will put all of that into a more fulsome written

11   order in due course.  But before we go, do the parties have any

12   questions about the scope of the administrative stay that I

13   have entered?

14        MS. MORTON:  Your Honor, I apologize, I may have

15   misspoken.  Whenever you asked about the date for

16   February 3rd, I was focused on the calendar.  I just wanted

17   to put on the record that we do not concede conversion for an

18   injunction at this time and that we would ask that the Court

19   consider it simply as a TRO.

20        THE COURT:  All right.  Thank you.

21        Mr. Schwei.

22        MR. SCHWEI:  My understanding is that the Court is

23   administratively staying the OMB memos' pause with respect to

24   all open awards; is that correct?

25        THE COURT:  That is correct.  Until 5 p.m. on Monday,

1    February 3rd.

2            MR. SCHWEI:  Okay.  Thank you for that clarification.

3    I do want to say up front that I fear that this stay will

4    require many complicated decisions about what is and is not

5    subject to it.  I would note that, for example, one of the

6    claimed harms that the plaintiffs point out about the SAGE

7    grant, it was actually terminated prior to January 27th,

8    prior to the challenged memo's issuance.

9            So my understanding would be that if something was

10   terminated prior to the challenged action even being issued,

11   then it is not subject to this administrative stay and instead

12   it is only this January 27th OMB memo that is

13   administratively stayed.  And so I just wanted to make that

14   clear, given the inclusion of that grant in the plaintiffs'

15   papers.

16           THE COURT:  Do you know the reason why SAGE was

17   terminated?

18           MR. SCHWEI:  I personally do not know anything beyond

19   what is in the declarations the plaintiffs filed at ECF 5-2.

20   And I'm looking at Paragraph 12 of the declaration saying that

21   it was terminated as of January 24th.

22           THE COURT:  Ms. Morton, do you have any context on

23   that?

24           MS. MORTON:  If the Court would indulge me for one

25   moment, please, I would appreciate it.

1          I don't have additional context at this time, Your

2    Honor, but it is my understanding that to the extent that any

3    award is terminated subject to a separate executive order, that

4    that applies to the Court's administrate stay, to the extent

5    that OMB is relying on the executive order that was

6    incorporated into the memorandum.  So to the extent that a

7    grant terminated before the OMB memo was issued, that is not

8    currently in the scope of the claims that we have brought.

9          THE COURT:  All right.  So yeah, I'm going to say that

10   anything that was terminated prior to this pause is outside the

11   scope of the administrative stay.  The scope of the

12   administrative stay is just to those grants that are open and

13   affected by OMB's order.

14         If there are executive order reasons or rationales for

15   the termination of other grants either before or after OMB's

16   guidance, perhaps they fall into the case as we proceed but

17   they would not be subject to the administrative stay.

18         MS. MORTON:  I really apologize, Your Honor.  If I

19   could just clarify my comment about Paragraph 12.  Really, it's

20   just simply the foreign aid grant specifically to which I was

21   referring.

22         THE COURT:  Sorry, say that one more time, please.

23         MS. MORTON:  I just wanted to clarify my comment that

24   my comments on Paragraph 12 are really specific to foreign and

25   grant executive order because I recognize there has been some

1    chaotic implementation of grant programs over the past weeks,

2    and so it is certainly not our position that if some were held

3    up for reasons unrelated to an executive order that they would

4    not get the benefit of the administrative stay here.

5            In other words, Your Honor, I wanted to draw a line

6    between a termination that is subject to a specific executive

7    action that is not the subject of this particular lawsuit and a

8    grant that, maybe for some reason, have been incorrectly

9    terminated through a mistake but would otherwise be reinstated

10   absent this particular memo.

11           THE COURT:  All right.  Thank you.  So I think to the

12   extent I'm understanding you, we're saying the same thing.  So

13   if SAGE was terminated before, they're not subject to the

14   administrative stay that is in place as it applies to the

15   disbursement to federal funds under open grants; is that

16   correct?

