**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| _____ | ) | |
| National Council of Nonprofits, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:25-cv-239 (LLA) |
| | ) | |
| Office of Management and Budget, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |


**<u>DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR A TEMPORARY RESTRAINING ORDER
AND IN SUPPORT OF MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................3

STANDARD OF REVIEW ....................................................................................................5

ARGUMENT .......................................................................................................................6

I.   This Court Lacks Jurisdiction Over Plaintiffs' Claims ..............................................6

    A.   Plaintiffs' Claims Are Moot Due to Rescission of the Challenged Memo ..........6

    B.   Plaintiffs Have Failed to Establish Article III Standing...................................7

II.  Plaintiffs Cannot Challenge the President's Executive Orders, or Agencies' General
    Implementation of those Orders..............................................................................11

    A.   The President's Executive Orders Are Not Subject to Challenge......................12

    B.   APA Claims Cannot Be Used to Broadly Challenge an Agency's General
        Implementation Activities..............................................................................13

III. Plaintiffs' Challenges Are Meritless ......................................................................16

    A.   The President and OMB May Lawfully Direct Agencies to Implement the
        President's Priorities, Consistent With Those Agencies' Own Authorities.........16

    B.   Temporary Pauses in Funding Are Legally Permissible ..................................20

    C.   A Temporary Pause in Funding Is Not Arbitrary and Capricious ....................22

    D.   Plaintiffs' First Amendment Claims Are Meritless Because the Government May
        Choose Which Programs It Intends to Subsidize..............................................24

IV.  The Balance of the Equities Independently Forecloses Relief .................................27

    A.   Plaintiffs Have Not Proven Irreparable Injury In the Short Timeframe of a
        Temporary Restraining Order .......................................................................27

    B.   The Public Interest Weighs Squarely Against Relief.......................................29

V.   Any Injunctive Relief Should be Stayed..................................................................30

CONCLUSION...................................................................................................................30

## INTRODUCTION

The President of the United States, along with the chief agency responsible for overseeing expenditures—the Office of Management and Budget (OMB)—plainly have authority to direct agencies to fully implement the President's agenda, consistent with each individual agency's underlying statutory authorities.  That is what President Trump has done in several Executive Orders including directions on federal spending, and that is what OMB did in the now-withdrawn Memorandum that is the focus of Plaintiffs' claims in this case.  *See* OMB Mem. M-25-13, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* (Jan. 27, 2025) ("OMB Memo").  Indeed, the President's authority to direct subordinate agencies to implement his agenda, subject to those agencies' own statutory authorities, is well-established in numerous D.C. Circuit decisions.  *See Bldg. & Const. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) ("[T]he President's power necessarily encompasses 'general administrative control of those executing the laws,' throughout the Executive Branch of government, of which he is the head." (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926), citation omitted)); *see also, e.g.*, *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) ("[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law."); *Sierra Club v. Costle*, 657 F.2d 298, 406 (D.C. Cir. 1981) ("The authority of the President to control and supervise executive policymaking is derived from the Constitution.").

Notwithstanding this clear authority, Plaintiffs here request sweeping relief, on an emergency basis, that would effectively disable the President and OMB from providing these types of instructions to agencies.  There is no valid basis for awarding such relief.  Plaintiffs' motion for a temporary restraining order should be denied, and this entire action should be dismissed.

First, this Court lacks jurisdiction.  Plaintiffs' claims in this case are directed solely against the OMB Memo, which has now been withdrawn thereby rendering their claims moot.  And even

prior to withdrawal, Plaintiffs have not established that the OMB Memo actually caused any harm redressable by an Order in this suit. Thus, this Court lacks Article III jurisdiction over their claims.

Plaintiffs have recently suggested during discussions between the parties that, despite the withdrawal of the challenged OMB Memo, they continue to suffer harm as a result of the President's Executive Orders which remain in effect. But Plaintiffs cannot expand their claims to seek relief against the President's Executive Orders, which are not subject to challenge. Over 150 years ago, the Supreme Court held that courts have "no jurisdiction . . . to enjoin the President in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867); *see also Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him, and have never submitted the President to declaratory relief." (citation omitted)). Nor can Plaintiffs use the Administrative Procedure Act (APA) to broadly challenge agencies' implementation of the Executive Orders. No federal agencies (other than OMB) have been named as defendants, and Plaintiffs cannot use this suit to seek relief against those non-parties. Moreover, the APA authorizes judicial review only over discrete, final agency actions, not generalized implementation activities.

Finally, even if the Court could review Plaintiffs' claims, they all fail on the merits. The President and OMB may lawfully direct agencies to implement the President's agenda consistent with each agency's governing authorities. And temporary pauses on the disbursement of federal funds are commonplace, accepted by the Legislative Branch, and well within OMB's statutory authorities. Such a pause to ensure that funding is distributed consistent with the President's agenda is not arbitrary and capricious, nor does anything about the pause infringe on Plaintiffs' expressive activity or otherwise violate the First Amendment. Accordingly, Plaintiffs' claims all fail, their request for emergency relief should be denied, and this case should be dismissed.

## BACKGROUND

On January 27, 2025, OMB issued the challenged OMB Memo, "requir[ing] Federal agencies to identify and review all Federal financial assistance programs and supporting activities consistent with the President's policies and requirements." OMB Memo at 1. The OMB Memo further directed that "[i]n the interim, to the extent permissible under applicable law, Federal agencies must temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders[.]" *Id.* at 2. In multiple places, the OMB Memo specified that agencies should take such action "to the extent permissible be law." *Id.*

On January 28, 2025, Plaintiffs filed the instant action against two Defendants—OMB and the Acting Director of OMB—seeking an order nullifying Memo M-25-13. *See* Complaint (ECF No. 1) ¶¶ 5-6, 43-61. Plaintiffs filed this suit on behalf of several associations and organizations, only some of which appear to directly receive federal financial assistance. For example, with respect to the National Council of Nonprofits (NCN) and Main Street Alliance (MSA), only their members appear to receive federal assistance. *See id.* ¶¶ 32, 37. The American Public Health Association (APHA) and SAGE are alleged to directly participate in certain grant programs. *Id.* ¶¶ 33, 41.

