## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL COUNCIL OF NONPROFITS, et al., | |
| *Plaintiffs*,ex. | |
| v. | Case No. 25-cv-239 |
| OFFICE OF MANAGEMENT AND BUDGET, et al., | |
| *Defendants*. | |

### PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS AND REPLY IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER

On Monday, OMB issued Memo M-25-13, which instructed all Federal agencies that they "**must temporarily pause** *all* activities related to obligation or disbursement of *all* Federal financial assistance," as well as "other relevant agency activities that may be implicated by [certain] executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal." Memo M-25-13 at 2 (first emphasis in original; second and third added). This sweeping decree was made public only by journalists' reporting, and was set to take effect by Tuesday at 5:00 p.m., *id*. Minutes before then, this Court ordered an administrative stay ordering Defendants to refrain from implementing the Memo with respect to the disbursement of Federal funds under all open awards.

The next afternoon, OMB issued Memo M-25-14, which purported to rescind Memo M-25-13. This, the government claims, ends the case. But the purported

rescission appears to be little more than a bait and switch. The White House press secretary immediately announced that Memo M-25-14 was "NOT a rescission of the federal funding freeze," but instead an effort to avoid the effect of this Court's order. Karoline Leavitt, X, https://x.com/PressSec/status/1884672871944901034 (Jan. 29, 2025 1:40 PM) (hereinafter, "Leavitt"). And the evidence shows that, although the government has restored access to some federal financial assistance, it has continued to implement the M-25-13 funding freeze, not just after the Court entered the administrative stay but even after the supposed rescission. Indeed, minutes before Plaintiffs submitted this filing, the only other Court to consider the issue determined, in a case brought by a number of state attorneys general, that "the policies in [Memo M-25-13] are still in full force and effect and thus the issues presented in the States' TRO motion are not moot." Order Granting TRO at 10-11, *New York v. Trump*, No. 1:25-cv-00039 (D.R.I. Jan. 31, 2025).

As of yesterday, for example, the EPA was answering inquiries about continued difficulties to access funds by explaining that it "is working diligently to implement the Office of Management and Budget's memorandum, Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs" and was "pausing all activities related to the obligation or disbursement of EPA Federal financial assistance at this time." Ex. A at 6. And while some other agencies have—like Defendants here—shifted to claiming that they are not seeking to implement the broad freeze OMB ordered but only the more specific freezes

mandated by the President's executive orders, the evidence is inconsistent with that story too.

Plaintiffs' request for a temporary restraining order therefore remains very much live. Plaintiffs have asked for an order enjoining Defendants "from implementing or enforcing" Memo M-25-13. Proposed Order, ECF No. 5-6, at 2. If, as appears, the government is continuing to implement the funding freeze ordered in the Memo, then the purported "rescission," M-25-14, is meaningless, and Plaintiffs' request for an injunction against "implementing" or "enforcing" the Memo, Proposed Order at 2, remains not just live but compelling. Plaintiffs are not challenging a piece of paper. They are challenging the Memo's freeze on federal funding. And the freeze that the Memo ordered—arbitrarily and capriciously, without statutory authority, and in violation of the First Amendment—remains at least partially in effect.

Because this dispute unfortunately remains very much live, and because Plaintiffs easily have established their standing to proceed, the Court should deny Defendants' motion to dismiss. It should also hold that Plaintiffs have met their burden under the traditional four-part test for an order temporarily restraining Defendants from continuing to implement or enforce the M-25-13 funding freeze.

## ADDITIONAL FACTUAL BACKGROUND

### A.    Memo M-25-13 Ordered a Broad Halt on Open Awards in Order to Allow Implementation of Several Executive Orders

OMB's Memo M-25-13 exists in relationship, and tension, with seven executive orders that it cites, Memo at 1–2:

- Protecting the American People Against Invasion (Jan. 20, 2025)
- Reevaluating and Realigning United States Foreign Aid (Jan. 20, 2025)
- Putting America First in International Environmental Agreements (Jan. 20, 2025)
- Unleashing American Energy (Jan. 20, 2025)
- Ending Radical and Wasteful Government DEI Programs and Preferencing (Jan. 20, 2025)
- Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government (Jan. 20, 2025)
- Enforcing the Hyde Amendment (Jan. 24, 2025)

The Memo explains that "[t]o implement these orders, each agency must complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders." Memo at 2. Meanwhile—separately—the Memo commands all federal agencies that, "[i]n the interim, to the extent permissible under applicable law," they "**must temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by" the executive orders. *Id.* (emphasis in original).

In other words, the Memo first separates the implementation of the executive orders—which, in its words, requires a comprehensive analysis—from its interim directive to freeze the funds. Second, it separates out two categories of funding that must be paused: "all activities related to obligation or disbursement of all Federal financial assistance" and "other relevant agency activities that may be implicated by the executive orders."[1] Memo at 2.

---

[1] The two clauses are separated by a comma: the phrase "that may be implicated by the executive orders" therefore modifies only "other relevant agency activities."

This separation makes sense, because several of the executive orders do not require a freeze of funds at all. *Putting America First in International Environmental Agreements*, for example, says nothing about financial assistance programs.[2] *Enforcing the Hyde Amendment* just revokes two prior executive orders.[3] *Defending Women from Gender Ideology* merely requires agencies to "assess" grants.[4] Similarly, *Ending Radical and Wasteful Government DEI Programs* provides agencies sixty days in which to terminate, to the maximum extent allowed by law, equity-related grants; it does not provide for an immediate pause.[5]

While some of the executive orders do purport to require the relevant agency to take action to pause or end certain disbursements—on grants supporting undocumented people, *Protecting the American People Against Invasion*,[6] certain foreign aid, *Reevaluating and Realigning United States Foreign Aid*,[7] and funds appropriated through the Inflation Reduction Act of 2022 or the Infrastructure Investment and Jobs Act, *Unleashing American Energy*[8]—these requirements in no way cover *all* disbursements of open grants across the government. The directive to

[2] https://www.whitehouse.gov/presidential-actions/2025/01/putting-america-first-in-international-environmental-agreements/

[3] https://www.whitehouse.gov/presidential-actions/2025/01/enforcing-the-hyde-amendment/

[4] https://www.whitehouse.gov/presidential-actions/2025/01/defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal-government/

[5] https://www.whitehouse.gov/presidential-actions/2025/01/ending-radical-and-wasteful-government-dei-programs-and-preferencing/

[6] https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-american-people-against-invasion/

[7] https://www.whitehouse.gov/presidential-actions/2025/01/reevaluating-and-realigning-united-states-foreign-aid/

[8] https://www.whitehouse.gov/presidential-actions/2025/01/unleashing-american-energy/)

do *that* comes from the Memo, not the executive orders.[9] And the text of the executive orders is difficult to square with the broad freezes on open awards that remain in place, as detailed below.

