**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| National Council of Nonprofits, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 1:25-cv-239 (LLA) |
| ) | |
| Office of Management and Budget, *et al*., ) | |
| ) | |
| Defendants. ) | |

**<u>DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

INTRODUCTION ...............................................................................................................1

ARGUMENT ...................................................................................................................3

I.   This Court Lacks Jurisdiction Over Plaintiffs' Claims ................................................3

  A.   Plaintiffs Lack Standing to Seek Prospective Relief ..............................................3

    1.   Injury in Fact................................................................................................3

    2.   Causation......................................................................................................5

    3.   Redressability................................................................................................7

  B.   Plaintiffs' Claims Are Moot Because the Challenged Action Has Been Rescinded............7

II.  Plaintiffs' Claims Are Not Otherwise Judicially Cognizable..................................11

  A.   Plaintiffs Concede That They Cannot Challenge the President's Executive Orders
       or Unnamed Agencies' Implementation of Those Orders..................................11

  B.   The OMB Memo Is Not Discrete, Final Agency Action .................................12

III. Plaintiffs Fail to State Any Valid Claims .............................................................15

  A.   The D.C. Circuit Has Confirmed that Agencies Are Required to Implement the
       President's Agenda, Consistent with Law, Which Is All That the OMB Memo
       Requires ......................................................................................................15

  B.   OMB Undoubtedly Has Authority to Advise Agencies on Implementing the
       President's Budget Directives ........................................................................16

  C.   A Temporary Pause in Funding Is Not Arbitrary and Capricious .....................18

  D.   The Government May Implement Its Policy Views Through Financial Assistance
       Programs Without Running Afoul of the First Amendment .............................21

CONCLUSION...............................................................................................................23

## INTRODUCTION

The President of the United States has authority to direct agencies to implement his agenda consistent with the law. And federal agencies are legally bound to follow those directives, to the extent permissible by law. These uncontroversial principles govern this case and require its dismissal, consistent with binding D.C. Circuit precedent. *See, e.g.*, *See Bldg. & Const. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) ("[T]he President's power necessarily encompasses 'general administrative control of those executing the laws,' throughout the Executive Branch of government, of which he is the head." (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926), citation omitted)); *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) ("[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law.").

Plaintiffs' opposition memorandum (ECF No. 24) scarcely acknowledges these principles, let alone the degree to which their claims would intrude on the separation of powers. Specifically, Plaintiffs' lawsuit names a single agency as a defendant, and challenges a single agency action that has now been withdrawn. *See* Office of Management and Budget (OMB), Mem. M-25-13, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* (Jan. 27, 2025) ("OMB Memo"). Yet Plaintiffs—only a handful of whom actually receive Federal grants—argue that they are entitled to sweeping relief, disabling every Executive Branch agency from implementing the President's agenda with respect to all grant recipients. And Plaintiffs expressly request that this Court become an overseer of all Federal disbursements, with ongoing oversight through regular status reports. There is simply no legal basis for such claims, and this entire lawsuit should be dismissed for several reasons.

First, Plaintiffs have not established standing to seek prospective relief. Even were the Court to consider the factual declarations submitted by Plaintiffs, they cannot overcome the

fundamental problem that it is speculative whether any alleged injuries are caused by the challenged OMB Memo (as opposed to independent agency actions), or redressable by an Order from this Court against the OMB Memo. Moreover, because this suit challenges only the OMB Memo, their claims against that Memo are moot.

Second, Plaintiffs make several important concessions narrowing the scope of their claims. Plaintiffs concede that they cannot challenge the President's Executive Orders, and they likewise concede that they cannot challenge non-defendant agencies' implementation of those Executive Orders. These limitations on Plaintiffs' claims are critical to avoid intruding even further into the Executive Branch's lawful authorities. Thus, to the extent Plaintiffs' claims are allowed to proceed in any fashion, the Court should codify these concessions in a dismissal Order confirming that Plaintiffs' claims here are not challenging the President's Executive Orders or non-defendant agencies' implementation of those Orders.

Third, even as to the OMB Memo, Plaintiffs are not challenging a discrete, final agency action. The OMB Memo did not itself institute a pause or delay of any federal funding, and thus it did not determine legal rights or consequences. Moreover, Plaintiffs' efforts to characterize their claims as challenging something broader than the OMB Memo—*i.e.*, a "federal funding freeze" apart from what's reflected in the OMB Memo, Opp'n at 25—only underscores that they are bringing a broad programmatic challenge that, if allowed to proceed, will place this Court in the untenable role of overseeing the entire Executive Branch's funding decisions.

Finally, on the merits, each of Plaintiffs' claims fails. Consistent with binding D.C. Circuit precedent, the OMB Memo directs agencies to implement the President's agenda to the extent permissible under each agency's own authorities. That is common, well within OMB's statutory authorities, and is not arbitrary and capricious—indeed, OMB was duty-bound to effectuate the

President's agenda.  Plaintiffs' First Amendment claim likewise fails because the Government is allowed to choose what programs it funds without running afoul of the First Amendment.  Nothing in the OMB Memo penalizes Plaintiffs for their speech, and instead the Memo directs agencies to institute a temporary pause in connection with determining the policies to which taxpayer money should be directed.  That is not a First Amendment violation, and for all of these reasons, Plaintiffs' Complaint should be dismissed in its entirety.

