# EXHIBIT L

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL COUNCIL OF NONPROFITS, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>OFFICE OF MANAGEMENT AND BUDGET, et al.,<br><br>*Defendants*. | Case No. 25-cv-239 |

## DECLARATION OF ▓▓▓▓

I, ▓▓▓▓, declare as follows:

1. I am the Board President of the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, a small nonprofit in ▓▓▓▓ West Virginia. The ▓▓▓▓ is a member of Plaintiff National Council of Nonprofits. The following is based on my personal knowledge and on conversations with our Director and Office Manager.

2. Our mission is to help West Virginians with disabilities to live in their own homes, instead of having to be placed in far more expensive and far more isolating institutional settings.

3. We have only five employees.

4. Despite our small size, the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ has helped a lot of people over forty-plus years in the ▓▓▓▓ region. We serve individuals with disabilities stemming from a range of medical conditions: auto accident survivors, Multiple Sclerosis, paraplegics, quadriplegics, diabetes,

1

amputations, blindness, hearing loss, seizures, heart disease, learning disability, Muscular Dystrophy, stroke, spinal cord injury, and many more.

5.　　We build ramps and modify bathrooms for wheelchair users, so they can continue to live in their homes. We transport elderly and disabled individuals to critical needs like dialysis, doctor appointments, pharmacies and grocery stores; and to quality-of-life destinations such as movies, shopping trips and social events. We train individuals to shop for themselves, cook for themselves, clean their homes, and manage their budgets. We support individuals with disabilities in searching for, and performing, employment they can manage that provides some income.

6.　　Seventy percent of our budget are federal funds through the Department of Health and Human Services Administration for Community Living, as part of the nationwide network of "Centers for Independent Living." Through these funds, we provide support services helping people with disabilities to remain in their homes rather than be placed in institutional settings.

7.　　We are not paid grant funds in advance or on a regular schedule. Instead, we can "draw down" federal funds only to pay immediate bills and obligations. All funds drawn down must be spent or obligated within three days of drawdown. Thus we cannot draw more than we need in order to "set aside" or reserve money for future emergencies. In essence, we operate on a federally mandated paycheck-to-paycheck budgeting system. When the flow of funds is interrupted, we are quickly in crisis mode.

8. The OMB Memo was issued on Monday, January 27. On Tuesday morning, January 28, we could not even get on the federal Payment Management System to request a draw down. On the morning of Wednesday, January 29 (after this Court entered its stay) we were able to log in to the system and submit a request for new funds. In the past, drawdown requests typically were deposited to our account immediately.

9. I understand from our Office Manager, however, that as of Sunday, February 2, no funds have been deposited to our bank account. We have checked our accounts multiple times a day since January 29, but no funds have been transmitted. We have received no information or explanation from the Administration for Community Living about the interruption in funds.

10. In short: we have received no federal funds since the OMB Freeze Memo was issued. Our Center had enough money to meet payroll on Friday, January 31, and to cover outstanding bills. But we did not have enough money on hand to cover another two-week pay period at full staffing.

11. Thus, on Friday, January 31, the Board of Directors voted to lay off three of our five employees and drastically reduce services to our customers. This presented a dire situation for our customers, who have immediate needs.

12. For example, on Monday, February 3, we are scheduled to take an 86-year-old woman to dialysis treatments (which we do for her every Monday, Wednesday, and Friday). Our agency is her only way to get to these life-sustaining appointments.

13. On Monday, February 3, we are also scheduled to "job coach" a 19-year-old man with intellectual disabilities who recently aged out of the foster care system, as he starts a new job at Goodwill. We will help train him in life skills like budgeting, cleaning his house, and managing employment. He also relies on us for food pantry support and transportation to his new job.

14. On Tuesday, February 4, we are scheduled to help a 63-year-old woman with orthopedic, hearing, and intellectual disabilities. She also cares for two adult sons with disabilities. We would help her with budgeting, cleaning, and searching for better housing. She has no transportation so we would pick her up and bring her to our office.

15. With the freeze still in effect we would have enough money on hand to function with our reduced skeleton staff for only two or three more weeks, serving only the consumers with the most dire and pressing needs. On Friday, the Board recognized that if federal funds do not begin flowing again in the next two to three weeks, we would have no option other than to lay off the remaining two employees and cease all services.

16. Fortunately over this weekend, we were notified that on Monday, February 3, we will receive two allocations of grant funds through state agencies. We intend to use that money to call back two of the three laid-off employees immediately. Our director estimates that, with these state grants, we can function for probably six to eight weeks with four staff (leaving one laid-off staffer still in limbo).

17. Nevertheless, the loss of 20% of our staff will have an immediate and significant effect on the services we are able to provide. And although we are grateful to the state for these allocations, we cannot count on them indefinitely. This has only bought us some more time, but if the freeze is not stopped, we will shut down and the people we serve will be helpless. They may wind up in much more expensive settings like nursing homes or group homes. They may wind up homeless on the streets. Or worse.

18. I am desperate to bring attention to our situation. I cannot believe anyone would NOT want to help an 86-year-old woman get to her dialysis sessions, or a family with Autism and Intellectual Disability get help to live on their own instead of being committed to an institution.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 2, 2025, in ███████ West Virginia.

5