## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL COUNCIL OF NONPROFITS, et al., | |
| *Plaintiffs,* | |
| v. | Case No. 25-cv-239 |
| OFFICE OF MANAGEMENT AND BUDGET, et al., | |
| *Defendants.* | |

## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Just two weeks ago, the Office of Management and Budget and its Acting Director, Matthew Vaeth, threw into chaos the complex systems by which trillions of dollars in federal financial assistance flow to thousands of nonprofits, small businesses, state agencies, tribes, and municipalities.[1] Those recipients depend on federal funding programs, many of which have operated reliably and predictably for years, to provide vital services and benefits to the public, from disaster relief to medical research to care for people who are sick or have disabilities. To facilitate a review of that funding for conformity with the new administration's ideological views, Defendants ordered that essentially all of it be shut off in 24 hours.

That agency action was unlawful. It violated the Administrative Procedure Act because it was arbitrary and capricious, undertaken without statutory

---

[1] The Senate voted to confirm Russell Vought as Director of OMB on February 6, 2025. Director Vought is automatically substituted for Acting Director Vaeth as a defendant in this case by operation of Federal Rule of Civil Procedure 25(d).

authority, and contrary to the First Amendment. And its effect would devastate Plaintiffs here—the National Council of Nonprofits, the American Public Health Association, Main Street Alliance, and SAGE—groups representing thousands of nonprofits and small businesses that rely on the federal financial assistance programs that Defendants seek to throttle.

The Court rightly entered a temporary restraining order to stop that irreparable harm. The same factors the Court previously considered now justify a preliminary injunction. Plaintiffs remain likely to succeed on all three of their claims. The freeze would cause irreparable harm to Plaintiffs and their members by punishing their exercise of core First Amendment rights, thwarting their ability to carry out their core missions, and in many cases inflicting existential economic injury. And the public interest strongly favors relief that would prevent Defendants from continuing to implement the Freeze Order, including under a different name.

The slow and disorderly process by which funds have become unfrozen since the Court issued its TRO—to the extent they actually have been unfrozen, *but see* Jonathan Allen, *FEMA Official Ignores Judge's Latest Order, Demands Freeze on Grant Funding*, NBC News (Feb. 11, 2025) (reporting on FEMA's freezing of funding "for grant programs going back several years, including those focused on emergency preparedness, homeland security, firefighting, protecting churches from terrorism and tribal security")[2]—only serves to underscore the need for preliminary

---

[2] https://www.nbcnews.com/politics/donald-trump/fema-official-ignores-judge-order-freeze-grant-funding-rcna191674

relief to bar another precipitous and poorly considered blanket freeze that will be even more difficult to unwind after the fact.

## BACKGROUND

### A. The Freeze Order commands a near immediate halt to federal financial assistance.

Shortly after taking office, President Trump began to issue a number of executive orders announcing his administration's priorities. Some but not all of these orders direct agencies to take steps to review and in some instances halt federal funding in certain specific areas. *See* Exec. Order No. 14,151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339, 8339 (Jan. 20, 2025) (directing agencies to "terminate, to the maximum extent allowed by law, . . . 'equity-related' grants or contracts" within 60 days); Exec. Order No. 14,169, *Reevaluating and Realigning United States Foreign Aid*, 90 Fed. Reg. 8619, 8619 (Jan. 20, 2025) (directing agencies to "immediately pause new obligations and disbursements of development assistance funds").

On January 27, 2025, Defendants issued a "Memorandum for Heads of Executive Departments and Agencies," numbered M-25-13 and titled "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs" (the "Freeze Order" or "Order"). The Order states that in the last fiscal year, the United States spent more than $3 trillion on federal financial assistance programs such as grants and loans. Order at 1. It warns that these programs "should be dedicated to advancing Administration priorities" such as "ending 'wokeness'" and should not be

used "to advance Marxist equity, transgenderism, and green new deal social engineering." *Id.*

To that end, the Order commands agencies to take certain steps. It "requires" them "to identify and review all Federal financial assistance programs and supporting activities consistent with the President's policies and requirements," citing seven recent executive orders. *Id.* at 1-2. The Order defines the scope of relevant "federal financial assistance" as "all forms of assistance listed in paragraphs (1) and (2) of the definition of this term at 2 CFR 200.1" and "assistance received or administered by recipients or subrecipients of any type"–excluding only "assistance provided directly to individuals," Medicare, and Social Security benefits. *Id.* at 1 nn.1-2.

The Order then states:

> In the interim [i.e., while agencies are reviewing spending for consistency with the President's policies], to the extent permissible under applicable law, Federal agencies **must temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal.

*Id.* at 2. The Order proceeds to reiterate several times the broad requirement to halt all obligations and disbursements. It requires that "[e]ach agency must pause," among other things, "issuance of new awards" and "disbursement of Federal funds under all open awards." It "directs Federal agencies to pause all activities associated with open NOFOs [notices of funding opportunity]." And it emphasizes that exceptions will be determined by OMB—not the agencies themselves—"on a

case-by-case basis." The Order provides that "[t]he temporary pause will become effective on January 28, 2025, at 5:00 PM." *Id.*

### B. Plaintiffs move expeditiously to challenge the unlawful Order.

Reports of the Freeze Order began to appear online near the end of the day on Monday, January 27. Plaintiffs filed this action at noon the next day, alleging that the Order is invalid and unlawful under the Administrative Procedure Act because it is arbitrary and capricious, in excess of statutory authority, and contrary to the First Amendment. Plaintiffs promptly sought a temporary restraining order to enjoin Defendants from implementing or enforcing the Order. ECF No. 5.

Minutes before the Freeze Order was set to take effect, this Court entered an administrative stay pausing the Order with respect to open awards of federal financial assistance. The Court did so in order to "maintain the status quo [with respect to open grants] until the court may rule on Plaintiffs' motion," and in response to the government's suggestion that additional time was needed for briefing and full consideration of the relevant legal issues. Admin. Stay Order 4, ECF No. 13. The Court's order made clear that it acted to "block[] executive action" by temporarily halting the "direction that agencies 'pause . . . disbursement of Federal funds under all open awards.'" *Id.* (citation omitted).

