# EXHIBIT R

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL COUNCIL OF NONPROFITS, et al., *Plaintiffs*, v. OFFICE OF MANAGEMENT AND BUDGET, et al., *Defendants*. | Case No. 25-cv-239 |

### DECLARATION OF ▮▮▮▮▮

I, ▮▮▮▮▮, declare as follows:

1. I am the Executive Director of the ▮▮▮▮▮ in Central Oregon. ▮▮ is a member of Plaintiff National Council of Nonprofits through the Nonprofit Association of Oregon. This declaration is based on my personal knowledge and a review of ▮▮'s business records.

2. ▮▮'s mission is to provide space and support to nonprofits that serve children and families. We have four collaborative community campuses that serve twenty-three different nonprofit partners. We provide all onsite property management, work space, utilities, collaborative space, and administrative support for pennies on the dollar. By providing administrative overhead, we free up our partners' dollars to do mission-driven work. And we also free up their staff from having to deal with day-to-day logistics, so they can focus on the people they serve.

1

3. ▮▮▮ supports nonprofits serving some of the most vulnerable people—specifically folks who have children and families. Our partners serve over 19,000 people annually. This includes everything from providing health services, to support for people in domestic violence situations, to sex trafficking support. We are a big arm of wraparound services that vulnerable people across Central Oregon need. Although two of our campuses are in ▮▮▮ which is relatively more populous, a lot of our staff serve the more outlying rural areas as well.

4. ▮▮▮ holds quarterly partner connection meetings with the nonprofits it serves, and through those meetings and other routine communications, we have heard from our partners with significant concerns about the federal grant funding freeze. I view it as part of my job to speak for our partners, so I am sharing the story of just one as an illustrative example.

5. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (also a member of Plaintiff National Council of Nonprofits through the Nonprofit Association of Oregon) provides really critical family support and intervention services to vulnerable families in Central Oregon. Intervention services are for families facing multiple stressors such as financial insecurity or being at risk of losing their children. ▮▮▮▮▮▮ steps in to provide family support, child care, advocacy, and other wraparound services so that families having a hard time can keep their children safe and keep their family together. They are focused on preventing child abuse, and often work with low-income families who are otherwise isolated.

6. ▆▆▆▆▆▆▆▆ has sites across Central Oregon and serves more than 300 children and their families each year. But that doesn't even begin to scratch the surface of the need in our communities. Because ▆▆▆▆▆▆▆▆ serves such a wide community, they need to expand. Specifically, they are beginning a construction project in ▆▆▆▆ Oregon, to expand their family support and child care services there. ▆▆▆▆ is one of the highest-need communities in Central Oregon. It has a very low-income population.

7. ▆▆▆▆▆▆▆▆ relies on grant funding from the Health Resources and Services Administration (HRSA) to fund this construction project. They were allocated over $340,000, and have spent $30,000 so far—with plans to spend the entirety.

8. ▆▆▆▆▆▆▆▆ receives its grants as a subrecipient through the Oregon Association of Relief Nurseries (OARN). Because they are a subrecipient, these reimbursements normally take fifteen days to receive.

9. On January 28, ▆▆▆▆▆▆▆▆ was notified by OARN that the account access was frozen. They received no communications from HRSA as to why.

10. ▆▆▆▆▆▆▆▆ was extremely worried to find their funding frozen: losing that funding would have been catastrophic to the ▆▆▆▆ construction project, and brought it completely to a halt.

11. Fortunately, on January 30, ▆▆▆▆▆▆▆▆ was notified by OARN that they had access to the funding portal, but even the relatively brief freeze has had lingering effects.

12. ███████████ is concerned about how to even proceed knowing there could be volatility if their funding is frozen again. If they were to spend further money on the construction project and not be able to get it reimbursed, that would be catastrophic to the organization and its staffing model.

13. Continuing the construction itself has also become more difficult. ███████████ is currently working with architects and engineers, and just on February 6 had their final meeting with the city on land use. But in all of those conversations, they had to be extremely open with everyone that they may run into a sudden pause again if the injunction in this litigation goes away.

14. To try to remedy some of those concerns, ███████████ has asked for biweekly progress billing, so they can draw down more frequently and not put too much money out at any given time. But it is very hard to secure vendors and contractors—especially in a rural area—if you have to tell them that the project you're asking them to work on may stop at any time.

15. This is further complicated by the fact that they must get three quotes for every element of the project. They have to spend a lot of administrative time securing contractors and vendors, and they are concerned that the freeze could come back on a moment's notice and therefore require them to do the work again or lose funding.

16. ███████████ doesn't get compensated for their staff's administrative time expended doing the legwork to try to find contractors who will work in these uncertain conditions. It has already had a significant impact on their senior

4

leadership team, and they are spending multiple hours every week attempting to solve the problems created by the freeze and plan for the possibility the freeze could return. This interferes with their ability to provide other services that are core to the organization's mission. Without a partnership between ▮▮▮▮ and ▮▮▮▮, ▮▮▮▮ leadership would not have had time to write a declaration.

17. Because of their concerns about the funding freeze restarting, ▮▮▮▮ is currently being forced to reevaluate whether they feel secure enough in their funding stream to even break ground, because they'd be on the hook for it whether or not their funding comes through as it is supposed to. And once actual construction starts, they'll be at the point of no return.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 10, 2025, in ▮▮▮▮, Oregon.