**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|                                                    |   |                                  |
|----------------------------------------------------|---|----------------------------------|
| National Council of Nonprofits, *et al.*,          | ) |                                  |
|                                                    | ) |                                  |
| Plaintiffs,                                        | ) |                                  |
|                                                    | ) |                                  |
| v.                                                 | ) | Civil Action No. 1:25-cv-239 (LLA) |
|                                                    | ) |                                  |
| Office of Management and Budget, *et al.*,         | ) |                                  |
|                                                    | ) |                                  |
| Defendants.                                        | ) |                                  |

_____

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................3

I.   Executive Actions Regarding Funding ...........................................................................3

II.  Procedural History .........................................................................................................5

STANDARD OF REVIEW .....................................................................................................7

ARGUMENT .......................................................................................................................8

I.   This Court Lacks Jurisdiction to Enter Preliminary Relief...............................................8

   A.  Rescission of the OMB Memo Has Mooted Plaintiffs' Claims, Or At Least Mooted
       Their Demand for Preliminary Relief .......................................................................8

   B.  Plaintiffs Lack Standing to Seek Prospective Relief ................................................11

II.  Plaintiffs' Claims Fail at the Outset Because They Are Too Amorphous for Resolution ........14

   A.  The OMB Memo Is Not a Discrete, Final Agency Action................................................14

   B.  Plaintiffs' Arbitrary and Capricious and First Amendment Claims Are Not Ripe.............16

III. Plaintiffs' Claims Are Meritless On Their Own Terms.......................................................20

   A.  All of Plaintiffs' Claims Rest on an Incorrect Reading of the OMB Memo.....................20

   B.  The OMB Memo Was Not Arbitrary and Capricious .......................................................25

   C.  OMB Has Ample Statutory Authority to Advise Agencies to Pause Funds .....................31

   D.  Plaintiffs' First Amendment Claims Are Meritless Because the Government May
       Choose Which Programs It Intends to Subsidize.................................................................34

IV.  The Balance of the Equities Independently Forecloses Relief .............................................36

   A.  Plaintiffs Have Not Proven Irreparable Injury in the Absence of a Preliminary
       Injunction .........................................................................................................................36

   B.  The Public Interest Weighs Squarely Against Relief.........................................................39

V.   Any Injunctive Relief Should be Limited and Stayed ...........................................................41

   A.  Injunctive Relief Should Be Limited to the Present Plaintiffs and the Object of Their
       Challenge: The OMB Memo .............................................................................................42

B.  Relief Should Be Limited to Preserve the Executive Branch's Discretionary Authority..........................................................................................................42

CONCLUSION.....................................................................................................................45

## INTRODUCTION

Plaintiffs here seek emergency, preliminary relief against an Office of Management and Budget (OMB) memorandum that has now been withdrawn. Even before its withdrawal, OMB expressly stated that the memorandum's temporary pause on funding was not an across-the-board freeze, it applied only to discrete categories of funding, and it was to be implemented by agencies only to the extent doing so was consistent with agencies' underlying statutory authorities. Plaintiffs nonetheless continue to portray the OMB memorandum in the broadest possible terms, characterizing this case as being about "a government-wide halt on trillions of dollars in grants, loans, and other forms of financial assistance." Mot. for Prelim. Inj. (ECF No. 40) at 21 ("PI Mot."). In reality, this case is about something far more modest—the Executive's ability to instruct agencies to temporarily pause limited categories of funding, to the extent doing so is consistent with agencies' underlying statutory authorities, to ensure that such funding aligns with a new Administration's priorities. That authority is well-settled, and this Court should decline Plaintiffs' invitation to enjoin and oversee the Executive Branch's funding decisions. For numerous reasons, this Court should deny Plaintiffs' motion.

First, Plaintiffs' claims are moot. Their Complaint seeks relief against only one action—OMB Memorandum M-25-13, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* (Jan. 27, 2025) ("OMB Memo")—which was withdrawn weeks ago. They cannot demonstrate a need for continued relief, and certainly not emergency preliminary relief, in light of that rescission. Plaintiffs' claims are also impermissibly amorphous, essentially litigating abstract questions about the Executive Branch's ongoing funding decisions, rather than seeking relief in concrete factual and legal contexts. These types of broad, programmatic challenges are not cognizable under the Administrative Procedure Act (APA) and are not ripe for review.

Plaintiffs' claims also all fail on the merits. They portray the OMB Memo as

"command[ing] a near immediate freeze on all obligations and disbursements of essentially all federal financial assistance."  PI Mot. at 16.  But they misconstrue the text of the OMB Memo itself, and their PI motion wholly ignores the guidance that OMB issued the very next day, before the temporary pause's effective date, making clear that the pause applied only to discrete categories of funding and must be implemented consistent with law.  There is no valid basis for ignoring this official pronouncement about the scope of the challenged action in this case, and Plaintiffs' refusal to acknowledge it underscores that their claims are tilting at windmills.

Regardless, the OMB Memo was lawful standing on its own.  Given that taxpayer funding is finite, it is perfectly rational for a new Administration to direct a temporary, short-term pause on funding to evaluate whether that funding is being put to the best use, as consistent with law.  Indeed, that is exactly what President Biden did four years ago with respect to over $1 billion in border wall funding.  Such actions are well within the Executive's authority, and should not be deemed irrational by courts second-guessing the wisdom of those policy choices.  Courts likewise should not preclude OMB from coordinating agencies' funding decisions consistent with the President's agenda.  That is precisely OMB's role given its responsibilities over financial management and budget execution and performance.  Lastly, Plaintiffs' First Amendment claim is foreclosed by longstanding Supreme Court precedent.  If a pause in funding is enough to create a First Amendment violation, then the Government would be disabled from ever choosing among eligible recipients for funds.

Even beyond the merits, the balance of the equities also weighs squarely against entering the intrusive relief Plaintiffs request.  Plaintiffs cannot identify any threat of immediate, irreparable harm given that the OMB Memo has been rescinded (and many of the funds for which they claim harm were not within the scope of that Memo's pause anyway).  In contrast, Plaintiffs' requested

relief would constitute an extraordinary intrusion into the Executive's lawful prerogatives, effectively turning this Court into a superintendent over the Executive Branch's funding decisions.

At an absolute minimum, any relief entered here should be significantly limited and immediately stayed pending any appeal that is authorized. The proper course, however, is to deny Plaintiffs' motion for a preliminary injunction, and to the extent they suffer funding deprivations in the future that they believe are unlawful, allow them to challenge such deprivations through the ordinary course of grant- and program-specific challenges.

## BACKGROUND

### I.    EXECUTIVE ACTIONS REGARDING FUNDING

On January 20, 2025, the President issued various Executive Orders, some of which directed temporary pauses in certain funding. For example, in the *Unleashing American Energy* Executive Order, the President directed that "[a]ll agencies shall immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58) . . . and shall review their processes, policies, and programs for issuing grants, loans, contracts, or any other financial disbursements of such appropriated funds for consistency with the law and the policy outlined in section 2 of this order." Exec. Order No. 14,154, *Unleashing American Energy*, 90 Fed. Reg. 8353, § 7 (Jan. 20, 2025). The Order further directed that it must be "implemented in a manner consistent with applicable law[.]" *Id.* § 10(b). The following day, OMB issued a Memorandum confirming that the Order's pause on funding "only applies to funds supporting programs, projects, or activities that may be implicated by the policy established in Section 2 of the order." OMB Memorandum M-25-11, *Guidance Regarding Section 7 of the Executive Order Unleashing American Energy* (Jan. 21, 2025), https://www.whitehouse.gov/briefings-statements/2025/01/omb-memo-m-25-11/.

Six days later, on January 27, 2025, OMB issued the Memorandum that is challenged in

this case.  *See* OMB Mem. M-25-13, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* (Jan. 27, 2025).  That Memorandum "require[d] Federal agencies to identify and review all Federal financial assistance programs and supporting activities consistent with the President's policies and requirements."  OMB Memo at 1.  In particular, "[t]o implement" the President's recent Executive Orders, "each agency must complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders."  *Id.* at 2.  The OMB Memo further directed that "[i]n the interim, to the extent permissible under applicable law, Federal agencies must temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders[.]"  *Id.* at 2.  In multiple places, the OMB Memo specified that agencies should take such action "to the extent permissible by law."  *Id.*  Although the OMB Memo's "temporary pause will become effective on January 28, 2025, at 5:00 PM," the OMB Memo also instructed agencies that, even before completing their review of programs, they "must immediately identify any legally mandated actions or deadlines for assistance programs arising while the pause remains in effect."  *Id.*

Following reports of agencies broadly pausing Federal financial assistance, the very next day OMB issued a guidance document emphasizing the narrow scope of the temporary pause.  *See* OMB Guidance (ECF No. 11-1) (Jan. 28, 2025).  In particular, the Guidance stated in bold text that "[a]ny program not implicated by the President's Executive Orders is not subject to the pause."  OMB Guidance at 1.  The OMB Guidance also reiterated that agencies should pause funding only when doing so is consistent with underlying law.  *See id.* ("In implementing President Trump's Executive Orders, OMB issued guidance requesting that agencies temporarily pause, *to the extent permitted by law*, grant, loan or federal financial assistance programs that are implicated by the

-4-

President's Executive Orders." (emphasis added)); *id.* ("Any payment required by law to be paid

will be paid without interruption or delay."); *id.* at 2 ("It is a temporary pause to give agencies time

to ensure that financial assistance conforms to the policies set out in the President's Executive

Orders, to the extent permitted by law."). Additionally, the OMB Guidance emphasized that,

consistent with the OMB Memo's exclusion for assistance received by individuals, *see* OMB

Memo at 1 n.1, numerous government programs were not subject to the pause:

> [A]ny program that provides direct benefits to Americans is explicitly excluded
> from the pause and exempted from this review process. In addition to Social
> Security and Medicare, already explicitly excluded in the guidance, mandatory
> programs like Medicaid and SNAP will continue without pause.
>
> Funds for small businesses, farmers, Pell grants, Head Start, rental assistance, and
> other similar programs will not be paused. If agencies are concerned that these
> programs may implicate the President's Executive Orders, they should consult
> OMB to begin to unwind these objectionable policies without a pause in the
> payments.

