## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL COUNCIL OF
NONPROFITS, et al.,

*Plaintiffs,*

v.

OFFICE OF MANAGEMENT AND
BUDGET, et al.,

*Defendants.*

Case No. 25-cv-239

## PLAINTIFFS' REPLY IN SUPPORT OF
## MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs have shown that a preliminary injunction is warranted. Unable to confront that analysis head-on, Defendants focus on a sideshow of their own creation. Rather than defend their actual Freeze Order, they imagine a different one and defend that instead. Rather than addressing the authority of the actual defendants in this lawsuit, they discuss the President's. Unable to explain the continued implementation of the Order even after its "rescission," they suggest it was just a coincidence, or agencies gone rogue. And unable to address the real and irreparable harm to thousands of grant and loan recipients who lost funding without notice and were forced to shutter critical programs, Defendants imagine that they are the ones at risk of injury. The Court should conclude otherwise.

## ARGUMENT

**I.    Plaintiffs are likely to succeed on the merits of their claims.**

### A. The Freeze Order commanded an immediate halt to nearly all federal financial assistance.

The Freeze Order unambiguously told agencies to halt payment of "all" federal financial assistance (subject to limited exceptions). Defendants now say it merely froze funds for programs already frozen by the President's executive orders. That cannot be squared with the language of the Order or the factual record. As the Court found, "Memorandum M-25-13 did not specify *certain* funds to be frozen; it froze *all* of them." TRO Order at 21, ECF No. 30. Defendants' inability to defend that action is powerful evidence that Plaintiffs are likely to succeed on the merits.

The express terms of the Order left no doubt that it required agencies to halt "*all* activities related to obligation or disbursement of *all* Federal financial assistance." Freeze Order at 2 (emphasis added). Defendants seek (at 12, 21) to escape that conclusion with an implausible parsing of this sentence from the Order:

> … Federal agencies **must temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal.

*Id.* (emphasis in original). Defendants claim that the phrase "that may be implicated by the executive orders" should be read to modify the command to "pause all activities related to obligation or disbursement of all Federal financial assistance." Defendants are wrong. The Order separately commands a pause of (1) all activities related to

obligation or disbursement of all Federal financial assistance, and (2) other relevant agency activities that may be implicated by the executive orders. It would defy basic grammar and ordinary usage to read a limitation that is specific to the latter category as applying to the former.

Any doubt is removed by the rest of the Freeze Order. As Plaintiffs previously showed, ECF No. 40, at 4, and Defendants fail to address, the Order reiterates several times the breadth of the commanded freeze. The very next paragraph directs agencies "to pause *all activities* associated with open NOFOs [notices of funding opportunity]," Freeze Order at 2 (emphasis added), without limiting that command to programs covered by an executive order. The next paragraph repeats that "[e]ach agency must pause: (i) issuance of new awards; (ii) disbursement of Federal funds *under all open awards*; and (iii) other relevant agency actions that may be implicated by the executive orders. . . ." *Id.* (emphasis added). And the Order gives agencies just 24 hours to implement the freeze–a timeline that is wholly inconsistent with Defendants' story that agencies were supposed to review thousands of grants and freeze only those implicated by the executive orders.

Stepping back, it appears to be undisputed that the purpose of the Order is to halt payments of federal financial assistance so that agencies can review those programs *and determine which may be implicated by the executive orders. See id.* ("To implement these orders, each agency must complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders.").

Defendants' new interpretation of convenience makes no sense in light of that express purpose: In Defendants' telling, the Order commanded a pause only of programs implicated by the executive orders in order to allow agencies to identify which programs were implicated by the executive orders.

Worse for Defendants, nothing in the record suggests that any agency interpreted or implemented the Freeze Order in the way Defendants now urge. To the contrary, the evidence shows that agencies well understood what they were being told to do. The National Science Foundation and Environmental Protection Agency, for example, stated clearly that they were halting all payments at the command of the Freeze Order. ECF No. 24-1; ECF No. 24-2.[1] And just like NSF and EPA, numerous other agencies implemented the Order by taking offline the centralized funding portals through which recipients of federal financial assistance draw on open awards, making all funds functionally unavailable. *E.g.*, ECF No. 24-5 ¶¶ 17–19. That approach is entirely inconsistent with an effort to freeze only certain awards. As Defendants have previously conceded, ECF No. 26 at 6-7, numerous declarations in this case describe halts to payments on open awards, starting at the time the Freeze Order was issued, that cannot possibly be attributed to the executive orders themselves, *e.g.*, ECF No. 24-6.