17           MS. MORTON:  To the extent that it was terminated

18   before, pursuant to an executive order, not a portion of this

19   lawsuit, correct.

20           THE COURT:  I think you agree with that, Mr. Schwei?

21           MR. SCHWEI:  Respectfully, no, Your Honor.  I think

22   now the challenge has expanded into seeking relief against

23   grants terminated not because of the OMB memo but because of

24   independent executive orders that are referenced in the OMB

25   memo.  And I think that makes the challenge even more vague and

1    unwieldy.

2         THE COURT:  Well, perhaps, then, I was

3    misunderstanding Ms. Morton.  So anything that was terminated

4    pursuant to other executive orders I think is fodder for

5    another lawsuit.  All I believe that is at issue, at least with

6    the administrative stay at this point, is anything that was due

7    to be paused as of 5 p.m. today for open funding on grants due

8    to the OMB memo is stayed.

9         Anything else that has been terminated or stayed

10   pursuant to a different executive order I think is outside the

11   scope of the administrative stay, and we will learn in the

12   coming days when we receive more briefing to what extent it's

13   even in this case at all versus the subject of a different

14   lawsuit.

15        So, Ms. Morton, do you understand that?

16        MS. MORTON:  I do, Your Honor.  And just to clarify, I

17   apologize if I'm beating a dead horse here, to the extent that

18   a grant was terminated through an administrative error but

19   would otherwise have been reinstated and not be -- and not be

20   the subject of the pause in funds, we request the

21   administrative stay apply there as well, which I think is a

22   different situation from a clear decision to have terminated

23   pursuant to a different executive authority.

24        THE COURT:  Yeah, I think those are outside the scope

25   of the administrative stay for now and it's something the

1   parties can brief on the TRO.

2            MS. MORTON:  Yes, Your Honor.

3            THE COURT:  All right.  Thank you.  Ms. Morton, is

4   there anything else at this time?

5            MS. MORTON:  Nothing further, Your Honor.  Thank you

6   for your time.

7            THE COURT:  All right.  Mr. Schwei.

8            MR. SCHWEI:  No, Your Honor.  Thank you.

9            THE COURT:  All right.  Thank you very much.  So just

10  to clarify, I expect the government's opposition at 5 p.m. on

11  Thursday, January 30th, and the plaintiff's reply on Friday,

12  January 31st at 5 p.m.  We will reconvene for a TRO hearing

13  on Monday, February 3rd at 11 a.m.

14           I will extend the administrative stay through 5 p.m.

15  on February 3rd, but I will advise, Ms. Morton, that I will

16  be stringently applying the Four-Factor Test under Nken and

17  going through each of the TRO factors.  The purpose of the

18  administrative stay is sort of TRO light, just to maintain the

19  status quo while we get full briefing.

20           And so I will be prepared, if I am not satisfied that

21  you've met the standard for the TRO, to vacate the

22  administrative stay on Monday.

23           MS. MORTON:  I understand, Your Honor.  Thank you.

24           THE COURT:  All right.  Thank you very much.  This

25  matter is adjourned.  I think we all have a lot of work cut out

1  for us for the next few days, but I will see you, hopefully in

2  person, at 11 a.m. on Monday.  And if you need it to be Zoom

3  for any reason, please just contact Ms. Pham, my courtroom

4  deputy.

5          MS. MORTON:  Thank you, Your Honor.

6          MR. SCHWEI:  We will plan to be there in person, Your

7  Honor.

8          THE COURT:  All right.  Thank you very much.  So I

9  will see you-all in person on Monday at 11.

10      (Proceedings concluded at 5:07 PM)

C E R T I F I C A T E

I, Stacy Johns, certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

Please note: This hearing occurred via Zoom and is therefore subject to the technological limitations of reporting remotely.


/s/ Stacy Johns                    Date: January 29, 2025

Stacy Johns, RPR, RCR
Official Court Reporter