Plaintiffs' Complaint portrays the OMB Memo as "unilaterally terminat[ing] all federal financial assistance programs across the entire government." *Id.* ¶ 60. As the text of the OMB Memo and subsequent OMB Guidance made clear, however, the OMB Memo's pause applied only to funding implicated by the President's recent Executive Orders. *See* OMB Memo at 2 ("To implement these orders, each agency must complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities *that may be implicated by any of the President's executive orders*. In the interim, to the extent permissible under

applicable law, Federal agencies must temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities *that may be implicated by the executive orders*[.]" (emphases added)); OMB Guidance (ECF No. 11-1) at 1 ("Any program not implicated by the President's Executive Orders is not subject to the pause."). Moreover, the OMB Guidance reiterated that agencies should pause their funding activities only when doing so is consistent with underlying law. *See id.* ("In implementing President Trump's Executive Orders, OMB issued guidance requesting that agencies temporarily pause, *to the extent permitted by law*, grant, loan or federal financial assistance programs that are implicated by the President's Executive Orders." (emphasis added)); *id.* ("Any payment required by law to be paid will be paid without interruption or delay."); *id.* at 2 ("It is a temporary pause to give agencies time to ensure that financial assistance conforms to the policies set out in the President's Executive Orders, to the extent permitted by law.").

Plaintiffs also filed a motion for a temporary restraining order against the OMB Memo. *See* TRO Mot. (ECF No. 5-1) at 16 (requesting that the Court "enter a temporary restraining order enjoining OMB and its Acting Director from implementing or enforcing Memo M-25-13 until further order of this Court"). The motion contends that the Memo is in excess of OMB's statutory authority, is arbitrary and capricious, and violates the First Amendment. *Id.* at 6-11.

Later that same day, this Court held an Emergency Hearing at which time it ordered an administrative stay of the OMB Memo. *See* Order (Jan. 28, 2025) (ECF No. 13). The administrative stay directed that "Defendants shall refrain from implementing OMB Memorandum M-25-13 with respect to the disbursement of Federal funds under all open awards." *Id.* at 4-5. The administrative stay did not, however, affect the implementation of the OMB Memo as it pertains to the "issuance of new awards" or "other relevant agency actions that may be implicated by the

executive orders." *Id*. at 4.  Nor did the administrative stay apply to agencies' implementation of the President's Executive Orders. *See* Tr. of Jan. 28 Hrg. at 27 ("If there are executive order reasons or rationales for the termination of other grants either before or after OMB's guidance, perhaps they fall into the case as we proceed but they would not be subject to the administrative stay."); *id.* at 29 ("So anything that was terminated pursuant to other executive orders I think is fodder for another lawsuit."). Because the purpose of the administrative stay was to allow "full briefing from the parties and a motions hearing," the Court set "expedited briefing and a hearing" on Plaintiffs' motion for a temporary restraining order.  ECF No. 13 at 3-4.

The following day, on January 29, 2025, OMB elected to rescind the challenged OMB Memo. *See* OMB Mem. M-25-14, *Rescission of M-25-13* (Jan. 29, 2025) ("OMB Memorandum M-25-13 is rescinded.  If you have questions about implementing the President's Executive Orders, please contact your agency General Counsel.") (ECF No. 18-1).  Notwithstanding this rescission, during discussions between the parties, Plaintiffs indicated that they believed neither their claims nor their request for a temporary restraining order was moot.  In light of Plaintiffs' position, Defendants hereby submit this opposition and motion to dismiss, consistent with the briefing schedule previously ordered by the Court.

## STANDARD OF REVIEW

As this Court recognized, "[t]o secure a temporary restraining order, 'the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction.'"  ECF No. 13 at 3 (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).  When "the Government is the opposing party," the assessment of "harm to the opposing party" and "the public interest" merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Additionally, Plaintiffs bear the burden of showing subject-matter jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Because "standing is not dispensed in gross," Plaintiffs must "demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

## ARGUMENT

## I.    THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS

### A.    Plaintiffs' Claims Are Moot Due to Rescission of the Challenged Memo

Plaintiffs' only claims in this case challenge the OMB Memo. That is the singular action challenged in the Complaint, *see* ECF No. 1 ¶¶ 43-61, and there are no defendants named in this suit other than OMB and the Acting Director of OMB, *id.* ¶¶ 5-6. Similarly, Plaintiffs' motion for a temporary restraining order seeks relief only against the OMB Memo. *See* TRO Mot. at 16; *see also* ECF No. 5 at 2. Now that the OMB Memo has been rescinded, therefore, Plaintiffs' claims are moot. *See Fund for Animals, Inc. v. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006) ("Because the memo has expired, this claim is moot."); *Christian Knights of Ku Klux Klan Invisible Empire, Inc. v. Dist. of Colum.*, 972 F.2d 365, 369 (D.C. Cir. 1992) (holding that case was moot because the challenger "received the full measure of relief it sought through its complaint").

While voluntary cessation may sometimes be insufficient to moot a case, "the government's abandonment of a challenged [policy] is just the sort of development that can moot an issue." *Friends of Animals v. Bernhardt*, 961 F.3d 1197, 1203 (D.C. Cir. 2020). That is because the case is no longer "an appropriate vehicle to address Appellant's interest in prospective clarification of or changes to [agency policy]." *Row 1 Inc. v. Becerra*, 92 F.4th 1138, 1144 (D.C. Cir. 2024), *cert. denied*, 220 L. Ed. 2d 170 (Oct. 21, 2024). This mootness defect, on its own, is sufficient to dispose of Plaintiffs' request for emergency relief and dismiss their Complaint.

**B.    Plaintiffs Have Failed to Establish Article III Standing**

Even if Plaintiffs' claims were not moot, their claims fail—and their motion for a temporary restraining order must be denied—because they have not established standing.  They have not proven with evidence (or even plausibly alleged) that, in the absence of relief from this Court, the OMB Memo's temporary pause would actually deprive Plaintiffs of any funds they otherwise would expect to receive under one of their existing grants.  Nor have they proven that any such injury would be traceable to the OMB Memo, as opposed to the particular agency that elected to pause that specific grant program's funding, or would be redressed by relief directed solely against the OMB Memo. Thus, Plaintiffs lack standing.

Standing is a "threshold question in every federal case, determining the power of the court to entertain the suit" and demands that a plaintiff have "a personal stake in the outcome of the controversy [so] as to warrant his invocation of federal-question jurisdiction."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  "[S]tanding is assessed as of the time a suit commences," *Chamber of Commerce of U.S. v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011).

To establish standing, a plaintiff must show: (1) an "injury in fact," that is, a violation of a legally protected interest that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) a causal connection between the injury and the defendant's conduct such that the injury is "fairly . . . traceable to the challenged action"; and (3) that it is "likely, as opposed to merely speculative that the injury will be redressed by a favorable decision." *Defs. of Wildlife*, 504 U.S. at 560-61.  "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements," and therefore "must clearly . . . allege facts demonstrating each element," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Warth*, 422 U.S. at 518).  Where, as here, the challenged government action governs the conduct of government officials and therefore "the plaintiff is not himself the object of the government action

. . . he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (citation omitted).