**B. Agencies Have Implemented Broad Freezes to Payments on Open Awards, Even After the Court Entered an Administrative Stay**

Minutes before the Memo was set to take effect, this Court entered an emergency stay for the express purpose of "maintain[ing] the status quo [with respect to open grants] until the court may rule on Plaintiffs' motion," and in response to the government's own suggestion that additional time was needed for briefing and full consideration of the relevant legal issues. Order, Dkt. No. 13, at 4. The Court's order was explicit that it acted to "block[] executive action" by temporarily halting Defendants' "direction that agencies 'pause . . . disbursement of Federal funds under all open awards.'" *Id.*

Despite that order, open awards of federal financial assistance have not only remained frozen but have become frozen, even after the Court issued its administrative stay. For example, the National Science Foundation appears to have sent an e-mail to staff at 9:22 p.m. on Tuesday, January 28—more than four hours

---

[9] To the extent OMB seeks to rely on the "guidance" it issued around the Memo, it does not save them. *See* "OMB Q&A Regarding Memorandum M-25-13" (Jan. 28, 2025), https://www.whitehouse.gov/fact-sheets/2025/01/omb-q-a-regarding-memoran dum-m-25-13/. The "guidance" states that "[a]ny program not implicated by the President's Executive Orders is not subject to the pause." *Id.* (emphasis removed). But, of course, "implicated" is significantly stronger than the directives actually contained in those executive orders. Once again, OMB's directive exceeds their scope. Moreover, the government is not in compliance with the supposed guardrails the "guidance" provides. It states that "[f]unds for small businesses" will not be paused, *id.*—but, as the declarations Plaintiffs have submitted show, that is simply not the case.

after the Court ordered an administrative stay—instructing them to continue carrying out the freeze on open awards. *See* Bobby Kogan, @bbkogan.bsky.social, Bluesky Post (Jan. 28, 2025 10:29 PM), https://bsky.app/profile/bbkogan.bsky.social/post/3lgtzpevuys2b.

The text of that e-mail—a "Message to the NSF principal investigator community"—was also posted on an NSF website. *See* Ex. B. It explains that the "Office of Management and Budget Memorandum M-25-13, issued on Jan. 27, 2025, directs all federal agencies to conduct a comprehensive review of their financial assistance programs to determine programs, projects and activities that may be implicated by the recent executive orders. Therefore, all review panels, new awards *and all payments of funds under open awards* will be paused as the agency conducts the required reviews and analysis." *Id.* (emphasis added).

NSF goes on to explain that "[a]ll NSF grantees must comply with these executive orders, and any other relevant executive orders issued, by ceasing all non-compliant grant and award activities. . . . In particular, this may include, but is not limited to conferences, trainings, workshops, considerations for staffing and participant selection, and any other grant activity that uses or promotes the use of diversity, equity, inclusion and accessibility (DEIA) principles and frameworks or violates federal anti-discrimination laws." *Id.*

State Attorneys General who are separately challenging the freeze in a different case have submitted evidence, in the form of more than 100 pages of declarations from state officials across the country, describing sweeping freezes of

hundreds of millions of dollars in funds that cannot possibly be explained as mere implementation of the specific executive orders. *See* Exs. B–C. Arizona, for example, reported that *all* funding from the Departments of Labor and Health and Human Services—approximately $200 million—was inaccessible as of January 28 and that the state's inability to access these funds "will have an immediate impact on [its] operations and daily activities." Ex. C at 8–9. Defendants cannot hope to describe that sweeping freeze as mere implementation of the relevant executive orders. So too, Colorado was unable to access payments on open federal awards that the state uses to fund public safety agencies such as the Colorado Department of Homeland Security and Emergency Management, among others. *Id.* at 30–32. Rhode Island was completely unable to access the HHS Payment Management System "through which most federal grant dollars flow." *Id.* at 109.

As set forth in Exhibit D, ¶ 11, open federal awards to one rural community health center remain frozen. If they are not restored in 14 days, the center will have to close clinics, local hospitals will experience a "catastrophic" loss of the health center's physicians, the center's dental services will be "debilitated," and patients will lose care. *Id.* ¶¶ 15-16. Some tribes remain unable to log in to their DOJ and HUD grant portals even after the Court's administrative stay and report that if they are unable to do so by the end of the week, they will need to lay off victim-services employees. Ex. E ¶¶ 17-19. Funds under the Tribal Assistance for Needy Families program have not been deposited into another tribe's account, which if not rectified will require furloughing employees by February 10 and will

disrupt "essential day-to-day services like healthcare, sanitation, housing and food assistance, child safety, and more." *Id.* ¶¶ 26.

As the Court correctly observed at the January 28 hearing, while the government says it is "limiting [the freeze] to certain programs that are the subject of these executive orders . . . that doesn't seem to be the way that this is rolling out." Tr. of Jan. 28 Hrg. at 11.

### C. The Government Purported to "Rescind" the Memo, Then Announced that the Funding Freeze Remains in Effect

In response to this lawsuit and the Court's administrative stay, Defendants on Wednesday, January 29, purported to rescind Memo M-25-13 through the issuance of Memo M-25-14. ECF No. 18-1. Memo M-25-14 states: "OMB Memorandum M-25-13 is rescinded. If you have questions about implementing the President's Executive Orders, please contact your agency General Counsel." *Id.* That purported rescission was subsequently widely reported on in the press.

Shortly after Memo M-25-14 was publicized, White House Press Secretary Karoline Leavitt announced on social media that the purported "rescission" of the federal funding freeze was, in fact, "NOT a rescission of the federal funding freeze":



Leavitt, *supra*. This social media post explained that Memo M-25-14 had issued specifically "[t]o end any confusion created by the court's injunction." *Id.* The government's position here is perplexing: If the executive orders alone supposedly implemented the federal funding freeze, then why was the Memo necessary in the first place?

### D. The Government's Statements and Actions Have Obscured the Extent of and Basis for Continuing Freezes on Open Awards.

If the government hoped to "end any confusion" about its freeze on open awards, it failed. From the beginning, the government has proved unable to answer even basic questions about the extent of the freeze. *See, e.g.*, Alexander Hutzler, ABC News, *Trump White House tries to clarify confusion over abrupt federal assistance freeze* (Jan. 28, 2025), https://abcnews.go.com/Politics/trump-white-house-clarify-confusion-abrupt-federal-assistance/story?id=118184086. The press secretary's statement that the federal funding freeze remains in effect has done little to clarify. As noted above, Plaintiffs

have also continued to receive reports of frozen payments on open awards and recipients being unable to access funding portals.

In many cases, the reasons for the continued freeze are unclear. In others, the government appears to be shifting to a story that the funds have been frozen not in response to OMB's command in Memo M-25-13 but directly by the executive orders cited in that memo. The NSF website, for example, has now been updated to say that "[a]ll NSF grantees must comply with these executive orders [i.e., those cited in Memo M-25-13], and any other relevant executive orders issued, by ceasing all non-compliant grant and award activities." Nat'l Science Foundation, *NSF Implementation of Recent Executive Orders*, https://new.nsf.gov/executive-orders.