**ARGUMENT**

**I.    THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS**

**A.    Plaintiffs Lack Standing to Seek Prospective Relief**

Notwithstanding the additional information submitted in Plaintiffs' Opposition, they still have failed to establish "injury in fact" that is "fairly . . . traceable to the challenged action" and "redress[able] by a favorable decision."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

**1.    Injury in Fact**

First, Plaintiffs state in conclusory fashion that "Plaintiffs and their members will suffer constitutional injury from the freeze's direct burdening of their First Amendment rights of speech and association."  Opp'n at 14.  Even for First Amendment claims, however, "in order to have standing, an individual must present more than allegations of a subjective chill.  There must be a claim of specific present objective harm or a threat of specific future harm."  *Bigelow v. Virginia*, 421 U.S. 809, 816-17 (1975).  And here, Plaintiffs nowhere identify the specific expressive activity for which they claim they are being penalized, or how the OMB Memo's pause as to certain grants involving certain policies operates as a threat of harm to them specifically.  Apart from this claimed First Amendment interest, Plaintiffs have conceded that the non-grant-recipient organizations lack standing to sue in their own right, because they have not shown anything more "than simply a setback to the organization's abstract social interests."  *Food & Drug Admin. v.*

-3-

*Alliance for Hippocratic Med.*, 602 U.S. 367, 394 (2024); Defs.' MTD (ECF No. 21-1) at 9.

Second, Plaintiffs argue that they have adequately alleged injury to those organizations that directly receive Federal financial assistance—purportedly APHA and SAGE. Opp'n at 15-16. But Plaintiffs continue to rely on general assertions—for instance, that APHA "has long received federal grants and funds to carry out its mission." *Id.* at 15. SAGE had one award that was terminated *prior* to issuance of the OMB Memo, *see* ECF No. 5-2 ¶ 12, and it is speculative whether their other grants would even be subject to the OMB Memo's pause. *Cf.* MTD at 9 (citing OMB Guidance, which stated that "OMB has worked with agencies and has already approved many programs to continue even before the pause has gone into effect"). Moreover, Plaintiffs still do not provide any information about when APHA and SAGE next expect grant payments or disbursements under their relevant federal financial assistance programs, making it wholly speculative whether they would be affected by any temporary pause. *See* MTD at 10. Plaintiffs nevertheless urge that these alleged injuries are not speculative, because the OMB Memo "commands an indefinite and near-immediate halt" to Federal financial assistance. Opp'n at 16. But as discussed previously, *see* MTD at 16-17, that broad characterization is contrary to the OMB Memo itself as well as OMB Guidance. And in any event, this generalized assertion cannot substitute for specific information supporting the existence of an alleged direct injury to APHA or SAGE as a result of a temporary pause. *See Defs. of Wildlife*, 504 U.S. at 560 (injury must be "actual or imminent, not conjectural or hypothetical").

Third, regarding associational standing, while Plaintiffs have submitted anonymous declarations from certain members of APHA, MSA, and NCN, *see* Opp'n at 16 (citing Exs. F-H, and K), those declarations cannot establish injury-in-fact sufficient for standing purposes, except as to challenges regarding funding of the specific set of programs described in those declarations.

As an initial matter, Exhibit F to Plaintiffs' Opposition purports to be a declaration from a member of MSA, but the declaration states that the individual joined MSA after the filing of this lawsuit, *see* ECF No. 24-6 ¶ 22, and therefore it is irrelevant for standing purposes. *See Chamber of Commerce of U.S. v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011) ("[S]tanding is assessed as of the time a suit commences."). Thus, at most, Plaintiffs only plausibly assert injury to a Plaintiff member in Exhibits G, H, and K—which relate to a "homeless program[] for a community mental health center," the "Wisconsin Shares Child Care Subsidy" program, and an unnamed "demonstration project to try to address issues of infant mortality and premature birth." *See* ECF No. 24-7 ¶ 5; ECF No. 24-8 ¶ 4; ECF No. 24-11 ¶ 14. It is at best speculative whether, to the extent OMB were allowed to implement the temporary pause, any of those programs would be subject to the pause given their apparent focus on providing assistance to individuals. *See* OMB Memo at 1 n.1 (exempting "assistance received directly by individuals" from any pause); OMB Guidance at 1-2. Regardless, the declarations only further emphasize the grant- and fact-specific nature of the standing analysis, and thus Plaintiffs cannot claim the requisite injury-in-fact for any relief that applies beyond those specific programs. *See Appalachian Voices v. Bodman*, 587 F. Supp. 2d 79, 86 (D.D.C. 2008) (plaintiffs only satisfied injury-in-fact requirement regarding project site they "asserted that they use and enjoy" and not eight other identified sites that "they have asserted absolutely no particularized connection to").

### 2. Causation

Even assuming injury-in-fact, Plaintiffs fail to establish that any injury is caused by the challenged OMB Memo, as opposed to independent federal agencies that administer the relevant programs and are not party to this suit. Plaintiffs respond that the OMB Memo "left agencies with no discretion." Opp'n at 17. But the OMB Memo on its face does not determine which funds or grants should be paused, but rather requires agencies to make that determination, consistent with

their own authorities. *See* MTD at 14; OMB Memo at 2 (instructing federal agencies to temporarily pause certain activities only "to the extent permissible under applicable law"). Thus, any temporary pause in funding would not necessarily be attributable to the OMB Memo itself, as opposed to an independent decision by a non-defendant agency pursuant to its own authorities.