### C. "Rescission" of the Order and continuing efforts to implement it.

In response to this suit and the Court's administrative stay, Defendants on Wednesday, January 29, purported to rescind the Freeze Order through the issuance of a new memorandum, M-25-14. ECF No. 18-1. That memo states: "OMB

Memorandum M-25-13 is rescinded. If you have questions about implementing the President's Executive Orders, please contact your agency General Counsel." *Id.* That purported rescission was subsequently widely reported on in the press.

Shortly after Memo M-25-14 was publicized, White House Press Secretary Karoline Leavitt announced on social media that the purported "rescission" of the federal funding freeze was, in fact, "NOT a rescission of the federal funding freeze":



Karoline      Leavitt      (@PresSec),      X      (Jan.      29,      2025,      1:40      PM), https://x.com/PressSec/status/1884672871944901034. This social media post explained that Memo M-25-14 had issued specifically "[t]o end any confusion created by the court's injunction." *Id.*

The Press Secretary's statement that "the federal funding freeze" continued was accurate. Even after this Court entered an administrative stay, and even after the purported "rescission" of the Order, implementation continued.

6

The National Science Foundation, for example, sent an e-mail to staff at 9:22 p.m. on Tuesday, January 28—hours after the Court ordered an administrative stay—instructing them to continue carrying out the freeze on open awards. *See* Bobby Kogan (@bbkogan.bsky.social), Bluesky (Jan. 28, 2025, 10:29 PM), https://bsky.app/profile/bbkogan.bsky.social/post/3lgtzpevuys2b. The text of that e-mail was also posted on an NSF website. *See* Ex. B, ECF No. 24-2. It explains that the "Office of Management and Budget Memorandum M-25-13, issued on Jan. 27, 2025, directs all federal agencies to conduct a comprehensive review of their financial assistance programs to determine programs, projects and activities that may be implicated by the recent executive orders. Therefore, all review panels, new awards *and all payments of funds under open awards* will be paused as the agency conducts the required reviews and analysis." *Id.* (emphasis added).

By NSF's own account, it did not restore access to its Award Cash Management Service, through which grantees draw on open awards, until midday on Sunday, February 2[3]—and the evidence shows that some NSF grantees were not able to actually access funds until days later. *See* Ex. M ¶ 3.

NSF was not the only one. As late as Thursday, January 30, the EPA was still informing recipients that it "is working diligently to implement the Office of Management and Budget's memorandum, Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs" and that "[t]he agency is temporarily

---

[3] *See* Nat'l Sci. Found., *NSF Implementation of Recent Executive Orders* (last updated Feb. 7, 2025) ("NSF has restored access to the ACM\$ system as of 12:00 PM ET on February 2, 2025."), https://new.nsf.gov/executive-orders#faq2.

pausing all activities related to the obligation or disbursement of EPA Federal financial assistance at this time." Ex. A, at 7, ECF No. 24-1.

Other agencies did the same thing less blatantly. On January 28, the day after the Freeze Order was announced, state agencies were unable to access funds through the Payment Management System used by the Department of Labor and Department of Health and Human Services to disburse funds on open awards. Ex. C, at 9-10, ECF No. 24-3. The next morning, tribes were still locked out of funding portals administered by the Department of Justice and the Department of Housing and Urban Development and could not draw on open awards, including for grants under the Tribal Governments Program, which funds efforts to curtail violent crimes against women. Ex. E, ECF No. 24-5 ¶¶ 14–16.

Funds were still becoming frozen, and remaining frozen, days after the Order was supposedly rescinded, with consequences for everything from disability care, Ex. L, ECF No. 27-1, to Head Start programs,[4] to community health centers[5]—programs with no conceivable connection to any of the handful of executive orders that could be read to themselves order pauses on funding.

---

[4] Moriah Balingit, *Still Locked Out Of Federal Funding, Several Head Start Preschools May Need to Close Temporarily*, Associated Press (Feb. 4, 2025), https://apnews.com/article/head-start-blackouts-trump-6e7655e56c0b451092411e7fdd1def2e.

[5] Sarah Kliff & Noah Weiland, *Some Federally Funded Clinics Still Cannot Access Funds After A Grant Freeze*, N.Y. Times (Feb. 5, 2025), https://www.nytimes.com/live/2025/02/05/us/trump-news#trump-federal-funding-freeze-health-clinics.

**D. Events since the Court's entry of a TRO.**

After briefing and a hearing, the Court on February 3 denied Defendants'
motion to dismiss and granted Plaintiffs' motion for a temporary restraining order.
ECF No. 30 ("TRO Order"). The TRO enjoined Defendants from "implementing,
giving effect to, or reinstating under a different name the directives in [the Freeze
Order] with respect to the disbursement of Federal funds under all open awards."
*Id.* at 29. It further required Defendants to provide notice of the TRO to other
agencies and instruct them similarly not to implement the Freeze Order and to
release any disbursements on open awards that were paused due to the Order. *Id.*

Since the Court's order, it appears that the freeze has mostly—but not
entirely—thawed, slowly and by degrees. The individual declarants who at the TRO
stage described their difficulties accessing funds have since been able to draw on
their open awards. *See, e.g.*, Ex. M ¶ 3 (funds unfrozen February 6); Ex. N ¶ 5
(funds unfrozen February 5); Ex. O ¶ 4 (funds unfrozen February 4). Many others of
Plaintiffs' members are now also able to draw on open awards. And yet reporting
suggests that the freeze is still at least partly in effect. *See* Allen, *supra* at 2
(describing FEMA's continuation of the Freeze Order).[6] As these recent events

---

[6] As of the time of this filing, counsel for Defendants informed Plaintiffs' counsel
that they were looking into this report but did not yet have full details to share.
Counsel for Defendants stated their preliminary understanding that there is not a
blanket pause or freeze on funding for FEMA grants, but rather "a new review
process before releasing funds for reimbursement." Given that the reporting
describes an e-mail from the director of FEMA's Office of Grant Administration with
the subject line, "URGENT: Holds on awards," that directed her team to "put
financial holds on all of your awards -- all open awards, all years (2021, 2022, 2023,
2024)," *see* Allen, *supra* at 2, Plaintiffs await further details about that e-mail and

reflect, restoring funding has been far more time-consuming and cumbersome than shutting it off in the first place—to the extent it is restored at all.