OMB Guidance at 1-2.

Before OMB and agencies were able to fully implement the OMB Memo and its

accompanying guidance, this Court entered a partial administrative stay of the OMB Memo on

January 28, 2025. *See* ECF No. 13. Following that administrative stay, OMB elected to rescind

the challenged Memo. *See* OMB Mem. M-25-14, *Rescission of M-25-13* (Jan. 29, 2025) ("OMB

Memorandum M-25-13 is rescinded. If you have questions about implementing the President's

Executive Orders, please contact your agency General Counsel.") (ECF No. 18-1).

## II.    PROCEDURAL HISTORY

Plaintiffs filed this case on January 28, 2025, against two Defendants—OMB and the

Acting Director of OMB—seeking an order nullifying Memo M-25-13. *See* Complaint (ECF

No. 1) ¶¶ 5-6, 43-61. Plaintiffs filed this suit on behalf of several associations and organizations,

only some of which directly receive federal financial assistance. With respect to the National

Council of Nonprofits (NCN) and Main Street Alliance (MSA), only their members appear to receive federal assistance. *See id.* ¶¶ 32, 37. The American Public Health Association (APHA) and SAGE appear to directly participate in certain grant programs. *Id.* ¶¶ 33, 41. Plaintiffs' Complaint alleges that the OMB Memo is arbitrary and capricious, is in excess of OMB's statutory authority, and violates the First Amendment. *Id.* ¶¶ 44-61.

Plaintiffs moved for a temporary restraining order against the OMB Memo, *see* ECF No. 5, and this Court entered a partial administrative stay as to the Memo, directing that "Defendants shall refrain from implementing OMB Memorandum M-25-13 with respect to the disbursement of Federal funds under all open awards." ECF No. 13 at 4-5. The administrative stay did not, however, affect implementation of the OMB Memo as it pertains to the "issuance of new awards" or "other relevant agency actions that may be implicated by the executive orders." *Id.* at 4. Nor did the administrative stay apply to agencies' implementation of the President's Executive Orders. *See* Tr. of Jan. 28 Hrg. at 27 ("If there are executive order reasons or rationales for the termination of other grants either before or after OMB's guidance, perhaps they fall into the case as we proceed but they would not be subject to the administrative stay."); *id.* at 29 ("So anything that was terminated pursuant to other executive orders I think is fodder for another lawsuit.").

Although OMB rescinded the challenged OMB Memo the day after this Court's administrative stay, Plaintiffs indicated that they still desired relief, and accordingly the parties litigated Plaintiffs' motion for a temporary restraining order as well as Defendants' motion to dismiss. *See* ECF Nos. 5, 20, 24, 26. This Court held a hearing on February 3, 2025, after which the Court entered a temporary restraining order and denied Defendants' motion to dismiss. *See* TRO Op. & Order (ECF No. 30). The Court concluded that it had jurisdiction notwithstanding rescission of the Memo, *id.* at 6-19, and also that "Plaintiffs have shown that they are likely to

succeed on the merits of their arbitrary and capricious claim." *Id.* at 26.  Accordingly, the Court ordered that "Defendants are enjoined from implementing, giving effect to, or reinstating under a different name the directives in OMB Memorandum M-25-13 with respect to the disbursement of Federal funds under all open awards," and also ordered that "Defendants must provide written notice of the court's temporary restraining order to all agencies to which OMB Memorandum M-25-13 was addressed," with that written notice "instruct[ing] those agencies that they may not take any steps to implement, give effect to, or reinstate under a different name the directives in OMB Memorandum M-25-13 with respect to the disbursement of Federal Funds under all open awards" and "also instruct[ing] those agencies to release any disbursements on open awards that were paused due to OMB Memorandum M-25-13[.]"  *Id.* at 29.  Consistent with the Court's Order, Defendants filed a copy of that written notice with the Court.  *See* ECF Nos. 39, 39-1.

Plaintiffs filed their motion for preliminary injunction on February 11, 2025, *see* ECF No. 40, and Defendants now oppose.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (cleaned up).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  When "the Government is the opposing party," the assessment of "harm to the opposing party" and "the public interest" merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Additionally, Plaintiffs bear the burden of showing subject-matter jurisdiction.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  Because "standing is not dispensed in gross," Plaintiffs must "demonstrate standing for each claim that they press and for each form of relief

that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

ARGUMENT

## I.    THIS COURT LACKS JURISDICTION TO ENTER PRELIMINARY RELIEF

Despite the parties disputing jurisdiction at the TRO stage, and despite this Court's expectation that the parties would "fully brief and argue Plaintiffs' request for a preliminary injunction," TRO Op. & Order at 29 n.10, Plaintiffs make no effort to establish this Court's jurisdiction over their PI motion.  Plaintiffs cannot simply assume the Court will find jurisdiction as it did at the TRO stage given the updated factual record now before the Court.  Nor does denial of a Rule 12 motion suffice for proving jurisdiction at the preliminary-injunction stage.  *See, e.g.*, *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) ("At the preliminary injunction stage, then, the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing."); *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) ("We note that the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion, for example[.]").  Plaintiffs' failure to discuss jurisdiction is reason enough to deny their motion, but in any event the record here confirms a lack of jurisdiction.

### A.    Rescission of the OMB Memo Has Mooted Plaintiffs' Claims, Or At Least Mooted Their Demand for Preliminary Relief

Plaintiffs' only claims in this case challenge the OMB Memo.  That is the singular action challenged in the Complaint, *see* Compl. ¶¶ 43-61, and there are no defendants named in this suit other than OMB and the Director of OMB, *id.* ¶¶ 5-6.  Furthermore, Plaintiffs' requested relief is explicitly tied to the OMB Memo.  *See id.* at 18-19 (prayer for relief asking for declaratory and injunctive relief relating to "Memo M-25-13").  And Plaintiffs have affirmatively conceded that this lawsuit does not challenge implementation of the President's Executive Orders, *see* TRO Hrg. Tr. at 15, or independent agency decisions wholly apart from the challenged OMB Memo, *see id.*

at 18-19; *see also* ECF No. 26 at 11-12.  Thus, the only challenge here is against the OMB Memo.

Of course, the OMB Memo was rescinded weeks ago.  Plaintiffs' claims are therefore moot. *See Fund for Animals, Inc. v. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006) ("Because the memo has expired, this claim is moot."); *Christian Knights of Ku Klux Klan Invisible Empire, Inc. v. District of Columbia*, 972 F.2d 365, 369 (D.C. Cir. 1992) (holding that case was moot because the challenger "received the full measure of relief it sought through its complaint").

Although Plaintiffs' motion does not directly address mootness, it does assert (based on an inadmissible news report) that "the freeze is still at least partly in effect."  PI Mot. at 9 & n.6.  But even if the Court considered this assertion, Plaintiffs do not establish that this purported continuing freeze stems from the OMB Memo (as opposed to independent agency discretion), or that it has any continuing adverse effects *on them*, as required to undermine mootness.  *See S.W. Bell Tel. Co. v. FCC*, 168 F.3d 1344, 1350 (D.C. Cir. 1999) (plaintiffs must "demonstrate a 'personal stake in the outcome' of the case" in order to invoke jurisdiction of the federal courts, and therefore "[w]here an action has no continuing adverse impact and there is no relief that a court may grant, any request for judicial review of the action is moot.").  In fact, Plaintiffs admit that "[t]he individual declarants who at the TRO stage described their difficulties accessing funds have since been able to draw on their open awards" and that "[m]any others of Plaintiffs' members are now also able to draw on open awards."  PI Mot. at 9.[1]

This Court's prior Order invoked the voluntary cessation exception to mootness.  *See* TRO Op. & Order at 14-16.  But application of that exception is inconsistent with the factual record now

---

[1] Plaintiffs also point to e-mails from EPA and NSF citing the OMB Memo even after it was administratively stayed and/or rescinded.  *See* PI Mot. at 7-8.  As explained at the TRO hearing, however, those were errors, and in both situations upon being made aware of the information counsel for Defendants acted promptly to rectify them.  *See* TRO Hrg. Tr. at 4-5.

before the Court.  In particular, there is no reason to think OMB would reissue the challenged Memo if relief were denied, given that the Executive Orders remain in effect.  Even before this Court granted any relief, OMB expressly stated that the temporary pause applied only to funding implicated by the President's Executive Orders.  *See* OMB Guidance at 1 ("Any program not implicated by the President's Executive Orders is not subject to the pause.").  Rescission of the OMB Memo (and press statements surrounding that rescission) cannot be characterized as an intent to defeat this Court's jurisdiction, *see* TRO Op. & Order at 15-16, when OMB had already confirmed that the challenged Memo sought to accomplish only what is unchallenged in this case—*i.e.*, temporarily pause funding implicated by the President's Executive Orders.  *See* TRO Hrg. Tr. at 15.  Moreover, and perhaps most significantly, although at the time the TRO was issued Plaintiffs had urged that a broad-based funding freeze remained in effect, as noted above they now acknowledge that not only have their identified members been able to draw on their awards, but many other entities that had not been identified in the context of this litigation have likewise been able to draw on their awards.  Those facts, together with OMB's decision to rescind the OMB Memo to avoid confusion, reflect that the Government is not adopting a wholesale funding freeze (which was never the intention to begin with), even if some confusion in the Memo's first days caused it to be construed by some agencies in an overbroad fashion.  Particularly in light of the presumption of good faith to which the Government is entitled, *see* TRO Op. & Order at 15, it is wholly speculative to suggest that, if this suit is dismissed, the Government will resume a policy of freezing all funding, which the Executive has both disclaimed and rescinded.