Defendants make much of a "guidance" document OMB put out the day after its Freeze Order. *See* ECF No. 11-1. That document, however, is no more meaningful

---

[1] Defendants say (at 9 n.1), without elaboration, that "those were errors." But the only "error" appears to have been that the agencies candidly acknowledged what they were doing and why.

than Defendants' purported "rescission" the next day. Far from interpreting the Freeze Order, the "guidance" is inconsistent with it, creating confusion, not clarity. For example, while the Order commands a halt to "all activities related to obligation or disbursement of all Federal financial assistance," the clean-up effort claims that "[a]ny program not implicated by the President's Executive Orders is not subject to the pause." While the Order excludes any "assistance [i.e., money] received directly by individuals," the rewrite claims more broadly that "[a]ny program that provides direct benefits to individuals is not subject to the pause." The "guidance" also describes entirely new carveouts for "mandatory programs like Medicaid and SNAP," plus "small businesses, farmers, Pell grants, Head Start, rental assistance, and other similar programs."[2]

While in some cases a follow-on guidance document may functionally modify a challenged policy, that was not the case with this guidance. Rather, the record evidence establishes that the Freeze Order was implemented as written even after the guidance issued. For example, contrary to the "guidance," agencies paused payments to small businesses and to Head Start programs. ECF No. 24-6; ECF No. 24-3 at 74. Also contrary to the "guidance," they cut off funding to numerous programs that "provide[] direct benefits to individuals." *E.g.*, ECF No. 24-5 ¶¶ 14–16 (program to curtail violent crimes against women); ECF No. 27-1 ¶¶ 4–5 (care center

---

[2] These exclusions for small businesses, farmers, and others cannot be reconciled either with the actual Freeze Order (which halted essentially all payments) or with the more limited order Defendants make believe here (which they say halted only programs implicated by the executive orders), since small businesses and farmers are just as capable as anyone else of championing "wokeness" or "Marxist equity."

for those with disabilities). "Both logic and record evidence point to the . . . conclusion" that agencies did so at the command of the Freeze Order. *See* TRO Order at 17. Just as the rescission of the Freeze Order should not permit the evasion of legal review, the guidance did not change the policy as implemented or undo the damage it caused.

The Court therefore should dismiss the "guidance" as either irrelevant to the policy that was actually implemented and challenged here, or merely another unsuccessful attempt at voluntary cessation, *see infra* Part I.C.

### B. As this Court previously found, Plaintiffs have standing.

Defendants complain (at 8) that Plaintiffs "make no effort" to establish this Court's jurisdiction. In fact, Plaintiffs already made that effort, *see* ECF No. 24 at 13–21, the Court agreed just two weeks ago, TRO Order at 6–19, and nothing has changed since then, beyond the relief this Court ordered as a result of that finding. Defendants identify no good cause to reconsider that prior holding now.

As to injury in fact, this Court previously found that Plaintiffs have put forth evidence that "the harms caused by the freeze are non-speculative, impending, and potentially catastrophic," detailing "that many organizations need weekly injections of federal funds in order to continue operating." TRO Order at 8–9. Rather than disputing that conclusion—or addressing in any way the detailed declarations Plaintiffs have provided—Defendants now argue that because these injuries do not flow from the executive orders mentioned in the Freeze Order, they must have been caused by independent agency decisions, and not the Freeze Order itself.

In short, Defendants—without providing a shred of supporting evidence—ask (at 12) this Court to believe that agencies across the federal government all independently happened to decide to freeze funding on a moment's notice at the exact same time that OMB ordered them to do so, and then independently each happened to decide to unfreeze their funding when OMB informed them of the TRO entered by this Court. The more reasonable inference is that the Freeze Order itself, and not the executive orders, caused the widespread freeze, and that the agencies were simply doing as OMB directed. This inference is also amply supported by statements from agencies themselves explaining that is precisely what they were doing. ECF No. 24-1; ECF No. 24-2. Justice may be blind, but it need not be blinkered to reality. *See* TRO Order at 13 (noting that Defendants' "explanation ignores both logic and fact").

Defendants further argue (at 12) that Plaintiffs' First Amendment claims fail to identify the specific expressive activity that is threatened, and that Plaintiffs' fears of lost future funding are irrelevant to this case. But the Court has already disposed of these arguments. TRO Order at 8. As the Court explained, Plaintiffs "claim that Defendants have singled out their funding programs (in other words, their economic lifelines) based on their exercise of speech and association." *Id.* It is that exercise of speech and association—made manifest in the positions Plaintiffs take on issues such as gender, racial equity, and environmental policy—that Plaintiffs claim is infringed by OMB's action. *See* ECF No. 5-2 ¶ 14; ECF No. 5-3 ¶ 15; ECF No. 5-4 ¶¶ 29, 31; ECF No. 5-5 ¶ 8.