To establish injury in fact, a plaintiff must show that the defendant's action affects him or her in a "personal and individual way," *see id.* at 560 n.1, rather than being a "generalized grievance," *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 381 (2024). A plaintiff "may not sue based only on an asserted right to have the Government act in accordance with law," nor may plaintiffs sue "merely because their legal objection is accompanied by a strong moral, ideological, or policy objection to a government action." *Id.* (citation omitted). Thus, the "[t]he injury in fact requirement prevents the federal courts from becoming a 'vehicle for the vindication of the value interests of concerned bystanders.'" *Id.* at 382 (quoting *Allen v. Wright*, 468 U.S. 737, 756 (1984)). Moreover, a plaintiff must show more than a "possible future injury"; he or she must show that harm has actually occurred or is "certainly impending." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (citations omitted). The Supreme Court has emphasized that "threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citations omitted).

Here, Plaintiffs raise several different theories of injury, none of which is sufficient under Article III. First, Plaintiffs assert that "[m]embers of APHA, MSA, and NCN receive and otherwise directly benefit from federal financial assistance, including grants and loans," and that "halting those expenditures will likewise halt the services they are able to provide in their communities, while risking their own financial viability." TRO Mot. at 13; *see also* Compl. ¶¶ 32-33, 37-39. By invoking the rights of *members* who receive federal financial assistance, Plaintiffs appear to be attempting to assert associational standing. However, Plaintiffs fail to specifically

identify any such member of their organizations.  This is inadequate to establish standing.  Indeed, the D.C. Circuit instructs that "[w]hen a petitioner claims associational standing, it is not enough to aver that unidentified members have been injured."  *Chamber of Commerce of U.S.*, 642 F.3d at 199.  "Rather, the petitioner must specifically 'identify members who have suffered the requisite harm.'"  *Id.* (quoting *Summers*, 555 U.S. at 499); *see also Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 820 (D.C. Cir. 2006) ("[A]n organization bringing a claim based on associational standing must show that at least one specifically-identified member has suffered an injury-in-fact. . . . At the very least, the identity of the party suffering an injury in fact must be firmly established.").  Because Plaintiffs "ha[ve] not identified a single member who . . . would be injured," they lack associational standing.  *Chamber of Commerce of U.S.*, 642 F.3d at 200.

Moreover, the Plaintiff organizations cannot establish injury by relying on the OMB Memo's purported harm to their overall "missions." TRO Mot. at 13. Plaintiffs "must show far more than simply a setback to the organization's abstract social interests." *Alliance for Hippocratic Med.*, 602 U.S. at 394.  "[A]n organization may not establish standing simply based on the intensity of the litigant's interest or because of strong opposition to the government's conduct, no matter how longstanding the interest and no matter how qualified the organization." *Id.* (citations omitted).

At most, the only Plaintiffs potentially with standing would be those organizations that directly receive Federal financial assistance—which here appears to be APHA and SAGE.  Compl. ¶¶ 33, 40. Even as to those organizations, however, it is speculative whether they would actually be harmed by any temporary pause.  As the OMB Guidance noted, "[a] pause could be as short as [a] day," and "OMB has worked with agencies and has already approved many programs to continue even before the pause has gone into effect."  OMB Guidance at 1.  Thus, it is far from

clear that any individual program or grant involving these Plaintiffs would have been subject to the pause at all. Moreover, neither APHA nor SAGE provides any information about when they next expect grant payments or disbursements under their programs, which makes it impossible for this Court to determine whether these programs would be affected by a temporary pause of limited duration. Indeed, Plaintiffs previously conceded that the record lacked such specificity. *See* Tr. of Jan. 28 Hrg. at 13 ("I do not believe we have a specific allegation of income as to a particular program."). In the absence of such proof, any injury stemming from a temporary pause is purely "hypothetical," as opposed to "actual or imminent." *Defs. of Wildlife*, 504 U.S. at 560.

In addition to failing to show injury in fact, Plaintiffs' alleged injuries are not "fairly . . . traceable to the challenged action." *Defs. of Wildlife*, 504 U.S. at 560. The now-rescinded OMB Memo did not itself temporarily pause (let alone eliminate) any federal financial assistance. Rather, the OMB Memo merely instructed federal agencies to temporarily pause certain federal financial assistance programs "to the extent permissible under applicable law." OMB Memo at 2. Thus, even assuming Plaintiffs established that they would suffer harm due to a temporary pause, any such harm would be caused not by OMB's Memo, but by as-yet-untaken action by other federal agencies that administer those programs and are not party to this suit. *See Defs. of Wildlife*, 504 U.S. at 560 (to establish standing, injury must be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court."); *see also Louisiana v. Biden*, 64 F.4th 674, 681 (5th Cir. 2023) (holding that plaintiffs lacked standing to challenge an executive order that required agencies to "exercise discretion in conducting their cost-benefit analyses and deciding to use the Interim Estimates as 'appropriate and consistent with applicable law,'" because "the mere 'possibility of regulation' fails to satisfy injury in fact"); *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1254 (11th Cir.

2020) (plaintiff failed to demonstrate standing where "a different, independent official" had control over the action which allegedly harmed the plaintiff).

Similarly, even if this Court granted relief against the OMB Memo, that would not prevent non-defendant agencies from exercising their own independent authorities to determine whether, consistent with law, a pause is warranted. Consequently, neither Plaintiffs nor this Court can "begin to predict on this record what impact," if any, invalidating the OMB Memo would have. *Freedom Republicans, Inc. v. Fed. Election Comm'n*, 13 F.3d 412, 419 (D.C. Cir. 1994). Plaintiffs have accordingly failed to allege facts which show that any injuries are traceable to the challenged actions, or that their requested relief will remedy any such claimed injuries.

## II.  PLAINTIFFS CANNOT CHALLENGE THE PRESIDENT'S EXECUTIVE ORDERS, OR AGENCIES' GENERAL IMPLEMENTATION OF THOSE ORDERS

The above defects are sufficient to dispose of this matter; Plaintiffs' only claims in this case are moot, and Plaintiffs have not properly invoked this Court's Article III jurisdiction. Based on Plaintiffs' position that emergency proceedings are still warranted, however, it appears that Plaintiffs now intend to seek relief against a broader set of actions beyond just the now-withdrawn OMB Memo—*e.g.*, perhaps the President's Executive Orders themselves, or agencies' implementation of those Executive Orders. But any such claims are absent from Plaintiffs' Complaint and TRO motion.