There is no explanation, however, of whether or how all NSF grants relate to those executive orders. Recent reporting states that NSF's online payment system remains down, freezing the salaries of postdoctoral researchers who rely on NSF grants. StatNews, *National Science Foundation suspends salary payments, leaving researchers unable to pay their bills* (Jan. 30 2025), https://www.statnews.com/2025/01/30/trump-funding-freeze-national-science-foundation-suspends-salary-payments/. The fallout? "One scientist texted his landlord to say February rent would be late. Another wasn't able to pay her credit card bill. Yet another wondered how much longer he could afford his mortgage." *Id.*

Another example: One of Plaintiff MSA's members remains locked out of her small business funding. Ex. F ¶18.She does not receive that funding through the Infrastructure Act or the Inflation Reduction Act. It is not foreign aid. It is not

equity-related. It does not serve undocumented people. It is simply a small business grant to help her company's work on scientific research and development. There is no basis in the executive orders Plaintiffs could identify that explain why her funds remain frozen. The continued freeze gives the lie to the idea that the freeze is only emanating from the executive orders, and to OMB's "guidance" that small businesses will not be affected. And the continued freeze appears to violate this Court's order.

Along similar lines, the states separately challenging OMB's funding freeze submitted additional evidence yesterday that the EPA has continued to implement Memo M-25-13 not only after the Court entered an administrative stay but even after the government's purported "rescission." *See* Ex. A at 6. In response to inquiries from a private nonprofit and a state agency regarding their continued inability to access the Automated Standard Application for Payments system that federal agencies use to disburse federal financial assistance under open awards, EPA stated via email that: "EPA is working diligently to implement the Office of Management and Budget's memorandum, Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs" and that "[t]he agency is temporarily pausing all activities related to the obligation or disbursement of EPA Federal financial assistance at this time." *Id*.

Defendants' opposition seeks to characterize the freeze (at 3), counterfactually, as having *always* been limited to "funding implicated by the President's executive orders," even though the Memo by its terms ordered a freeze

on "*all* activities related to obligation or disbursement of *all* Federal financial assistance," Memo at 2, and was so understood by the agencies that continued to implement it even after this Court had entered an administrative stay, *see* Ex. B. (agency instruction to staff that "*all payments of funds under open awards* will be paused as the agency conducts the required reviews and analysis"). This characterization at best reflects the continued confusion caused by the government's hasty and arbitrary action and at worst an unconvincing attempt to rewrite history.

## ARGUMENT

### I. The Court has jurisdiction over this matter and should deny the motion to dismiss.

#### A. Plaintiffs have standing to sue on behalf of themselves and their members.

Defendants dispute Plaintiffs' Article III standing to press this suit. But this is not a case where Plaintiffs seek to rely on some attenuated or speculative theory of harm. They or their members are direct recipients of federal financial assistance. They allege that the M-25-13 funding freeze will abruptly deprive them of those funds (or already has, given the flouting of this Court's stay), causing significant disruption and financial harm, and that it targets them or their members based on the exercise of their constitutional rights. Whether the allegations in the complaint are viewed in isolation or in conjunction with the numerous declarations Plaintiffs have submitted, Plaintiffs have easily established their standing to sue on their own behalf as well as their associational standing to sue for their members.

Standing, of course, requires Plaintiffs to establish (1) "injury in fact" that is (2) "fairly traceable to the challenged action of the defendant," and (3) could be "redressed by a favorable decision." *Humane Soc'y of the United States v. United States Dep't of Agric.*, 41 F.4th 564, 567 (D.C. Cir. 2022). To have standing to sue on behalf of its members, an association must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Metro. Washington Chapter, Associated Builders & Contractors, Inc. v. D.C.*, 62 F.4th 567, 572 (D.C. Cir. 2023) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). At the motion-to-dismiss phase, Plaintiffs "need only make a plausible allegation of facts establishing each element of standing." *Cutler v. HHS*, 797 F.3d 1173, 1179 (D.C. Cir. 2015). Only one Plaintiff need establish standing for this case to proceed. *See Massachusetts v. EPA*, 549 U.S. 497, 518 (2007).

*Injury-in-fact.* Plaintiffs have adequately alleged—and their declarations further support—that the M-25-13 funding freeze will cause them and their members injury-in-fact in the form of substantial constitutional and economic harm. Plaintiffs and their members will suffer constitutional injury from the freeze's direct burdening of their First Amendment rights of speech and association. *See* ECF No. 1 ¶¶ 42, 52-54. They will suffer classic economic harm from the sudden loss of

expected payments on outstanding grants, loans, and other forms of federal financial assistance. *See id.* ¶¶ 31-41; *see also* Dkt. Nos. 5-2, 5-3, 5-4, 5-5; Exs. F–J .

Contrary to Defendants' absurd suggestion (at 7-8) that Plaintiffs and their members are not themselves "the object of the government action . . . [they] challenge[]," the challenged freeze will operate directly on Plaintiffs and their memberships by halting payments on open awards to which they are entitled. That is more than enough to show injury-in-fact.

Defendants wholly ignore Plaintiffs' allegations of constitutional harm to themselves and their members, which on their own suffice to show injury. They argue (at 9–10) only that (1) it is "speculative" whether the individual Plaintiffs will suffer economic injury from the abrupt loss of federal financial assistance and (2) Plaintiffs cannot proceed on behalf of their members because they have not identified at least one member. Defendants are wrong on both counts.

First, Plaintiffs have more than met their burden at the motion-to-dismiss phase to plausibly allege that an immediate freeze on federal financial assistance will cause Plaintiffs themselves economic hardship. *See Cutler*, 797 F.3d at 1179. The complaint, for example, alleges that Plaintiff the American Public Health Association "has long received federal grants and funds to carry out its mission," such as by helping to fund the National Council for Environmental Health and Equity, and that the M-25-13 freeze "would take a wrecking ball to APHA's public health programs that receive federal financial assistance and grants." ECF No. 1 ¶ 34; *see also id.* ¶ 41 (describing similar harm to Plaintiff SAGE).

Defendants say (at 9) that these harms are "speculative" because it is possible the freeze "could be as short as [a] day," and OMB can approve programs to continue during the freeze. That argument ignores the language of the Memo itself, which commands an indefinite and near-immediate halt to "all activities related to obligation or disbursement of all Federal financial assistance," Memo at 2, in order to facilitate a review of all such programs. The Memo itself recognizes that this review will take time; it gives agencies until February 10, 2025, to identify the assistance programs they have frozen. And, of course, for some recipients, it is clear that the "pause" will be anything but, and that their funding, once frozen, will not resume. Indeed, the declarations submitted here demonstrate that the pause has not, in fact, been as short as a day—even during the Court-ordered stay thereof.

Second, even assuming that Plaintiffs were required to identify specific injured members in order to establish their associational standing, *but see Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 593-94 (D.C. Cir. 2022) (individual member need not be identified for associational standing where "standing is . . . apparent from the administrative record" (quotation marks omitted)), they have done so, *see* Exs. F–H, K.[10] Plaintiffs therefore have shown their associational standing to press claims on behalf of their members. *See Chamber of Com. of U.S. v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011)

---

[10] Even at the merits stage, an association may establish standing even though its identified members are anonymous. *See Advocs. for Highway & Auto Safety*, 41 F.4th at 594 ("anonymity is no barrier to standing on this record") (citing *NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 86 (D.C. Cir. 2012)). Plaintiffs are already experiencing a real threat of harassment and retaliation, *see infra* at 36; accordingly member declarations are submitted in redacted form to protect their anonymity.