This case is therefore quite similar to the Fifth Circuit's decision in *Louisiana v. Biden*, 64 F.4th 674 (5th Cir. 2023), in which Louisiana sought to challenge an executive order requiring the creation of certain estimates for agencies to use, as consistent with applicable law, when conducting rulemakings. *See id.* at 679. The Fifth Circuit held that Louisiana lacked standing to bring its claims, including because any harms "are traceable to possible agency actions, not to [the executive order] or the Interim Estimates." *Id.* at 684. Similarly here, even if the OMB Memo influences an agency's exercise of its authorities, any temporary pause instituted by the agency would be traceable to that independent agency's action—not the OMB Memo.

As a factual matter, moreover, Plaintiffs' failure to demonstrate causation is further crystallized by the fact that, after rescission of the OMB Memo, funding has allegedly resumed for certain Plaintiffs, *see, e.g.*, ECF No. 24-7 ¶ 15, but remains paused for others, *see, e.g.*, ECF No. 24-8 ¶ 11; ECF No. 24-11 ¶ 19. That just further underscores how speculative it is which funding pauses are traceable to the now-rescinded OMB Memo, as opposed to independent agency actions not subject to challenge in this case. Indeed, as noted above, many of the declarations seem to describe assistance that would not be subject to the OMB Memo's pause, either because they involve assistance to individuals or Plaintiffs have not identified a clear link to an implicated Executive Order. *See, e.g.*, ECF No. 24-6 ¶ 8 (describing grants funding "the development of a Hyper-Compact Neutron Generator"); ECF No. 24-8 ¶¶ 4–8 (outlining grant program for "demonstration project to try to address issues of infant mortality and premature birth"); ECF

No. 24-11 ¶ 2 (describing childcare services funded in part by grants); ECF No. 24-7 ¶¶ 6–10 (describing funding that has resumed for programs regarding the homeless); *cf.* OMB Memo at 1 n.1; OMB Guidance at 1-2.  Given that it is unclear on this record whether these programs fall within the scope of the OMB Memo's intended pause, it is speculative whether any funding pause for these programs was caused by the OMB Memo rather than the "independent action of [a] third party" Federal agency.  *Defs. of Wildlife*, 504 U.S. at 560.

### 3.    Redressability

Plaintiffs claim that "an injunction on implementation of the M-25-13 funding freeze[] clearly would redress" their alleged injuries.  Opp'n at 17.  But Plaintiffs allege pauses in funding by Federal agencies that are not parties to this lawsuit, and "nonparties" "would not be bound" by any injunction in this case.  *Haaland v. Brackeen*, 599 U.S. 255, 293 (2023).  Thus, regardless of any injunction that could be entered here, those Federal agencies would remain free to pause funding of federal financial assistance programs, pursuant to their own discretion or pursuant to the relevant Executive Orders.  Plaintiffs assert that this is a "mere possibility," Pls.' Opp'n at 17, but it is actually a necessary step for any of the Plaintiffs to obtain relief—*i.e.*, unless and until the relevant agencies exercise their own authorities and elect to disburse funds to Plaintiffs, any relief against the OMB Memo would not redress Plaintiffs' injuries.  Thus, this Court cannot redress these alleged injuries, since the federal agencies making independent decisions to pause funding even after the OMB Memo's rescission are not parties to this lawsuit, and "an injunction" against the OMB Memo "would not give [Plaintiffs] legally enforceable protection from the allegedly imminent harm."  *Brackeen*, 599 U.S. at 293.

### B.    Plaintiffs' Claims Are Moot Because the Challenged Action Has Been Rescinded

Plaintiffs' only claims in this case challenge the OMB Memo and the only Defendants in

this case are OMB and the Acting Director of OMB. *See* ECF No. 1 ¶¶ 5-6, 43-61. And Plaintiffs'
requested relief is explicitly tied to the OMB Memo. *See id.* at 18-19 (prayer for relief asking for
declaratory and injunctive relief relating to "Memo M-25-13"). Because the OMB Memo has
been rescinded, Plaintiffs' claims are therefore moot.

In arguing to the contrary, Plaintiffs first respond that the voluntary cessation doctrine
applies here, largely relying on a conclusory assertion that they "can have no assurances that the
government will not simply resume implementing and enforcing the challenged policy going
forward." *Id.* at 19. However, Plaintiffs provide no factual basis for their assertion that the
government might reissue the challenged OMB Memo, and such an assumption would be contrary
to the presumption of good faith that courts routinely accord the government when assessing
voluntary cessation. *See, e.g.*, *Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th
Cir. 2010) ("The government's change of policy presents a special circumstance in the world of
mootness . . . unlike in the case of a private party, [the courts] presume the government is acting
in good faith."); *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir.
2009) ("[G]overnment actors . . . are accorded a presumption of good faith because they are public
servants, not self-interested private parties. Without evidence to the contrary, we assume that
formally announced changes to official governmental policy are not mere litigation posturing.");
*Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1328–29 (11th Cir. 2004)
("[G]overnmental entities and officials have been given considerably more leeway than private
parties in the presumption that they are unlikely to resume illegal activities.").

Plaintiffs further suggest that rescission of the OMB Memo was "an attempt at
manipulation of [the Court's] jurisdiction." Opp'n at 19 (citation omitted). But the only evidence
Plaintiffs point to is a statement that demonstrates the opposite, *i.e.*, a goal of ending confusion.