**E. Parallel litigation challenging the Freeze Order.**

On the same day Plaintiffs filed this suit, 22 states and the District of Columbia filed suit in the U.S. District Court for the District of Rhode Island and also sought a TRO to halt implementation of the Freeze Order. *See* Compl., *New York v. Trump*, No. 1:25-cv-39 (D.R.I. Jan. 28, 2025), ECF No. 1. The court granted that motion on January 31. *New York v. Trump*, 2025 WL 357368. The TRO it entered swept broadly, categorically ordering Defendants not to "pause, freeze, impede, block, cancel, or terminate Defendants' compliance with awards and obligations to provide federal financial assistance to the States." *Id.* at *5.

The plaintiff attorneys general moved for a preliminary injunction on February 7. "[F]or good cause including the complexity of the issues involved, the number of parties, and the need to maintain the status quo while this matter is being expeditiously litigated," the Court extended the TRO "until the Court enters an order on the Plaintiffs' Motion for Preliminary Injunction." Minute Entry, *New York v. Trump*, No. 1:25-cv-39 (D.R.I. Feb. 6, 2025). The motion is set to be fully briefed by February 14.

Also on February 7, the plaintiff attorneys general filed a "motion for enforcement of the temporary restraining order." *New York v. Trump*, ECF No. 66. The motion described that, a week after the court entered its TRO, "Plaintiff States

_____

the processes currently in place at FEMA, and respectfully note that, as details emerge, additional expeditious briefing may be appropriate.

and entities within the Plaintiff States continue to be denied access to federal funds." *Id.* at 1-2. The court granted the states' motion on February 10, finding that they "have presented evidence … that the Defendants in some cases have continued to improperly freeze federal funds and refused to resume disbursement of appropriated federal funds." Order at 2, *New York v. Trump*, ECF No. 96. The court therefore ordered the defendants to "immediately end any federal funding pause during the pendency of the TRO" and "take every step necessary to effectuate the TRO." *Id.* at 4. The government has noticed an appeal of these orders. ECF No. 98.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The final two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

In this Circuit, "[t]he four factors have typically been evaluated on a 'sliding scale.'" *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009); *see also Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (noting "arguabl[e] . . . tension" between this approach and *Winter* but declining to repudiate it). Under the "sliding scale" approach, "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis*, 571 F.3d at 1291-92.

## ARGUMENT

### I.    Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs are likely to prevail on their claims that the Freeze Order is arbitrary and capricious, in excess of statutory authority, and contrary to the First Amendment.

#### A.    The Freeze Order is final agency action.

The Administrative Procedure Act makes reviewable "final agency action." 5 U.S.C. § 704. For agency action to be "final" it must (1) "mark the consummation of the agency's decisionmaking process" and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotation marks omitted).

The Freeze Order marks the "consummation" of OMB's decisionmaking process with respect to the freeze on federal financial assistance because—far from being "merely tentative or interlocutory," *see id.* at 178—it is a final directive from OMB, signed by the head of that agency, commanding other agencies to take specific and almost immediate action. *See* Order at 2 ("Federal agencies **must temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance. . . ."); *cf. Louisiana v. Biden*, 622 F. Supp. 3d 267, 292 (W.D. La. 2022) (collecting over a dozen cases in which courts found final agency action where agencies paused or delayed particular programs).

The Freeze Order is also one "by which rights or obligations have been determined, or from which legal consequences will flow," *Bennett*, 520 U.S. at 177–

78 (quotation marks omitted), because its direct result (and express purpose) is to cut off access to federal financial assistance for recipients with open awards who would otherwise have a right to access those funds in the ordinary course.

Defendants previously disputed the second of these elements, arguing that no legal consequences flow from the Freeze Order because it "did not itself determine which funds or grants should be paused; instead, it required agencies to make that determination, consistent with their own authorities." ECF No. 20, at 14. Defendants are wrong on both counts. The Order *does* "determine which funds or grants should be paused": It tells agencies to halt "all activities related to obligation or disbursement *of all Federal financial assistance*," Order at 2 (emphasis added), a term it specifically defines by reference to 2 C.F.R. § 200.1 and after excluding Medicare and Social Security benefits, *id.* at 1 nn.1–2.

Nor does the Order leave it to agency discretion to decide what to pause. By its unmistakable terms, it commands. The Order directs agencies that they: "**must temporarily pause**" the obligation and disbursement of all covered federal financial assistance by 5 p.m. the next day; "must complete a comprehensive analysis of all of their Federal financial assistance programs"; "must pause," among other things, "disbursement of Federal funds under all open awards"; "must, for each Federal financial assistance program" take certain additional steps; and further "directs Federal agencies to pause all activities associated with open NOFOs [notices of funding opportunity]." *Id.* at 2. As the Court previously observed, the

13

Freeze Order "is not merely a guidance. It is a directive that immediately produced legal consequences across the entire federal funding system." TRO Order at 21-22.

That is so notwithstanding that the Order modifies some (but not all) of its commands with the phrase "to the extent permissible under applicable law," or similar. For two reasons, agencies' discretion under the Freeze Order is not expanded in any relevant way by the caveat that they act in accordance with law.

First, agencies had no practical ability to give effect to the "permissible under applicable law" language in the 24 hours they were given to shut off perhaps trillions of dollars in federal funding. After all, "it is unclear whether twenty-four hours is sufficient time for an agency to independently review a single grant, let alone hundreds of thousands of them." TRO Order at 17.

That reality puts this case a world away from *Building & Construction Trade Department, AFL-CIO v. Allbaugh*, on which Defendants have relied and where the court held that the "mere possibility that some agency might make a legally suspect decision" in the future did not justify enjoining a policy that was "above suspicion in the ordinary course of administration." 295 F.3d 28, 33 (D.C. Cir. 2002). The Freeze Order's directive to halt essentially all federal financial assistance within 24 hours can hardly be compared to a policy found to fall well within "the ordinary course of administration." *Id.* And, unlike the policy in *Allbaugh*, the Freeze Order plainly creates more than a "*mere possibility* that some agency might make a legally suspect decision." *See id.* (emphasis added); *cf. City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1239 (9th Cir. 2018) (rejecting the government's attempted

reliance on *Allbaugh* in analogous circumstances and emphasizing that "[s]avings clauses are read in their context"); *Louisiana v. Biden*, 622 F. Supp. 3d at 289-90 (same).