Even if the Court concludes that this case as a whole is not moot, at a minimum Plaintiffs' request for preliminary relief is moot.  Courts recognize that there is a "distinction between mootness as to a preliminary-injunction . . . and mootness as to the case as a whole."  *Ohio v.*

*Envtl. Prot. Agency*, 969 F.3d 306, 309 (6th Cir. 2020) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 394-95 (1981)).   Whether a request for preliminary relief is moot therefore "depends on whether there remains a reasonable possibility that [the challenged conduct will recur] while this case remains pending in the district court." *Id.* at 309.   Thus, even in cases in which courts rule that plaintiffs' claims as a whole are not moot due to the voluntary cessation doctrine, courts rule that "*preliminary* relief . . . is moot because defendants have [voluntarily] provided or promised to provide all the relief that plaintiffs sought." *Brooks v. Gant*, No. 12-5003, 2012 WL 871262, at *2 (D.S.D. Mar. 14, 2012); *see also Int'l Gemmological Inst., Inc. v. Indep. Gemological Labs, Inc.*, No. 00-4897, 2000 WL 1278179, at *1 (S.D.N.Y. Sept. 7, 2000) ("While voluntary cessation of challenged conduct does not of itself moot an action for injunctive relief, and thus does not require dismissal of a complaint, such a cessation surely is relevant to a claim for a preliminary injunction.").   By rescinding the OMB Memo, the Government has voluntarily provided the prospective injunctive relief that Plaintiffs sought in their Complaint. *See* Compl. at 18-19 (seeking injunctive relief as to the OMB "Memo").   To the extent Plaintiffs claim to suffer from a revived version of the OMB Memo during the pendency of this action, they can file another motion for preliminary relief.   At present, however, it is wholly speculative to claim that emergency relief is necessary to avert harms associated with an agency action that has already been rescinded.   Thus, even if the voluntary rescission of the challenged OMB Memo does not moot the entire case, it surely moots Plaintiffs' request for preliminary relief.

### B.    Plaintiffs Lack Standing to Seek Prospective Relief

Even if Plaintiffs' claims were not moot, their claims fail—and their motion for preliminary injunction must be denied—because they still have not established "injury in fact" that was "fairly . . . traceable to the challenged action" and "redress[able] by a favorable decision" even before the OMB Memo was rescinded. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

As an initial matter, Plaintiffs cannot claim injury-in-fact based on funding streams that were not included within the OMB Memo's temporary pause. The OMB Memo itself expressly tied the pause to activities "that may be implicated by the executive orders." OMB Memo at 1. And even if there were some ambiguity, the OMB Guidance—issued the very next day, before the temporary pause's effective date—made explicit that "[a]ny program not implicated by the President's Executive Orders is not subject to the pause." OMB Guidance at 1. At the TRO hearing, Plaintiffs stated that *none* of their members' funding implicates any of the Executive Orders. *See* TRO Hrg. Tr. at 51 ("It's hard, actually, to think of one of the declarants that we provided whose funding does have an obvious connection to any of the EOs."). If that is correct, Plaintiffs' alleged injuries do not stem from the OMB Memo itself, but rather (at most) implementation decisions by agencies who are not named as defendants.

Nor can Plaintiffs establish injury through their conclusory statement that the OMB Memo's "threat to core rights of speech and association protected by the First Amendment constitutes irreparable harm all on its own." PI Mot. at 31, 35. Even for First Amendment claims, "in order to have standing, an individual must present more than allegations of a subjective chill. There must be a claim of specific present objective harm or a threat of specific future harm." *Bigelow v. Virginia*, 421 U.S. 809, 816-17 (1975). And here, Plaintiffs nowhere identify the specific expressive activity for which they claim they are being penalized, or how the OMB Memo's pause as to certain grants involving certain policies operates as a threat of harm to them specifically. Indeed, their actual feared harm appears to be a loss of *future* federal funding—*i.e.*, that "their future receipt of federal financial assistance depends on the content and viewpoint of their speech," PI Mot. at 35—which is not only premature prior to any decision on future funding, but also would not be redressed by an order prohibiting a temporary pause in current funding.

Even if Plaintiffs had an injury, Plaintiffs still have not proven that such injuries were caused by the OMB Memo as opposed to unchallenged actions by non-defendant agencies. The now-rescinded OMB Memo did not itself temporarily pause any federal financial assistance. Rather, the OMB Memo merely instructed federal agencies to temporarily pause certain federal financial assistance programs "to the extent permissible under applicable law." OMB Memo at 2.

Plaintiffs argue that the OMB Memo did not "leave it to agency discretion to decide what to pause." PI Mot. at 13. But the OMB Memo on its face does not determine which funds or grants should be paused; it requires that agencies make that determination, consistent with their own authorities. Because the OMB Memo's instruction was conditional on each agency's determination that they had discretion to pause particular funding, any pause in funding is not "fairly . . . trace[able] to the challenged action of the defendant" but rather is "th[e] result [of] the independent action of some third party not before the court." *Defs. of Wildlife*, 504 U.S. at 560; *see also Louisiana v. Biden*, 64 F.4th 674, 681-84 (5th Cir. 2023) (holding that States lacked standing to challenge Executive Order because the Order "d[id] not *require* any action from federal agencies," in part because "[a]gencies must exercise discretion in . . . deciding to use the Interim Estimates as 'appropriate and consistent with applicable law,'" and thus any harms "are traceable to possible agency actions, not to the [executive order] or the Interim Estimates").

Plaintiffs contend that causation must exist because certain "funds began flowing again" following entry of this court's temporary restraining order. PI Mot. at 33 n.10. But that could equally be because such funds were not intended to be paused under the OMB Memo and OMB Guidance, or because of a broader court order entered by a district court in Rhode Island (extending beyond just the OMB Memo challenged in this case). *See New York et al. v. Trump et al.*, No. 25-cv-39 (JJM), ECF Nos. 50, 96 (D.R.I. Feb. 3, 2025). Thus, the resumption of funding does not

prove causation specific to the challenged OMB Memo.

Finally, Plaintiffs cannot establish redressability because their funding is not administered by OMB, but instead by Federal agencies that are not parties to this lawsuit who "would not be bound" by any injunction in this case. *Haaland v. Brackeen*, 599 U.S. 255, 293 (2023). Regardless of any injunction that could be entered here, those Federal agencies would remain free to pause Plaintiffs' funding pursuant to their own discretion. Thus, "an injunction" against the OMB Memo "would not give [Plaintiffs] legally enforceable protection from the allegedly imminent harm." *Id.*

Ultimately, to establish standing, Plaintiffs must clearly articulate specific funds that (1) are within the scope of the OMB Memo's pause, (2) remain at risk of being paused because of that Memo as opposed to some other independent agency action or Executive Order not challenged in this case, and (3) would necessarily be unpaused (or remain unpaused) if this Court entered preliminary relief directed at the OMB Memo. Plaintiffs have not made that showing here, especially as they fail to address standing. Accordingly, even apart from mootness, Plaintiffs also lack standing to obtain prospective preliminary relief.

## II.    PLAINTIFFS' CLAIMS FAIL AT THE OUTSET BECAUSE THEY ARE TOO AMORPHOUS FOR RESOLUTION

Beyond just failing to address jurisdiction, Plaintiffs' PI motion fails to address another fundamental defect in their claims, which is that they are simply too amorphous for resolution in the absence of concrete factual contexts.

### A.    The OMB Memo Is Not a Discrete, Final Agency Action

The APA permits review only over "final agency action," 5 U.S.C. § 704, which must also be "circumscribed [and] discrete." *Norton v. Southern Utah Wilderness Alliance (SUWA)*, 542 U.S. 55, 62 (2004). The APA does not provide for "general judicial review of [an agency's] day-to-day operations," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1999).

Here, the OMB Memo is not a final agency action because, as discussed, the OMB Memo itself did not determine that any particular grants should be paused.  Any effect on Plaintiffs necessarily required a subsequent agency to decide to actually suspend Plaintiffs' funding, which means the OMB Memo itself was not a final agency action subject to direct challenge.  *See, e.g.*, *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) ("The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties."); *DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) ("[C]ourts have defined a nonfinal agency order as one, for instance, that does not itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action." (quotation marks omitted)).

Even apart from final agency action, however, Plaintiffs' APA claims fail for an even more straightforward reason: even assuming Plaintiffs could challenge the OMB Memo based on its supposedly determinative impact on numerous funding streams, that is an amorphous programmatic challenge—not a challenge to a discrete agency action as required under the APA. "Under the terms of the APA, respondent must direct its attack against some particular 'agency action' that causes it harm."  *Nat'l Wildlife Fed'n*, 497 U.S. at 891.  Perhaps the APA would allow individual grant recipients to challenge specific withholdings of funds under a particular grant. But that is not what Plaintiffs seek in this suit; they are not bringing claims, for example, based only on a pause of funding under specific programs affecting their specific Plaintiffs.  Instead, they claim to seek relief on behalf of "tens of thousands of members" potentially affected by the "many, many grant programs across the country."  Tr. of Jan. 28 Hrg. at 6.

Such amorphous, generalized claims—untethered to specific decisions in the context of individual grant programs—are indistinguishable from the type of broad, programmatic challenges

the Supreme Court and D.C. Circuit have rejected.  *See Nat'l Wildlife Fed'n*, 497 U.S. at 890; *Am. Forest Res. Council v. United States*, 77 F.4th 787, 805 (D.C. Cir. 2023) (rejecting a "blunderbuss challenge" in which the plaintiffs "complain not that the Secretary failed to take a specific action but rather that she failed to carry out the . . . Act's general directives"); *Fund for Animals, Inc. v. Bureau of Land Mgmt.*, 460 F.3d 13, 21 (D.C. Cir. 2006).

These principles are not limited to situations where a private party seeks to compel compliance with a broad statutory mandate.  Rather, these principles reflect a concern about ensuring courts maintain a limited role in APA litigation.  Plaintiffs here are essentially arguing that, for every single grant involving them or their members, OMB (and non-defendant agencies) have unlawfully failed to disburse their funding.  Providing relief on such a claim would necessarily require "pervasive oversight by federal courts over the manner and pace of agency compliance" with countless appropriations laws, which is simply "not contemplated by the APA." *SUWA*, 542 U.S. at 67.  As Plaintiffs' ongoing compliance accusations reflect, *see* PI Mot. at 8-9 & nn.4-6, this Court cannot resolve their broad claims without risking becoming an overseer of a wide swath of the Executive Branch's ongoing funding activities.  This inability to fashion tailored relief highlights the fundamental defect in Plaintiffs' impermissibly broad APA claims.