As to causation, Defendants again base their arguments on a version of the Freeze Order that simply does not exist. Defendants claim (at 13) that the Freeze Order does not itself determine which grants are frozen, but leaves that to agency discretion. But it is impossible to square that belief with the plain text of the Freeze Order, as described above, *see supra* Part I.A, or with the fact that meaningful exercise of any such discretion would be impossible to undertake in the limited time before the Freeze Order took effect, *see* TRO Order at 17. Defendants have no counterargument: The only authority they cite is an out-of-circuit case this Court has already deemed inapposite because, unlike the Freeze Order, the executive order at issue there required no action from federal agencies. *See id.* at 10–11 (distinguishing *Louisiana ex rel. Landry v. Biden*, 64 F.4th 674 (5th Cir. 2023)).

And as to redressability, Defendants again attempt (at 14) to shift blame to other agencies. *But see* TRO Order at 12–13. But the thrust of Plaintiffs' complaint is that OMB—not other agencies—is the author of their injuries through OMB's clear directive, which did not provide agencies with any meaningful discretion. As a last effort, Defendants point out (again at 14) that agencies may later decide to freeze Plaintiffs' funding on their own. But speculation that other actors may take future actions that harm Plaintiffs cannot preclude this Court from affording relief against Defendants who, absent a Court order, risk harming Plaintiffs now.

### C. As this Court previously found, this case is not moot.

Defendants likewise recycle their mootness argument—with a twist. Unable to offer a compelling reason for this Court to reconsider its ruling applying the voluntary

cessation exception to mootness, Defendants argue (at 10) that things have changed since the Court entered its TRO. Specifically: The Court entered its TRO, and as a result, many of Plaintiffs' members have had their funding restored. Defendants now say that, because they appear to have taken steps to comply with the TRO they so strongly resisted, it would be speculative to believe that they would resume their pre-TRO behavior. But if Defendants were right about that logic, then no court could ever enter a preliminary injunction following a TRO.

Defendants further argue (at 10–11) that mootness applies specifically in the preliminary injunction context, but fail to explain how this analysis would operate differently than it did for the TRO. In any event, this is little more than an effort to end-run around the voluntary cessation analysis: The cases on which Defendants rely (at 11) are clearly inapplicable here. In one, the Sixth Circuit found a preliminary-injunction appeal moot where Plaintiffs complained of a rule that had already been repealed and replaced—on the theory that another court could enjoin both the repeal rule *and* the replacement rule, and do so nationwide. *Ohio v. EPA*, 969 F.3d 306, 307–10 (6th Cir. 2020). In another, the District of South Dakota found that the requested preliminary relief—the establishment of satellite early voting locations—was moot because the defendants had voluntarily granted that exact relief, which was already in process. *Brooks v. Gant*, No. 12-cv-5003, 2012 WL 871262, at *1–2 (D.S.D. Mar. 14, 2012). And in a third, the Southern District of New York found that there was no threat of irreparable harm where a defendant in a trademark infringement suit had redesigned its mark in response to the plaintiff's objections. *Int'l Gemmological Inst.,*

*Inc. v. Indep. Gemological Labs, Inc.*, No. 00-cv-4897, 2000 WL 1278179, at *1 (S.D.N.Y. Sept. 7, 2000).

Here, Defendants suggest that preliminary relief is moot because they, too, have voluntarily provided the relief sought. But they did not. As the Court's prior analysis made clear, TRO Order at 14–17, the purported rescission of the Freeze Order did not in fact provide that relief at all. It was only the issuance of the TRO— not the rescission—that provided Plaintiffs and their members with the relief they so desperately needed: funding from grants that had already been awarded to them, and against which guarantee they had already incurred expenses.[3] Finding mootness now would only imperil that relief.

Lastly on mootness, Defendants argue (at 25) that the arbitrary and capricious claim is moot, because any future across-the-board freeze would be supported by better reasoning than the Order challenged here. Setting aside the question of whether any explanation could possibly render such action "reasonable," this argument is just another attempt to resist application of the voluntary cessation doctrine. As the Court found, TRO Order at 14–19, the Order's purported "recission"

---

[3] Defendants glibly suggest (at 11) that if they revive the Freeze Order, Plaintiffs can simply file another motion for a preliminary injunction. But neither Plaintiffs nor this Court should be forced into more emergency proceedings because of Defendants' conduct. And, as the evidence shows, the uncertainty that would be created by Defendants' approach is its own form of injury. *See* ECF No. 24-7 ¶¶ 25–26; ECF No. 40-4 ¶¶ 6, 11–17. Defendants also were unable to turn the spigot of funding on as quickly as they turned it off, *see* ECF No. 40 at 33–34, meaning that even if Plaintiffs were to seek and the Court to grant a preliminary injunction in the future, such an order may not provide practical relief for days or even weeks.

did not stop its continued implementation—without Defendants or anyone else providing any additional rationale.[4]

### D. Plaintiffs are likely to show final agency action and ripeness.

As the Court previously concluded, the Freeze Order constitutes final agency action subject to judicial review under the APA. TRO Order at 21–23; *see also* ECF No. 40 at 12–15. Defendants can muster no persuasive reason the Court should reconsider that ruling. And their claims about ripeness fare no better.