This Court should not allow Plaintiffs to expand this case and seek relief against a broader set of actions that appear nowhere in their Complaint or TRO motion. *Cf. Mylan Lab'ys Ltd. v. Food & Drug Admin.*, 910 F. Supp. 2d 299, 312 (D.D.C. 2012) (concluding that a new argument raised in a reply in support of a motion for preliminary injunction was waived); *Quinn v. Dist. of Colum.*, 740 F. Supp. 2d 112, 130 (D.D.C. 2010) (declining to consider claim not included within Complaint). In particular, Plaintiffs should not be permitted to seek injunctive relief against non-

party agencies that have not been named as defendants in this suit, and have not been fairly apprised of any particularized agency actions that Plaintiffs seek to challenge. *See Defs. of Wildlife*, 504 U.S. at 569 & n.4 (Scalia, J., plurality op.) (holding that resolution of a disputed legal issue "would not have been binding upon the agencies" that "were not parties to the suit"); *see also Haaland v. Brackeen*, 599 U.S. 255, 293 (2023) ("[S]tate officials are nonparties who would not be bound by the judgment."); *Murthy v. Missouri*, 603 U.S. 43, 73-74 (2024).

Regardless, even if the Court allowed Plaintiffs to seek relief beyond just the OMB Memo—*e.g.*, against the President's Executive Orders or agencies' implementation of those Orders—such claims are likewise precluded. The President's Executive Orders are not subject to challenge, and Plaintiffs cannot use the APA to broadly challenge agencies' ongoing implementation of their overall budget programs.

## A.  The President's Executive Orders Are Not Subject to Challenge

Plaintiffs cannot seek relief directly against the President or his Executive Orders. Courts have no authority to second-guess "discretion[ary]" acts taken by the President "in the performance of his official duties." *Mississippi*, 71 U.S. at 501; *see also Franklin v. Massachusetts*, 505 U.S. 788, 827 (1992) (Scalia, J., concurring in part). The Court explained in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165-66 (1803), that under "the constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character." The courts' refusal to police the President's discretionary acts is "a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history." *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982); *see also Newdow*, 603 F.3d at 1013 ("With regard to the President, courts do not have jurisdiction to enjoin him, and have never submitted the President to declaratory relief." (citation omitted)).

-12-

Thus, to the extent Plaintiffs' theory is that their claimed harms are now caused by the President's recently issued Executive Orders (as opposed to the now-rescinded OMB Memo), Plaintiffs cannot seek relief directly against those Orders or against the President himself. Pursuant to fundamental separation of powers principles, the Executive Orders themselves are not subject to challenge before this Court.

### B. APA Claims Cannot Be Used to Broadly Challenge an Agency's General Implementation Activities

It is true that, even when the President himself cannot be sued, "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." *Franklin*, 505 U.S. at 828 (Scalia, J., concurring in part). But no agency (aside from OMB) is presently a defendant in this suit. And in any event, the suit would still need to satisfy the normal requirements for obtaining judicial review of agency action. Here, Plaintiffs cannot use the APA to challenge agencies' ongoing funding decisions or implementation of Presidential Executive Orders—such overall programs are not the type of discrete, final agency actions subject to challenge under the APA.

The APA permits review only over "final agency action," 5 U.S.C. § 704, which means that the action "must mark the consummation of the agency's decisionmaking process," and "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted). Additionally, these final agency actions must be "circumscribed [and] discrete." *Norton v. Southern Utah Wilderness Alliance (SUWA)*, 542 U.S. 55, 62 (2004). The APA does not provide for "general judicial review of [an agency's] day-to-day-operations," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1999), like "constructing a building, operating a program, or performing a contract," *Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186, 193 (4th Cir.

2013). "The case-by-case approach that this requires is understandably frustrating to an organization . . . which has as its objective across-the-board protection of our Nation's wildlife and the streams and forests that support it. But this is the traditional, and remains the normal, mode of operation of the courts." *Nat'l Wildlife Fed'n*, 497 U.S. at 894.

Here, Plaintiffs cannot challenge the OMB Memo (or any other overarching guidance about how to implement the President's priorities) because that is not final agency action. The OMB Memo did not itself determine which funds or grants should be paused; instead, it required agencies to make that determination, consistent with their own authorities. The OMB Memo was therefore akin to general guidance, not the final agency decision as to any particular funding, let alone a legally binding determination as to that funding. *See, e.g.*, *Vill. of Bensenville v. Fed. Aviation Admin.*, 457 F.3d 52, 69 (D.C. Cir. 2006) (holding that "a planning document . . . does not complete the agency's decisionmaking process"); *Ctr. for Auto Safety v. Nat'l Hwy. Traffic Safety Admin.*, 452 F.3d 798, 809-10 (D.C. Cir. 2006) (holding that policy guidelines were not final agency actions, because the agency retained discretion to engage in case-by-case evaluation); *see also Fund for Animals, Inc. v. Bureau of Land Mgmt.*, 460 F.3d 13, 22 (D.C. Cir. 2006) (describing "this court's consistent refusal to review agency orders that do not themselves adversely affect complainant but only affect his rights adversely on the contingency of future administrative action" (cleaned up)); *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731-32 (D.C. Cir. 2003); *cf. Louisiana*, 64 F.4th at 684 (holding that "Plaintiffs contemplate harms that are several steps removed from . . . the challenged Executive Order," and they "cannot do away with their alleged parade of horribles in a single swipe at the duly elected executive").

Moreover, Plaintiffs also cannot use the APA to advance a broad, programmatic attack on how agencies implement the President's Executive Orders or other funding directives. "Under the

terms of the APA, respondent must direct its attack against some particular 'agency action' that causes it harm." *Nat'l Wildlife Fed'n*, 497 U.S. at 891.  Perhaps the APA would allow individual grant recipients to challenge specific withholdings of funds under a particular grant.  But that is not what Plaintiffs seek in this suit; they are not bringing claims, for example, based only on a pause of funding under specific programs affecting their specific Plaintiffs.  Instead, they claim to seek relief on behalf of "tens of thousands of members" potentially affected by the "many, many grant programs across the country." Tr. of Jan. 28 Hrg. at 6.  Such amorphous, generalized claims— untethered to specific decisions in the context of individual grant programs—are indistinguishable from the type of broad, programmatic challenges the Supreme Court and D.C. Circuit have rejected. *See Nat'l Wildlife Fed'n*, 497 U.S. at 890; *Am. Forest Res. Council v. United States*, 77 F.4th 787, 805 (D.C. Cir. 2023) (rejecting a "blunderbuss challenge" in which the plaintiffs "complain not that the Secretary failed to take a specific action but rather that she failed to carry out the . . . Act's general directives"); *Fund for Animals, Inc. v. Bureau of Land Mgmt.*, 460 F.3d 13, 21 (D.C. Cir. 2006) (holding that a "budget proposal represent[ing] the Bureau's latest plan to comply with its broad statutory mandate" was not reviewable).