(finding associational standing where plaintiff, "[a]long with its briefs, . . .
submitted declarations from two of its . . . members alleging injury").

*Causation.* The injuries Plaintiffs allege would be the direct result of the
challenged M-25-13 freeze and thus Plaintiffs have shown causation sufficient to
establish their standing. Defendants disagree (at 10) on the grounds that OMB's
command to agencies to freeze funds would not be the cause of those agencies
freezing funds and, anyway, the Memo instructs them to act only "to the extent
permissible under applicable law." As explained in more detail elsewhere, *see infra*
at 22-24, the Memo was not a suggestion but a command to agencies, and they have
treated it as such. It left agencies with no discretion whether or not to follow its
clear command, and therefore Defendants' cited cases (at 10) involving "the
independent action" of third parties "exerci[sing] discretion" are inapplicable here.
So too, and as further explained below in Section II.A.2, the Memo's inclusion of the
boilerplate phrase "to the extent permissible under applicable law" does not insulate
it from review, and certainly does not show that injuries resulting from
implementation of the M-25-13 freeze were not caused by that freeze.

*Redressability.* The relief Plaintiffs seek, including an injunction on
implementation of the M-25-13 funding freeze, clearly would redress the injuries
from that freeze going into effect. Defendants' only response (at 11) is to speculate
that even if the Court enjoined Defendants' implementation of the freeze, other
agencies might still exercise their authority to broadly freeze funds. But the mere
possibility that another actor might inflict similar harms on Plaintiffs does not show

a lack of standing here. Nor have Defendants claimed that any other agency would have the authority to impose the sweeping freeze that Defendants ordered.[11]

### B. This case is not moot.

Defendants next contend that their purported rescission of Memo M-25-13 renders this case moot. But that assertion misapprehends the nature of Plaintiffs' claims and the relief they seek. Moreover, it is contradicted by the facts on the ground, including the government's own statements that it has *not* rescinded "the federal funding freeze," Leavitt, *supra*, and its continued pause on open awards. The only other court to review OMB's action after the purported rescission has indicated that it agrees and entered preliminary relief shortly before Plaintiffs submitted this filing. *See* Order Granting TRO at 10-11, *New York v. Trump*, No. 1:25-cv-00039 (D.R.I. Jan. 31, 2025).

If the government is, as it appears, continuing to "implement or enforce" the funding freeze announced in Memo M-25-13, then Plaintiffs' need for a temporary restraining order remains not only live but pressing, and Defendants' purported "rescission" amounts to no more than an effort to evade the Court's review via (supposed) voluntary cessation. For two related reasons, Plaintiffs' request for relief remains live.

---

[11] Defendants offer no argument that Plaintiffs lack associational standing on germaneness grounds or because the participation of individual members is required here. *See Metro. Washington Chapter, Associated Builders & Contractors*, 62 F.4th at 572. That concession is sound. The interests Plaintiffs seek to protect here are germane to their institutional purposes of supporting their members' ability to advance their missions, which for many depends on being able to compete for and receive federal financial assistance. *See, e.g.*, ECF No. 1 ¶¶ 1-3. Nor is there any reason the participation of any particular member is required in this case.

First, it is well established that "[a] defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 174 (2000). This is just what Defendants claim has happened here: In response to this lawsuit and the Court's stay order, they say they have rescinded Memo M-25-13 and ceased the allegedly unlawful conduct. But basic principles of voluntary cessation make clear that alone is not enough to thwart this Court's jurisdiction (let alone evade its administrative stay). Particularly in light of the government's shifting actions and explanations with respect to the funding freeze, Plaintiffs can have no assurances that the government will not simply resume implementing and enforcing the challenged policy going forward—assuming they fully stopped at all.

The doctrine of voluntary cessation carries particular force in circumstances where "the facts . . . suggest" an attempt at "manipulation of [the Court's] jurisdiction." *Pub. Citizen, Inc. v. FERC*, 92 F.4th 1124, 1128 (D.C. Cir. 2024) (quoting *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 (2001)) (internal quotation marks omitted); *see also Alaska v. United States Dep't of Agric.*, 17 F.4th 1224, 1229 (D.C. Cir. 2021) (explaining that voluntary cessation doctrine applies to federal agencies in circumstances where the government "act[ed] in order to avoid litigation" (quotation marks and citation omitted)). In those situations, "the prospect of manipulation gives us reason to doubt the party's claims that it will not resume the challenged activity once the court dismisses the challenge." *Id.*

19

Here, the government has all but admitted to engaging in just such an attempt. It has said that, notwithstanding the Court's stay and the purported "rescission," the freeze of Federal funds announced in Memo M-25-13 remains in effect, and the only purpose of the "rescission" was "to end any confusion" about the Court's order. *See* Leavitt, *supra*. The Court should not brook the government's transparent efforts to evade the force and effect of its stay order or thwart its jurisdiction to resolve this continuing dispute.

Second, Defendants have not fully stopped the challenged implementation. As described above, the White House publicly announced that the rescission of the document is not a rescission of the policy announced in that document and, consistent with that announcement, payments on at least some open awards remain frozen, even those entirely unrelated to the substance of the executive orders cited in the Memo. As of yesterday, the EPA was informing recipients that it continued to implement the Memo. Ex. A at 6.

If the government is continuing the funding freeze ordered in Memo M-25-13, then plainly it has not ceased the challenged conduct, Plaintiffs' need for immediate relief remains live and pressing, and the Court should decline to dismiss this case and instead, as originally requested, enter an order barring Defendants from "implementing or enforcing" Memo M-25-13—including by continuing to carry out the policy described and ordered in that document, even after its supposed "rescission." *See* ECF No. 5-6 at 2. The Court should also order Defendants to file

regular status reports describing their efforts to ensure Memo M-25-13 is no longer being implemented or enforced across the government. *See id.*

The cases on which the government relies (at 6) misapprehend Plaintiffs' requested relief. In *Row 1 Inc. v. Becerra*, 92 F.4th 1138, 1141 (D.C. Cir. 2024), the court found that a request to vacate a contested policy was moot after the policy had been rescinded. But Plaintiffs did not merely seek the vacation of the Memo—they sought an order barring OMB from *implementing* it. *See* Compl., Dkt. 1 (request for relief). Indeed, in *Row 1* itself—the very case the government cites—the court found that allegations that contractors continued to apply the terms of the rescinded letters were *not* moot. 92 F.4th at 1145. So too here. And *Friends of Animals v. Bernhardt* involved "the government's abandonment of a challenged [policy]" that the Court found it was "inconceivable that the [agency] will attempt to reinstate." 961 F.3d 1197, 1203 (D.C. Cir. 2020). Here there has been no such abandonment.

## II.   Plaintiffs have shown the need for a temporary restraining order.

The Court should enter a temporary restraining order enjoining Defendants from implementing or enforcing the freeze described and ordered in Memo M-25-13. Plaintiffs are likely to succeed on the merits of their claims. Without relief, they and their members will suffer irreparable injury in the form of per se harm to core First Amendment rights, the impairment of their ability to carry out their primary organizational missions, and economic harms severe enough to threaten their very existence. A temporary restraining order is also in the public interest.