*See id.* at 10, 20.  This statement did not suggest the rescission was litigation posturing, as opposed to focusing on the legal effect of the President's recent Executive Orders.

Next, Plaintiffs assert that "Defendants have not fully stopped the challenged implementation," asserting that "payments on at least some open awards remain frozen, even those entirely unrelated to the substance of the executive orders cited in the Memo."  *Id.* at 20.  As discussed above, however, Plaintiffs incorrectly assume that any paused funding must necessarily be paused as a result of the now-rescinded OMB Memo.  Even assuming that some funding is currently frozen, Plaintiffs' allegations of continuing adverse effects would not rescue Plaintiffs' moot claims to the extent that any ongoing freeze stems from other agency actions (not challenged in this case) besides the OMB Memo.

While courts have ruled that claims are not moot where there are continuing adverse effects on the parties, it is axiomatic that those continuing effects must arise *from the challenged action*. *See Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (explaining that, in order for a case to be mooted by voluntary action, "interim relief or events" must have "eradicated the effects *of the alleged violation*" (emphasis added)); *S.W. Bell Tel. Co. v. FCC*, 168 F.3d 1344, 1350 (D.C. Cir. 1999) ("Where *an action* has no continuing adverse impact and there is no relief that a court may grant, *any request for judicial review of the action* is moot." (emphasis added)); *Miccosukee Tribe of Indians of Fla. v. United States*, 259 F. Supp. 2d 1237, 1245 (S.D. Fla. Feb. 28, 2003) ("A request for declaratory relief should be dismissed as moot if *the challenged conduct* has no continuing adverse effects on the parties." (emphasis added) (citing *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 122 (1974)).  Here, Plaintiffs cannot escape mootness given that ongoing pauses in funding would not be attributable to the now-rescinded OMB Memo, but rather the result of independent and unchallenged action taken by government agencies that are not defendants in

this case. *See City of Houston, Tex. v. Dep't of Housing & Urban Dev.*, 24 F.3d 1421, 1429 (D.C. Cir. 1994) ("[I]f a plaintiff has made no challenge to some underlying policy, but merely attacks an isolated agency action, then the mooting of the specific claim moots any claim for a declaratory judgment that the specific action was unlawful.").

Notably, Plaintiffs fail to cite any case law supporting an argument that allegations of continuing effects arising from separate action by other government agencies would be sufficient to overcome mootness. Plaintiffs point to *Row 1 Inc. v. Becerra*, 92 F.4th 1138 (D.C. Cir. 2024), noting that "the court found that allegations that contractors continued to apply the terms of [] rescinded letters were *not* moot." Opp'n at 21. But that was a claim that the identical policy was continuing to be applied; here, any agency exercising its own discretion to institute a pause would not be implementing the OMB-directed pause that Plaintiffs seek to challenge. Moreover, Plaintiffs ignore that the Medicare contractors allegedly continuing to implement the rescinded policy were *also* defendants in that case. *See Row 1 Inc. v. Becerra*, No. 22-718, 2023 WL 183687, at *1 (D.D.C. Jan. 12, 2023) (district court decision noting that Plaintiff brought claims against "several Medicare Administrative Contractors"). Thus, it does not support Plaintiffs' effort to escape mootness here based on effects caused by unchallenged actions of non-defendants.

Meanwhile, the district court decision in *Miccosukee Tribe of Indians of Florida v. United States* is instructive. In that case, the plaintiff challenged a water management decision by the U.S. Army Corps of Engineers, called the Interim Structural and Operational Plan ("ISOP"). *See* 259 F. Supp. at 1239. Later, the defendant adopted a superseding plan called the Interim Operating Plan ("IOP"). *See id.* at 1242–43. The court ruled that the plaintiff's claim for declaratory relief was mooted by the adoption of the IOP, despite plaintiff's claims of continuing adverse effects generally caused by the defendant's policies and procedures. *See id.* at 1245. The court noted that

"[a]lthough the IOP certainly appears to incorporate many elements of the ISOPs, which the [plaintiff] alleges have harmed and continue to harm its interests, the IOP supercedes both the ISOP that prompted this litigation and the ISOP 2001 upon which the Supplemental Complaint was based." *Id.* "Thus, the ISOP and ISOP 2001 are already of no further legal force and effect" and "cannot be said to have a continuing adverse effect on the [plaintiff]." *Id.* Therefore, since any grant of relief on the plaintiff's claims "would have no effect on the IOP now in place," plaintiff's claims for declaratory relief were moot and any declaration "would constitute an impermissible advisory opinion." *Id.* Similarly, here, Plaintiffs' Complaint only challenges and asks for relief regarding the OMB Memo, and even if they assert that other Federal agencies have implemented policies that share elements of the now-rescinded OMB Memo, the OMB Memo is not in effect and therefore "cannot be said to have a continuing adverse effect" on Plaintiffs. *Id.* Plaintiffs therefore have not established jurisdiction under both standing and mootness.

## II.    PLAINTIFFS' CLAIMS ARE NOT OTHERWISE JUDICIALLY COGNIZABLE

### A.    Plaintiffs Concede That They Cannot Challenge the President's Executive Orders or Unnamed Agencies' Implementation of Those Orders

Importantly, Plaintiffs' opposition concedes two critical points that narrow the scope of their claims. To the extent this Court allows Plaintiffs' claims to proceed in some fashion, therefore, Plaintiffs' claims must be limited in scope and should expressly *not* extend to the President's Executive Orders or nondefendant agencies' implementation of those Orders.