Second, even if agencies *could* have given effect to the "permissible under applicable law" language, that would not expand their discretion in any way that matters for the "final agency action" analysis. All it would mean, at most, is that the Order told agencies to halt payments on open awards that they could legally halt, rather than halting payments on open awards, full stop. In either case, agencies would be stopping payments at the command of the Freeze Order, and thus the Order would have exactly the kind of legal consequences necessary for it to qualify as final agency action.

### B. The Freeze Order is arbitrary and capricious.

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Nevertheless, a reviewing court "must ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *State Farm*, 463 U.S. at 43).

An agency falls short of this requirement when it "entirely fail[s] to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

Plaintiffs are likely to show that the Freeze Order flunks this test multiple times over. The Order, again, commands a near immediate freeze on all obligations and disbursements of essentially all federal financial assistance. It recognizes that such assistance involves literally trillions of dollars each year, yet gives agencies only until 5 p.m. the next day to halt such funding, subject only to the caveat—meaningless in this context—"to the extent permissible under applicable law." The Order gives no indication when the "temporary pause" might end. As justification for immediately and indefinitely halting necessary funding for community health clinics, emergency centers, Head Start programs, disaster relief, scientific research, state agencies, small businesses, and much more across the country, the Order states that such a halt "will provide the Administration time to review agency programs and determine the best uses of the funding for those programs consistent with the law and the President's priorities." Order at 2.

As the Court aptly put it, "[t]o say that OMB 'failed to consider an important aspect of the problem' would be putting it mildly." TRO Order at 24. The Freeze Order fails even to acknowledge—let alone try to ameliorate—the catastrophic effects of suddenly cutting funding to thousands of community nonprofits, small businesses, state programs, and other recipients of federal financial assistance nationwide. An agency action that completely fails to consider its most direct and obvious practical consequences is by definition arbitrary and capricious. *Cf. Ohio v.*

*EPA*, 603 U.S. at 293-94 (holding that EPA likely acted arbitrarily and capriciously where it purportedly did not consider the specific question of how the number of states participating in an emissions-limitation plan would "affect what measures maximize cost-effective downwind air-quality improvements"). That is particularly true where those consequences are of the magnitude they are here.

The Order fails to consider other important aspects of the problem as well. It does not acknowledge the vital services that recipients of federal financial assistance provide to their communities and the nation. *See, e.g.*, Ex. D, ECF No. 24-4 ¶ 4 ("provid[ing] primary medical, dental, and behavioral health services to a rural, underserved population"); Ex. E, ECF No. 24-5 ¶ 26 (providing essential day-to-day governmental services "like healthcare, sanitation, housing and food assistance, child safety, and more"); Ex. G, ECF No. 24-7 ¶ 7 (providing emergency shelter and community-based care management for people experiencing chronic homelessness); Ex. H, ECF No. 24-8 ¶ 7 (providing services to expecting families, including wellness visits, treatment for postpartum depression, and transportation to doctor's offices); Ex. L, ECF No. 27-1 ¶ 5 (providing people with disabilities with modifications that enable them to live in their homes and transportation to medical appointments and grocery stores); Ex. P ¶ 5 (providing services to prevent child abuse and keep families together).

It does not consider the exceedingly thin margins on which many grantees operate or the immediate disruption to their ability to provide services that even a short pause will entail. *See, e.g.*, Ex. G, ECF No. 24-7 ¶¶19–24. It does not consider

the fact that, as subsequent events have shown, *see infra* at 33-34, funds can be significantly slower and more cumbersome to turn back on than to shut off in the first place. And it does not attempt to weigh the predictable and drastic costs of an immediate blanket freeze against the stated objective of "provid[ing] the Administration time to review agency programs." *Cf. Michigan v. EPA*, 576 U.S. 743, 753 (2015) ("[R]easonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions."). For all of these reasons, Plaintiffs are likely to show that the Order is unreasonable.

An agency is also required "to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." *Spirit Airlines, Inc. v. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021). "This principle goes to the heart of reasoned decisionmaking; it is not limited to rulemaking." *Id.* "The failure of an agency to consider obvious alternatives has led uniformly to reversal." *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986).

The Order fails here too. Nowhere does it pause to consider whether the administration's review could be carried out without effecting a nationwide catastrophe, such as by cabining the freeze to new awards, providing more time for agencies to implement the Order and for recipients to prepare, or simply conducting the review while allowing federal financial assistance programs to carry on in the ordinary course. These alternative approaches and others were sufficiently obvious that, "[a]t the very least," they "should have been addressed and adequate reasons

given" for their rejection. *State Farm*, 463 U.S. at 48, 50-51. Defendants' failure to do so provides another reason Plaintiffs are likely to succeed in showing the Order to be arbitrary and capricious.

Not just that, the Order fails to take into account the significant reliance interests to which it would take a wrecking ball. "When an agency changes course, as [Defendants] did here, it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). Here, that required Defendants, before abruptly changing course with respect to nearly all federal financial assistance programs in the country, "to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 33.

The Order does none of those things. It entirely overlooks the reliance interests that have reasonably built up around the regular administration of federal financial assistance (particularly but not only for grantees with open awards), fails to recognize the massive significance of those interests, and takes no steps to weigh them against the stated goal of "provid[ing] the Administration time to review agency programs and determine the best uses of the funding." Order at 2. The Order's complete failure to grapple with its effect on significant reliance interests is another reason it is arbitrary and capricious. *See Int'l Org. of Masters, Mates & Pilots, ILA, AFL-CIO v. NLRB*, 61 F.4th 169, 180 (D.C. Cir. 2023) (vacating

rule where agency "adopted it[] . . .with no regard for the parties' reliance interests").

The Freeze Order is therefore invalid as arbitrary and capricious for multiple independent reasons—a point that is merely underscored by the serious constitutional questions (which the Order never addresses) that might be raised by an executive branch agency asserting such sweeping authority over the federal purse. *See* TRO Order at 25.

Defendants have previously offered a few counterarguments meant to resuscitate the Order's reasonableness. Those arguments do not withstand scrutiny.

Defendants point out that the Order describes its objectives: "to effectuate the President's Executive Orders and 'safeguard valuable taxpayer resources.'" ECF No. 20, at 22 (quoting Order at 1). But that hardly makes it rational. A mere statement of purpose does not show that an agency, for example, acted reasonably in pursuing those objectives and considered important aspects of the problem before it. *See State Farm*, 463 U.S. at 43.