**B.    Plaintiffs' Arbitrary and Capricious and First Amendment Claims Are Not Ripe**

Similar to the above defect, Plaintiffs' claims are highly amorphous at this stage.  Plaintiffs are particular grantees with individual factual circumstances, but they seek expansive relief that would disable OMB from taking similar action as to *any* grantee.  Their claims are too amorphous and not ripe at this stage to support such broad requested relief.

"The ripeness doctrine favors postponement of review when a court believes that it would be better able to decide the case in the concrete factual context of a specific application of the

challenged agency decision." *Consolidation Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 824 F.2d 1071, 1083 (D.C. Cir. 1987). That is true even when an agency's policy is sure to cause the plaintiff's claimed injury. *See Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 300 (1979). And even if the injury is alleged to have already occurred, the claim still must arise in a sufficiently concrete factual context to allow for judicial resolution. *See State Farm Mut. Auto. Ins. Co. v. Dole*, 802 F.2d 474, 484 (D.C. Cir. 1986) ("Although we agree that the Secretary's alleged violation (as New York sees it) of the Safety Act has already occurred, this issue is still unfit for review because it has not yet arisen in a sufficiently concrete setting.").

Here, two of Plaintiffs' claims necessarily require fact-specific analysis. First, in connection with their arbitrary and capricious claim, Plaintiffs are essentially bringing a facial challenge—arguing that the OMB Memo is necessarily irrational as to every single federal grantee. *See, e.g.*, *Reno v. Flores*, 507 U.S. 292, 300-01 (1993) ("[T]his is a facial challenge to INS regulation 242.24. Respondents do not challenge its application in a particular instance; it had not yet been applied in a particular instance . . . and it had been in effect only a week when the District Court issued the judgment invalidating it. . . . To prevail in such a facial challenge, respondents 'must establish that no set of circumstances exists under which the [regulation] would be valid.'"); *Am. Hosp. Ass'n v. N.L.R.B.*, 499 U.S. 606, 619 (1991) ("The fact that petitioner can point to a hypothetical case in which the rule might lead to an arbitrary result does not render the rule 'arbitrary or capricious.' This case is a challenge to the validity of the entire rule in all its applications."); *Sherley v. Sebelius*, 644 F.3d 388, 397 (D.C. Cir. 2011). But there are undoubtedly some grants for which the temporary pause was lawful, including grants where the pause was less than a day. *See* OMB Guidance at 1 ("A pause could be as short as [a] day. In fact, OMB has worked with agencies and has already approved many programs to continue even before the pause

has gone into effect.").

In its prior Order, the Court concluded that the OMB Memo was irrational in part because "Defendants' actions appear to suffer from infirmities of a constitutional magnitude," in particular under "[t]he Appropriations Clause of the Constitution [which] gives Congress 'exclusive power' over federal spending," because "OMB ordered a nationwide freeze on pre-existing financial commitments without considering any of the specifics of the individual loans, grants, or funds." TRO Op. & Order at 25-26.  Plaintiffs here do not bring any claims under the Appropriations Clause, and aside from their claim about OMB's underlying authority, they do not contend that the OMB Memo violated particular statutes or appropriations measures.  *See* Compl. ¶¶ 44-61.  This Court should not expand Plaintiffs' claims beyond what they have chosen to plead in their Complaint.  *See, e.g.*, *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015) ("A court's equitable power lies only over the merits of the case or controversy before it.  When a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction.").

In any event, even if these considerations were appropriate, they only underscore the abstract and unripe nature of Plaintiffs' challenge.  The relevant question would be whether, for each particular grant program, a temporary pause violates the underlying statutory authorities, appropriations measures, or other regulations governing the grant.  *See In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) ("[T]he President may not decline to follow a statutory mandate or prohibition simply because of policy objections."); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018) ("[T]he Executive Branch may not refuse to disperse the federal grants in question *without congressional authorization*." (emphasis added)).  As Plaintiffs acknowledge, however, grant programs "operate pursuant to a wide array of statutory

-18-

authorizations and appropriations," and "[t]he agencies that administer those programs in turn have promulgated their own governing regulations[.]"  PI Mot. at 23.  This Court cannot conduct such analysis in the abstract, untethered from those underlying statutory authorities, appropriations measures, and grant regulations.  Even Plaintiffs do not appear to dispute that, for many grant programs, the Executive has significant discretion over selecting recipients and deciding whether to continue funding them.  Indeed, the Supreme Court has previously held that allocations from a lump-sum appropriation provide such significant discretion to the Executive that such decisions are not susceptible to judicial review.  *See Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) ("The allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion.").  Thus, to the extent the Court is considering whether the OMB Memo's pause is consistent with Congressional directions to disburse funding—a claim that Plaintiffs have not presented in this case—the claim is plainly not ripe because it is too abstract for resolution at this stage, unmoored from any specific grant or program.

Similarly, Plaintiffs' First Amendment claim likewise requires evaluation in more concrete settings.  A necessary predicate for a First Amendment claim is that a grantee must be engaging in expressive activity.  *See U.S. Telecom Ass'n v. Fed. Commc'ns Comm'n*, 825 F.3d 674, 741 (D.C. Cir. 2016) ("The Supreme Court has explained that the First Amendment comes 'into play' only where 'particular conduct possesses sufficient communicative elements,' that is, when an "intent to convey a particularized message is present, and in the surrounding circumstances the likelihood is great that the message would be understood by those who viewed it." (cleaned up)).  That is necessarily a fact-specific inquiry that cannot be generalized across all recipients of federal funding to conclude that they, too, believe the OMB Memo stifles their expressive conduct and are entitled to relief.  Such a claim requires more granular analysis, inconsistent with the broad, amorphous

attack that Plaintiffs bring against the OMB Memo.[2]

## III.    PLAINTIFFS' CLAIMS ARE MERITLESS ON THEIR OWN TERMS

Even if the Court were willing to review Plaintiffs' claims on the merits, the Executive Branch's actions here were lawful.  It is well established that, to effectuate his discretion and policy objectives, the President may direct agencies to take actions to pause funding pursuant to the authority those agencies possess under their organic statutes and regulations.  Plaintiffs do not take issue with that legal proposition, which should end the matter because that is all the OMB Memo sought to accomplish.

Plaintiffs' claims all rest on a serious misreading of the OMB Memo, both in terms of its scope and instructions to agencies.  Properly understood, the OMB Memo amply satisfies the standard for arbitrary and capricious review under the APA.  And the OMB Memo fits comfortably within the statutory authorities vested in OMB, as well as the First Amendment's constraints.  Thus, none of Plaintiffs' claims warrants the extraordinary relief of a preliminary injunction.

### A.    All of Plaintiffs' Claims Rest on an Incorrect Reading of the OMB Memo

Plaintiffs' claims in this case all rest on a flawed premise—that the OMB Memo instructed agencies to pause all forms of federal financial assistance, without regard to the underlying legal framework governing such funding.  But this characterization is incorrect in two respects:  the OMB Memo's temporary pause was not across the board, and the OMB Memo expressly instructed agencies to implement a pause only to the extent permissible by law.  This critical language in both

---

[2] Defendants understand Plaintiffs' statutory claim to be solely about the question whether OMB has "authority to issue . . . a government-wide halt on trillions of dollars in grants, loans, and other forms of financial assistance."  PI Mot. at 21.  That statutory question on its own does not raise ripeness concerns.  But to the extent Plaintiffs' claim is broader—and seeks to disable OMB from *ever* advising agencies to implement temporary pauses on particular funding to the extent permissible by law, *cf. infra* Part V—that broader claim would raise ripeness concerns because Plaintiffs would essentially be asking this Court to issue an advisory opinion on the full parameters of OMB's authority.

the OMB Memo and the OMB Guidance cannot simply be ignored.

Plaintiffs continue to frame this case as being about whether the Executive Branch can categorically pause all funding without consideration of whether a pause is consistent with the underlying legal framework governing that funding. *See, e.g.*, PI Mot. at 16 ("The Order . . . commands a near immediate freeze on all obligations and disbursements of essentially all federal financial assistance."). But that interpretation is contrary to the OMB Memo's plain text. First, the OMB Memo's temporary pause was expressly connected to the President's Executive Orders:

> *To implement these orders*, each agency must complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that *may be implicated by any of the President's executive orders*. In the interim, to the extent permissible under applicable law, Federal agencies must temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities *that may be implicated by the executive orders*[.]

OMB Memo at 2 (emphases added, bold text omitted). Second, as that language also reflects, agencies were instructed to implement that pause only "to the extent permissible under applicable law." *Id.* The OMB Memo elsewhere reiterated that the temporary pause is about the President's Executive Orders and should be implemented only consistent with law: "This temporary pause will provide the Administration time to review agency programs and determine the best uses of the funding for those programs *consistent with the law and the President's priorities*." *Id.* (emphasis added). The OMB Memo acknowledged six times that agencies should act "consistent with the law," *i.e.*, that agencies should *not* contravene their statutory authorities. *Id.*

Consistent with the OMB Memo, the OMB Guidance—issued the very next day—further emphasizes both these points. Its bolded text states upfront that "[a]ny program not implicated by the President's Executive Orders is not subject to the pause." OMB Guidance at 1. And it later emphasizes that "the pause does not apply across-the-board," and "is expressly limited to programs, projects, and activities implicated by the President's Executive Orders." *Id.* Similarly,

the Guidance makes clear that the pause applies only to the extent permissible by law.  *See, e.g.*, OMB Guidance at 1 ("OMB issued guidance requesting that agencies temporarily pause, to the extent permitted by law, grant, loan or federal financial assistance programs that are implicated by the President's Executive Orders."); *id.* ("Any payment required by law to be paid will be paid without interruption or delay."); *id.* at 2 ("It is a temporary pause to give agencies time to ensure that financial assistance conforms to the policies set out in the President's Executive Orders, to the extent permitted by law.").