They repeat (at 15) their claims that the Order did not itself freeze any funds, but that assertion is belied by common sense and the factual record, which confirm, for example, that agencies halted payments on open awards in direct response to the Order. *See, e.g.*, ECF No. 24-1; ECF No. 24-2. They again seek (at 15–16) to portray Plaintiffs' challenge to a specific agency action and its implementation as "an amorphous programmatic challenge." But simply repeating this claim does not make it true. The fact that Defendants' unlawful Freeze Order threatens to affect so many thousands of grant recipients is part of why the action is unreasonable; it does not insulate that unreasonable action from review. And unlike this case, Defendants'

---

[4] Indeed, it is far from clear that, even now, the rippling effects of the Freeze Order have stopped. As Plaintiffs previously pointed out, ECF No. 40 at 9 & n.6, reporting shows that the director of FEMA's Office of Grant Administration directed her team to put a "hold" on all open awards. Defendants' counsel has now apprised Plaintiffs that "the employee's use of the word 'hold' was not intended to direct a freeze on grant payments, but to enable further review of payment requests," and that the director has subsequently clarified that the team is "not holding on awards" and "will still be processing" them, "but will be adding a level of internal controls to ensure that payment requests are reviewed prior to payments be released [sic] to recipients." Although now framed as holding payments pending an indefinite and unspecified review, a distinction likely without much difference, it is telling that the employee first described the action as an across-the-board freeze.

cited cases (at 16) did not involve challenges to specific final agency action and therefore are readily distinguishable.

This case is also ripe for the Court's review. Ripeness requires that "that an injury in fact be certainly impending." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996). "[I]f a threatened injury is sufficiently 'imminent' to establish standing, the constitutional requirements of the ripeness doctrine will necessarily be satisfied." *Id.* at 1428. As Plaintiffs have detailed, the injury from Defendants' action is not some far-off, speculative event; it was already occurring until this Court entered a temporary restraining order to stop it.

Defendants nonetheless protest (at 17, 19) that Plaintiffs' arbitrary and capricious and First Amendment claims are not ripe because they "necessarily require fact-specific analysis." Not so. That the Order was not "reasonable and reasonably explained," *Ohio v. EPA*, 603 U.S. 279, 292 (2024), is clear from the face of the Order itself. And the fact that it is arbitrary and capricious warrants holding it unlawful as to all recipients with open awards—not just some. *See, e.g.*, *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."). Defendants fail to explain what further facts they believe need to be developed with respect to this claim, and the cases they cite (at 17) do not hold that agency action may be set aside as arbitrary and capricious only if it can be shown to be arbitrary and capricious in every application.

Similarly, for Plaintiffs' First Amendment claim to succeed, and contrary to Defendant's position (at 19), Plaintiffs would not need to establish that the Order stifles the free expression of every funding recipient with an open award. *See, e.g.*, *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (explaining that courts will hold a law facially invalid under the First Amendment even where just "a substantial number of [the law's] applications"—rather than all of them—"are unconstitutional").

### E.  Plaintiffs are likely to show the Freeze Order is arbitrary.

The Court previously held that Plaintiffs were likely to show that the Freeze Order is arbitrary and capricious. TRO Order at 23–26. That remains the case.

Defendants' response falls flat. Defendants repeat (at 27–28, 29–30) their view that the Order is reasonable because it: describes its objectives; exempts Medicare, Social Security, and payments directly to individuals; provides for the theoretical possibility of additional exemptions on a "case-by-case" basis; "pause[s]" funding instead of canceling it outright; and "provide[s] a delayed effective date" (of the very next day). As Plaintiffs have explained, however, ECF No. 40 at 20–21, none of these attributes makes the Order rational. While without them, the Order would have been even more irrational, that is hardly sufficient. If identifying ways that an agency action could have been worse were enough to defeat an arbitrary and capricious challenge, no action would ever be held unlawful under that standard.

Defendants disparage (at 28) the obvious alternative approach they could have taken: reviewing grants while those programs operated as normal. But their justifications for doing so are unpersuasive and, crucially, entirely post hoc,

13

appearing nowhere in the Order itself. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (explaining that "courts may not accept . . . counsel's post hoc rationalizations" and that "an agency's action must be upheld, if at all, on the basis articulated by the agency itself").