One of the reasons why plaintiffs must challenge discrete, final agency actions is to avoid injecting courts into the day-to-day oversight and supervision of agencies' compliance:

> If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved—which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management.

*SUWA*, 542 U.S. at 66-67.  That concern is particularly apt here.  Whatever the scope of Plaintiffs' challenges, it is virtually impossible to imagine a court order that "state[s] its terms specifically," Fed. R. Civ. P. 65(d)(1)(B), without also threatening to place this Court in the role of overseeing a

wide swath of the Executive Branch's ongoing funding activities, particularly when Plaintiffs demand emergency relief applicable to *all* recipients of federal financial assistance. *See* TRO Mot. at 15-16; *see also Louisiana v. Biden*, 45 F.4th 841, 846 (5th Cir. 2022) (vacating an injunction purporting to enjoin a "pause" of certain leases, because the court could not "ascertain from the record what conduct—an unwritten agency policy, a written policy outside of the Executive Order, or the Executive Order itself—is enjoined"). The inability to fashion tailored relief highlights the fundamental defect in Plaintiffs' efforts to oversee the entirety of the Executive Branch's funding decisions, whether as part of a challenge to the now-withdrawn OMB Memo or to some other universe of agency actions.

## III.    PLAINTIFFS' CHALLENGES ARE MERITLESS

Even if the Court were willing to review Plaintiffs' claims on the merits, or allow Plaintiffs to expand their claims beyond just the OMB Memo at issue in this case, none of the Executive Branch's actions were unlawful. To the contrary, they were fully consistent with longstanding Executive Branch authority, as recognized by the D.C. Circuit. And the OMB Memo (although now withdrawn) was likewise lawful and appropriate. Finally, Plaintiffs' First Amendment claims fail because the Government is allowed to choose what activities to fund without being subjected to heightened scrutiny. Thus, even if the Court were willing to consider Plaintiffs' claims, those claims all fail on the merits and should be dismissed.

### A.    The President and OMB May Lawfully Direct Agencies to Implement the President's Priorities, Consistent With Those Agencies' Own Authorities

Throughout their motion, Plaintiffs seek to portray the Executive Branch's pause in funding as being inherently unlawful. *See, e.g.*, TRO Mot. at 2 ("In practice, the Memo purports to eradicate essentially all federal grant, loan, and other financial assistance programs."); *id.* at 6 (asserting that OMB cannot "unilaterally, without notice or process, purport to effectively stop all

grant programs across the entire federal government via a two-page Memo"); *id.* at 9 ("Whatever the new administration's feelings about the policy priorities of its predecessors, it does not have carte blanche to ignore the consequences of those prior agency actions."). But this argument is fundamentally flawed for two reasons. First, as a legal matter, temporary pauses in funding are not unlawful and indeed are commonplace, as discussed further below. *See* Section III.B, *infra*. Second, as a factual matter, Plaintiffs' characterization of the Executive Branch's actions is simply incorrect—they do not purport to issue categorical directives to pause all funding, and instead the President and OMB have instructed agencies to implement the President's priorities to the extent permissible with each agency's own governing legal authorities. As discussed above, the D.C. Circuit has long upheld these types of Presidential directives to agencies.

The challenged OMB Memo is explicit that the temporary pause must only be implemented "to the extent permissible under applicable law." OMB Memo at 2. The OMB Guidance makes this point even more clear. *See, e.g.*, OMB Guidance at 1 ("Any payment required by law to be paid will be paid without interruption or delay."); *id.* at 2 ("It is a temporary pause to give agencies time to ensure that financial assistance conforms to the policies set out in the President's Executive Orders, to the extent permitted by law."). Similarly, each of the relevant Executive Orders highlighted by the OMB Memo and the supplemental Guidance instructs agencies to take certain action but also includes a "General Provision[]" stating that the order "shall be implemented" "consistent with applicable law and subject to the availability of appropriations." *See, e.g.*, *Reevaluating and Realigning United States Foreign Aid* § 4(b) (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/reevaluating-and-realigning-united-states-foreign-aid/.

Definitionally, directing executive agencies to take action *to the extent consistent with*

*applicable law* cannot be interpreted as an order to violate the law.  It is plainly lawful for the OMB and the President to instruct agencies to act within their own authorities to implement the President's priorities consistent with applicable law.  *See, e.g.*, *Sherley*, 689 F.3d at 784 ("[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law."); *Sierra Club*, 657 F.2d at 406.

The D.C. Circuit's decision in *Building & Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002) is instructive.  There, Plaintiffs challenged an executive order that provided that "to the extent permitted by law," no federal agency and no entity that receives federal assistance for a construction product could require or prohibit bidders or contractors from entering into a project labor agreement.  *Id.* at 29.  Plaintiffs sued, claiming that the executive order exceeded the President's constitutional authority.  *See id.* at 31-32.  The D.C. Circuit rejected this argument, pointing out that the executive order "directs [agencies] how to proceed in administering federally funded projects, but only '[t]o the extent permitted by law.'"  *Id.* at 33.  "Thus, if an executive agency, such as the FEMA, may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law."  *Id.*  The court concluded that "[t]he mere possibility that some agency might make a legally suspect decision to award a contract or to deny funding for a project does not justify an injunction against enforcement of a policy that, so far as the present record reveals, is above suspicion in the ordinary course of administration."  *Id.* (citing *Reno v. Flores*, 507 U.S. 292, 301 (1993)); *see also Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. 2020) (Katsas. J.) ("We cannot ignore these repeated and unambiguous qualifiers imposing lawfulness and feasibility constraints on implementing the memorandum.").