**A. Plaintiffs are likely to succeed on the merits.**

Plaintiffs not only state a claim as to their three APA challenges, they are likely to succeed on each.

### 1. The federal funding freeze is final agency action subject to review.

The M-25-13 funding freeze constitutes a final agency action subject to this Court's review under the Administrative Procedure Act. To be final, agency action must (1) "mark the consummation of the agency's decisionmaking process" and (2) determine rights or obligations or otherwise impose "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotations and citations omitted). Defendants dispute only whether the Memo's funding freeze satisfies the second element. Plainly it does.

Recipients of federal financial assistance such as open grants and loans have the right to access funds made available pursuant to the terms of those agreements unless and until the grant or loan is lawfully modified or terminated. Courts thus agree that decisions involving the approval of a particular grant or the terms on which grants will be extended constitute final agency action. *See, e.g.*, *Louisiana v. U.S. Env't Prot. Agency*, 712 F. Supp. 3d 820, 851 (W.D. La. 2024) ("[C]ourts consider the grant of funds as a final agency action."); *Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 337 F. Supp. 3d 308, 329 (S.D.N.Y. 2018) ("[C]ourts routinely hold that agency action is final where it affects grant eligibility criteria."); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 271, 279–80 (E.D. Pa. 2018) (finding final agency action where "DOJ publicly announced

that all grant recipients must comply with" certain new conditions). Whether thought of as an (unlawful) modification to the terms of open awards, the imposition of new conditions on federal financial assistance, or (for many recipients) the termination of federal funding, the funding freeze ordered by Memo M-25-13 straightforwardly imposes legal consequences for recipients.

The M-25-13 freeze is final agency action for another reason as well: It effectively "binds" the agencies to which it is directed, "withdraw[ing] [their] previously-held discretion" with respect to open awards by requiring them to "pause" disbursements and, ultimately, terminate some number of them. *Scenic Am., Inc. v. United States Dep't of Transportation*, 836 F.3d 42, 56 (D.C. Cir. 2016) (citing *NRDC v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011)); *cf. Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127, 149 (D.D.C. 2020) ("*Bennett*'s second prong is satisfied by legal consequences that affect only the agency itself."), *aff'd*, 850 F. App'x 14 (D.C. Cir. 2021). By requiring that agencies "**must temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance," Memo at 2, the Memo's edict binds those agencies' previously held discretion. For this reason as well, the M-25-13 funding freeze is subject to review as final agency action.

Defendants resist this conclusion (at 14) by suggesting that the Memo did not itself determine anything, but merely offered "general guidance" to agencies. That claim is borderline frivolous. The Memo's command was clear: "Federal agencies **must temporarily pause** all activities related to obligation or disbursement of all

Federal financial assistance." Memo at 2. It left no room for the exercise of agency discretion (beyond the boilerplate insertion that they act "to the extent permissible by law," *id.*). Not surprisingly, it was understood by agencies as a command to be promptly carried out—apparently even after the Court issued an administrative stay. *See* Ex. B; *see also generally Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) ("Our cases likewise make clear that an agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding or is applied by the agency in a way that indicates it is binding." (internal citations omitted)).

The cases the government cites (at 14) do not help them here, as they all found that final agency action was not present in "a planning document," *Vill. of Bensenville v. Fed. Aviation Admin.*, 457 F.3d 52, 69 (D.C. Cir. 2006), or where "the agency retained discretion," *Ctr. for Auto Safety v. Nat'l Hwy. Traffic Safety Admin.*, 452 F.3d 798, 809–10 (D.C. Cir. 2006), or where it set forth "contingenc[ies]," *Fund for Animals, Inc. v. Bureau of Land Mgmt.*, 460 F.3d 13, 22 (D.C. Cir. 2006). These findings are all irrelevant in considering the clear directive here.

Even if Defendants were correct that the Memo should be read as a mere suggestion to further action, that would not save Defendants because agency action need not be the final or most proximate cause of legal consequences to qualify as reviewable final agency action. *See, e.g.*, *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 41–45 (D.D.C. 2011) (rejecting claim that agency guidance documents

concerning permitting were "not final because they do not [themselves] mark the grant or denial of the various permits at issue").

As an ancillary point, the government suggests (at 15) that Plaintiffs' challenge is inappropriate because it would require court supervision of compliance. But the government is wrong in saying that the Court cannot fashion tailored relief. Indeed, it has already done so. And an order permanently enjoining Defendants from implementing the allegedly rescinded Memo would neither be unusual nor difficult to oversee. The government should not be permitted to rely on the chaos it has created by flouting this Court's stay, and declaring that the supposed rescission is no rescission at all, to say that relief cannot be fashioned.

Finally, in arguing that there is not a basis of agency action on which to bring a challenge, the government spills a great deal of ink (at 11–15) on the propriety of the executive orders themselves, and agency implementation. This fundamentally misapprehends Plaintiffs' claims. As set forth above, the federal funding freeze emanates from the Memo—not the executive orders—and it is the continued implementation of the Memo of which Plaintiffs complain.[12]

---

[12] The government also complains (at 15) that Plaintiffs are making a "blunderbuss challenge" with "amorphous, generalized claims." This again misapprehends Plaintiffs' claims, which target specific agency action and lay out three ways that action is legally deficient. The mere fact that Defendants' action is so consequential does not shield it from review. And this APA challenge to a specific agency directive bears little resemblance to the cases the government cites, which concerned agencies' compliance with the broad, general terms of their authorizing statutes.

## 2. The freeze is not saved by the inclusion of the phrase "to the extent permissible under applicable law."

Defendants seek shelter (at 17-19) in the fact that the Memo directs agencies, in "temporarily paus[ing] *all* activities related to obligation or disbursement of *all* Federal financial assistance" on 24 hours' notice, an action that OMB itself recognized could implicate trillions of dollars in disbursements, to do so only "to the extent permissible under applicable law." (emphasis added). As Plaintiffs explained, ECF No. 5-1 at 9, and Defendants fail to rebut, the inclusion of that boilerplate cannot possibly insulate the M-25-13 from attack, particularly when the clear effect of the Memo would be—and, indeed, was—to initiate a broad freeze of open awards without particularized review. Such particularized review would have been impossible in any event.

Defendants get nowhere relying on *Building and Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28, 30 (D.C. Cir. 2002). That case concerned an order directing agencies to take certain actions with respect to bids on construction projects, "to the extent permitted by law." *Id.* at 29. That case therefore involved a starkly different factual context from this case. A qualifier such as "to the extent permissible" may well have real effect in the slow-moving and complex world of government contracting, where officials have an opportunity to consider and apply any relevant provisions of law. Memo M-25-13's arbitrary deadline and confused rollout effectively guaranteed that agencies would not have the same opportunity here.

26

And even if it were realistic that the phrase "to the extent permissible under applicable law" could have been given any real effect in the circumstances here, that would not preserve the M-25-13 from being held unlawful as arbitrary and capricious. The mere fact the OMB (in its telling) did not order agencies to do something unlawful would not itself establish that OMB's directive satisfied the basic standards of rationality required by the APA.