First, Plaintiffs concede that they cannot seek relief directly against the President or his Executive Orders. *See* MTD at 12-13. It is well-established that courts have no authority to second-guess "discretion[ary]" acts taken by the President "in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867); *see also Franklin v. Massachusetts*, 505 U.S. 788, 827 (1992) (Scalia, J., concurring in part); *Newdow v. Roberts*, 603

F.3d 1002, 1013 (D.C. Cir. 2010).

Second, Plaintiffs also concede that they cannot challenge the actions of unnamed agencies who are not defendants in this action. *See* MTD at 11-12. That includes those unnamed agencies' ongoing implementation of the President's Executive Orders. *See id.* at 13-16. Indeed, Plaintiffs expressly disavow any intent to challenge the Executive Orders or other unnamed agencies' actions. *See* Opp'n at 25 (although "the government spills a great deal of ink . . . on the propriety of the executive orders themselves, and agency implementation," that "fundamentally misapprehends Plaintiffs' claims").

Accordingly, even if this Court allows certain claims to survive, this Court should expressly confirm that Plaintiffs are *not* permitted to challenge the President's Executive Orders or unnamed agencies' implementation of those Orders, and that any such claims are dismissed.

### B.    The OMB Memo Is Not Discrete, Final Agency Action

Even as to Plaintiffs' claims against the OMB Memo, those claims are not justiciable because Plaintiffs do not challenge discrete, final agency action.

First, Plaintiffs continue to ignore that the OMB Memo did not direct that any particular funding be paused. Instead, OMB instructed that *agencies* must determine whether to temporarily pause funding implicated by the Executive Orders, as consistent with the law. *See* OMB Memo at 2. Thus, the OMB Memo itself did not determine legal consequences. *Cf. Fund for Animals, Inc. v. Bureau of Land Mgmt.*, 460 F.3d 13, 22 (D.C. Cir. 2006). Plaintiffs contend that "decisions involving the approval of a particular grant or the terms on which grants will be extended constitute final agency action," Opp'n at 22, but their citations only further prove the point—their cited cases all involve suits against the agency *actually administering the grant funding*, not a claim against a precursor memorandum issued by a separate agency like the OMB Memo here.

Plaintiffs also contend that the OMB Memo is final because it "effectively binds the

agencies to which it is directed, withdrawing their previously-held discretion."  Opp'n at 23 (cleaned up).  But the OMB Memo does not withdraw agency discretion; it reaffirms that agencies must make their own determination as to the legality of any pause.  That is fundamentally different than Plaintiffs' cited authority, which involved creation of a "safe harbor" that precluded an agency from acting in the relevant circumstances.  *Scenic Am., Inc. v. Dep't of Transportation*, 836 F.3d 42, 56 (D.C. Cir. 2016).  And to the extent any agency discretion may have been withdrawn, that would have resulted from the policies set forth in the President's Executive Orders—not any OMB-ordered pause.  *Cf.* OMB Guidance at 1 ("Any program not implicated by the President's Executive Orders is not subject to the pause.").[1]

In an effort to avoid some of the justiciability problems stemming from withdrawal of the OMB Memo, Plaintiffs try to broaden their claims—characterizing them as not just challenging the OMB Memo, but more broadly seeking relief against "the federal funding freeze" that "emanates from the Memo."  Opp'n at 25.  But this effort to recharacterize their claims only further underscores that Plaintiffs are bringing a wide-ranging programmatic challenge, not a challenge to discrete agency action.  Just as in *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), there was no such thing as a "land withdrawal review program" because that was "simply the name by which petitioners have occasionally referred to the continuing (and thus constantly changing) operations of the BLM," *id.* at 890, the same is true for the "funding freeze" here.  There is no singular "funding freeze," but rather that is the name Plaintiffs attribute to the thousands of

_____

[1] Plaintiffs also cite *National Mining Association v. Jackson*, 768 F. Supp. 2d 34, 41–45 (D.D.C. 2011), *see* Opp'n at 24-25. But the final agency action analysis in that opinion appears to have been overruled by Judge Kavanaugh's subsequent opinion in *National Mining Association v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014), which held that the EPA guidance was not reviewable because it "imposes no obligations or prohibitions on regulated entities."  Similarly here, the OMB Memo imposes no obligations on individual grant recipients (who are the purported regulated entities in Plaintiffs' view, *see* Opp'n at 15).

individual decisions made by agencies about whether particular grants or other funding should be paused.  Indeed, Plaintiffs effectively admitted as much at the TRO hearing, stating that their claims seek relief on behalf of "tens of thousands of members" potentially affected by the "many, many grant programs across the country." Tr. of Jan. 28 Hrg. at 6.

Plaintiffs also fail to meaningfully address the inevitable compliance difficulties that would arise if their amorphous claims were allowed to proceed.  *See* MTD at 15-16.  Plaintiffs insist that "tailored relief" is available, Opp'n at 25, but they fail to acknowledge that, in their view, an injunction against the OMB Memo would require this Court to superintend grant disbursements throughout the entire federal government, as confirmed by their own Complaint.  *See* Prayer for Relief, ¶ (c) (requesting an order that Defendants file periodic status reports "confirming the regular disbursement and obligation of federal financial assistance funds").