Defendants also note that the Order purported to exempt "assistance provided directly to individuals," Medicare, and Social Security benefits. ECF No. 26, at 19. All that shows is that it is possible to imagine an even more arbitrary and irrational Order. It does not show that OMB's actual instruction, to immediately freeze all *other* federal financial assistance, was both "reasonable and reasonably explained." *See Ohio v. EPA,* 603 U.S. at 292.

Contrary to Defendants' claims, the fact that OMB retained authority to grant "case-by-case" exceptions in unspecified circumstances, and apparently in OMB's sole discretion, *see* Order at 2, does not "provide[] for a safety valve" that transforms the funding freeze from blatantly irrational into reasonable agency action, ECF No. 26, at 19. An arbitrary ban is not saved by the theoretical possibility of arbitrary exceptions around the edges.

## C. The Freeze Order is in excess of statutory authority.

"Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). Again: Agencies "'literally ha[ve] no power to act' except to the extent Congress authorized them." *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 912 (D.C. Cir. 2024) (quoting *FEC v. Cruz*, 596 U.S. 289, 301 (2022)). Under the APA, courts must hold unlawful final agency action taken "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

Defendants lack statutory authority to issue the Freeze Order, a government-wide halt on trillions of dollars in grants, loans, and other forms of financial assistance. The Order itself does not explain the alleged basis of OMB's authority to command that halt. It does not cite any statutes at all. And nothing in OMB's enabling statute, 31 U.S.C. § 501 *et seq.*, confers authority on the agency to command a full stop of essentially all federal financial assistance. As Judge McConnell explained in the parallel action brought by attorneys general, "[t]he Executive cites no legal authority allowing it to [issue the Freeze Order]; indeed, no

21

federal law would authorize the Executive's unilateral action here." *New York v. Trump*, 2025 WL 357368, at *2.

Defendants' response proves the point. The sole statutory provision they have so far been able to muster is 31 U.S.C. § 503(a), subsections (2), (5), and (14). *See* ECF No. 26 at 16-17. Those provisions authorize the deputy director for management at OMB, the agency's second-in-command, to:

> (2)   Provide overall direction and leadership to the executive branch on financial management matters by establishing financial management policies and requirements, and by monitoring the establishment and operation of Federal Government financial management systems.

> (5)   Monitor the financial execution of the budget in relation to actual expenditures, including timely performance reports.

> (14)  Issue such other policies and directives as may be necessary to carry out this section, and perform any other function prescribed by the Director.

The suggestion that these provisions somehow authorize the Freeze Order is risible. Nothing in the deputy director's duties to "establish[] financial management policies and requirements," "monitor[] the establishment and operation of Federal Government financial management systems," and "[m]onitor the financial execution of the budget in relation to actual expenditures" can reasonably be read as authorizing him or the agency to decide to simply turn off all federal financial assistance the next day. Shutting off funds is not "monitoring," nor can it fairly be described as "establishing financial management policies and requirements."

And Defendants cannot hope to bootstrap their way into authority with the catchall language in subsection 14, since that provision allows the deputy director

to issue only such policies and directives "as may be necessary to carry out this section." 31 U.S.C. § 503(a)(14). Defendants have located nothing in Section 503 that would even allow—let alone *necessitate*—the Freeze Order or anything like it.

In contrast to the silence of OMB's statute, many other federal laws speak directly to the administration of federal financial assistance programs. Such programs operate pursuant to a wide array of statutory authorizations and appropriations, from the sweeping, *e.g.*, 42 U.S.C. § 1396b (providing for payments to the states of a fixed percentage of their annual Medicaid expenditures), to the targeted, *e.g.*, 34 U.S.C. § 11211 *et seq.* (authorizing grants to centers serving runaway and homeless youth). The agencies that administer those programs in turn have promulgated their own governing regulations, 2 C.F.R. §§ 300.1-6000.1, which sometimes track and sometimes depart from OMB's model policies and procedures, *see id.* subtit. A. Defendants cannot hope to rely on OMB's general authorities in order to justify action that takes no account of these many more specific provisions of law governing financial assistance. *Cf. Am. Petroleum Inst. v. EPA*, 52 F.3d 1113, 1119 (D.C. Cir. 1995) (holding that a "general grant of rulemaking power to EPA cannot trump specific portions of the [relevant statute]").

Defendants' claim to authority is even weaker in light of the sweeping and unprecedented nature of the power they seek to exercise. The Supreme Court has emphasized repeatedly in recent years that it "expect[s] Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *OSHA*, 595 U.S. at 117 (quoting *Ala. Ass'n of Realtors v. HHS*, 141

S.Ct. 2485, 2489 (2021)). That rule, the Court has held, applies equally in cases involving regulatory obligations and "in cases involving benefits." *Biden v. Nebraska*, 143 S. Ct. 2355, 2374 (2023).

There can be no doubt that the power Defendants claim here—to immediately "cut the fuel supply to a vast, complicated, nationwide machine" by which thousands of nonprofits, small businesses, states, tribes, and others deliver critical services, TRO Order at 24—is one of "vast economic and political significance." *OSHA*, 595 U.S. at 117. Defendants themselves recognize that the Order implicates more than $3 trillion in financial assistance. *Cf. Biden v. Nebraska*, 143 S. Ct. at 2372 (considering an action affecting $430 billion in student loans). And the decision to suddenly cut nearly all that assistance is one of vast political and practical significance, as demonstrated by the severe disruption and hardship the Order has already caused. *See, e.g.*, Ex. G, ECF No. 24-7 ¶¶ 19–24; Ex. L, ECF No. 27-1 ¶ 11. "Given these circumstances, there is every reason to 'hesitate before concluding that Congress' meant to confer on [OMB] the authority it claims." *See West Virginia v. EPA*, 597 U.S. 697, 725 (2022) (quoting *Brown v. Williamson*, 529 U.S. 120, 1296 (2000)).

Defendants have sought to shore up their meager claim to statutory authority by pointing to OMB's "central purpose," which they describe as "assist[ing] the President in the preparation of the annual Federal budget and oversee[ing] its execution." ECF No. 26 at 16 (brackets and emphasis omitted). Agencies, however, "literally have no power to act except to the extent Congress

authorized them." *Marin Audubon Soc'y*, 121 F.4th at 912 (quotation marks and brackets omitted). The general purposes and goals of an agency, "[c]ommendable though these goals may be," do not authorize the agency to act as a "roving commission" with "default authority" to take whatever actions it determines would advance its general goals. *Michigan v. EPA*, 268 F.3d 1075, 1084 (D.C. Cir. 2001).