Plaintiffs' claims ignore all of these provisions.  Indeed, their PI motion entirely ignores the existence of the OMB Guidance.  There is no valid basis for simply ignoring an official agency pronouncement of what the challenged agency policy means.  That pronouncement was issued one day after the challenged action, divorced from the context of this litigation, and has all the same hallmarks of being an official statement from the agency regarding its policy.  Particularly in the context of a motion seeking emergency, prospective relief, Plaintiffs cannot simply ignore an official pronouncement about the action that is the object of Plaintiffs' challenge.  *Cf. Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 661 n.1 (1989) ("We therefore consider the HHS Regulations to the extent they supplement or displace the Commissioner's original directive.").

Moreover, even Plaintiffs do not dispute that the OMB Memo itself instructed agencies to pause funding only "to the extent permissible under applicable law."  As previously discussed, the D.C. Circuit has recognized that such language has meaningful effect.  *See Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002) (upholding Executive Order as proper "exercise of the President's supervisory authority over the Executive Branch" including because "the President directs his subordinates how to proceed in administering federally funded

-22-

projects, but only '[t]o the extent permitted by law,'" and thus "if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law"); *Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. 2020) (Katsas, J.) ("We cannot ignore these repeated and unambiguous qualifiers imposing lawfulness and feasibility constraints on implementing the memorandum.").

Plaintiffs now seek to distinguish *Allbaugh* on the basis that the OMB Memo's "directive to halt essentially all federal financial assistance within 24 hours can hardly be compared to a policy found to fall well within 'the ordinary course of administration.'" PI Mot. at 14 (quoting *Allbaugh*, 295 F.3d at 33). But that argument simply begs the question—by portraying the OMB Memo in the broadest possible terms, assuming that agencies will *not* give effect to the very provision under discussion, and wholly ignoring what OMB itself said was the actual scope of the policy. This is not a situation, therefore, where a savings clause "would override clear and specific language" in the challenged policy. *City & Cnty. of San Francisco*, 897 F.3d at 1239 (cited in PI Mot. at 14-15). To the contrary, the challenged policy here is replete with references to agencies acting only consistent with law. Thus, Plaintiffs cannot continue attacking an interpretation of the OMB Memo—as constituting an across-the-board freeze of all federal financial assistance—that OMB itself has expressly disavowed (and rescinded). That is the definition of inviting this Court to issue an advisory opinion with no prospective effect.

At a minimum, the challenged OMB Memo is capable of being construed as directing only a pause in funding for programs implicated by the President's Executive Orders, and directing only those funding pauses that agencies have concluded are lawful. This Court should construe the challenged policies to preserve their legality, just as it would for any other type of action. *Cf. Arizona v. United States*, 567 U.S. 387, 415 (2012) ("inappropriate to assume" that state enactment

-23-

will be construed in an impermissible manner); *Blodgett v. Holden*, 275 U.S. 142, 148 (1927) (per curiam) (presumption that statutes should be construed to be lawful); Restatement (Second) of Contracts § 203(a) (same for contracts).

Plaintiffs also dispute the "to the extent permissible by law" language by contending that "agencies had no practical ability to give effect" to that provision.  PI Mot. at 14.  As an initial matter, the OMB Memo's pause implicated only those funds related to the President's Executive Orders, most of which had been issued a week prior to the OMB Memo on January 20, 2025.  And Plaintiffs cite no authority for the proposition that courts get to decide how much time the President must afford agencies before directing them to act.  Indeed, it would be a fundamental intrusion on Article II for courts to require the President to wait a particular amount of time before directing agencies to implement his agenda to the extent permissible by law.

In any event, the dispute over whether the OMB Memo provided sufficient time for agencies to determine the legality of particular funding pauses is largely academic at this stage. The OMB Memo was withdrawn weeks ago, and the sole question before this Court is whether it should enter emergency, preliminary relief prohibiting the Executive from implementing *other* funding pauses to the extent permissible by law.  Agencies have by now had more time to analyze the Executive Orders and the various funding programs they administer, and would have even more opportunity to do so in light of any subsequent directive that might ultimately be issued. There is plainly no basis for preliminary relief now, based on *Allbaugh* and other longstanding decisions recognizing the President's legitimate authority to direct subordinate agencies' activities, as consistent with law.  *See Allbaugh*, 295 F.3d at 32 ("[T]he President's power necessarily encompasses 'general administrative control of those executing the laws,' throughout the Executive Branch of government, of which he is the head." (quoting *Myers v. United States*, 272

U.S. 52, 164 (1926), citation omitted)); *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) ("[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law."); *Sierra Club v. Costle*, 657 F.2d 298, 406 n.524 (D.C. Cir. 1981) ("The ordinary duties of officers prescribed by statute come under the general administrative control of the President by virtue of the general grant to him of the executive power, and he may properly supervise and guide their construction of the statutes under which they act[.]").  At the absolute most, Plaintiffs' argument would justify an injunction against OMB directives that provide "24 hours . . . to shut off perhaps trillions of dollars in federal funding," PI Mot. at 14, but cannot justify extending relief to the permissible exercise of Executive Branch authority that *Allbaugh* and the OMB Memo plainly comprehend.

At bottom, Plaintiffs' claims are premised on portraying the OMB Memo in the broadest possible terms—applying to all funding, regardless of that funding's own legal framework—which is contrary to the Memo's own text and the subsequent Guidance that was issued.  Properly understood, the Memo was lawful and far more modest than Plaintiffs portray.

### B.    The OMB Memo Was Not Arbitrary and Capricious

This Court previously concluded that "Plaintiffs have shown that they are likely to succeed on the merits of their arbitrary and capricious claim."  TRO Op. & Order at 26.  The Court should reach a different conclusion at this stage.

As a threshold matter, even if Plaintiffs' speculation is correct that some version of the OMB Memo might be reinstated in the future, their arbitrary-and-capricious challenge to the reasoning in this particular OMB Memo is moot.  Any new memorandum would be premised on new considerations and would not present the same legal issue as the one presented here, so a decision by this Court about the propriety of OMB's past analysis would be a pure advisory opinion.  *See Noem v. Haaland*, 41 F.4th 1013, 1016-17 (8th Cir. 2022) (finding arbitrary-and-

capricious claim challenging past event moot because "the circumstances [in the future] are likely to be different" and noting that "[i]n arbitrary-and-capricious review, even small factual differences can matter"); *cf. Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1908 (2020) (when an agency chooses to "'deal with the problem afresh' by taking *new* agency action," the agency "is not limited to its prior reasons"). Success on an arbitrary-and-capricious claim cannot foreclose the agency from taking new action based on new reasoning, *see infra* Part V, and thus success on this particular claim would not justify Plaintiffs' broad relief against both the OMB Memo and potential future versions of the OMB Memo.

Regardless, there is nothing irrational about a temporary pause in funding, to the extent permissible by law, pending a review to ensure compliance with the President's priorities. That is precisely what OMB and other subordinate agencies are legally required to do pursuant to the President's Executive Orders. *See supra* Part III.A; *Sherley*, 689 F.3d at 784 ("[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law."). It cannot be irrational for agencies, including OMB, to comply with the law in such a manner. Indeed, requiring a federal agency to articulate a rationale for its action—beyond simple compliance with the President's directives—would, in essence, subject the President's directive to arbitrary and capricious review, contrary to the principle that the President is not an agency under the APA. *Franklin*, 505 U.S. at 800-01; *see also Dalton v. Specter*, 511 U.S. 462, 475-76 (1994); *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 801 F. Supp. 2d 383, 403 (D. Md. 2011) ("the State Department and Assistant Secretary were acting on behalf of the President, and therefore their actions are not reviewable under the APA"), *aff'd*, 698 F.3d 171 (4th Cir. 2012).

The OMB Memo was also rational on its own terms. The scope of review under the

"arbitrary and capricious" standard, 5 U.S.C. § 706(2)(A), is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). This standard "deems the agency action presumptively valid provided the action meets a minimum rationality standard." *Sierra Club v. EPA*, 353 F.3d 976, 978 (D.C. Cir. 2004).

The bulk of Plaintiffs' argument, as well as this Court's prior analysis, is based on the OMB Memo constituting "a near immediate freeze on all obligations and disbursements of essentially all federal financial assistance." PI Mot. at 16; *see also* TRO Op. & Order at 26 ("OMB ordered a nationwide freeze on pre-existing financial commitments without considering any of the specifics of the individual loans, grants, or funds."). As discussed above, however, the reality is far more modest—agencies were instructed to pause discrete categories of funding, to the extent doing so is consistent with their underlying statutory authorities, to ensure that such funding aligns with a new Administration's priorities. This is not, as the Court characterized it, "a blank check for OMB to do as it pleases." TRO Op. & Order at 23. At every juncture, the Memo emphasized that all actions must be taken within the confines of existing law. *See* OMB Memo at 1-2 (cautioning six times that any pause must be in accordance with law). And as the OMB Guidance makes clear, the pause was only to affect certain discrete funding streams implicated by the President's Executive Orders, excluding "mandatory programs like Medicaid and SNAP" as well as "[f]unds for small businesses, farmers, Pell grants, Head Start, rental assistance, and other similar programs." OMB Guidance at 1-2. Thus, Plaintiffs cannot invoke those very programs to impugn the Memo's rationality. *See* PI Mot. at 16.

Additionally, the OMB Memo cogently explains that its objective is to effectuate the President's Executive Orders and "safeguard valuable taxpayer resources." OMB Memo at 1. The

OMB Memo rationally connected the temporary pause with these objectives by explaining that it is necessary to "provide the Administration time to review agency programs and determine the best uses of the funding for those programs consistent with the law and the President's priorities." OMB Memo at 2.  Plaintiffs and the Court have posited that the Executive could have made a different choice to review programs without pausing funding.  *See* TRO Op. & Order at 24; PI Mot. at 18.  But the question is whether the agency engaged in reasoned decisionmaking, not "whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016).  And the suggested alternative overlooks the obvious problem that resources are finite, and any funds that are disbursed are unlikely to ever be recouped and thus cannot be redirected and put to more valuable uses.  *Cf.* 2 C.F.R. § 200.346 (procedures for collecting debts).  Weighing the costs of a temporary pause in funding, versus the potential benefits of being able to redirect that limited funding to purposes that the Administration believes will better serve the public, is a judgment entrusted to the Executive and not the courts.  *Cf. Off. of Commc'n of United Church of Christ v. FCC*, 707 F.2d 1413, 1437 (D.C. Cir. 1983) ("When the Commission reaches such predictive conclusions about what would best be in the public interest, it is entitled to substantial judicial deference.").