So Defendants try (repeatedly) to change the subject to the President. They contend (at 26) that an agency cannot violate the APA if it is carrying out the President's orders. That is a shocking position that, if accepted, would eviscerate the APA's foundational requirement that agency action be both "reasonable and reasonably explained." *See Ohio v. EPA*, 603 U.S. at 292. It would mean, for example, that all an administration needs to do to insulate agencies' actions from arbitrary-and-capricious review would be to have the President order that those actions be taken. But while the Court should soundly reject that view, it need not even address it here. That is because, try as Defendants might to obscure this fact, nothing in the record so much as suggests—let alone demonstrates—that the President instructed Defendants to issue the blanket freeze order.[5]

For this reason among others, Defendants' cited cases (at 26) are far afield. *Franklin v. Massachusetts* involved an action taken by the President—not an agency. 505 U.S. 788, 796 (1992). The same is true of *Dalton v. Specter*, 511 U.S. 462, 470–72 (1994). And in *Ancient Coin Collectors Guild v. Customs & Border Protection*, the agency defendant was acting pursuant to an express delegation of the President's

---

[5] Public reporting suggests just the opposite: that the Freeze Order "was produced by the budget office alone" and not shared beforehand with the White House. Ashley Parker, *The Memo That Shocked the White House*, The Atlantic (Jan. 29, 2025), https://www.theatlantic.com/politics/archive/2025/01/omb-white-house/681506/.

authority under statute, and "in the realm of foreign affairs," which the court found significant. 801 F. Supp. 2d 383, 401–03 (D. Md. 2011), *aff'd on other grounds*, 698 F.3d 171 (4th Cir. 2012).

Defendants further allege (at 28–29) that "Plaintiffs are asking this Court to impose arbitrary timetables on the Executive." What Plaintiffs are actually urging is that arbitrary and capricious agency action is unlawful under the APA, and that the 24-hour timetable that OMB gave agencies to turn off potentially trillions in federal financial assistance is one reason that action was arbitrary. Nor was the decision to impose that timetable made by "the Executive"—assuming that term, which Defendants' response uses repeatedly, is meant to invoke the President.[6]

### F. Plaintiffs are likely to show that OMB lacks statutory authority for the Freeze Order.

Plaintiffs are likely to prevail on this claim as well, because agencies such as OMB "'literally ha[ve] no power to act' except to the extent Congress authorized them," *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 912 (D.C. Cir. 2024) (quoting *FEC v. Cruz*, 596 U.S. 289, 301 (2022)), and no statute authorized OMB to order a near total and near immediate halt to all federal financial assistance programs, *see* ECF No. 40 at 21–26.

Defendants are unable to point to any statutory provision that would clearly give them this authority. They resort instead (at 32–33) to certain general

---

[6] Although Defendants again trot out (at 28–29) some executive orders in which past Presidents—not OMB—ordered delays to funding for specific projects, the mere existence of those program-specific pauses does not establish that Defendants' Freeze Order was reasonable.

responsibilities of OMB's deputy director for management. *See* 31 U.S.C. § 503(a). But none of those responsibilities—e.g., "[m]onitor the financial execution of the budget in relation to actual expenditures"—even imply the sweeping authority OMB claims for itself here. And the statutory context in which they appear—as duties that the agency's second-in-command must carry out, "[s]ubject to the direction and approval of the Director," 31 U.S.C. § 503(a)–strongly suggests they do not include the authority to shut off federal financial assistance nationwide on 24 hours' notice.[7] And that's before even getting to the major questions doctrine, which Defendants barely address (at 33–34) but which requires identifying a clear statement from Congress before concluding that Congress has "authoriz[ed] an agency to exercise powers of vast economic and political significance." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022).

Offering a new theory, Defendants point (at 31–32) to 31 U.S.C. §§ 1512 and 1513(b), which authorize OMB to apportion appropriations. Defendants acknowledge that they did not rely on this authority in issuing the Freeze Order and are careful not to actually say that they could have, *see* Opp'n at 32 ("*if* OMB had authority to implement the pause through apportionment. . . ." (emphasis added)), ECF No. 47. It is doubtful they could have done so for all federal financial assistance programs

---

[7] Defendants' resort (at 32–33) to Congress's purposes in establishing the deputy director for management position does not help them. *See* Pub. L. No. 101-576, § 102, 104 Stat. 2838, 2838 (1990). Congress's goal of improving "management functions" so as to promote "a modern Federal financial management structure and associated systems" hardly implies an authority to unilaterally freeze payments to thousands of clinics, shelters, emergency relief programs, medical researchers, small businesses, and many other recipients of federal funding across the country.

simultaneously, given the procedures OMB must follow in order to apportion funds. *See, e.g.*, 31 U.S.C. § 1513(b)(2) (requiring that apportionment take place at specific times); Pub. L. No. 117-103, §§ 204, 748, 136 Stat. 49, 256-57, 306 (2022) (requiring that OMB make public and report to Congress its apportionment decisions, and specifically requiring OMB to notify Congress when such decisions "may hinder the prudent obligation of [an] appropriation or the execution of a program, project, or activity"). For present purposes, it suffices to say that Defendants' vaguely developed reference to an entirely different authority, one they acknowledge they did not use and do not actually show they could have used, does nothing to defeat Plaintiffs' showing that they are likely to succeed on this claim.