Similarly, here, the now-rescinded OMB Memo and each of the related Executive Orders only directs agencies to take action to the extent consistent with applicable law. Therefore, neither the OMB Memo nor the Executive Orders can be construed as violating the law. Plaintiffs' only response is to contend that the OMB Memo provided too little time for agencies to implement consistent with the law. *See* TRO Mot. at 9 ("Applicable law for federal financial assistance is complex, with specific terms and requirements that vary across grant programs and individual awards. Such an assessment is simply impossible to do across all federal financial assistance programs accurately and completely within the twenty-four hours permitted for implementation."). But this argument only highlights how Plaintiffs' challenge, whether directed against the OMB Memo or other agency actions, is not a challenge to a discrete, individualized action but rather an effort to superintend the Executive Branch's funding decisions "across all federal financial assistance programs." *Id.*; *see* Section II.B, *supra*.

More fundamentally, the effective date of the temporary pause did not override the OMB Memo's instruction that the pause be implemented only "to the extent permissible by law," as confirmed by the subsequent OMB Guidance: "It is a temporary pause to give agencies time to ensure that financial assistance conforms to the policies set out in the President's Executive Orders, *to the extent permitted by law*." Guidance at 2 (emphasis added). And as that Guidance also explained, the only financial programs affected are those "implicated by the President's Executive Orders," *id.* at 1, most of which had been issued over a week earlier on January 20, 2025. Contrary to Plaintiffs' theory here, the D.C. Circuit's cases do not require that the President or OMB provide agencies a specific period of time before those agencies can be directed to take actions to implement the President's agenda, to the extent permissible by law.

As the D.C. Circuit noted, "[i]n the event that an agency does contravene the law in a

particular instance, an aggrieved party may seek redress through any of the procedures ordinarily available to it: a bid protest, a motion for administrative reconsideration, or an action in the district court challenging that specific decision." *Allbaugh*, 295 F.3d at 33.[1]  But the mere fact that the Executive Branch has directed a pause in funding, to the extent permissible within an agency's own authorities, is hardly improper and indeed has been repeatedly endorsed by the D.C. Circuit.

**B.    Temporary Pauses in Funding Are Legally Permissible**

Plaintiffs argue that the OMB Memo "is in excess of OMB's statutory authority," which they say does not extend to OMB directing pauses in funding.  TRO Mot. at 6.  But Plaintiffs take an unduly cramped view of OMB's statutory authorities, and in fact temporary pauses in funding are commonplace and accepted by the Legislative Branch.

As other courts have recognized, OMB possesses expansive authority, including "aiding the President in managing the entire executive branch[.]"  *Meyer v. Bush*, 981 F.2d 1288, 1294 (D.C. Cir. 1993); *see also* Budget and Accounting Act of 1921, 31 U.S.C. § 1101, *et seq.*; Reorganization Plan No. 2 of 1970, Message of the President, 5 U.S.C. App'x 1, reprinted in 1970 U.S.C.C.A.N. 6315, 6316.  As the President explained in connection with establishing the modern-day OMB, the agency is expected to "assess[] the extent to which programs are actually achieving their intended results, and delivering the intended services to the intended recipients." Reorg. Plan No. 2, Message of the President.  This evaluation of programs is precisely what OMB directed here, through a "review [of] agency programs [to] determine the best uses of the funding for those programs consistent with the law and the President's priorities." OMB Memo at 2.  Such a review

---

[1] The fact that the OMB Memo and related Executive Orders only instruct agencies to act consistent with applicable law also demonstrates that Plaintiffs' claims are not ripe.  *See Common Cause*, 506 F. Supp. 3d at 47–50; *see also Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (citations omitted)).

"falls well within [OMB's] management and budgetary role," including its responsibility "to provide federal agencies with consistent, government-wide policy guidance." *New York v. Shalala*, 959 F. Supp. 614, 618 (S.D.N.Y. 1997), *aff'd*, 143 F.3d 119 (2d Cir. 1998).

Indeed, temporary pauses in obligations or payments of appropriations are quite common. *See City of New Haven v. United States*, 809 F.2d 900, 901 (D.C. Cir. 1987) (explaining how Congress has previously "acknowledged that 'the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year' and such delays may result from the 'normal and orderly operation of the government'" (quoting H.R. Rep. No. 658, 93d Cong., 1st Sess. 41 (1971)). The Government Accountability Office (GAO), itself an entity within the Legislative Branch, has approved of agencies "taking the steps it reasonably believes are necessary to implement a program efficiently and equitably, even if the result is that funds temporarily go unobligated." *In re James R. Jones*, *House of Representatives*, B-203057 L/M, 1981 WL 23385 (Comp. Gen. Sept. 15, 1981). The OMB Memo fits comfortably within this Executive Branch practice of short-term delays in order to determine how best to implement programs consistent with the President's policy objectives and consistent with the underlying law governing each program, and therefore the OMB Memo's pause is not in excess of OMB's authority.

Plaintiffs ignore all of the above authorities and history, and instead base their analysis of OMB's authority on a single statutory section about the agency. *See* TRO Mot. at 6 (discussing 5 U.S.C. § 503). But even considering only those authorities in isolation, the OMB Memo is still amply justified. OMB's responsibilities include, among other things, "[p]rovid[ing] overall direction and leadership to the executive branch on financial management matters"; "[m]onitor[ing] the financial execution of the budget in relation to actual expenditures, including timely performance reports"; and "[i]ssu[ing] such other policies and directives as may be

necessary to carry out this section." 31 U.S.C. § 503(a)(2), (5), (14). These capacious grants of authority are consistent with OMB's instruction to agencies that, to the extent permitted by law, they should pause and review their payments to ensure consistency with the President's policy objectives. Thus, Plaintiffs' claim that OMB lacks authority to issue the Memo is meritless.

### C.    A Temporary Pause in Funding Is Not Arbitrary and Capricious

The scope of review under the "arbitrary and capricious" standard, 5 U.S.C. § 706(2)(A), is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). This standard "deems the agency action presumptively valid provided the action meets a minimum rationality standard." *Sierra Club v. EPA*, 353 F.3d 976, 978 (D.C. Cir. 2004) (citation omitted).

Here, there is nothing irrational about a temporary pause in funding, to the extent permissible by law, pending a review to ensure compliance with the President's priorities. That is precisely what OMB and other subordinate agencies are legally required to do; it cannot be irrational for them to comply with the law in such a manner. *See* Part III.A, *supra*; *Sherley*, 689 F.3d at 784 ("[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law.").