### 3. Plaintiffs are likely to succeed on their claim that Defendants lacked statutory authority for the freeze.

In response to Plaintiffs' observation that the M-25-13 freeze is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), and thus unlawful, Defendants point (at 21–22) to a single statutory provision: 31 U.S.C. § 503(a). That provision sets out in highly general terms OMB's areas of responsibility, such as "establishing financial management policies and requirements" and "[i]ssu[ing] such other policies and directives as may be necessary to carry out this section." § 503(a)(2), (14).

Nothing in Section 503(a), however, specifically authorizes issuance of a near-government-wide, indefinite freeze on essentially all federal financial assistance programs. And as the government is surely aware, "[a]n agency's general rulemaking authority plus statutory silence does not . . . equal congressional authorization." *Merck & Co. v. HHS*, 385 F. Supp. 3d 81, 92 (D.D.C. 2019), *aff'd*, 962 F.3d 531 (D.C. Cir. 2020). "The D.C. Circuit has echoed these principles in multiple settings, stating that provisions like those at issue here do not supply an agency carte blanche authority to promulgate rules on any matter relating to its enabling

statute." *Id.* (collecting cases) (internal quotations and citations omitted). There is particular reason for skepticism about the agency's assertion of authority here given the vast practical and economic consequences that it would entail. *Cf. Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." (quotation marks and citations omitted)).

Defendants thus resort (at 20–21) to explaining that OMB is an important budgetary agency. Set aside for a moment that Defendants' arguments here appear flatly inconsistent with their suggestion elsewhere that agencies retain discretion to simply ignore OMB's command. OMB's general purposes are not sufficient to establish that it possesses the statutory authority it alleges here—particularly given the numerous other statutes that more specifically govern the various assistance programs OMB acted to freeze. *See Michigan v. EPA*, 268 F.3d 1075, 1083–84 (D.C. Cir. 2001) (holding that EPA's purposes and general authorities did not convey "some default authority" to act other than as specified in statute).

Defendants also assert (at 21) that "temporary pauses in obligations or payments of appropriations are quite common." But past practice is no substitute for actual statutory authority. And anyway, Defendants muster no precedent remotely resembling the broad, indefinite freeze OMB ordered.

Defendants' one case, *City of New Haven, Conn. v. United States*, actually undermines their position. 809 F.2d 900 (D.C. Cir. 1987). It treated as noncontroversial "routine 'programmatic' deferrals [of payments], by which the

Executive Branch attempts to meet the inevitable contingencies that arise in administering congressionally-funded agencies and programs." *Id*. at 901. But the actual subject of the decision were four discrete "policy" deferrals, undertaken not for administrative reasons but "to advance the broader fiscal policy objectives of the Administration." *Id*. Far from being accepted as legitimate, the maneuver was rejected by both the judicial branch, which held invalid the law under which the administration had acted, and Congress, which passed legislation "overturning the challenged deferrals." *Id*. at 902.[13] Defendants' authorities are inapposite, their attempt (at 21) to minimize an *indefinite* funding free as "short-term" is inaccurate, and their claim to authority finds no basis in law.

### 4.  Plaintiffs are likely to succeed on their claim that the freeze is arbitrary and capricious.

Defendants' attempt to rehabilitate the Memo on arbitrary and capricious grounds fail too. They first say (at 22) the action cannot be arbitrary because it seeks to carry out the President's priorities. By that logic, any action taken to advance the administration's goals would be rational. Defendants next claim the Memo is saved because it explains that its purpose is to "safeguard valuable taxpayer resources" and allow for review of existing awards. But the APA requires that agencies, when pursuing their policy goals, must act reasonably. Agencies fail

---

[13] Similarly, *James R. Jones, House of Representatives*, B-203057 L/M, 1981 WL 23385 (Comp. Gen. Sept. 15, 1981), addressed minor programmatic deferrals necessary for ordinary administration of the budget—not anything like the sweeping and indefinite pause, for policy reasons, at issue here. As the government's own citation (at 21) reflects, *James R. Jones* is about funds that were *unobligated*—unlike the open grants at issue here.

to clear that bar where they have "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). As detailed below in Section III, OMB's hasty, sweeping, indefinite freeze on open awards threatens to cause and has already caused immense disruption and genuine suffering. The Memo, even while recognizing that it risks affecting trillions of dollars in financial assistance, entirely fails to take into account the obvious and immediate harms produced by abruptly halting that assistance. For this reason alone it is arbitrary and capricious.

Defendants' other arguments fare no better. Contrary to Defendants' apparent belief (at 23), Plaintiffs are not arguing that the Memo was required to go through notice and comment—only that it had to meet basic standards of rationality and did not. Defendants also express doubt (at 23) that the funding freeze implicates any genuine reliance interests that OMB was required to consider. This argument fails for reasons that have already been explained: The reliance interests at stake were enormous and obvious, an indefinite pause (which will not be a "pause" at all for some recipients) cannot accurately be characterized as "temporary," and the Memo left agencies with no discretion to take reliance interests into account in implementing the freeze.

The government relies entirely on *Solenex LLC* v. *Bernhardt*, 962 F.3d 520 (D.C. Cir. 2020), in opposing that argument. But the reliance on *Solenex* is misplaced. In that case, the court explained that the reliance interests the plaintiff flagged "were, in fact, specifically considered and addressed by the Secretary." *Id.* at

30

529. Not so here. The government contends (at 23) that there may be only a reliance interest in the *receipt* of funding, and not the *timing* of the receipt. But it offers no support for that proposition. And indeed, that misconception only underscores the paucity of OMB's analysis on this score. Had OMB actually considered whether grant recipients might rely on receiving funds in a timely manner, it would have realized that many grant recipients specifically rely on funding being disbursed, as scheduled, to make payroll, maintain their programming, and keep their doors open. *See* Ex. I ¶¶ 5-7; Ex. F ¶¶ 19-24; Ex. G ¶¶ 21-24; Ex. H ¶¶ 12-13; Ex. E ¶¶ 17-26; Ex. D ¶¶ 4-16.

Lastly on this point, Defendants have no answer to Plaintiffs' argument, *see* ECF No. 5-1 at 8, that the M-25-13 freeze is arbitrary for the additional reasons that the agency failed to explain why its sweeping freeze had to be implemented on 24-hours' notice rather than a reasonable time frame that would at least give recipients some time to prepare and plan accordingly. Likewise, Defendants failed to provide any cogent explanation for why any "assessment" required by executive orders—which, to be clear, would still be narrower in scope than the freeze mandated by the Memo—could not have occurred while funding continues disbursement as usual.