Moreover, the administrative stay itself highlights such difficulties.  For example, Plaintiffs' opposition repeatedly asserts noncompliance with the Court's stay order based on a statement that the President's Executive Orders remain in effect.  *See, e.g.*, Opp'n at 2, 20. Defendants understood, however, that pauses due to the Executive Orders (and other reasons apart from the OMB Memo) were not encompassed within the administrative stay, as discussed at the TRO hearing.  *See, e.g.*, TRO Hrg. Tr. at 27 ("If there are executive order reasons or rationales for the termination of other grants either before or after OMB's guidance, perhaps they fall into the case as we proceed but they would not be subject to the administrative stay."); *id.* at 29 ("So anything that was terminated pursuant to other executive orders I think is fodder for another lawsuit.").  The inability to fashion specific relief against the OMB Memo (let alone to a "federal funding freeze" that "emanates from the Memo") is because the OMB Memo is not discrete agency action, but rather a collection of countless independent agency actions.  That is an inherent flaw in

Plaintiffs' claims, which requires their dismissal.

### III.    PLAINTIFFS FAIL TO STATE ANY VALID CLAIMS

#### A.    The D.C. Circuit Has Confirmed that Agencies Are Required to Implement the President's Agenda, Consistent with Law, Which Is All That the OMB Memo Requires

Plaintiffs do not dispute the fundamental proposition that the President may direct subordinate agencies to implement his agenda, to the extent permissible by law.  *See, e.g.*, *Sherley*, 689 F.3d at 784 ("[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law."); *Allbaugh*, 295 F.3d at 32 ("[T]he President's power necessarily encompasses 'general administrative control of those executing the laws,' throughout the Executive Branch of government, of which he is the head." (quoting *Myers*, 272 U.S. at 164, citation omitted)).  That is all that the OMB Memo requires and what it is intended to accomplish, and therefore the Memo is lawful.

Plaintiffs contend that "boilerplate" language in the OMB Memo about complying with the law cannot "insulate the [Memo] from attack."  Opp'n at 26.  But the relevant proviso ("to the extent permissible under applicable law") was not boilerplate included only one time—it was repeated in multiple places, *see* OMB Memo at 2, as well as throughout the subsequent OMB Guidance, at 1-2.  Thus, the OMB Memo is legal, just like the executive order at issue in *Allbaugh* that contained similar language.  295 F.3d at 33 ("In the Executive Order, the President directs his subordinates how to proceed in administering federally funded projects, but only 'to the extent permitted by law.'" (modifications omitted)).

Plaintiffs' only response to *Allbaugh* is to portray it as being rooted in "the slow-moving and complex world of government contracting[.]"  Opp'n at 26.  But the challengers in *Allbaugh* certainly did not view government contracting that way.  *See* 295 F.3d at 33 (upholding executive order, even in the face of argument that "it is untenable to require each federal grantee . . . to

challenge a threatened denial of funds . . . because projects are planned and conducted on tight and critical timeframes"). And in any event, the D.C. Circuit's decision was not rooted in the factual context of government contracting; it was based on the President's Article II authority to direct subordinate agencies to implement his agenda. *See id.* at 32 ("Those [executive] officers are duty-bound to give effect to the policies embodied in the President's direction, to the extent allowed by the law."); *see also Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. 2020).

The *Allbaugh* decision therefore reveals an overarching flaw in all of Plaintiffs' claims. It is not unlawful for OMB to tell agencies to implement the President's agenda consistent with the law, as those agencies are already required to do. Nor can Plaintiffs simply assume that agencies will pause funding in a manner that violates the First Amendment or other legal constraints, contrary to the directions in the OMB Memo itself. *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971) (agencies are "entitled to a presumption of regularity"). Because their claims necessarily require assuming that agencies will *not* follow the directive in the OMB Memo to act consistent with the law, Plaintiffs' claims all fail.

### B.   OMB Undoubtedly Has Authority to Advise Agencies on Implementing the President's Budget Directives

Even ignoring *Allbaugh*, Plaintiffs' claims still fail for numerous reasons. Plaintiffs contend that OMB lacks statutory authority to temporarily pause funds, Opp'n at 27, but they ignore that the central purpose of OMB—approved by Congress in connection with the President's reorganization plan—is to "assist[] the President in the preparation of the annual Federal budget and *oversee[] its execution*." Reorganization Plan No. 2 of 1970, Message of the President, 5 U.S.C. App'x 1, reprinted in 1970 U.S.C.C.A.N. 6315, 6316 (emphasis added).

Even based on the authorities in 31 U.S.C. § 503, OMB has authority to issue "policies and directives," including with respect to "[m]onitor[ing] the financial execution of the budget" and

"[p]rovid[ing] overall direction and leadership to the executive branch on financial management matters." 31 U.S.C. § 503(a)(2), (5), (14). Those authorities, naturally read, plainly extend to providing instructions to agencies on temporary pauses in funding to ensure that such funding is consistent with the President's priorities.

As noted, temporary pauses in funding are commonplace, *see* MTD at 21, yet Plaintiffs' theory would nonsensically forbid OMB from providing instructions to agencies in all such circumstances. In response to the documented history of funding pauses, Plaintiffs argue that the D.C. Circuit in *City of New Haven v. United States*, 809 F.2d 900, 908 (D.C. Cir. 1987), "held invalid the law under which the administration had acted," Opp'n at 29. But the invalidity was based on an unconstitutional legislative veto—not a determination that delays in funding were inherently unlawful as Plaintiffs imply.