So Defendants have tried to change the subject by asserting that "temporary pauses in funding are commonplace." ECF No. 26, at 17. The claim that the Freeze Order has historical precedent, even if correct, would do little to establish that Defendants acted with statutory authority. *See Se. Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912, 920 (D.C. Cir. 2009) ("No matter how consistent its past practice, an agency must still explain why that practice comports with the governing statute and reasoned decisionmaking.").

In any case, that claim is not correct. Defendants have relied on a few executive orders involving delays in funding or implementing government programs. ECF No. 26, at 17–18. But those orders were issued by the President, not OMB; are all of recent vintage; and all involved targeted pauses to specific programs, among other distinctions.[7] They are not remotely comparable to the sweeping authority Defendants claim for themselves here and do nothing to suggest that Congress actually gave Defendants that authority.

---

[7] Moreover—although questions about the President's authority are not implicated by the present motion—at least one of the ordered pauses on which Defendants have relied was held to be unlawful and "beyond the authority of the President." *Louisiana v. Biden*, 622 F. Supp. 3d at 289.

Because no statute confers on Defendants the authority to command the Freeze Order, Plaintiffs are likely to succeed on their claim that the Freeze Order is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

### D. The Freeze Order contravenes the First Amendment.

Plaintiffs are also likely to prevail on their claim that the Order is "contrary to constitutional right," *id.* § 706(2)(B), because it threatens their continued receipt of federal financial assistance based explicitly on their exercise of their core First Amendment rights of speech and association.

The Order is not shy about naming its targets: "wokeness," "Marxist equity," "transgenderism," "green new deal social engineering," "DEI," and "woke gender ideology." These terms describe not activities but sets of ideas and beliefs on matters of deeply held political conviction and personal conscience. And it is clear what will happen to recipients of federal financial assistance whose speech or associations somehow connect them to these disfavored ideas: Their funding will cease. For them, the "temporary pause" in financial assistance will be anything but.

The effect for many recipients will be terminal. Plaintiffs' members, like many other recipients of federal financial assistance, typically operate on thin margins, rely on open awards for a significant portion of their operating budget, and count on being able to access those open awards on a regular and predictable basis in order to meet immediately upcoming expenses and cover those already incurred. *See, e.g.*, Ex. G, ECF No. 24-7 ¶ 25 (explaining reliance on regular drawdowns); Ex. H, ECF No. 24-8 ¶ 8 (noting that about 90% of the organization's funding comes

from grants, mostly through HHS); Ex. L, ECF No. 27-1 ¶ 6 (noting that 70% of the organization's budget comes from HHS grants).

As the record makes clear, many of Plaintiffs' members cannot afford even a short pause in funding—let alone an indefinite one. Particularly for these members, it is difficult to imagine a more coercive cudgel the government could use to impose conformity with its preferred views. The Order appears to already be producing the intended chill. *See* David A. Fahrenthold et al., *Trump's Attempt to Freeze Grant Funding Leaves Nonprofits Reeling*, N.Y. Times (Feb. 6, 2025) (reporting that even after this Court's TRO, "many nonprofit groups said they still felt frozen, or at least chilled" and had taken steps such as "scrub[bing] websites of content that the new administration might deem too 'woke'");[8] Jasmine Mithani, *Domestic Violence Nonprofits Rocked by Trump Funding Freeze*, 19th News (Feb. 6, 2025) (describing widespread efforts by grant recipients to "edit their websites and public-facing materials" in order to avoid cancellation of their funding).[9]

By holding frozen all federal funding while the government conducts a review for ideological correctness, the Freeze Order "seek[s] to leverage funding to regulate speech outside the contours of the [federal financial assistance] program[s themselves]," in violation of the First Amendment. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013) ("*USAID*"). "Conditioning federal grants in this manner clearly would constitute a content-based restriction on

---

[8] https://www.nytimes.com/2025/02/04/us/politics/grant-funding-freeze-nonprofits.html

[9] https://19thnews.org/2025/02/trump-funding-freeze-domestic-violence-nonprofits/

protected speech." *See Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 542 (N.D. Cal. 2020) (preliminarily enjoining an effort during the first Trump Administration to require "grantees to certify that they will not use grant funds to promote concepts the Government considers 'divisive'").

"[T]he Government may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit." *USAID*, 570 U.S. at 214 (quotation marks omitted). Thus, the Supreme Court has struck down a number of unconstitutional conditions on federal funding. *Id.*; *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 547-49 (2001); *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 399-400 (1984). Even in cases where it has upheld funding conditions, the Court has emphasized that, "[t]he case would be different if Congress were to discriminate invidiously in its subsidies in such a way as to aim at the suppression of dangerous ideas." *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 548 (1983) (quotation marks and brackets omitted); *see also Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) ("If the NEA were to leverage its power to award subsidies . . . into a penalty on disfavored viewpoints, then we would confront a different case.").

To be sure, "Congress can, without offending the Constitution, selectively fund certain programs to address an issue of public concern, without funding alternative ways of addressing the same problem." *USAID*, 570 U.S. at 217 (citing *Rust v. Sullivan*, 500 U.S. 173 (1991)). More generally, Congress may "define the limits of the government spending program" by "specify[ing] the activities Congress

wants to subsidize." *Id.* at 214. It may not, however, consistent with the First Amendment, prescribe "conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *Id.* at 214-15.

The Freeze Order's targeting of ill-defined concepts like "wokeness," "Marxist equity," and "transgenderism" cannot plausibly be described as "specify[ing] the activities Congress"—or, in this case, OMB—"wants to subsidize." *Id.* at 214. First, these concepts are not "activities," and they reveal nothing about what specific services or offerings—as opposed to what political views or associations—Defendants deem worthy of receiving federal financial assistance.

Second, the Freeze Order cannot be understood as "defin[ing] the limits of the government spending program" with respect to open awards because recipients of such awards have already, by definition, established that they are engaged in the activities that Congress meant to subsidize. *See id.* at 218 (rejecting argument that challenged condition was "simply a selection criterion" where "its effects go beyond selection" to impose "an ongoing condition on recipients' speech and activities, a ground for terminating a grant after selection is complete").