The unavoidable consequence of Plaintiffs' argument is that the Executive cannot pause funding pending a review, and must instead wait a certain amount of time before implementing its priorities.  By that logic, it was irrational for agencies (at President Biden's instruction) to "pause work" and "pause immediately the obligation of funds related to construction of the southern border wall, to the extent permitted by law," for at least 60 days pending a review and development of a new plan for that funding.  Procl. No. 10,142, *Termination of Emergency With Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall*

*Construction*, 86 Fed. Reg. 7225 (Jan. 20, 2021), §§ 1(a)(i)-(ii), 2; *see also id.* § 1(a) (directing OMB to assist in implementing pauses).  Similarly, it was irrational for agencies to implement President Obama's direction to "delay funding of the project for 30 days" with respect to certain Recovery Act funding to "ensure adequate opportunity for public scrutiny of the project." *Ensuring Responsible Spending of Recovery Act Funds*, 74 Fed. Reg. 12,531 (Mar. 20, 2009), § 2(d)(i); *see also id.* (directing agencies to implement delays in consultation with OMB).

Plaintiffs cannot brush away these historic precedents as only "involv[ing] targeted pauses to specific programs," PI Mot. at 25, because the OMB Memo here likewise targeted only discrete types of funding implicated by the President's Executive Orders.  And in any event, that distinction just underscores the degree to which Plaintiffs are asking this Court to impose arbitrary timetables on the Executive based on the Court's own weighing of the relative merit of the "specific programs" at issue in the pause—*i.e.*, that it was permissible for President Biden on the first day of his Administration to immediately pause $1.375 billion in FY 2021 funding (and more from prior years' funding) associated with the southern border wall, but is nonetheless arbitrary for this Administration to likewise pause certain types of funding.  *Cf.* Department of Homeland Security Appropriations Act, 2021, Pub L. No. 116-260, div. F, § 210, 134 Stat. 1182, 1456-57 (Dec. 27, 2020) (appropriating $1.375 billion "for the construction of barrier system along the southwest border").  This Court should not open the door for arbitrary-and-capricious claims against agencies that implement the President's priorities through temporary pauses in funding.

Additionally, contrary to Plaintiffs' arguments, *see* PI Mot. at 16-17, the OMB Memo did consider real-world consequences associated with the pause—and in fact took steps to mitigate them.  First, recognizing potential consequences for individuals, the OMB Memo exempted "assistance provided directly to individuals," specifically mentioning "Medicare or social security

benefits."  OMB Memo at 1 nn.1-2; *see also* OMB Guidance at 1-2.  Second, the OMB Memo recognized that, despite the need for a pause and review of certain assistance, there may be some particular circumstances warranting a different approach, and thus provided for a safety valve through "case-by-case" exceptions to the Memo.  OMB Memo at 2.  Plaintiffs may dispute the usefulness of said safety valve, *see* PI Mot. at 21, but reasonable minds can disagree about the "best" approach; the agency is required only to make a reasonable choice.  *See State Farm* 463 U.S. at 43 ("a court is not to substitute its judgment for that of the agency").  Third, the OMB Memo was explicit that it directed only a temporary pause and review, not anything more significant such as outright cancellation of any grants.  And fourth, the OMB Memo provided a delayed effective date, with OMB acting quickly even before that effective date to "approve[] many programs to continue even before the pause has gone into effect."  OMB Guidance at 1. Those efforts do not reflect wholesale disregard of real-world consequences, but rather an attempt to balance those consequences with the stated objectives of "act[ing] as faithful stewards of taxpayer money" and ensuring that federal programs "are being executed in accordance with the law and the new President's policies." *Id.* at 2.

Finally, Plaintiffs argue that OMB failed to account for reliance interests.  *See* PI Mot. at 19.  But, in addition to addressing reliance interests through the above safeguards, the OMB Memo leaves discretion to agencies to consider any reliance issues that would be relevant to a decision about a specific federal grant—that is part of the agencies' duty to ensure they act in accordance with applicable law.

In short, there is nothing irrational about the OMB Memo's temporary pause on certain forms of assistance, to the extent permissible by law, pending a review to ensure consistency with the President's Executive Orders, as OMB (and individual agencies) are required to do. *Sherley*,

689 F.3d at 784.  A temporary pause in funding, accompanied by multiple safeguards, is a rational step toward achieving the best uses of taxpayer money as evaluated by the Executive; therefore the OMB Memo was not arbitrary and capricious.

### C.    OMB Has Ample Statutory Authority to Advise Agencies to Pause Funds

Plaintiffs argue that OMB "lack[s] statutory authority to issue . . . a government-wide halt on trillions of dollars in grants, loans, and other forms of financial assistance."  PI Mot. at 21. Again, their arguments are largely tied to their mischaracterization of the OMB Memo itself.  *See supra* Part III.A.  In any event, Plaintiffs take an unduly cramped view of OMB's authority.

At the outset, Plaintiffs' argument should be viewed skeptically given the longstanding recognition of OMB's central role in the Executive Branch.  *See, e.g.*, *Pub. Citizen, Inc. v. Off. of Mgmt. & Budget*, 598 F.3d 865, 867 (D.C. Cir. 2010) ("The Office of Management and Budget (OMB), located in the Executive Office of the President . . . , helps the President prepare the federal budget and ensures that legislation, testimony, reports, and policies prepared by other federal agencies are consistent with Administration policy."); *Meyer v. Bush*, 981 F.2d 1288, 1294 (D.C. Cir. 1993) ("[T]he OMB Director, whose duties include aiding the President in managing the entire executive branch, is . . . the cabinet officer functionally, if not actually, closest to the President.").  Indeed, it would be a startling proposition that the Office of Management and Budget cannot advise agencies on managing their budgets.

Plaintiffs largely argue that "command[ing] a full stop of essentially all federal financial assistance" is outside OMB's authorities set forth in 31 U.S.C. § 503.  But that statute is not the only one under which OMB is vested with authority.  OMB also has responsibility over budget execution, including the responsibility to apportion funds as OMB "considers appropriate."  31 U.S.C. § 1512(b)(2).  As the Fourth Circuit has explained, this provision "vest[s] the decision as to the frequency of payments in an executive officer," specifically "the Director of OMB."

*Maryland Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 854 F.2d 40, 42 (4th Cir. 1988); *see also id.* n.* (tracing the history of this provision's delegation to OMB).  To be clear, OMB did not exercise its apportionment authority in connection with the challenged OMB Memo and the temporary pause, which is yet another example of why OMB did not itself determine the legal rights or consequences of any particular funding stream.  For purposes of Plaintiffs' statutory claim, however, the relevant point is that if OMB had authority to implement the pause through apportionment, then surely it likewise had authority to implement the pause through the less-coercive form of a general memorandum.  *Cf. Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1052 (D.C. Cir. 1987) ("In this area, the greater surely includes the lesser: that is, the greater authority of an agency to review all hospital activity includes the lesser authority to train its reviewing resources on a subset of that activity likely to include a heavier dose of abuse.").

In any event, even considering only 31 U.S.C. § 503, Plaintiffs' claim still falls flat.  OMB is directed to "monitor the financial execution of the budget in relation to actual expenditures, including timely performance reports," 31 U.S.C. § 503(a)(5), which necessarily implies an oversight function in connection with "actual expenditures."  The OMB Memo's instruction to temporarily pause "actual expenditures" to allow for a review of "the financial execution of the budget" in connection with the President's priorities easily falls within this provision.

Moreover, OMB is directed to "[p]rovide overall direction and leadership to the executive branch on financial management matters by establishing financial management policies and requirements[.]" *Id.* § 503(a)(2).  Those functions are carried out by the Office of Federal Financial Management (subject to the OMB Deputy Director's control), *see id.* § 504(a), and those functions are intertwined with overseeing proper expenditures of the Government's funds.  The Office of Federal Financial Management was created by the Chief Financial Officers Act of 1990, Pub. L.

No. 101-576, 104 Stat. 2838 (Nov. 15, 1990), in which Congress made findings that:

> (1) General management functions of the Office of Management and Budget need to be significantly enhanced to improve the efficiency and effectiveness of the Federal Government.

> (2) Financial management functions of the Office of Management and Budget need to be significantly enhanced to provide overall direction and leadership in the development of a modern Federal financial management structure and associated systems.

> (3) Billions of dollars are lost each year through fraud, waste, abuse, and mismanagement among the hundreds of programs in the Federal Government.

> (4) These losses could be significantly decreased by improved management, including improved central coordination of internal controls and financial accounting.

Pub. L. No. 101-576, § 102(a).  Congress plainly understood OMB's increased role to include "central coordination of internal controls" and "provid[ing] overall direction and leadership," to help avoid further losses "through fraud, waste, abuse, and mismanagement."  *Id.*  That understanding of financial management is precisely what the OMB Memo reflects, as implementing a temporary pause "to review agency programs and determine the best uses of the funding for those programs consistent with the law and the President's priorities," and thereby "increase the impact of every federal taxpayer dollar."  OMB Memo at 1-2.

Plaintiffs' contrary theory—that OMB has no role to play in implementing such reviews and improvements—would disable OMB from acting under *all* Administrations to ensure the best uses of taxpayer dollars, contrary to the examples cited above involving Presidents Biden and Obama.  And Plaintiffs' reliance on other federal laws governing grant programs and appropriations, *see* PI Mot. at 23, is irrelevant given that the OMB Memo expressly instructs agencies to comply with those laws in implementing the pause.  Nor does the short-term, temporary pause announced in the OMB Memo bear any resemblance to the "mass debt cancellation program" in *Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023).  *See* PI Mot. at 24.  Given that the

OMB Memo itself tells agencies to implement the pause consistent with applicable law—in other words, consistent with congressional intent—there is no reason to assume that the ability to temporarily pause funding (where legally permissible) is a power "that Congress would likely have intended for itself." *Nebraska*, 143 S. Ct. at 2375.