### G. Plaintiffs are likely to show that the Freeze Order is contrary to the First Amendment.

The Freeze Order commands agencies to halt payments to federal financial assistance programs in order to identify grant recipients that have expressed or somehow associated themselves with disfavored viewpoints such as "woke gender ideology" and "Marxist equity." The result is a direct and immediate threat to the rights of free speech and association that Plaintiffs and other recipients of federal funding enjoy under the First Amendment. *See* ECF No. 5-2 ⁋ 14 (describing grant recipient's reasonable fear that its "future receipt of federal financial assistance will depend on [its] past and future exercise of its First Amendment rights"); ECF No. 5-4 ⁋ 31 (describing the Order's chilling effect on "[public health professionals'] research, our work, our expression, and our speech"). Plaintiffs are likely to succeed in showing that Defendants' obvious attempt "at the suppression of dangerous ideas"

via "subsid[ies] . . . manipulated to have a coercive effect," *see Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998), is unconstitutional.

As they have throughout, Defendants rely almost entirely on a single decades-old decision, *Rust v. Sullivan*, 500 U.S. 173 (1991), and ignore the many cases Plaintiffs have cited emphasizing that subsidies may not be used to suppress disfavored ideas such as "wokeness," *see* ECF No. 40 at 28–30. The Supreme Court, however, has cabined *Rust*'s reasoning in ways that make clear it does not apply here. As the Court stated in *Legal Services Corp. v. Velazquez*, it has since understood *Rust* as being limited to situations in which the subsidized activities "amounted to governmental speech." 531 U.S. 533, 541 (2001). Here, by contrast, no one could reasonably attribute the expressive conduct of the many thousands of recipients of federal financial assistance to the government. *Cf. id.* at 543–44 (distinguishing *Rust* because the speech at issue "cannot be classified as governmental speech even under a generous understanding of that concept").

The more relevant authority in this area is Chief Justice Roberts's opinion for the Court in *Agency for International Development v. Alliance for Open Society International, Inc.*, 570 U.S. 205 (2013). That decision squarely holds that while Congress may "define the limits of the government spending program" by "specify[ing] the activities Congress wants to subsidize," it may not prescribe "conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *Id.* at 214–15. As Plaintiffs have explained and Defendants have

failed to rebut, *see* ECF No. 40 at 29–30, Plaintiffs are likely to establish that the Freeze Order falls on the wrong side of that line.[8]

A few other points are worth addressing. Defendants seem to suggest (at 36) that Plaintiffs are unlikely to succeed on this claim unless every grantee describes a concern for their ability to engage in expressive conduct. That is not how the First Amendment works. *See, e.g.*, *Moody*, 603 U.S. at 723 (explaining that laws may be held facially invalid even if not unconstitutional in all applications). Defendants invoke (at 35) the discussion of lump-sum appropriations in *Lincoln v. Vigil*, 508 U.S. 182 (1993), but the Freeze Order commanded a near across-the-board halt to payments on financial assistance programs—not the allocation to different objects of a lump-sum appropriation. And Defendants seek to portray (also at 35) the undisguised hostility of the Order's language as just a valid exercise of government speech. But what it underscores is the Order's clear and obvious purpose to suppress viewpoints with which the administration disagrees. *Cf. Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 634–38 (2018) (finding that state violated its "duty under the First Amendment not to base laws or regulations on hostility to a

---

[8] Indeed, as Defendants acknowledge (at 36), one of the executive orders that the Freeze Order purports to help implement specifically instructs agencies to identify grant recipients to OMB based on their past speech or association with disfavored ideas—not the activities for which they are presently receiving funding. *See* Exec. Order No. 14,151 § 2(b)(ii)(C), *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339, 8340 (Jan. 20, 2025). While that order is not itself before the Court here, it confirms that as to the broader freeze, Defendants are not merely engaged in an effort to define the activities that should be federally subsidized going forward. To be clear: Although the executive orders may well violate the First Amendment (or be otherwise unlawful) themselves, the Freeze Order is responsible for an independent First Amendment injury.

[particular] viewpoint" where state's conduct suggested "a clear and impermissible hostility toward" that viewpoint).

## II.    Plaintiffs have amply demonstrated the irreparable harm they face.

Plaintiffs "easily meet their burden" to show irreparable injury through the many documented examples of "existential injuries" their members will suffer. TRO Order at 26–27. Plaintiffs have also shown irreparable harm to themselves and their members from being unable to carry out their core missions and from the infringement of core First Amendment rights. *See* ECF No. 40 at 30–35.