Moreover, the OMB Memo cogently explains that its objective is to effectuate the President's Executive Orders and "safeguard valuable taxpayer resources." OMB Memo at 1. It rationally connects the temporary pause with this objective by explaining that it is necessary to "provide the Administration time to review agency programs and determine the best uses of the funding for those programs consistent with the law and the President's priorities." *Id*. at 2. Contrary to Plaintiffs' assertion that Defendants failed to consider practical consequences or quantify the problem, *see* TRO Mot. at 8, the OMB Memo emphasized the significant amount of money that is expended every year on federal financial assistance—"$3 trillion [in] Federal

financial Assistance, such as grants and loans," OMB Memo at 1—and then directed agencies to identify the specific assistance "that may be implicated by any of the President's executive orders." *Id.* at 2. An agency's direction to quantify the problem can hardly be impugned as irrational for failing to quantify the problem.

Plaintiffs complain that the Memo was issued without notice, *see* TRO Mot. at 7, as though this were a rulemaking under the APA. But the APA explicitly exempts from notice-and-comment rulemaking "matter[s] relating to agency management . . . or to public property, loans, grants, benefits, or contracts." 5 U.S.C. § 553(a)(2). And to the extent any individual grant program or other form of assistance required advance notice, the OMB Memo's directive to institute the temporary pause "to the extent permissible under applicable law," OMB Memo at 2, would have allowed (and required) the individual agency to provide such notice.

Lastly, Plaintiffs argue that the Memo was arbitrary and capricious because it failed to take their reliance interests into account. But "unidentified and unproven reliance interests are not a valid basis on which to undo agency action. Instead, the harm occasioned must be specifically identified, reasonably incurred, and causally tied to the delay." *Solenex LLC v. Bernhardt*, 962 F.3d 520, 529 (D.C. Cir. 2020). As discussed earlier, *supra* Section I.B, Plaintiffs have not identified any reliance interests in receiving payments on particular timeframes that they have proven would even be affected by the temporary pause. At most, some Plaintiffs might have reliance interests in receiving specific grant funding. But a temporary pause does not deprive them of any such funding; it only potentially delays further expenditures for the short time needed to conduct a review of that funding, which is a potential delay that is wholly unproven on this record. Accordingly, these are the hallmarks of "unidentified and unproven reliance interests" and are an "[in]valid basis on which to undo agency action." *Solenex, LLC*, 962 F.3d at 529.

Furthermore, to the extent that reliance issues would be relevant to a decision about a specific federal grant, the OMB Memo would not prevent agencies' consideration of such interests as appropriate because the OMB Memo makes clear that agencies should act in accordance with applicable law.  In short, there is nothing irrational about the OMB Memo's temporary pause on certain forms of assistance, to the extent permissible by law, pending a review to ensure consistency with the President's Executive Orders, as OMB (and individual agencies) are required to do.  *Sherley*, 689 F.3d at 784.

### D.   Plaintiffs' First Amendment Claims Are Meritless Because the Government May Choose Which Programs It Intends to Subsidize

It is well-established that "[t]he Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way.  In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other."  *Rust v. Sullivan*, 500 U.S. 173, 193 (1991); *see also Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (explaining that government "is not required to assist others in funding the expression of particular ideas"); *United States v. Am. Library Ass'n*, 539 U.S. 194, 212 (2003) (plurality) (a "'decision not to subsidize the exercise of a fundamental right does not infringe the right'") (quoting *Rust*, 500 U.S. at 193); *Leathers v. Medlock*, 499 U.S. 439, 450 (1991) (government "is not required to subsidize First Amendment rights").  The Supreme Court has held time and again that the Government does not penalize, prohibit, restrict, or otherwise infringe on speech simply because it chooses not to pay for it.

Here, the funding pause falls squarely within these authorities.  In particular, the pause does not discriminate based on funding recipients' viewpoints.  Nothing in the OMB Memo or

elsewhere depends on the expressive activity of recipients; the pause applies evenly to *all* recipients in the programs implicated by the President's Executive Orders.

So long as the government follows existing law, as the OMB Memo and Executive Orders direct, the new Administration "'may make value judgment[s]'" and "'implement th[ose] judgment[s] by the allocation of public funds.'" *Rust*, 500 U.S. at 192-93 (quoting *Maher v. Roe*, 432 U.S. 464, 474 (1977)).  Congress's "broad discretion" under the Spending Clause "to tax and spend for the 'general Welfare'" includes the authority "to impose limits on the use of [the] funds" it appropriates for particular programs, "to ensure they are used in the manner Congress intends." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013).  In its efforts to faithfully execute the laws, OMB instructed agencies to implement a pause, where permissible by law, to determine whether grants are being distributed in the manner that the American people, through their representatives in Congress and the White House, intended.  OMB Memo at 2 ("This temporary pause will provide the Administration time to review agency programs and determine the best uses of the funding for those programs consistent with the law and the President's priorities.").

Plaintiffs object to the pause by relying on caselaw cautioning the government against adding conditions to spending that may infringe upon recipients' First Amendment rights.  *See* TRO Mot. at 10.  This line of precedent is inapposite.  OMB does not seek to add any new conditions on federal financial assistance, which explains Plaintiffs' conspicuous failure to name any specific condition.  *See id.* at 10-11.  Rather, OMB is aligning the President's and Congress's spending priorities within the bounds of the law, which is the statutory function Congress has assigned OMB.  *See generally* 5 U.S.C. § 503; Part III.B, *supra*.

As the Supreme Court explained in *Agency for Int'l Dev.*, there is a difference "between

conditions that define the limits of the government spending program—those that specify the activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself."  570 U.S. at 214-15.  In other words, the government cannot condition funding on a requirement that recipients express or refrain from expressing certain ideas, "thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded programs," *Rust*, 500 U.S. at 197.  But here, nothing in the pause requires potential recipients to modify their expressive activities so that they can "hope to receive federal funding again."  TRO Mot. at 11.  To the extent the pause contains any conditions whatsoever, they are solely about the content of the federally funded programs themselves—conditions that are fully permissible. *See, e.g.*, *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 188-89 (2007) (the "government can make content-based distinctions when it subsidizes," rather than regulates, speech); *Am. Library Ass'n*, 539 U.S. at 204-05 (the government has "broad discretion" to "make content-based judgments in deciding what private speech to make available to the public"): *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587–88 (1998) ("[I]n the subsidy context," the Government may allocate funding "according to criteria that would be impermissible were direct regulation of speech . . . at stake[.]").  And even if there were legitimate First Amendment concerns in an individual case, an agency could evaluate those issues as part of its consideration of what actions are permitted under the law in the context of specific grant programs and awards.

Ultimately, Plaintiffs disagree with the pause because it reflects their concern that the new Administration has "ma[de] value judgment[s]" and "intends to implement [them] by the allocation of public funds"—but that is precisely what the Government is within its authority to do.  *Rust*, 500 U.S. at 192-93.  As a result, Plaintiffs fail to demonstrate a First Amendment

violation, and all of their claims are meritless.