**5. Plaintiffs are likely to succeed on their claim that the freeze violates the First Amendment.**

Memo M-25-13 orders a "pause" of all federal financial assistance in order to facilitate the identification of and, ultimately, termination of funding for certain recipients. Both the Memo and related actions by the government, including the

executive orders cited in the Memo, establish that recipients will be targeted for loss of funds not merely on the basis of the activities for which they receive funds but for those recipients' unrelated exercise of their First Amendment rights. The Memo denounces "Marxist equity, transgenderism, and green new deal social engineering policies" and announces a dedication to "ending 'wokeness'" (without defining any of these terms). It purports to implement an executive order devoted to excoriating "gender ideology." *Defending Women from Gender Ideology* (Jan. 20, 2025). In remarks about the Memo, the White House press secretary emphasized that the policy's target was funding "for transgenderism and wokeness." WhiteHouse.gov, *Press Briefing by Press Secretary Katherine Leavitt* (Jan. 29, 2025), https://www.whitehouse.gov/briefings-statements/2025/01/press-briefing-by-press-se cretary-karoline-leavitt/.

These sweeping, vague, and hostile denunciations of those holding different views than the administration on matters of deep political conviction and personal conscience cannot be understood as anything but a promise that dissenters will be punished through the loss of already awarded federal financial assistance. That policy directly burdens the exercise of core First Amendment rights of speech and association, having no bearing on the purposes for which federal financial assistance was extended or the recipient's continued fitness to receive such assistance under the terms of the program. It cannot be squared with the Constitution.

The unconstitutional conditions doctrine provides that "the Government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit.'" *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) ("*USAID*"). Defendants seek (at 24-25) to hide behind the principle that "the government may place speech-restrictive conditions on participation in its programs if those conditions are confined to the scope of the program." *Archdiocese of Washington v. Washington Metro. Area Transit Auth.*, 897 F.3d 314, 336 (D.C. Cir. 2018); *see also USAID*, 570 U.S. at 217 ("Congress can, without offending the Constitution, selectively fund certain programs to address an issue of public concern, without funding alternative ways of addressing the same problem." (citing *Rust v. Sullivan*, 500 U.S. 173 (1991)). That principle is no help to Defendants here.[14]

The government's targeting of current recipients who are in some way associated with "wokeness," "transgenderism," "gender ideology," and "Marxist equity" is plainly not an effort to "specify the activities Congress wants to subsidize" via the countless and varied grant programs to which the M-25-13 freeze applies. *USAID*, 570 U.S. at 214. Those programs themselves, along with application statutes, regulations, and agency guidance, define the activities they are meant to subsidize. Current recipients of federal financial assistance have already, by definition, established that they are engaged in "activities Congress wants to

---

[14] Defendants also argue (at 24-25) that the "pause" does not implicate the First Amendment because it "applies evenly to *all* recipients in the programs implicated by the President's Executive Orders." But even if the pause did apply only (and "equally") to all disfavored speakers, that would not save it from First Amendment challenge.

subsidize." The M-25-13 freeze announces that the executive branch nonetheless will *not* fund them, on the ground that it disagrees with their positions on matters protected by the First Amendment. Grant recipients that for years have received federal funding to carry out beneficial activities that Congress has chosen to subsidize need fear that money disappearing simply because the administration in some way associates them with undefined pejoratives such as "wokeness."

Because the freeze will deprive existing recipients of funding they have already been determined eligible for, it cannot be defended as merely defining what sorts of activities are eligible for federal subsidy. *Cf. Westchester Legal Servs., Inc. v. Westchester Cnty.*, 607 F. Supp. 1379, 1382-84 (S.D.N.Y. 1985) (granting preliminary injunction where government actor cancelled existing contract because of recipient's exercise of protected First Amendment rights).

## B. Without a temporary restraining order, Plaintiffs, their members, and many others will be irreparably harmed.

### 1. The freeze will inflict per se constitutional harm by stifling the rights of free speech and association.

It is well established by both the Supreme Court and the D.C. Circuit that "[t]he loss of First Amendment freedoms, for even minimal periods of time, *unquestionably constitutes irreparable injury*." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (emphasis added) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)); a*ccord Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). As explained, the M-25-13 freeze poses just such a threat to protected freedoms and therefore will cause irreparable harm to Plaintiffs,

their members, and others. Defendants fail even to address this controlling precedent or the constitutional harms their actions threaten.

### 2. The freeze will inflict irreparable harm by preventing Plaintiffs from carrying out their primary missions.

Plaintiffs explained in their motion that without a temporary restraining order they "will also suffer concrete, and indeed existential injuries to their mission, as entire programs will simply disappear." ECF No. 5-1 at 12. Defendants again have no answer to this, yet "the D.C. Circuit has confirmed" that "'obstacles' that 'unquestionably make it more difficult for [an organization] to accomplish [its] primary mission . . . provide injury for purposes <u>both</u> of standing and irreparable harm.'" *Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 56 (D.D.C. 2020) (emphasis in original) (quoting *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)); *see also Open Communities All. v. Carson*, 286 F. Supp. 3d 148, 178 (D.D.C. 2017) (finding irreparable harm and granting injunction where agency action would "perceptibly impair [plaintiff's] programs and directly conflict with [its] mission" of assisting families receiving housing vouchers "gain access to greater opportunity"). *Cf. generally FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (recognizing that organizations suffer injury when government action "perceptibly impair[s]" their ability to carry out their core mission or "directly affect[s] and interfer[s] with [their] core business activities").

The funding freeze will "unquestionably make it more difficult" for Plaintiffs and their mission-oriented members to carry out their core purposes. Indeed, the obstacle here is even more direct and obvious than in other cases where courts have

found irreparable injury, *e.g.*, *Open Communities*, 286 F. Supp. 3d at 178, because the freeze will abruptly halt funding that in many cases enables Plaintiffs and their members to accomplish their organizational missions. *See also* [Ellison decl] ¶¶ 13-15; [Strickland decl] ¶¶ 21-31.

Plaintiffs expect that there are many more examples of grant recipients who face irreparable injury, but do not wish to share this publicly due to threats of retaliation. This morning, Elon Musk, a close presidential advisor and purported leader of the U.S. DOGE Service, retweeted and pinned at the top of his X account a post from Joe Lonsdale, stating that "we're engaged in a war that will decide the trajectory of our civilization, and NGO's [sic] are a major front. . . . Trump is fighting leftist judges over his federal grant freeze . . . . What can we do? TO ARMS."



https://x.com/JTLonsdale/status/1885226687283290301.

Musk commented: "Tyranny."



https://x.com/elonmusk/status/1885293172458242296.

### 3. The freeze will inflict existential and unrecoverable economic injuries on award recipients.

"[E]conomic loss can constitute irreparable injury . . . where monetary loss . . . threatens the very existence of the movant's business or where the claimed economic loss is unrecoverable (*e.g.*, when the defendant is entitled to sovereign immunity." *AmSurg EC Washington, Inc. v. MGG Grp. Co., Inc.*, No. 23-cv-2416, 2024 WL 2405822, at *2 (D.D.C. Apr. 26, 2024). Here, the economic loss that would be caused by the freeze constitutes irreparable harm for both reasons. It is

unrecoverable due to the federal government's sovereign immunity. And it threatens the very existence of numerous of Plaintiffs' members.

For example, the member of MSA described above who remains locked out of her small business funding has established with specificity that, without relief from this Court, her small business will suffer catastrophic and existential harm from her continued inability to access funds on an open award. *See* Ex. F. Her declaration explains that she relies on an online portal to draw funds twice per month in order to meet payroll and that the portal has remained frozen. *Id.* ¶¶ 12-13, 17-18. It further explains that without access to those funds, her company will be unable to pay its employees or contractors, will be required to lay off its entire staff, and "will cease to exist." *Id.* ¶¶ 20, 21.