Plaintiffs also contend that "Defendants muster no precedent remotely resembling the broad, indefinite freeze OMB ordered." Opp'n at 28. But again, that is a distorted characterization of the OMB Memo, particularly in light of the OMB Guidance. Regardless, it is common for Presidents to pause different types of agency action—including funding—based on policy concerns, including directing pauses that are effective immediately and are longer in duration than what the OMB Memo contemplated here. *See, e.g.*, Procl. No. 10,142, *Termination of Emergency With Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction*, 86 Fed. Reg. 7225 (Jan. 20, 2021), § 1(a)(ii) (directing agencies to "pause immediately the obligation of funds related to construction of the southern border wall, to the extent permitted by law," with no specific end date but requiring a plan within 60 days); *Ensuring Responsible Spending of Recovery Act Funds*, 74 Fed. Reg. 12531 (Mar. 20, 2009), § 2(d)(i) ("Where legally permissible, the department or agency shall . . . delay funding of the

project for 30 days[.]"); *see also, e.g.*, Exec. Order. No. 14,008, *Tackling the Climate Crisis at Home and Abroad*, 86 Fed. Reg. 7619 (Jan. 27, 2021), § 208 ("To the extent consistent with applicable law, the Secretary of the Interior shall pause new oil and natural gas leases on public lands or in offshore waters pending completion of a comprehensive review," with no specific end date); Exec. Order No. 13990, *Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis*, 86 FR 7037 (Jan. 20, 2021), § 4(a) ("[T]he Secretary of the Interior shall, as appropriate and consistent with applicable law, place a temporary moratorium on all activities of the Federal Government relating to the implementation of the Coastal Plain Oil and Gas Leasing Program," with no specific end date). Plaintiffs' statutory theory would preclude OMB from implementing any of these measures, a proposition squarely at odds with Article II and the D.C. Circuit's decisions recognizing the President's authority to direct agencies to effectuate his agenda. OMB, as the primary overseer of budget execution, may lawfully assist the President by instructing agencies on how to administer their funding consistent with law.

### C.    A Temporary Pause in Funding Is Not Arbitrary and Capricious

When the Founders designed the Executive Branch under Article II, "they sought to encourage energetic, vigorous, decisive, and speedy execution of the laws." *Clinton v. Jones*, 520 U.S. 681, 712 (1997). Plaintiffs now argue those very features of the OMB Memo are so irrational as to be legally invalid. But there is nothing irrational about a temporary pause in funding, to the extent permissible by law, pending a review to ensure compliance with the President's priorities. That is precisely what OMB and other subordinate agencies are legally required to do; it cannot be irrational for them to comply with the law in such a manner. *Sherley*, 689 F.3d at 784 ("[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law."). Indeed, requiring a federal agency to articulate a rationale for its action—beyond simple compliance with the President's directives—would, in

essence, subject the President's directive to arbitrary and capricious review, contrary to the principle that the President is not an agency under the APA. *Franklin*, 505 U.S. at 800-01.

In any event, the OMB Memo cogently explains that a temporary pause is necessary to "provide the Administration time to review agency programs and determine the best uses of the funding for those programs consistent with the law and the President's priorities." OMB Memo. at 2. This directly connects to the stated goal of "safeguard[ing] valuable taxpayer resources." *Id*. at 1. Plaintiffs argue that "Defendants failed to provide any cogent explanation for why any 'assessment' . . . could not have occurred while funding continues disbursement as usual." Opp'n at 31. But the answer is simple: resources are finite, and the Executive is entitled to ensure that all funding aligns with the President's priorities to the extent permissible by law. The Executive's policy judgment to conserve federal resources in that manner should not be subject to "judicial second-guessing of agency discretion." *Crumpton v. Stone*, 59 F.3d 1400, 1406 (D.C. Cir. 1995); *see also State Farm*, 463 U.S. at 43 (the scope of review under the "arbitrary and capricious" standard is "narrow and a court is not to substitute its judgment for that of the agency.").

Contrary to Plaintiffs' suggestion, the OMB Memo does not "fail[] to take into account the obvious and immediate harms produced by abruptly halting . . . assistance." Opp'n at 30. First, recognizing potential consequences for individuals, the OMB Memo exempted "assistance provided directly to individuals," specifically mentioning "Medicare or social security benefits." OMB Memo at 1 nn.1-2; *see also* OMB Guidance at 1-2. Second, the OMB Memo recognized that, despite the need for a pause and review of certain assistance, there may be some particular circumstances warranting a different approach, and thus provided for a safety valve: "OMB may grant exceptions allowing Federal agencies to issue new awards or take other actions on a case-by-case basis." OMB Memo at 2. Third, the OMB Memo was explicit that it directed only a

temporary pause and review, not anything more significant such as outright cancellation of any grants. And fourth, the OMB Memo provided a delayed effective date, with OMB acting quickly even before that effective date to "approve[] many programs to continue even before the pause has gone into effect." OMB Guidance at 1. Those efforts do not reflect wholesale ignoring of real-world consequences, but rather an attempt to balance those consequences with the stated objectives of "act[ing] as faithful stewards of taxpayer money" and ensuring that federal programs "are being executed in accordance with the law and the new President's policies." *Id.* at 2.