Third, the Order's ultimate purpose of suppressing disfavored viewpoints is undisguised. It is couched in a tone of schoolyard hostility that, until very recently, would have been unimaginable in a formal government document. It drips with scorn for the opposing viewpoints it targets and openly announces a goal of "ending 'wokeness.'" And, of course, it orders the effective end to vital funding for those recipients who express dissenting views, without distinguishing between whether

they do so as part of their grant-funded activities or otherwise. *Cf. Santa Cruz*, 508 F. Supp. 3d at 542 (finding funding condition was likely unconstitutional where "the sweep of the condition goes beyond barring workplace training promoting the 'divisive' concepts to barring *any* promotion of the 'divisive' concepts using federal funds").

The Order runs afoul of the Supreme Court's clear admonition that "the Government may not aim at the suppression of dangerous ideas" via "subsid[ies] . . . manipulated to have a coercive effect." *Nat'l Endowment for the Arts*, 524 U.S. at 587 (quotation marks and brackets omitted); *see also Am. Ass'n of Pol. Consultants v. Small Bus. Admin.*, 613 F. Supp. 3d 360, 368 (D.D.C.) (explaining that the government's "funding choices" will raise First Amendment concerns if "they are 'the product of invidious viewpoint discrimination,' or 'aim[ed] at the suppression of dangerous ideas'" (quoting *Nat'l Endowment for the Arts*, 524 U.S. at 587)), *aff'd*, 810 F. App'x 8 (D.C. Cir. 2020).

Because the Order seeks to leverage money for federal financial assistance programs to suppress core rights of political speech and association, Plaintiffs are likely to prevail on their claim that it violates the First Amendment.

## II. Without Preliminary Relief, Plaintiffs and their Members Will Likely Suffer Irreparable Injury

An irreparable injury "must be both certain and great; it must be actual and not theoretical." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quotation marks omitted). In other words, an injury must be sufficiently imminent "that there is a clear and present need for equitable relief"

and it must be "beyond remediation." *Id.* (quotation marks omitted). As this Court has previously found, Plaintiffs "easily meet their burden here." TRO Order at 26.

Plaintiffs and their members have provided declarations attesting that even a short freeze in their federal grant disbursements irretrievably harms their mission and poses an existential threat to their organizations. "[O]bstacles" that "make it more difficult for [Plaintiffs and their members] to accomplish their primary mission" suffice to show irreparable injury. *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). Economic injuries too are irreparable if they pose an existential threat, *see Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985), or are otherwise unrecoverable (such as when a defendant is entitled to sovereign immunity), *see AmSurg EC Wash., Inc. v. MGG Group Ins. Co.*, No. 23-cv-2416, 2024 WL 2405822, at *2 (D.D.C. Apr. 26, 2024). In addition, the Freeze Order's threat to core rights of speech and association protected by the First Amendment constitutes irreparable harm all on its own. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

Plaintiffs and their members have documented examples of each of these injuries. As one nonprofit leader explained, her organization—a member of NCN that provides critical services to West Virginians experiencing homelessness—experienced a relatively short freeze of only 19 hours. Ex. G, ECF No. 24-7 ¶¶ 10-11. But even that short interruption required her organization to shut down programs

that assist people experiencing homelessness in obtaining birth certificates and identification cards, as well as a "Family Reunification" program that helps their clients travel to their families elsewhere in the state and country. *Id.* ¶¶ 20-23. The organization also stopped intake into its rapid rehousing program. *Id.* ¶ 24.

Another member of NCN—a nonprofit that helps people with disabilities live in their own homes—had to lay off three of its five employees during the Freeze Order. Ex. L, ECF No. 27-1 ¶¶ 11. Had state agencies not stepped in with a stop-gap measure, the nonprofit would have been forced to immediately reduce its services to only consumers with "the most dire and pressing needs"—forced, for instance, to choose between job coaching a teenager with intellectual disabilities who recently aged out of the foster care system and transporting an 86-year-old woman to dialysis treatments. *Id.* ¶¶ 12–17.

Similarly, a member of MSA who runs a daycare serving low-income families reported that without federal funding, her daycare would no longer be able to care for children with subsidized tuition payments, and that loss in income would lead to the daycare's closure in two months, at most. Ex. K, ECF No. 24-11 ¶¶ 20–22. And another member of MSA explained that, unless the Freeze Order was paused, her small business would not be able to make payroll on February 7, would have to lay off its entire staff by the end of the month at the latest, and would, for all practical purposes, cease to exist. Ex. F, ECF No. 24-6 ¶¶ 19–20.

"Damocles's sword does not have to actually fall on all [Plaintiffs] before the court will issue an injunction," *League of Women Voters v. Newby*, 838 F.3d at 75,

but it came close enough here to wound. The small business owner who feared not making payroll on February 7 did not receive her grant funds until February 6. Ex. M ¶ 3. A member of APHA chairs an organization that received its grant funds on February 4; had those funds come one day later, they would have missed payroll. Ex. O ¶ 4.[10] And, of course, as detailed above, some of Plaintiffs' members already suffered irreparable injury while waiting for their funds to be unfrozen.

These close shaves—and the cuts they actually inflicted—only confirm the necessity of converting the temporary restraining order into a preliminary injunction to prevent further irreparable injury to Plaintiffs and their members. Plaintiffs' members reasonably fear that if the funding freeze takes effect again—for example, if the temporary restraining order is lifted—they will once again imminently face layoffs and the closure of programs providing critical services to their communities. *See, e.g.* Ex. M ¶ 4; Ex. N ¶¶ 7-8; Ex. Q ¶ 8; Ex. O ¶¶ 4-5. Indeed, at least one of Plaintiffs' members has *already* changed her business habits as a result of the Freeze Order: She now draws down funds more frequently, taking up more administrative time and leaving less bandwidth for mission-critical work. *See* Ex. G, ECF No. 24-7 ¶¶ 25–26.