In sum, particularly now that the OMB Memo has been withdrawn, that memorandum should not result in a judicial ruling that disables OMB from performing its functions on behalf of all Presidential Administrations. In any case, OMB had authority to issue the challenged Memo.

### D. Plaintiffs' First Amendment Claims Are Meritless Because the Government May Choose Which Programs It Intends to Subsidize

It is well-established that "[t]he Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way. In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). That straightforward principle forecloses Plaintiffs' First Amendment claim.

Plaintiffs try to circumvent *Rust* by asserting that the OMB Memo is instead stifling their expressive activity outside just the grant programs receiving federal funding. *See* PI Mot. at 26 ("[I]t is clear what will happen to recipients of federal financial assistance whose speech or associations somehow connect them to these disfavored ideas: Their funding will cease."). But Plaintiffs point to nothing in the OMB Memo reflecting an intent to penalize mere association with "disfavored ideas," except the very thing the Government is undisputedly allowed to do which is define the types of programs that the Administration does (and does not) wish to fund.

Plaintiffs continue to invoke *U.S. Agency for Int'l Dev. (USAID) v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013), but that case involved a policy "mandat[ing] that recipients of

Leadership Act funds explicitly agree with the Government's policy to oppose prostitution and sex trafficking." *Id.* at 213. Thus, it directly governed speech beyond just the confines of the activity being funded. Here, the OMB Memo's directives are framed solely around "focusing taxpayer dollars" and "[t]he use of federal resources." OMB Memo at 1.

Plaintiffs argue that the OMB Memo's definition of what activities should be funded are "ill-defined concepts." PI Mot. at 29. But each of the relevant concepts is addressed in more detail in the President's Executive Orders. And in any event, using general terms (in general guidance), while deferring to agencies to conduct the specific reviews of their programs, hardly justifies an inference that OMB is targeting "political views or associations" rather than programs receiving federal funding. *Id.* Plaintiffs also contend that they *must* be targeted because, having already received awards, they have "already . . . established that they are engaged in the activities that Congress meant to subsidize." *Id.* But that argument ignores the significant discretion afforded to agencies across numerous funding programs to choose, within the parameters set by Congress, exactly which programs to fund. *See generally Lincoln*, 508 U.S. at 192-94. Simply because a grantee receives an award at the outset does not preclude the agency from later determining that the award "no longer effectuates the program goals or agency priorities," 2 C.F.R. § 200.340(a)(4), let alone suggest that any such termination must necessarily be because of a grantee's political views or associations. Plaintiffs' objection to the tone of the OMB Memo also does not establish an impermissible purpose. PI Mot. at 29; *cf. Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015) ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says.").

At the TRO hearing, Plaintiffs argued that they were being targeted because one of the Executive Orders "tell[s] agencies to report to OMB the names of federal grantees who received

federal funding to provide or advance DEI, DEIA or environmental justice programs in the past," which they say is "irrelevant to . . . determining what activities are going to be subsidized in the future." TRO Hrg. Tr. at 56-57. But that theory of purported harm stems from an Executive Order not challenged in this suit, and has nothing to do with the validity of the OMB Memo's temporary pause. In any event, that section of the Executive Order is about winding down any ongoing programs involving policies about which the new Administration has concerns; identifying grantees that have received funds for those programs is a logical way to ensure that any ongoing programs are terminated. *See* Exec. Order No. 14,151, *Ending Radical And Wasteful Government DEI Programs And Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025), § 2(b)(ii)(C).

Finally, it bears emphasizing that the pre-requisite for any First Amendment claim is that a particular grantee is engaged in expressive conduct. That is necessarily an individualized showing, and many of the declarants do not even purport to be concerned about the OMB Memo's effect on their expressive activities. *Compare, e.g.*, TRO Hrg. Tr. at 26 (identifying Exhibit F as an example of someone "wonder[ing] will my funds ever be unfrozen, will I be associated in some way with these incredibly general targets described in the memo: Green new deal, wokeness, gender ideology, Marxist equity"), *with* Pls.' Exh. F (ECF No. 24-6) ¶¶ 3-24 (not identifying any expressive activity associated with their research or concerns about expressive activity). Even if there were a cognizable First Amendment claim, then, it could not support the broad relief that Plaintiffs seek here. But more fundamentally, Plaintiffs' First Amendment theory is foreclosed by *Rust v. Sullivan* and the principle that the Government need not fund programs to which it objects.

## IV. THE BALANCE OF THE EQUITIES INDEPENDENTLY FORECLOSES RELIEF

### A. Plaintiffs Have Not Proven Irreparable Injury in the Absence of a Preliminary Injunction

In this Circuit, there is a "high standard for irreparable injury." *Chaplaincy of Full Gospel*

*Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  Any alleged irreparable harm "must be both certain and great; it must be actual and not theoretical."  *Id*.  It also must be of such "*imminence* that there is a clear and present need for equitable relief."  *Id*. (citing *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)) (emphasis in original).  Plaintiffs' motion can be denied solely on the basis that they have failed to demonstrate irreparable injury.  *See id.* ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." (citing *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1210–11 (D.C. Cir. 1989))).

As already discussed, Plaintiffs' claims are moot, and, in any event, Plaintiffs never sufficiently alleged injury to satisfy the requirements of Article III standing.  *See supra* Section I. It therefore follows that Plaintiffs have failed to show irreparable injury for similar reasons.

Moreover, in order to demonstrate irreparable harm, Plaintiffs must show "that the alleged harm will directly result from the action which the movant seeks to enjoin." *Wis. Gas Co.*, 758 F.2d at 674; *see also California v. Trump*, 379 F. Supp. 3d 928, 959 n.21 (N.D. Cal. 2019) (in order to show irreparable harm "Plaintiffs must demonstrate some likely harm resulting *from the challenged action*" (emphasis added)).  Therefore, as previously explained in the context of mootness, Plaintiffs' assertions that they will experience harms stemming from a potential future funding pause cannot establish irreparable harm in this suit, which challenges only the *rescinded* OMB Memo.

Indeed, it is wholly speculative that Plaintiffs would experience any injury in the absence of preliminary relief.  Plaintiffs admit that their declarants and other Plaintiff members are currently "able to draw on open awards," PI Mot. at 9, so any alleged irreparable harm must be based on speculative future events that might change the status quo.  But Plaintiffs do not provide

anything more than speculation that, absent preliminary relief, the OMB Memo would be reissued, nor do they establish that their grant programs would fall within any such reconstituted OMB Memo. *See* OMB Memo at 1 n.1 (exempting "assistance received directly by individuals" from any pause); OMB Guidance at 1-2 (stating that the OMB Memo did not apply to "[a]ny program not implicated by the President's Executive Orders"). Instead, Plaintiffs simply aver that they would be harmed by a future funding freeze. *See* ECF No. 40-1 ¶ 4; ECF No. 40-2 ¶ 8; ECF No. 40-3 ¶ 5; ECF No. 40-4 ¶ 17; ECF No. 40-5 ¶ 8; ECF No. 40-6 ¶ 11; ECF No. 40-7 ¶ 9. Absent proof that the OMB Memo would be reissued in the absence of preliminary relief and that it would pause funding to the relevant programs, Plaintiffs cannot show irreparable harm that is "both certain and great" and "actual and not theoretical." *Chaplaincy*, 454 F.3d at 297.

Plaintiffs' citation to *League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) is inapposite. In that case, the plaintiffs—which included several voting-rights organizations and two Kansas residents—challenged decisions by the Election Assistance Commission to include a proof-of-citizenship requirement on the federally prescribed national mail voter registration form in the states of Alabama, Georgia, and Kansas. *See id.* at 3. The court ruled that voting-rights organizations in Alabama and Georgia had demonstrated irreparable harm, even though it was "unclear whether Alabama and Georgia [were] currently enforcing their proof-of-citizenship laws." *Id.* at 8. The court reasoned that "based on the experience of the Kansas [voting-rights plaintiff], it seems almost certain that similar obstacles to registration will spring up in Alabama and Georgia when those States decide to enforce their laws." *Id.* Thus, unlike here, *Newby* involved a threat of prospective harm arising from clearly defined agency action *that was still in place*. While it may not be speculative to assume that Alabama and Georgia would "decide to enforce their laws" and that any harms would be similar to those evidenced in another state, *id.*

at 8, it is certainly speculative to assume that in the absence of a preliminary injunction the OMB Memo would be both reissued and applicable to Plaintiffs' identified programs.

Finally, Plaintiffs argue that their alleged First Amendment injury "constitutes its own form of irreparable harm." PI Mot. at 35. To begin with, Plaintiffs' First Amendment claim is meritless, *see supra* Section III.D, so it cannot be the basis for a finding of irreparable harm. In any event, Plaintiffs must "do more than allege a violation of freedom of expression in order to satisfy the irreparable injury prong of the preliminary injunction frame-work." *Chaplaincy*, 454 F.3d at 301. Specifically, Plaintiffs "must also establish they are or will be engaging in constitutionally protected behavior to demonstrate that the allegedly impermissible government action would chill allowable individual conduct." *Id.* Plaintiffs fail this test because, as previously explained, they do not identify specific expressive activity for which they claim they are being or will be penalized, nor do they explain how the OMB Memo's pause of certain funding operates to harm their First Amendment rights specifically. Moreover, Plaintiffs' theory of constitutional harm does not vitiate the requirement that the alleged irreparable harm must directly result from the challenged action. *See id.* (plaintiffs must demonstrate that "the allegedly impermissible government action would chill allowable individual conduct"); *see also California v. Trump*, 379 F. Supp. 3d at 959 n.21 (even under a constitutional-harm theory, "Plaintiffs must demonstrate some likely harm resulting from the challenged action, and not simply a constitutional violation"). And since the challenged OMB Memo has been rescinded, any alleged ongoing or prospective harm to Plaintiffs' First Amendment rights would be caused by independent action not challenged in this suit, and therefore cannot provide the basis for irreparable harm on this preliminary-injunction motion.