Rather than grapple with those injuries, Defendants repackage their standing and mootness claims—to no greater effect. Once more, they contend (at 37–38) that because the declarants can now draw on their open awards, any fears of a resumed funding freeze are mere speculation. But—again—this argument fails to acknowledge that the declarants received relief only because this Court ordered it. *See supra* Part I.C. Plaintiffs need not show, as Defendants suggest, "proof" that the Freeze Order would be reissued; as this Court has found, a large part of the problem is that the Freeze Order was never truly rescinded. *See* TRO Order at 16–17.[9]

As to the irreparable harm incurred by Plaintiffs' First Amendment violation, Defendants largely repeat their standing arguments, which fail to convince for the same reasons. *See supra* Part I.B. Defendants reiterate their view that because the

---

[9] Defendants seek (at 38) to distinguish *League of Women Voters v. Newby*, 838 F.3d 1 (D.C. Cir. 2016), because that case "involved a threat of prospective harm arising from clearly defined agency action *that was still in place*." As this description suggests, Defendants miss the point: *League of Women Voters* is relevant here precisely because, as in that case, the action of which Plaintiffs complain still threatens to harm them, but for the temporary restraining order holding it at bay.

Freeze Order was purportedly rescinded, any First Amendment injury must be caused by actions outside the scope of this lawsuit. This argument again overlooks that the Order was not truly rescinded and that its implementation was reversed only by the Court's intervention.

### III. The public interest weighs strongly in favor of injunctive relief.

Defendants likewise offer no cause to disturb this Court's finding that "the balance of the equities and public interest heavily favor" injunctive relief. TRO Order at 29. They once again rely (at 40) on debunked arguments that no harm can flow from a rescinded memo, and that the harm that immediately followed the Freeze Order was due to some other mysterious, unnamed source.

Defendants ignore the "far-reaching effects" of the Freeze Order, TRO Order at 28, preferring to focus closer to home: They contend that the only harm at issue is the irreparable injury they will suffer by being prevented from "effectuating statutes enacted by representatives of [the] people.'" Opp'n at 40 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). It is not clear which statute enacted by Congress OMB believes it will be precluded from effectuating; certainly not any of the appropriations Congress made which OMB now tries to withhold. And, in any event, it is blackletter law that "the government has no interest in acting unlawfully" and that "the public has an interest in having its government follow the law." *Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 34 (D.D.C. 2021).

Finally, Defendants attempt to shoehorn into the public interest analysis a complaint about the scope of relief, claiming (at 41) that "[a] broad preliminary

injunction would have a significant chilling effect on the President's and his advisors' ability to lawfully direct and guide agencies' spending decisions." It remains unclear, though, how a preliminary injunction against OMB and its director—not the President—in an APA case could chill the President at all.

## IV. Staying injunctive relief or requiring a bond would undermine this Court's ruling.

In contesting the scope of relief, Defendants first argue (at 42) that any preliminary injunction should be limited to grant awards to Plaintiffs alone. But that fails to account for the rule in this Circuit that the appropriate remedy in APA litigation is to set aside agency action in its entirety. *See, e.g., Nat'l Mining Ass'n*, 145 F.3d at 1409; *see also D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 47 (D.D.C. 2020) (explaining that "[t]he same reasoning has force in the preliminary injunction context"). Instead, Defendants rely on a quotation selectively pulled from a discussion of the *lower* evidentiary standards that apply to a preliminary injunction, as opposed to a trial on the merits. Opp'n at 42 (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). And they do not explain how it would be practicable to sort out which awards belong to Plaintiffs' members, which number in the tens of thousands. *See* ECF No. 5-3 ¶ 2; ECF No. 5-4 ¶ 1; ECF No. 5-5 ¶ 2.

Defendants next argue (also at 42) that any relief should be limited to the Freeze Order, and not to future iterations thereof. But what is already clear from the short history of this case is that for an injunction to be worth the paper, it must prevent Defendants from continuing to implement the same challenged conduct.

Defendants cite (at 43) a number of cases for the proposition that this Court should enter more limited relief, but none are helpful to the analysis. *Carlson v. Postal Regulatory Commission* makes the point that "the APA permits a court to sever a rule by setting aside only the offending parts of the rule," 938 F.3d 337, 351 (D.C. Cir. 2019)—but Defendants do not ask the Court to sever the Freeze Order and do not attempt the relevant severability analysis. In *City of New York v. Mickalis Pawn Shop, LLC*, the Second Circuit addressed a problematic injunction that required a defendant to "adopt prophylactic measures to prevent violation" of firearms laws, without identifying just how "the defendants must alter their behavior to comply with those laws." 645 F.3d 114, 144 (2d Cir. 2011) (alteration omitted). But this bears no resemblance to the proposed order Plaintiffs submitted (and Defendants do not actually claim otherwise).