## IV.    THE BALANCE OF THE EQUITIES INDEPENDENTLY FORECLOSES RELIEF

To the extent this Court does not dismiss this suit, and instead considers whether to grant a temporary restraining order, such relief is independently foreclosed because Plaintiffs have not proven any irreparable injury would occur in the short timeframe of any temporary restraining order.  Moreover, the harm to the Government and the public interest would be significant.

### A.    Plaintiffs Have Not Proven Irreparable Injury In the Short Timeframe of a Temporary Restraining Order

In this Circuit, there is a "high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  Any alleged irreparable harm "must be both certain and great; it must be actual and not theoretical." *Id*.  It also must be of such "*imminence* that there is a clear and present need for equitable relief." *Id*. (citing *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)) (emphasis in original).  Plaintiffs' motion can be denied solely on the basis that they have failed to demonstrate irreparable injury. *See id.* ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." (citing *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1210–11 (D.C. Cir. 1989))).

As already discussed, Plaintiffs' claims are moot, and, in any event, Plaintiffs never sufficiently alleged injury even to satisfy the requirements of Article III standing. *See* Section I.B, *supra*.  It therefore follows that Plaintiffs have failed to show irreparable injury for similar reasons.

That conclusion is further underscored by Plaintiffs' failure to establish irreparable injury in the short timeframe relevant to a temporary restraining order.  As Plaintiffs themselves acknowledged, *see* Tr. of Jan. 28 Hrg. at 13, nothing in the record indicates when any Plaintiff expects to receive any relevant grant payment, let alone that any such payment is expected within

the time period in which Plaintiffs' requested temporary restraining order could last.  *See* Fed. R. Civ. P. 65(b)(2).  Absent such proof, they cannot show harm of such "*imminence* that there is a clear and present need for equitable relief."  *Chaplaincy*, 454 F.3d at 297.

Additionally, even assuming *arguendo* that a payment was imminently expected, Plaintiffs fail to explain how a short delay in any payment could cause them irreparable harm.  Plaintiffs attempt to address this issue in connection with SAGE, by asserting that a "short term pause in funding" would "prevent SAGE from promoting SAGEYou . . . thereby significantly curtailing its reach and effectiveness."  Tax Decl. (ECF No. 5-2) ¶ 9.  But even assuming such amorphous "reach and effectiveness" could be considered irreparable harm, the SAGEYou platform does not appear to exist yet, and instead its "planned launch" is "this spring."  *Id.*  Again, Plaintiffs provide no specific information regarding the timing of inflow of payments, let alone explain why a 14-day temporary restraining order is necessary to prevent harm to a platform that may not launch yet for several months.

Plaintiffs' Motion relies heavily on *Chef Time 1520 LLC v. Small Business Administration*, 646 F. Supp. 3d 101 (D.D.C. 2022), but that case is inapposite.  In *Chef Time*, the court found that the plaintiff would suffer irreparable harm in the absence of a temporary restraining order, because the defendant was "in the process of distributing . . . the last of the remaining [Restaurant Revitalization Fund] funds" and the plaintiff would not be able to seek damages "once the fund has fully expired."  *Id.* at 115. Here, by contrast, Plaintiffs make no allegation regarding grant money being exhausted in the absence of a temporary restraining order.  In fact, any temporary pause in a program pursuant to the now-rescinded OMB Memo or the related Executive Orders would apply to the entire program, rather than to Plaintiffs specifically.  Nor do Plaintiffs submit any information about whether, under their particular grants or other forms of assistance, there are

administrative schemes available for challenging the withholding of funds, or recovering funds to the extent such funds were improperly delayed or denied. Thus, the reasoning in *Chef Time* is inapplicable.

### B.    The Public Interest Weighs Squarely Against Relief

Lastly, Plaintiffs cannot establish that the balance of equities and the public interest favor granting the extraordinary remedy of a temporary restraining order. These final two factors merge in cases where relief is sought from the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (when the government is a party, these two factors merge and "are one and the same, because the government's interest *is* the public interest").

In arguing that the public interest weighs in their favor, Plaintiffs primarily rely on the notion that there is no public interest in the perpetuation of unlawful agency action.  *See* TRO Mot. at 14.  But that is just a repackaged version of their merits arguments, and as previously discussed, the now-rescinded OMB Memo and the related Executive Orders are lawful. Furthermore, an injunction here would effectively disable OMB and/or the President from effectuating the President's agenda consistent with their constitutional and statutory authorities. "Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (brackets omitted).  And where the Government is legally entitled to make decisions about the disbursement or allocation of federal funds but is nonetheless ordered to release the funds, such funds may not be retrievable afterwards. Particularly given the broad relief that Plaintiffs seek with respect to all recipients of federal financial assistance, *see* TRO Mot. at 15-16, the harms to the Government would be tremendous. Thus, the balance of the equities weighs in favor of the Government and relief should be denied.

## V.     ANY INJUNCTIVE RELIEF SHOULD BE STAYED

It is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  Here, Plaintiffs' requested TRO—extending "to all recipients of federal financial assistance," TRO Mot. at 15—goes far beyond that principle, and indeed their requested relief goes beyond the limits of a TRO.  *See* ECF No. 5 at 2 (requesting that "the Court order Defendants to file a status report . . . confirming the regular disbursement and obligation of federal financial assistance funds" for "twelve weeks").  Not only does such a request fail to "describe in reasonable detail . . . the act or acts restrained or required," Fed. R. Civ. P. 65(d)(2)(C), it also extends beyond the permissible duration of a TRO, which is 14 days subject to renewal. *See* Fed. R. Civ. P. 65(b)(2).

Particularly in light of the extraordinary breadth of Plaintiffs' motion, to the extent the Court issues injunctive relief, the United States respectfully requests that such relief be stayed pending the disposition of any appeal that is authorized, or at a minimum that such relief be administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized.

## CONCLUSION

Plaintiffs' motion for a temporary restraining order should be denied and this entire action should be dismissed.


Dated: January 30, 2025                        Respectfully submitted,

                                               BRETT A. SHUMATE
                                               Acting Assistant Attorney General

                                               ALEXANDER K. HAAS
                                               Director

_/s/   Daniel Schwei_
DANIEL SCHWEI
Special Counsel (N.Y. Bar)
ANDREW F. FREIDAH
EITAN R. SIRKOVICH
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel.:     (202) 305-8693
Fax:     (202) 616-8460
Email:     daniel.s.schwei@usdoj.gov

_Counsel for Defendants_