Another member of MSA, who runs a daycare that serves low-income families, "will begin sliding toward imminent and certain closure" without "access to the federal funding programs" in which it participates. Ex. K ¶ 20. Without federal funding, the daycare can no longer continue caring for children with subsidized tuition payments. *Id.* ¶ 21. And without that income, the daycare will not be able to meet its monthly operating costs, and would close within two months, at most. *Id.* ¶ 22.

Another declaration, from a member of NCN, describes the impact of the freeze on her small nonprofit's provision of direct services to people with mental health issues, substance issues, or who are experiencing homelessness. Ex. G. Following release of Memo M-25-13, the member was unable to access funds on

open federal awards, which provide roughly half of her group's budget. *Id.* ¶¶ 13-14. Nineteen hours after the Court issued its administrative stay, access eventually returned. *Id.* ¶¶ 10-11. Even just that brief interruption, however, required the member to begin shuttering programs such as assisting people in obtaining birth certificates and ID cards as well as a "Family Reunification" initiative that helps people without the means to visit their families in other parts of the state or country. *Id.* ¶¶ 20-24. If the freeze on funds were to resume, the member would be forced to again shut down certain vital programs immediately and eventually wind down all operations, with dire consequences for those who depend on the services the group provides. *Id.* ¶¶ 25-30.

Another declarant, a member of APHA who chairs the board of a small nonprofit dedicated to providing community health care services, also explained how his organization, which relies on open federal grants for nearly all its funding, would be severely and irremediably harmed by the freeze. Ex. H. His organization continues to be unable to draw funds through the portal provided by HHS. *Id.* ¶¶ 9-11. If funds remain frozen by Tuesday, February 4—i.e., the day after the scheduled hearing in this case—the member's organization will not have money to make payroll and will face other irreparable harms to its ability to provide care. *Id.* ¶¶ 12-15.

## C. The equities and public interest require relief.

Finally, the balance of equities heavily favors a temporary restraining order here. The M-25-13 freeze is unlawful, and the government has no legitimate

interest in its continued implementation. The government's purported "rescission" all but concedes the point that Defendants will not be harmed if they are unable to implement that freeze.

The government further ignores the public interest beyond Plaintiffs' injuries. Plaintiffs and their members have explained in detail how the freeze harms not only them, but also other similarly situated grant recipients, and the people that they serve. *See* Ex. I ¶¶ 5-7; G ¶¶ 21-32; Ex. J (text of speech from NCN member explaining that a federal grant funding pause will cause her organization to lose half of their state funding for program that provides no-cost preschool to income-eligible 4-year-olds); *see also* Ex.C.

Reporting confirms what Plaintiffs know: under the OMB freeze, preschools were unable to pay their staff;[15] disaster aid to Los Angeles and North Carolina would stop abruptly;[16] elderly people who depend on Meals on Wheels to eat did not know if they would have food;[17] an Alabama city worried it would not receive funding to fix their drinking water system;[18] scientists, told to stop working on grant-funded projects, faced missing opportunities to present their work;[19] a nonprofit serving mostly people who are elderly, have disabilities, are on fixed income, and/or are living in poverty is staring down $128,729 of unpaid

---

[15] https://www.reuters.com/world/trump-orders-pause-all-federal-grants-loans-2025-01-28/
[16] *Id.*
[17] https://apnews.com/article/donald-trump-pause-federal-grants-aid-f9948b9996c0c a971f0065fac85737ce
[18] *Id.*
[19] https://www.cnn.com/2025/01/29/us/federal-grant-pause-what-we-know-hnk/index.html

expenditures for activities already conducted under HUD grants and feels that its existence is threatened;[20] Plaintiffs have likewise received reports that several Head Start programs are still unable to draw down funds and are planning not to be open on Monday if the situation does not change—and so much more. *See, e.g.*, Ex. C (setting out in detail the numerous state-run programs that will be affected by a continuation of the freeze). The government does not attempt to describe how these results are in the public interest.

### D. Injunctive relief should not be stayed.

The Court should deny Defendants' request (at 30) that it stay its injunctive relief, which Defendants make no effort to justify under the traditional four-part test governing that form of relief. Defendants voice objections to this Circuit's precedent approving nationwide relief, *see* ECF No. 5-1 at 15-16, but that precedent is binding here, and in any event irrelevant to the question of a stay. They bristle at the proposed requirement to file periodic status reports, but those requirements are reasonable (particularly in light of the government's conduct inconsistent with the administrative stay), specifically described, and again irrelevant to whether a stay is needed. More fundamentally, Defendants' request that the Court stay its temporary restraining order would make that order self-defeating by allowing the very irreparable harm the Court would be acting to address.[21]

---

[20] https://nwfairhouse.org/news/2025/northwest-fair-housing-alliance-is-at-risk-of-lo sing-federal-funding-to-provide-essential-housing-support-services

[21] Although Plaintiffs strenuously argue that dismissal is not warranted, should the Court be inclined to disagree, Plaintiffs respectfully submit that it would be premature to dismiss without providing an opportunity for Plaintiffs to file an amended complaint. In the ordinary course, Plaintiffs would have 21 days to amend as of right. Fed. R. Civ. P. 15(a). Given the government's shifting position on the

## CONCLUSION

For all these reasons, and those in Plaintiffs' opening brief, this Court should

grant the temporary restraining order and deny the motion to dismiss.


Dated: January 31, 2025                Respectfully submitted,

                                       /s/ *Kevin E. Friedl*

                                       Kevin E. Friedl* (Admitted only in New
                                       York; practice supervised by DC Bar
                                       members)
                                       Jessica Anne Morton (DC Bar No. 1032316)
                                       Kaitlyn Golden (DC Bar No. 1034214)
                                       Robin F. Thurston (DC Bar No. 1531399)
                                       Skye L. Perryman* (DC Bar No. 984573)
                                       Will Bardwell* (DC Bar No. 90006120)
                                       Democracy Forward Foundation
                                       P.O. Box 34553
                                       Washington, DC 20043
                                       (202) 448-9090
                                       kfriedl@democracyforward.org
                                       jmorton@democracyforward.org
                                       kgolden@democracyforward.org
                                       rthurston@democracyforward.org
                                       sperryman@democracyforward.org
                                       wbardwell@democracyforward.org.

                                       *admitted *pro hac vice*

---

freeze, and the chaotic factual landscape that has resulted, it would be
fundamentally unfair to deprive Plaintiffs of that right because of their compliance
with this Court's order requiring a prompt response to the motion to dismiss.

**CERTIFICATE OF SERVICE**

On January 31, 2025, I caused the foregoing and accompanying declarations and proposed order to be filed electronically via the Court's CM/ECF system, which provides electronic notice to all counsel of record. I further caused those documents to be served on pro se movant Beatrice Adams at the mailing address she has entered on the record.

Dated: January 31, 2025                    */s/ Kevin E. Friedl*
                                            Kevin E. Friedl