To the extent Plaintiffs disagree with OMB's weighing of the possible consequences, this reflects only a difference in policy perspective. And Plaintiffs do not dispute that, under their theory, the President and OMB would be required to provide agencies a specific period of time before those agencies could be directed to take actions to implement the President's agenda, lest such actions be deemed arbitrary and capricious. That result would be squarely at odds with past Administrations' Executive Orders directing immediate pauses in certain activities, including disbursement of funds. Particularly in light of this history and the impractical nature of Plaintiffs' theory, OMB's reasoning here was sufficient to "meet[] a minimum rationality standard" that entitles it to a "presumpti[on] [of] valid[ity]." *Sierra Club v. EPA*, 353 F.3d 976, 978 (D.C. Cir. 2004) (citation omitted).

As for reliance interests, Plaintiffs still do not carry their burden of proving specific interests in the particular timing of any grant funding. And OMB's instruction to agencies to implement the pause, to the extent permissible by law, does not foreclose agency consideration of any such interests. It is perfectly rational for OMB to expect agencies, as the ones who actually administer grants and know their terms, to determine whether a temporary pause is appropriate for that particular grant and its grantees.

In short, there is nothing irrational about the OMB Memo's acting expeditiously to place a temporary pause on certain forms of assistance, to the extent permissible by law, pending a review to ensure the fundings' usage aligns with Presidential priorities and is not contributing to wasteful spending, as OMB (and individual agencies) are required to do. *Sherley*, 689 F.3d at 784.

### D.    The Government May Implement Its Policy Views Through Financial Assistance Programs Without Running Afoul of the First Amendment

"When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says . . . [t]hus, government statements (and government actions and programs that take the form of speech) do not normally trigger the First Amendment rules designed to protect the marketplace of ideas." *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015). Moreover, as Defendants originally explained (and Plaintiffs do not contest), so long as the government follows existing law, as the OMB Memo and Executive Orders direct, the Administration "'may make value judgment[s]' and "'implement th[ose] judgment[s] by the allocation of public funds.'" *Rust v. Sullivan*, 500 U.S. 173, 192-93 (1991) (quoting *Maher v. Roe*, 432 U.S. 464, 474 (1977)). Those principles foreclose Plaintiffs' claim here.

Plaintiffs criticize certain language in the OMB Memo (and the President's Executive Orders), Opp'n at 32, but that is nothing more than Plaintiffs' policy disagreements masquerading as a First Amendment claim. The OMB Memo does not restrict Plaintiffs' speech, but rather implements the Government's own speech, which Plaintiffs cannot use the First Amendment to challenge. *Cf. Walker*, 576 U.S. at 207 ("[T]he Free Speech Clause helps produce informed opinions among members of the public, who are then able to influence the choices of a government that, through words and deeds, will reflect its electoral mandate.").

Plaintiffs accuse the OMB Memo of being an effort to "facilitate the identification of and, ultimately, termination of funding for certain recipients." Opp'n at 34. But the OMB Memo's

pause applies evenly to all recipients in the programs implicated by the President's Executive Orders. And the Executive, as part of its authority to choose what activities to fund, need not be neutral as to the programs it seeks to review.  Any contrary rule would essentially foreclose the Government from ever pausing or modifying only certain programs.

Nor can the OMB Memo reasonably be portrayed as "a promise that dissenters will be punished through the loss of already awarded federal financial assistance."  OMB Memo at 32. The text of the Memo emphasizes that it is focused on "safeguard[ing] valuable taxpayer resources" and undoing certain policies that do not align with the President's agenda.  OMB Memo at 1.  Again, choosing which policies to fund is not a First Amendment violation for the potential recipients of such funding.  *Cf. O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 725 (1996) ("If the government terminates its affiliation with a service provider for reasons unrelated to political association . . . there will be no First Amendment violation. These are choices and policy considerations that ought to remain open to government officials when deciding to contract with some firms and not others.").

Finally, Plaintiffs invoke the unconstitutional conditions doctrine, Opp'n at 33, but they still do not specify any new condition that has been imposed.  Plaintiffs acknowledge that the government "can, without offending the Constitution, selectively fund certain programs to address an issue of public concern, without funding alternative ways of addressing the same problem." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 217 (2013) (citing *Rust*, 500 U.S. at 173).  They also cite *Archdiocese of Washington v. Washington Metro. Area Transit Auth.* for the point that "the government may place speech-restrictive conditions on participation in its programs if those conditions are confined to the scope of the program."  897 F.3d 314, 336 (D.C. Cir. 2018).  The OMB Memo is well within those principles, and Plaintiffs' theory would transform

every pause or suspension in grant funding on policy grounds into a First Amendment violation. *See* Opp'n at 34 (arguing that "the freeze will deprive existing recipients of funding they have already been determined eligible for" and therefore violates the unconstitutional conditions doctrine). That theory is untenable, and Plaintiffs' First Amendment claim is meritless and should be dismissed.

## CONCLUSION

This entire action should be dismissed, because Plaintiffs have not established this Court's subject-matter jurisdiction and they fail to state any claims upon which relief may be granted.

Dated: February 1, 2025

Respectfully submitted,

BRETT A. SHUMATE
Acting Assistant Attorney General

ALEXANDER K. HAAS
Director

*/s/  Daniel Schwei*
DANIEL SCHWEI
Special Counsel (N.Y. Bar)
ANDREW F. FREIDAH
EITAN R. SIRKOVICH
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel.:    (202) 305-8693
Fax:    (202) 616-8460
Email:    daniel.s.schwei@usdoj.gov

*Counsel for Defendants*