Moreover, the lag time Plaintiffs and their members experienced between the injunction against the Freeze Order and receiving their funds likewise counsels in

---

[10] To the extent that any doubts remain as to causation and redressability—and they should not, *see* TRO Order at 9-13—the events following the entry of the TRO put them to bed. Plaintiffs complained that the OMB Memo froze the disbursement of open grant awards. This Court entered the relief Plaintiffs sought, and those funds began flowing again. There can be no clearer evidence that more permanent relief from this Court would redress the same injury on a more permanent basis.

favor of a preliminary injunction. Because this Court stayed the Order minutes before it took effect, no funds should ever have been frozen. But, despite that stay, they were—and it took days for the freeze to thaw. *See, e.g.*, Ex. M ¶ 3 (funds unfrozen February 6); Ex. N ¶ 5 (funds unfrozen February 5); Ex. O ¶ 4 (funds unfrozen February 4); Ex. R ¶ 10 (funds unfrozen February 7); *see also, e.g.*, Richelle Wilson, *Half of Wisconsin Head Start programs can't access needed funds after federal freeze*, Wis. Pub. Radio (Feb. 3, 2025)[11]; Shannon Pettypiece, *Head Start child care programs are still unable to access federal money after Trump's funding freeze*, NBC News (Feb. 5, 2025)[12]; Order, *New York v. Trump*, No. 1:25-cv-39 (D.R.I. Feb. 10, 2025), ECF No. 96 (finding that pauses in funding violated the TRO entered by that Court).[13]

In other words, it appears to be much easier for the government to turn funds off than to turn them back on. *See* Opp'n to Mot. to Enforce at 9–11, *New York v. Trump*, ECF No. 70 (describing alleged backlogs in HHS's payment management system). But Plaintiffs and their members court irreparable injury each time the

---

[11] https://www.wpr.org/news/half-wisconsin-head-start-programs-cant-access-funds-federal-freeze-trump

[12] https://www.nbcnews.com/politics/donald-trump/head-start-childcare-programs-are-still-unable-access-federal-money-tr-rcna190791

[13] The government has noticed an appeal of that order of the underlying temporary restraining order. *See* Defs.' Notice of Appeal, *New York v. Trump*, ECF No. 98. The resulting uncertainty only exemplifies why the existence of a temporary restraining order in another court is immaterial to the Court's analysis of whether Plaintiffs here require protection from irreparable harm. *See Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 60 (D.D.C. 2020) (noting that "courts routinely grant follow-on injunctions against the Government, even in instances when an earlier nationwide injunction has already provided plaintiffs in the later action with their desired relief" and collecting cases).

funds are delayed even for a short period. And even the uncertainty around the reliability of federal grant disbursements has already hurt another NCN member that focuses on providing intervention services to vulnerable families, preventing child abuse, and helping families stay together. Ex. P ¶ 5. That organization is beginning a construction project to expand their services in a low-income, rural community but are now forced to disclose to contractors that they may have to halt construction midstream if the OMB freeze is not more permanently enjoined— making it more difficult to secure vendors, and leading the organization to reevaluate whether they feel secure enough in their (already awarded) funding stream to break ground. *Id.* ¶¶ 6, 11–17.

Separately, Plaintiffs' alleged First Amendment injury constitutes its own form of irreparable harm. "The loss of First Amendment freedoms, for even minimal periods of time, may constitute irreparable injury" where "the party seeking it can demonstrate that First Amendment interests are either threatened or in fact being impaired at the time relief is sought." *Nat'l Treasury Emps. Union v. United States*, 927 F.2d 1253, 1254 (D.C. Cir. 1991) (Thomas, J.) (internal quotation marks, citations, and alterations omitted). As Plaintiffs have made clear from the beginning, the Order's targeting of particular content and points of view— "wokeness," "gender ideology," etc.—have caused them and their members to reasonably fear that their future receipt of federal financial assistance depends on the content and viewpoint of their speech. *See* ECF No. 5-2 ¶ 14; ECF No. 5-3 ¶ 15; ECF No. 5-4 ¶¶ 29, 31; ECF No. 5-5 ¶ 8.

III.    **The Balance of Equities and Public Interest Strongly Favor a Preliminary Injunction**

The Court concluded at the TRO stage that "the balance of the equities and public interest heavily favor granting Plaintiffs' request" for preliminary relief. TRO Order at 28–29. Nothing has changed since then.

Implementation of Memo M-25-13 under that or any other name continues to threaten massive nationwide disruption that will affect, and in some cases terminate, the provision of vital services from health care to subsidized meals for the elderly to emergency relief to children's Head Start programs and much more. *See id; see also New York v. Trump*, 2025 WL 357368, at *4 (finding that, if the Freeze Order continued to be implemented, "there is a substantial risk that the States and its citizens will face a significant disruption in health, education, and other public services that are integral to their daily lives"). It is difficult to overstate the amount of chaos and genuine suffering that Defendants' precipitous and poorly considered Order would continue to cause if carried out; the declarations Plaintiffs have submitted in this case detail only a tiny fraction of the much larger harm that would be caused. *See* Ex. I, ECF No. 24-9 ¶¶ 5, 7, 8.

On the other side of the scale is, essentially, nothing. The government has no legitimate interest in carrying out an unlawful action. *See C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) ("It is well established that the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" (quoting *Open Cmties. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)). And even accepting Defendants' stated reason for the Freeze Order—to "provide the

36

Administration time to review agency programs," Order at 2—there is no reason that objective could not be accomplished through more rational means, such as by simply conducting the review while open awards continue as normal.

## CONCLUSION

For all these reasons, the Court should grant Plaintiffs' motion and enter a preliminary injunction as set forth in the attached proposed order.

Dated:  February 11, 2025          Respectfully submitted,

/s/ *Kevin E. Friedl*

Kevin E. Friedl* (Admitted only in New York; practice supervised by DC Bar members)
Jessica Anne Morton (DC Bar No. 1032316)
Kaitlyn Golden (DC Bar No. 1034214)
Robin F. Thurston (DC Bar No. 1531399)
Skye L. Perryman* (DC Bar No. 984573)
Will Bardwell* (DC Bar No. 90006120)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kfriedl@democracyforward.org
jmorton@democracyforward.org
kgolden@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org
wbardwell@democracyforward.org.

*admitted *pro hac vice*

## CERTIFICATE OF SERVICE

On February 11, 2025, I caused the foregoing and accompanying declarations and proposed order to be filed electronically via the Court's CM/ECF system, which provides electronic notice to all counsel of record. I further caused those documents to be served on pro se movant Beatrice Adams at the mailing address she has entered on the record.

Dated: February 11, 2025                    /s/ *Kevin E. Friedl*
                                            Kevin E. Friedl