### B.    The Public Interest Weighs Squarely Against Relief

Lastly, the balance of equities and the public interest weigh against granting the extraordinary remedy of a preliminary injunction. Plaintiffs argue that "[t]he government has no

legitimate interest in carrying out an unlawful action." PI Mot. at 36. But that is just a repackaged version of their merits arguments, and same with irreparable harm, *see id.* Again, Plaintiffs fail to identify a causal link between any alleged future harms to the public and "[i]mplementation of Memo M-25-13," *id.*, which has been rescinded and in any event did not apply to many of the programs Plaintiffs identify, *compare id.* at 36 (alleging "nationwide disruption" in the absence of preliminary relief, affecting "the provision of vital services from health care to subsidized meals for the elderly to emergency relief to children's Head Start programs"); *with* OMB Guidance at 1 ("Any program not implicated by the President's Executive Orders is not subject to the pause."); *id.* at 1–2 (listing categories of funding that "will not be paused," including "[a]ny program that provides direct benefits to individuals" as well as "mandatory programs," and "[f]unds for small businesses, farmers, Pell grants, Head Start, rental assistance, and other similar programs").

Meanwhile, contrary to Plaintiffs' assertions that Defendants will not suffer harm if a preliminary injunction is granted, an injunction here would effectively disable OMB from implementing the President's priorities consistent with its legal authorities. "Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (brackets omitted). Additionally, where the Government is legally entitled to make decisions about the disbursement or allocation of federal funds but is nonetheless ordered to release the funding, such funds may not be retrievable afterwards.

Plaintiffs here seek exceptionally broad relief, not limited to remedying the alleged harms they suffer and not seeking to invalidate only the specific portions of the challenged OMB Memo that they allege are unlawful. *See* ECF No. 40-8 at 1 (asking the Court to enjoin Defendants from "implementing, giving effect to, or reinstating under a different name the directives in OMB

Memorandum M-25-13"). Given the breadth of that requested relief, the harms to the Government would be tremendous. A broad preliminary injunction would have a significant chilling effect on the President's and his advisors' ability to lawfully direct and guide agencies' spending decisions—contrary to the will of the people as expressed through the President and his priorities. Indeed, agencies may feel obligated to forgo pursuing legally permissible actions in furtherance of the President's operative Executive Orders or other policy priorities for fear of risking contempt. Thus, the balance of equities weighs in favor of the Government and relief should be denied.

## V.    ANY INJUNCTIVE RELIEF SHOULD BE LIMITED AND STAYED

It is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Additionally, "'preliminary relief may never be granted that addresses matters 'which in no circumstances can be dealt with in any final injunction that may be entered.'" *In re Microsoft Corp. Antitrust Litig*, 333 F.3d 517, 525 (4th Cir. 2003) (quoting *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945)). Therefore, the scope of equitable relief available here should be constrained by what would be available to Plaintiffs at final judgment under the APA. *See Pac. Radiation Oncology, Ltd. Liab. Co. v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015) (preliminary relief must be "of the same nature as that to be finally granted.").

Relief under the APA is limited; courts may either "compel agency action unlawfully withheld or unreasonably delayed" or "hold unlawful and set aside agency action." 5 U.S.C. § 706; *see also SUWA* 542 U.S. at 66-67 (explaining how the APA's limits on relief are intended to "protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements"). Plaintiffs' constitutional claim does not alter the scope of relief that is available to them in this APA case, as review still occurs under 5 U.S.C. § 706(2)(B) for being "contrary to constitutional right, power, privilege, or immunity." *Cf.*

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327-28 (2015) ("Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law.").

Thus, if the Court is inclined to grant Plaintiffs' motion, it must do so consistent with the APA.  Any relief should be narrowly tailored to apply only to Plaintiffs, to the object of their challenge (the OMB Memo), and to leave intact the Executive Branch's discretion to engage in further consideration of the topic at hand and implement new policies consistent with law.

### A.    Injunctive Relief Should Be Limited to the Present Plaintiffs and the Object of Their Challenge: The OMB Memo

Any preliminary relief should be limited to addressing any established harms of the present Plaintiffs that stem from the OMB Memo.  There is no basis for extending relief to non-parties in this suit, or to funding streams that do not appear to have any effect on Plaintiffs.  Accordingly, any preliminary injunction should confirm that all obligations in the injunctive order apply only with respect to awards involving the identified Plaintiffs.  *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions *of the parties* until a trial on the merits can be held." (emphasis added)).

Furthermore, it is axiomatic that Plaintiffs are not entitled to emergency injunctive relief reaching beyond the scope of what they challenge in this case.  *See, e.g., Bird v. Barr*, No. 19-cv-1581, 2020 WL 4219784, at *2 (D.D.C. July 23, 2020) (a preliminary injunction "is not a generic means by which a plaintiff can obtain auxiliary forms of relief that may be helpful to them while they litigate unrelated claims").  Plaintiffs cannot possibly challenge future iterations of the OMB Memo that do not yet exist, and thus any relief should be limited to the OMB Memo.

### B.    Relief Should Be Limited to Preserve the Executive Branch's Discretionary Authority

To the extent the Court considers Plaintiffs' proposed preliminary injunction, that order should also be limited to mitigate (albeit not eliminate) the significant harms it would cause to

Defendants' and the Executive Branch's abilities to exercise their lawful authority and discretion. Specifically, the Court should decline to enjoin Defendants from implementing, giving effect to, or reinstating under a different name the OMB Memo. Foreclosing further executive action on the matter would be contrary to the limited relief available under the APA, which generally allows courts to invalidate only the specific portions of an agency policy that it finds unlawful. *Cf. Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019) ("The APA permits a court to sever a rule by setting aside only the offending parts of the rule."). And this particular aspect of relief is especially vague as to how OMB is supposed to determine whether a subsequent action is equivalent to "reinstating under a different name" the OMB Memo at issue in this case.

If the Court concludes it is likely that certain provisions of the OMB Memo were *substantively* contrary to law, 5 U.S.C. § 706(2), any injunction that flows from that determination must be specific as to the provisions OMB is enjoined from reissuing. *See City of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 145 (2d Cir. 2011) ("An injunction is overbroad when it seeks to restrain the defendants from engaging in legal conduct, or from engaging in illegal conduct that was not fairly the subject of litigation."). The injunction must "state its terms specifically," and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed R. Civ. P. 65(d)(1)(C). When granting equitable relief under the APA, "ordinarily the appropriate course is *simply to identify a legal error* and then remand to the agency" for further action consistent with that determination. *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir. 2012) (emphasis added).

When there is a finding of arbitrary and capricious action, then "further consideration of the issue by the agency" is the required remedy. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 46 (1983). But an overbroad preliminary injunction like

-43-

the one Plaintiffs request would prohibit the agency from engaging in "further consideration." *Id.*; *cf. Pub. Emps. for Env't Resp. v. Nat'l Park Serv.*, 605 F. Supp. 3d 28, 49 (D.D.C. 2022) (declining to "preclude an agency from reaching a similar result on the same issue of substantive policy, as long as the second decision result[s] from a new procedural process distinct enough that it can fairly be considered a new 'action'").

By requesting the exact opposite of the remedy that is typically available under the APA, Plaintiffs' proposed injunction also runs counter to the rule that "'preliminary relief may never be granted that addresses matters 'which in no circumstances can be dealt with in any final injunction that may be entered.'" *In re Microsoft Corp. Antitrust Litig*, 333 F.3d at 525 (quoting *De Beers Consol. Mines*, 325 U.S. at 220). To avoid this, any preliminary relief here should make clear that it does not prohibit OMB from issuing new policies effectuating the President's priorities. Failure to include that clarification would only highlight the intrusive nature of Plaintiffs' requested injunction, prohibiting OMB from assisting the President in implementing his agenda. *Cf. Sherley*, 689 F.3d at 784 ("an agency under the direction of the executive branch . . . must implement the President's policy directives to the extent permitted by law").

Defendants respectfully request that any preliminary relief be narrowly tailored to preserve the Executive Branch's authority as a coordinate branch of government to further consider the issues at hand and act upon those considerations pursuant to proper procedures and the Court's identification of specific legal constraints. That is the normal remedy in APA litigation, and anything broader would constitute a significant intrusion on the separation of powers.

Additionally, to the extent the Court enters injunctive relief, the Court should also order a bond consistent with the mandatory language of Fed. R. Civ. P. 65(c). Although the D.C. Circuit has allowed courts to dispense with a bond in certain circumstances, *Fed. Prescription Serv., Inc.*

*v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980), injunctive relief here would cause "material damage" to the Executive by instructing agencies not to pause disbursements on grants that they may ultimately wish to terminate or award to a different recipient. And particularly given that several of the Plaintiffs here are associations (not direct grant recipients), it is difficult to see how the Government could recoup any funding from those associations in the event the injunction is overturned. The Court should therefore order at least the Plaintiff associations to post a bond commensurate with the scope of relief ordered, *i.e.*, with a lesser amount required to the extent the Court awards relief only for the identified members' funding, as opposed to all grant recipients.

Finally, in light of the extraordinary breadth of Plaintiffs' requested relief, to the extent the Court issues any injunctive relief, the United States respectfully requests that such relief be stayed pending the disposition of any appeal that is authorized, or at a minimum that such relief be administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction should be denied.

Dated: February 15, 2025                    Respectfully submitted,

                                            BRETT A. SHUMATE
                                            Acting Assistant Attorney General

                                            ALEXANDER K. HAAS
                                            Director

                                            */s/   Daniel Schwei*
                                            DANIEL SCHWEI
                                            Special Counsel (N.Y. Bar)
                                            ANDREW F. FREIDAH
                                            EITAN R. SIRKOVICH
                                            Trial Attorneys
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch

1100 L Street NW
Washington, DC 20530
Tel.:    (202) 305-8693
Fax:     (202) 616-8460
Email:     daniel.s.schwei@usdoj.gov

*Counsel for Defendants*