In *Northern Air Cargo v. U.S. Postal Service*, from the *Chevron* era, the court remanded to the agency to ask it for an authoritative interpretation of a "hopelessly" ambiguous statute. 674 F. 3d 852, 855 (D.C. Cir. 2012). Here, there is no similar need to remand for OMB to do anything. *State Farm* sent an arbitrary and capricious rule back to the agency for further consideration—but, unlike here, the agency was statutorily required to issue standards via rulemaking. 463 U.S. at 46. No such further agency action is necessary here. *Public Employees for Environmental Responsibility v. National Park Service* provides an analysis of the ratification doctrine, which is wholly inapplicable here. 605 F. Supp. 3d 28, 49 (D.D.C. 2022). *In re Microsoft Corp. Antitrust Litigation* only confirms that the point of a preliminary

injunction is to maintain the status quo, which is precisely what Plaintiffs seek. 333 F.3d 517, 525 (4th Cir. 2003). And *Sherley v. Sebelius* simply held that NIH was not required to specifically address comments opposing all embryonic stem-cell research when it issued guidance, at the direction of an executive order, setting out the terms on which NIH funding would be available for such research. 689 F.3d 776, 784–85 (D.C. Cir. 2012). Here, by contrast, Plaintiffs do not allege that Defendants ignored any comments, and no executive order or anything else required that they issue the Freeze Order.

Defendants next try to coerce Plaintiffs to limit relief themselves. They ask (at 44–45) that the Court require the plaintiff associations to "post a bond commensurate with the scope of relief ordered"—meaning, apparently, sufficient to cover all payments on open grants the government makes while the injunction is in effect. That suggestion is facially absurd. Defendants point to no example of a court ordering a bond in analogous circumstances. *But cf. Powelton Civic Home Owners Ass'n v. Dep't of Hous. and Urb. Dev.*, 284 F. Supp. 809, 840–41 (E.D. Pa. 1968) (rejecting "proposition that Rule 65(c) was intended to raise virtually insuperable financial barriers insulating the agency's decision from effective judicial scrutiny").

Defendants also make no effort to explain how OMB and its director could themselves suffer monetary harm from the ordinary disbursement of payments on open awards such that the bond requirement would be even theoretically applicable here. *See* Fed. R. Civ. P. 65(c) (providing that bond may be appropriate to "pay the *costs and damages sustained* by *any party* found to have been wrongfully enjoined");

24

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980) (confirming that courts may "dispense with any security requirement whatsoever where the restraint will do the defendant no material damage" or "where there has been no proof of likelihood of harm" (quotation marks omitted)).

Given the lack of any plausible claim to damages by OMB or Director Vought, and the sheer scale of the bond they suggest, it is difficult to conclude that Defendants' request is anything other than an effort to retaliate against Plaintiffs for bringing this suit and to discourage potential litigants from bringing further actions—ironic in a case that turns in part on Defendants' efforts to suppress other exercises of First Amendment rights. *See generally Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 387 (2011) ("[T]he right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government."). The Court should reject Defendants' request out of hand.

Finally, Defendants ask (at 45) the Court to stay any injunction pending appeal. The Court should deny that request, too, because Plaintiffs have shown they are likely to succeed on the merits, would be irreparably harmed without the Court's intervention, and that the balance of equities heavily favors keeping injunctive relief in place. *See generally Nken v. Holder*, 556 U.S. 418, 433–34 (2009).

## CONCLUSION

For all these reasons and those in Plaintiffs' motion, the Court should enter a preliminary injunction, without a bond and without a stay.

Dated:  February 18, 2025        Respectfully submitted,

/s/ *Kevin E. Friedl*

Kevin E. Friedl* (Admitted only in New
York; practice supervised by DC Bar
members)
Jessica Anne Morton (DC Bar No.
1032316)
Kaitlyn Golden (DC Bar No. 1034214)
Robin F. Thurston (DC Bar No. 1531399)
Skye L. Perryman* (DC Bar No. 984573)
Will Bardwell* (DC Bar No. 90006120)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kfriedl@democracyforward.org
jmorton@democracyforward.org
kgolden@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org
wbardwell@democracyforward.org.

*admitted *pro hac vice*

## CERTIFICATE OF SERVICE

On February 18, 2025, I caused the foregoing to be filed electronically via the Court's CM/ECF system, which provides electronic notice to all counsel of record. I further caused those documents to be served on pro se movant Beatrice Adams at the mailing address she has entered on the record.

Dated: February 18, 2025                    /s/ *Kevin E. Friedl*
                                            Kevin E. Friedl