## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL COUNCIL OF
NONPROFITS, *et al.*,

        *Plaintiffs*,

   v.

OFFICE OF MANAGEMENT AND
BUDGET, *et al.*,

        *Defendants*.

Civil Action No. 25‑239 (LLA)

## <u>MEMORANDUM OPINION</u>

On February 3, 2025, the court issued a temporary restraining order ("TRO") prohibiting Defendants Russell Vought[1] and the Office of Management and Budget ("OMB") (collectively, "Defendants") from implementing, giving effect to, or reinstating under a different name OMB memorandum M-25-13 freezing all federal financial assistance under open awards. ECF No. 30, at 29-30. The court found good cause to extend the TRO under Rule 65(b)(2) on February 6, 2025. Feb. 6, 2025 Minute Order. Plaintiffs, several coalitions of nonprofit organizations, have moved for a preliminary injunction granting similar relief as the TRO. ECF No. 40. Upon consideration of the parties' briefs, ECF Nos. 40, 47, 49, an amicus brief from the American Center for Law and Justice, ECF No. 48, the oral argument held on February 20, 2025, Feb. 20, 2025 Minute Entry, and for the reasons explained below, the court will enter a preliminary injunction.

---

[1] Although Plaintiffs originally named then-Acting Director of the Office of Management and Budget Matthew Vaeth as a defendant, Russell Vought—who was confirmed by the Senate on February 6, 2025—"is automatically substituted as a party" in Mr. Vaeth's place pursuant to Federal Rule of Civil Procedure 25(d).

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

While most of the following factual background and procedural history was explained in the court's opinion granting the TRO, ECF No. 30, the court recounts the details here for completeness and adds developments since the court's February 3, 2025 hearing, TRO Hr'g, *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-CV-239 (D.D.C. Feb. 3, 2025).

### A.    Office of Management and Budget Memorandum M-25-13

On January 27, 2025, Matthew J. Vaeth, Acting Director of OMB, issued a memorandum directing federal agencies to "complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders." *Off. of Mgmt. & Budget, Exec. Off. of the President, Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* (Jan. 27, 2025), https://perma.cc/69QB-VFG8 ("OMB Pause Memorandum," or "M-25-13"), at 2. The memorandum stated that, "[i]n the interim, to the extent permissible under applicable law, Federal agencies *must temporarily pause* all activities related to [the] obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal." *Id.* Additionally, the memorandum directed that "[e]ach agency must pause: (i) issuance of new awards; (ii) disbursement of Federal funds under all open awards; and (iii) other relevant agency actions that may be implicated by the executive orders, to the extent permissible by law." *Id.*

The memorandum defined "Federal financial assistance" as: "(i) all forms of assistance listed in paragraphs (1) and (2) of the definition of this term at 2 [C.F.R. §] 200.1; and (ii) assistance received or administered by recipients or subrecipients of any type except for assistance received

directly by individuals." *Id.* ¶ 17.  This includes all federal assistance in the form of grants, loans, loan guarantees, and insurance.  *Id.* ¶ 18; *see* 2 C.F.R. § 200.1.[2]  As relevant executive orders, it listed:

- *Protecting the American People Against Invasion* (Jan. 20, 2025);

- *Reevaluating and Realigning United States Foreign Aid* (Jan. 20, 2025);

- *Putting America First in International Environmental Agreements* (Jan. 20, 2025);

- *Unleashing American Energy* (Jan. 20, 2025);

- *Ending Radical and Wasteful Government DEI Programs and Preferencing* (Jan. 20, 2025);

- *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (Jan. 20, 2025); and

- *Enforcing the Hyde Amendment* (Jan. 24, 2025).

OMB Pause Memorandum, at 1-2.

The memorandum stated that "[t]he temporary pause [would] become effective on January 28, 2025 at 5:00 PM."  *Id.* at 2.  During the pause, agencies were directed to "submit to OMB detailed information on any programs, projects[,] or activities subject to [the] pause" on or before February 10, 2025.  *Id.* at 2.

### B.    Complaint, Emergency Hearing, and Administrative Stay

Shortly after noon on January 28, Plaintiffs brought this suit against OMB and Acting Director Vaeth arguing that OMB's action violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*  ECF No. 1.  Plaintiffs alleged that the implicated federal grants and funding "are the lifeblood of operations and programs for many . . . nonprofits, and [that] even a short

---

[2] The memorandum included a footnote stating: "Nothing in this memo should be construed to impact Medicare or Social Security benefits."  OMB Pause Memorandum, at 1 n.2.

pause in funding . . . could deprive people and communities of their life-saving services." *Id.* ¶ 32. They argued that Defendants' action was arbitrary and capricious, violated the First Amendment of the United States Constitution, and exceeded OMB's statutory authority. *Id.* ¶¶ 43-61.

Along with their complaint, Plaintiffs sought a temporary restraining order "barring the OMB and all of its officers, employees, and agents from taking any steps to implement, apply, or enforce Memo M-25-13." ECF No. 5, at 18. Defendants entered an appearance, ECF No. 9, and the court held an emergency hearing at 4:00 p.m. on January 28 to discern the parties' positions with respect to the issuance of a brief administrative stay pending the resolution of Plaintiffs' request for a TRO, Jan. 28, 2025 Minute Entry.

Given the extreme time constraints of the litigation and the magnitude of the legal issues, the court entered a brief administrative stay to permit the parties to fully brief the TRO motion and "buy[] the court time to deliberate."[3] ECF No. 13, at 3 (quoting *United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring)). The administrative stay was limited in scope and only prohibited Defendants "from implementing OMB Memorandum M-25-13 with respect to the disbursement of Federal funds under all open awards" until 5:00 p.m. on February 3, 2025. *Id.* at 4-5. The court also set a hearing on Plaintiffs' TRO motion for 11:00 a.m. on February 3, 2025. *Id.* at 5.

### C.    Rescission of Memorandum M-25-13 and Aftermath

On January 29, the day after the court entered its administrative stay, OMB issued a new memorandum ("M-25-14") that purported to rescind M-25-13. *See* ECF Nos. 18, 18-1. The new

---

[3] The court issued the administrative stay from the bench shortly before the "temporary pause" of federal funding was set to take effect at 5:00 p.m. Tr. of Emergency Hr'g, at 23:21-24:5, *Nat'l Council of Nonprofits*, No. 25-CV-239 (D.D.C. Jan. 28, 2025).

memorandum consisted of two sentences: "OMB Memorandum M-25-13 is rescinded.  If you have questions about implementing the President's Executive Orders, please contact your agency General Counsel."  ECF No. 18-1.

Shortly after this "rescission" was issued, White House Press Secretary Karoline Leavitt announced from her official social media account that the new memorandum was "NOT a rescission of the federal funding freeze."  Karoline Leavitt, X (formerly Twitter) (Jan. 29, 2025), https://perma.cc/99C4-5V6G.  Instead, she stated that "[i]t [was] simply a rescission of [OMB memorandum M-25-13]."  *Id.*  She further explained that the purpose of the rescission was "[t]o end any confusion created by the court's injunction."  *Id.*  The entire post may be viewed below:



*Id.*[4]

---

[4] The same day, Beatrice Adams moved to intervene on behalf of herself and all others similarly situated.  ECF No. 19.  She sought to dissolve the court's then-active administrative stay, arguing that child-welfare funding was being used to "facilitate the separation of children from loving homes."  *Id.* at 3-4.  Both parties oppose Ms. Adams's intervention.  ECF Nos. 41, 42.  The court will deny Ms. Adams's motion.  To the extent she only seeks to challenge the administrative stay, Ms. Adams's motion to intervene is now moot.  In any event, Ms. Adams's claims are too factually and legally attenuated from those alleged in Plaintiffs' complaint, and Defendants are "already adequately representing the Government's interests in ensuring that all federal funding is administered appropriately."  ECF No. 42, at 1.

### D.       Temporary Restraining Order Phase

On January 30, Defendants filed their opposition to Plaintiffs' TRO motion and concurrently moved to dismiss the complaint for lack of subject matter jurisdiction.  ECF Nos. 20, 21.  Both motions were fully briefed by February 1.  ECF Nos. 24, 25, 26.

On the morning of February 3, 2025, the court held a hearing on Plaintiffs' motion for a TRO.  Feb. 3, 2025 Minute Entry.  At the conclusion of the hearing, the court explained that it was inclined to grant a TRO and deny Defendants' motion to dismiss.  Tr. of TRO Hr'g, *Nat'l Council of Nonprofits*, at 58:17-59:15, No. 25-CV-239 (D.D.C. Feb. 3, 2025).  Pursuant to the court's request, Plaintiffs submitted a proposed TRO order shortly after the hearing concluded, and Defendants responded to the proposed order by mid-afternoon.

Before the administrative stay expired at 5:00 p.m., the court issued a memorandum opinion and order granting Plaintiffs' motion for a temporary restraining order.  ECF No. 30.  The court concluded that it had jurisdiction over Plaintiffs' motion, that the case was not moot following the purported "rescission" of the OMB Pause Memorandum, and that Plaintiffs had met the heavy burden of showing that they were entitled to a temporary restraining order.  *Id.* at 6-29.  Specifically, the court found that Plaintiffs had demonstrated that they were likely to succeed on their arbitrary and capricious claim because "Defendants . . . offered no rational explanation for why they needed to freeze *all* federal financial assistance—with less than twenty-four-hours' notice—to 'safeguard valuable taxpayer resources.'"  *Id.* at 23 (quoting OMB Pause Memorandum, at 1).[5]  The court further determined that Plaintiffs had produced evidence that they would suffer irreparable injury in the absence of emergency relief because "the funding freeze threaten[ed] the lifeline that keeps

---

[5] While the court did not fully address Plaintiffs' other two claims (that Defendants' actions were in excess of statutory authority and violated the First Amendment), it noted that they had shown at least some likelihood of success on both.  ECF No. 30, at 20 n.6.

countless organizations operational." *Id.* at 28. Finally, the court concluded that the "nationwide panic" and widespread chaos caused by the impending freeze tipped the public interest heavily in favor of a temporary restraining order. *Id.* at 28-29.

The order prohibited Defendants "from implementing, giving effect to, or reinstating under a different name the directives in OMB Memorandum M-25-13 with respect to the disbursement of Federal funds under all open awards." ECF No. 30, at 29. Pursuant to the order, Defendants sent written notice "to all agencies to which OMB Memorandum M-25-13 was addressed" informing them of the temporary restraining order later that evening. ECF No. 39, at 1.

On February 6, the court set an expedited preliminary injunction briefing schedule and ordered the parties to appear for a hearing on February 20 at 11:00 a.m. Feb. 6, 2025 Minute Order. The court also extended the TRO for good cause until it could resolve Plaintiffs' forthcoming preliminary injunction motion. *Id.*

### E. Preliminary Injunction Phase

On February 11, Plaintiffs filed their motion for a preliminary injunction. ECF No. 40. Defendants filed their opposition on February 15, ECF No. 47, and Plaintiffs filed their reply on February 18, ECF No. 49.[6]

Some of Plaintiffs' members submitted new declarations explaining that they have been able to access their previously allocated federal funds since the court's entry of the TRO. *See* ECF Nos. 40-1 ¶ 3; 40-2 ¶ 6; 40-3 ¶ 4. Those declarants still maintain, however, that any additional pause in funding will have catastrophic or fatal consequences for their organizations. *See* ECF Nos. 40-1 ¶¶ 4-5; 40-2 ¶¶ 7-8; 40-3 ¶ 5.

---

[6] In the interim, on February 14, the American Center for Law and Justice filed an amicus brief in support of Defendants. ECF No. 46.

On the morning of February 20, the court held a hearing on Plaintiffs' motion for a preliminary injunction.  Feb. 20, 2025 Minute Entry.

### F.    Parallel Litigation in the District of Rhode Island

On the same day Plaintiffs filed this suit, and several hours before memorandum M-25-13's pause was to go into effect, twenty-two states and the District of Columbia filed suit in the U.S. District Court for the District of Rhode Island and sought a TRO to halt implementation of the memorandum.  *See* Compl., *New York v. Trump*, No. 25-CV-39 (D.R.I. Jan. 28, 2025), ECF No. 1.

The district court held a hearing on January 29 at 3:00 p.m., after OMB had "rescinded" memorandum M-25-13.  The court granted the States' request and issued a TRO on January 31, 2025.  TRO, *New York*, No. 25-CV-39 (D.R.I. Jan. 31, 2025), ECF No. 50.  The restraining order prohibited the defendants (President Trump, OMB, and eleven federal agencies) from "paus[ing], freez[ing], imped[ing], block[ing], cancel[ing], or terminat[ing] [their] compliance with awards and obligations to provide federal financial assistance to the [plaintiff] States."  *Id.* at 11.  The order also prohibited the defendants "from reissuing, adopting, implementing, or otherwise giving effect to the [OMB memorandum M-25-13] under any other name or title, . . . such as the continued implementation identified by the White House Press Secretary's statement of January 29, 2025."  *Id.* at 12.  Finally, the court directed the States to file their forthcoming motion for a preliminary injunction expeditiously.  *Id.* at 11.

On the morning of February 3, the defendants filed a notice of compliance with the District of Rhode Island's TRO.  Notice of Compliance with Court's TRO, *New York*, No. 25-CV-39 (D.R.I. Feb. 3, 2025), ECF No. 51.  In it, the defendants explained that they had provided written notice to all defendant agencies on January 31 to inform them of the TRO and instruct them to comply with its restrictions.  *Id.* ¶ 1.  The defendants also notified the court that they believed

certain terms of the TRO "constitute[d] significant intrusions on the Executive Branch's lawful authorities and the separation of powers." *Id.* ¶ 2.

The court subsequently set a briefing schedule on the States' motion for a preliminary injunction. Text Order, *New York*, No. 25-CV-39 (D.R.I. Feb. 3, 2025). On February 6, the court held a status conference and extended the duration of its TRO until it could rule on the preliminary injunction motion. Text Order, *New York*, No. 25-CV-39 (D.R.I. Feb. 6, 2025). The next day, the States filed an emergency motion to enforce the TRO, citing evidence that they "continue[d] to be denied access to federal funds." Mot. for Enforcement of the TRO, *New York*, No. 25-CV-39 (D.R.I. Feb. 7, 2025), ECF No. 66. The defendants opposed, arguing that their actions "d[id] not run afoul of the Court's injunction, or at least not a 'clear and unambiguous command' in the Court's injunction." Opp'n to Pls.' Mot. to Enforce TRO, *New York*, No. 25-CV-39 (D.R.I. Feb. 9, 2025), ECF No. 70. On February 10, the court granted the States' motion and ordered the defendants to "immediately restore frozen funding," "end any federal funding pause," and "take every step necessary to effectuate the TRO" during its pendency. Order, *New York*, No. 25-CV-39 (D.R.I. Feb. 10, 2025), ECF No. 96.

Even though the court had not ruled on the still-pending motion for a preliminary injunction, the defendants appealed later that day. Notice of Appeal, *New York*, No. 25-CV-39 (D.R.I. Feb. 10, 2025), ECF No. 98. They sought (1) review of the district court's TRO order and enforcement orders, and (2) an administrative stay of the district court's rulings pending the appeal. Emergency Mot. for Immediate Administrative Stay, *New York v. Trump*, No. 23-1138 (1st Cir. Feb. 10, 2025). The First Circuit assumed that it had jurisdiction over the appeal and unanimously denied the request for an administrative stay without prejudice. Order, *New York*, No. 23-1138 (1st Cir. Feb. 11, 2025). It expressed uncertainty as to whether such an administrative stay could

issue and noted that "the defendants d[id] not cite any authority in support of their administrative stay request or identify any harm related to a specific funding action or actions that they w[ould] face without their requested administrative stay." *Id.* The appellate court did not address the merits of the appeal. *Id.* The defendants then moved to voluntarily dismiss their appeal, Mot. to Voluntarily Dismiss Appeal, *New York*, No. 23-1138 (1st Cir. Feb. 13, 2025), which the court granted on February 13. Judgment, *New York*, No. 23-1138 (1st Cir. Feb. 13, 2025).

On February 21, the District of Rhode Island held a preliminary injunction hearing. The court took the States' motion under advisement but "reiterate[d] that the previously entered TRO [remained] in full force and effect." Minute Entry, *New York*, No. 25-CV-39 (D.R.I. Feb. 21, 2025). Litigation remains ongoing.

## II.   DISCUSSION

### A.   Jurisdiction

The factual situation has shifted somewhat since the court entered its TRO, and Defendants again press their jurisdictional arguments. While the initial funding freeze has begun to thaw, the court concludes that it still retains jurisdiction.

#### 1.   Standing

As an initial matter, there is no question that Plaintiffs had standing when they initially brought their complaint. ECF No. 30, at 6-13; *see Garcia v. U.S. Citizenship & Immigr. Servs.*, 168 F. Supp. 3d 50, 65 (D.D.C. 2016) (explaining that standing "is concerned with the presence of injury, causation, and redressability *at the time a complaint is filed*"). As the court explained in its TRO opinion, Plaintiffs had satisfied each of the three standing requirements: (1) a concrete and particularized injury in fact; (2) a causal connection linking the injury and the challenged conduct; and (3) a likelihood that a favorable court decision will redress the injury. ECF No. 30, at 6-7

(quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).  While that alone is sufficient to confer standing, the court pauses to note that standing persists.

### a.    Injury in fact

Plaintiffs have demonstrated that "even a temporary pause in funding to their members . . . would destroy their ability to provide [critical] services."  ECF No. 30, at 7; *see* ECF No. 1 ¶¶ 33-34, 36-40.  Many, if not all, of Plaintiffs' members "need weekly injections of federal funds in order to continue operating."  ECF No. 30, at 8; *see, e.g.*, ECF No. 24-7 ¶¶ 20-21.  Some have employees who "live paycheck to paycheck, meaning that a single missed payment could prevent them from buying groceries or paying rent."  ECF No. 30, at 9 (internal quotation marks omitted); *see* ECF No. 24-4 ¶ 7.  Others had begun to feel the effects of the freeze even before it was supposed to go into effect: one tribal organization was forced to preemptively lay off two employees on January 28. ECF No. 30, at 9; *see* ECF No. 24-5 ¶ 13.  Plaintiffs also demonstrated constitutional injury because "Defendants [allegedly] singled out their funding programs (in other words, their economic lifelines) based on their exercise of speech and association."  ECF No. 30, at 8.

Defendants now try to frame the issue as one of Plaintiffs' "standing to seek prospective relief."  ECF No. 47, at 11.  The court reminds Defendants that the injunctive relief currently in place was issued to temporarily stave off imminent, irreparable harm.  Facts have certainly evolved since then, *see infra* Part II.A.2, but Defendants cannot pretend that the nationwide chaos and paralysis from two weeks ago is some distant memory with no bearing on this case.  The relief Plaintiffs now seek is a more durable version of the relief they sought then, when their members were on the brink of extinction.  In sum, Plaintiffs have marshalled significant evidence indicating that the funding freeze would be economically catastrophic—and in some circumstances, fatal— to their members.  That is sufficient to show an injury-in-fact.

*b.*     *Causation*

The court previously rejected Defendants' attempts to break the causal chain between the funding freeze and the OMB Pause Memorandum.  ECF No. 30, at 9-12.  Plaintiffs convincingly demonstrated that the memorandum—not some other cause—triggered the shutting down of federal funding portals and the suspension of assistance payments.  *Id.*  While Defendants have tried to attribute the pauses to individual agency discretion, those pauses did not occur until *after* the memorandum was issued.

In opposing the TRO, Defendants cited two cases, ECF No. 21-1, at 10-11, but the court was not persuaded then, and it remains unpersuaded.  The first featured an executive order that "d[id] not *require* any action from federal agencies."  *Louisiana ex rel. Landry v. Biden*, 64 F.4th 674, 681 (5th Cir. 2023).  Instead, the order allowed agencies to individually determine whether the guidance applied to their activities.  *Id.*  For that reason, causation in *Louisiana* "hinge[d] on the independent choices of [a] regulated third party" and was not traceable to the defendant.  *Center for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005) (quoting *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004), *abrogated on other grounds by Cohen v. United States*, 650 F.3d 717 (D.C. Cir. 2011) (en banc)).  In contrast, the OMB Pause Memorandum was a clear command.  It emphatically stated that all federal agencies "*must temporarily pause* all activities related to [the] obligation or disbursement of all Federal financial assistance."  OMB Pause Memorandum, at 2.  That was a directive, not a suggestion.  Just two paragraphs later, it reiterated that agencies "must pause . . . disbursement of Federal funds under all open awards."  *Id.*  And in the penultimate paragraph, it stated that "*OMB* may grant exceptions allowing Federal agencies to issue new awards or take other actions on a case-by-case basis."  *Id.* (emphasis added).  On its face, the memorandum does not read like a guidance that leaves funding decisions solely in the hands of independent, third-party agencies.

The second case, on which Defendants no longer rely, was also inapposite. In *Jacobson v. Florida Secretary of State*, 974 F.3d 1236 (11th Cir. 2020), the plaintiffs sought to change the way elections officials were listing gubernatorial candidates, but they had sued a government actor with no actual control over those officials. *Id.* at 1253. The elections officials were answerable only to voters, not the defendant. *Id.* Here, however, Defendants try to build their case on the exact opposite premise: that OMB *does* exercise control over federal financial policies. *See* ECF No. 21-1, at 16-20. Both *Louisiana* and *Jacobson* are therefore inapplicable.

Further undermining Defendants' position, federal agencies clearly behaved as if the memorandum caused the freeze. In the immediate aftermath of the court's administrative stay on January 28, the Environmental Protection Agency continued to pause funding disbursements *explicitly based on* the memorandum. *See* ECF No. 24-1, at 7 (explaining that the agency was still "working diligently to implement [OMB]'s memorandum" and was therefore "temporarily pausing all activities related to the obligation or disbursement of EPA Federal financial assistance" and working closely "with OMB" to do so).

Undeterred, Defendants vigorously challenge causation again at the preliminary-injunction stage. They start by rehashing the independent-agency theory, claiming that the memorandum "did not itself temporarily pause any federal financial assistance." ECF No. 47, at 13. For that to be true, Defendants would have the court believe that countless federal agencies, none of which had acted to cut off financial assistance before January 28, suddenly began exercising their own discretion to suspend funding across the board at the exact same time. That would be a remarkable—and unfathomable—coincidence. That this uniform freeze occurred just hours after the memorandum's issuance would be quite the happenstance, too. Indeed, the record belies Defendants' assertions. It reflects that after OMB issued its memorandum on January 27, agencies

immediately began freezing funds, and after this court entered its TRO, some of those funds were released. *See, e.g.*, ECF Nos. 40-3 ¶ 4 (organization able to draw down funds on February 4, one day after entry of the TRO); 40-1 ¶ 3 (organization able to draw down funds on February 5, two days after entry of the TRO); 40-2 ¶ 6 (organization received funds on February 6, three days after entry of the TRO).

Defendants try to downplay the fact that the freeze began to thaw after the court entered its TRO. They claim that this "could equally be because such funds were not intended to be paused under the OMB Memo and OMB Guidance, or because of a broader court order entered by the district court in Rhode Island." ECF No. 47, at 13. But this argument requires the exact same coincidental assumptions as above, just in reverse. And it contradicts the record, which indicates that agencies explicitly relied on the memorandum when responding to funding inquiries. *See* ECF No. 24-1, at 7. Adopting Defendants' view would require reading the memorandum differently than how it was written. Its directive was broad and mandatory, and that is exactly how the agencies interpreted it. *See infra* Part II.A.2.a.

Defendants also argue that the memorandum "d[id] not determine which funds or grants should be paused" and instead "require[d] that agencies make that determination, consistent with their own authorities." ECF No. 47, at 13. In a manner of speaking, Defendants are right that the memorandum did not identify specific funds to be paused. Instead, it simply paused them all. OMB Pause Memorandum, at 2. Defendants cannot show that this directive left any room for agency discretion, especially on the nearly nonexistent timetable it provided. Agencies were not given an option on whether to continue honoring their payment obligations; they simply had to stop. And even if the agencies thought they had discretion to act, they were given roughly half a day to evaluate up to $3 trillion in grants, loans, and other programs. That is not discretion.

When Plaintiffs filed suit, they alleged that Defendants had illegally ordered all federal agencies to suspend payments on open awards.  Plaintiffs provided evidence that those agencies only started freezing funds after the memorandum was issued and—in some cases—expressly relied on the memorandum to do so.  Within days of this court's TRO (and Defendants' written notice to all federal agencies), payments began to resume.  Defendants ask the court to overlook the simplest, most logical explanation for that sequence of events.  The court declines to do so.

### c.    *Redressability*

Redressability is closely related to causation, and Plaintiffs have satisfied it.  Defendants claim that "[Plaintiffs'] funding is not administered by OMB" and that an injunction against it "would not give [them] legally enforceable protection from the allegedly imminent harm."  ECF No. 47, at 14 (quoting *Haalend v. Brackeen*, 599 U.S. 255, 293 (2023)).

But Plaintiffs seek an injunction barring Defendants from directing agencies to freeze federal funding nationwide in a blanket fashion.  Prelim. Inj. Hr'g, *Nat'l Council of Nonprofits*, No. 25-CV-239 (Feb. 20, 2025).  As the court previously explained, a ruling in Plaintiffs' favor would force agencies "to behave as if the memorandum were never issued."  ECF No. 30, at 13. Any pauses premised on the memorandum would cease, thus granting Plaintiffs significant relief. Whether individual agencies later exercise their individual discretion to stop funding on another basis does not defeat redressability as it pertains to the OMB Pause Memorandum.

### 2.    Mootness

Mootness, sometimes defined as "standing set in a time frame," asks whether a case continues to present a live controversy as it progresses.  *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) (quoting Henry P. Monaghan, *Constitutional Adjudication: The Who and When*, 82 Yale L.J. 1363, 1384 (1973)).  As the court explained in its earlier opinion, despite the purported "recission"

of the OMB Pause Memorandum, the case was not moot at the time the court entered its TRO. ECF No. 30, at 13-19. While Defendants continue to argue mootness in light of recent factual developments, the court's previous analysis still applies today.

### a.    Rescission of the memorandum

Defendants begin by again relying on the rescission of the OMB Pause Memorandum, which occurred on January 29. ECF No. 47, at 8. That "rescission," however, had already taken place when Defendants last made this same argument. The court rejected the claim then, and it rejects the claim now.

First, the doctrine of voluntary cessation still applies. A party's decision to stop "a challenged practice does not deprive a federal court of its power to determine [its] legality." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). This doctrine exists to protect plaintiffs and prevent a defendant from "return[ing] to [its] old ways" as soon as a case gets dismissed. *Id.* (quoting *City of Mesquite*, 455 U.S. at 289). To overcome it, a defendant must meet a heavy burden: it must show that it is "*absolutely clear* [that] the allegedly wrongful behavior [cannot] reasonably be expected to recur." *Pub. Citizen, Inc. v. Fed. Energy Reg. Comm'n*, 92 F.4th 1124, 1128 (D.C. Cir. 2024) (emphasis added) (quoting *Friends of the Earth, Inc.*, 528 U.S. at 189).

Rescinding the OMB Pause Memorandum did not moot the case because Defendants could not—and still cannot—show that they will not "resume the challenged activity." *Id.* As the court previously observed, the White House Press Secretary appeared to completely contradict the act of rescission by expressly stating that it was "NOT a rescission of the federal funding freeze." Karoline Leavitt, X (formerly Twitter) (Jan. 29, 2025), https://perma.cc/99C4-5V6G. By any reading of the Press Secretary's remarks, the memorandum's retraction was an empty gesture. At

best, it was meaningless.  At worst, it was a brazen attempt to deprive the court of jurisdiction without actually altering course.  *See Pub. Citizen, Inc.*, 92 F.4th at 1128 (explaining that the voluntary-cessation doctrine applies with greater force when a party is suspected of "manipulating the judicial process through the false pretense of singlehandedly ending a dispute" (internal quotation marks omitted) (quoting *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 15 (D.C. Cir. 2019) (per curiam))).  Because Plaintiffs' members were *still* being frozen out of their funding in the wake of the purported "rescission," *see* ECF Nos. 24-4 ¶ 12; 24-5 ¶ 24; 24-11 ¶ 19, "it appears that OMB sought to overcome a judicially imposed obstacle without . . . ceasing the challenged conduct."  ECF No. 30, at 16.[7]

Defendants and Amicus now say that factual developments have made the voluntary-cessation doctrine inapplicable.  ECF No. 47, at 9-10.  Specifically, they say that "there is no reason to think OMB [will] reissue the challenged Memo" because the President's executive orders—which Plaintiffs do not challenge—remain in place.  *Id.* at 10; *see* ECF No. 48, at 4 (Amicus

---

[7] Amicus American Center for Law and Justice echoes Defendants' mootness argument, claiming that "*none* of [Plaintiffs'] desired terms of the Prayer for Relief can be implemented [because] there is no OMB Memo that can be enjoined, restrained, or vacated."  ECF No. 48, at 3.  The court has already rejected this argument.  To the extent that Plaintiffs' prayer for relief is limited only to the memorandum, they have shown that the rescission had no real effect on Defendants' actions.  For days after the memorandum purportedly ceased to exist, agencies continued to withhold funds pursuant to its authority.  *See* ECF No. 24-1, at 7.  If Amicus were correct, a government agency could order illegal activity, retract that order in name only while continuing to implement its substance, and escape legal liability.  The court refuses to ratify such behavior.  Amicus goes on to argue that "Plaintiffs cannot use a Complaint directed against the OMB Memo as a basis for obtaining relief against all pauses of whatever basis," ECF No. 48, at 5, but this misconstrues the requested injunctive relief.  Plaintiffs made clear at the preliminary injunction hearing that they only seek to prevent Defendants from ordering or implementing unilateral, blanket pauses across the entire federal funding apparatus.  *See* Tr. of Prelim. Inj. Hr'g, at 55:15-18, *Nat'l Council of Nonprofits*, No. 25-CV-239 (Feb. 20, 2025) (proposing an order that would enjoin a "unilateral[] . . . freeze on the payment of open awards on a non-individualized basis").  In other words, Plaintiffs wish to use a complaint directed against an agency-ordered blanket freeze to obtain relief against that precise action.

arguing that the "executive orders related to federal funding" independently "order[ed] federal agencies to engage in certain specified pauses"). In other words, the memorandum would have no added benefit. But this argument ignores the fact that the effects of the OMB Pause Memorandum and the President's executive orders were not coextensive. At the TRO hearing, Defendants could not explain all the frozen funding by relying on the executive orders alone. *See* ECF No. 30, at 18 ("Plaintiffs have provided evidence that the scope of frozen funds appears to extend far beyond the reach of the executive orders[.]"), 19 ("At oral argument, when asked about another declarant who was receiving a grant from the National Science Foundation, Defendants could not give a clear answer as to why that recipient would be denied funds pursuant to the executive orders." (citation omitted)). Defendants insist that this overreach may have been because agencies overzealously implemented the freeze. But that is a problem of Defendants' own creation. Their memo was written, interpreted, and executed as a blanket pause. *See, e.g.*, Tr. of TRO Hr'g, at 16:1-5, *Nat'l Council of Nonprofits*, No. 25-CV-239 (D.D.C. Feb. 3, 2025) ("[T]he way that the OMB order has been implemented in many cases . . . is [not by] pausing individual grants but by freezing the platforms, the online portals[.]"). Defendants cannot shift the blame onto federal agencies because those agencies followed Defendants' own orders.

Attempting to put the agencies' real-world interpretations aside, Defendants assert that the memorandum's language was clearly limited only to activities covered by the seven executive orders referenced in the memorandum. *See* Tr. of Prelim. Inj. Hr'g, at 26:25-29:17, *Nat'l Council of Nonprofits*, No. 25-CV-239 (D.D.C. Feb. 20, 2025). The court is unconvinced for several reasons. The memorandum's primary directive ("*must temporarily pause*") targeted "all activities related to [the] obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial

assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal." OMB Pause Memorandum, at 2. OMB's decision to separate the first and second clauses indicated that they were to be treated as distinct categories for the pause. If both clauses were meant to be limited to the executive orders, it is not clear why OMB would distinguish "all activities related to obligation or disbursement" from "other relevant agency activities." *Id.* Conceivably, OMB would have simply instructed agencies to pause all funding activities related to the executive orders and leave it at that.

Furthermore, the whole purpose of the pause was to give agencies time "to identify programs, projects, and activities that *may be implicated* by any of the President's executive orders." *Id.* (emphasis added). The pause was to apply "[i]n the interim"—in other words, *while* that identification took place. It would make little sense for agencies to only pause activities associated with the executive orders while evaluating what activities are even associated with the executive orders in the first place. The narrower reading that Defendants endorse would require agencies to *already know* what activities "may be implicated" by the executive orders. For the memorandum's order of operations to be logical, then, the court would need to read it the way Plaintiffs do: OMB told agencies to assess funding for consistency with the President's executive orders and, "[i]n the interim," "temporarily pause all activities related to [the] obligation or disbursement of Federal financial assistance" while that assessment was underway. *Id.*

Additionally, if the memorandum's language were obviously limited to the executive orders, the court does not understand why OMB included a footnote carving out Social Security and Medicare, *see id.* at 1 n.2, or subsequently issued an entirely new document clarifying the original directive, ECF No. 11-1. None of the executive orders addresses Social Security or Medicare at all. If it were apparent that the pause did not extend beyond the executive orders, the

footnote is entirely unnecessary. And as for the subsequent guidance, it does not make sense for Defendants to claim that an initial instruction is unambiguous but then feel a need to clarify it only hours later.

In sum, the doctrine of voluntary cessation still applies. Defendants have not made it "absolutely clear" that they will refrain from resuming the challenged activity given their post-complaint actions and overly restrictive reading of the memorandum's language. *Pub. Citizen, Inc.*, 92 F.4th at 1128.

### b.    Resumption of funding

Second, Defendants try to argue that the gradual thawing of the freeze indicates mootness. ECF No. 47, at 9–11. The court disagrees. It is true that some of Plaintiffs' members are now receiving federal funds again, but that does not render their case, or their request for injunctive relief, moot.

At the preliminary injunction stage, Defendants cannot simply "claim that the need for an injunction is now moot because [they have] 'ceased [their] wrongful conduct.'" *Costa v. Bazron*, 464 F. Supp. 3d 132, 141 (D.D.C. 2020) (quoting *Taylor v. Resol. Tr. Corp.*, 56 F.3d 1497, (D.C. Cir. 1995)). This rings especially true when the cessation "follow[s] the entry of a TRO." *Id.* The "court's power to grant injunctive relief survives discontinuance of the illegal conduct" because the "purpose . . . is to prevent future violations." *Dep't of Just. v. Daniel Chapter One*, 89 F. Supp. 3d 132, 143 (D.D.C. 2015) (alteration in original) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)).

Defendants instructed agencies to disregard the directives of the memorandum, as they were required to do so by two different courts' orders. *See* ECF No. 30, at 29 (directing Defendants to issue written notice to all agencies); ECF No. 39-1 (Defendants' written notice); TRO, *New*

*York*, No. 25-CV-39 (D.R.I. Jan. 31, 2025), ECF No. 50.  But Defendants cannot now rely on this *court-ordered* compliance to argue that a court order is unnecessary.  As Plaintiffs point out, and as other judges of this court have recognized, adopting Defendants' position would mean that no TRO could ever become a preliminary injunction.  *See Costa*, 464 F. Supp. 3d at 142 ("If compliance with the terms of a TRO were sufficient to defeat entry of a preliminary injunction, few—if any—cases would make it past the TRO stage.").

Defendants blithely suggest that if they were to revive or reissue the OMB Pause Memorandum at some future point in time, Plaintiffs could simply "file another motion for preliminary relief."  ECF No. 47, at 11.  This proposal completely disregards the mountain of evidence Plaintiffs presented showing that even the threat of a funding freeze was enough to send countless organizations into complete disarray.  Hours *before* the original pause was scheduled to start, organizations were already laying off staff or shuttering programs.  *See, e.g.*, ECF Nos. 24-5 ¶ 13; 24-7 ¶¶ 20-21.  In some cases, this was anticipatory; in others, it was because organizations were already being frozen out of funding portals.  *See* ECF Nos. 24-8 ¶¶ 8-9; 24-6 ¶ 15; 24-7 ¶ 13; 24-8 ¶ 9.  Defendants' assumption that Plaintiffs can easily rush back before the court for injunctive relief before catastrophe ensues is, quite simply, divorced from reality and the record.  Indeed, while turning off funding streams appears to have been alarmingly easy, turning them back *on* has proven much more difficult.  *See* ECF No. 40-2 ¶ 6 (explaining that it took three days to receive funding after entry of the TRO); Prelim. Inj. Hr'g, at 3:9-10, *Nat'l Council of Nonprofits*, No. 25-CV-239 (Feb. 20, 2025) ("Unfreezing of funds in response to that order has not always been smooth; in some cases, we think maybe imperfect and incomplete.").

Additionally, other intervening developments since the court issued its TRO seem to *increase* the urgency of injunctive relief.  On February 10, the judge in the District of Rhode Island

case was forced to issue an order enforcing its TRO after the States "presented evidence . . . that the Defendants in some cases have continued to improperly freeze federal funds and refused to resume disbursement of appropriated federal funds."  Order, *New York*, No. 25-CV-39 (D.R.I. Feb. 10, 2025), ECF No. 96.  The court did not mince words, concluding that "[t]hese pauses in funding violate the plain text of the TRO."  *Id.*  Defendants cannot convincingly tell *this* court that there is no longer a need for injunctive relief after they were found to be in violation of *another* court's order.

For all these reasons, the court remains unpersuaded by Defendants' mootness arguments.  To be sure, the government is normally entitled to a presumption of good faith on voluntary cessation.  *Pub. Citizen, Inc.*, 92 F.4th at 1128-29 (quoting *Clarke v. United States*, 915 F.2d 699, 705 (D.C. Cir. 1990) (en banc)).  But the court will not confer that presumption when the government says one thing while expressly doing another.  Karoline Leavitt, X (formerly Twitter) (Jan. 29, 2025), https://perma.cc/99C4-5V6G.  And it will not reward parties who change appearances without changing conduct.

### 3.    Ripeness

At the preliminary injunction stage, Defendants raise a new jurisdictional argument based on ripeness.  They claim that Plaintiffs' claims are currently "too amorphous" for judicial review, and that the court should delay adjudication until further factual developments.  ECF No. 47, at 14.[8]

---

[8] Defendants acknowledge, however, that Plaintiffs' statutory claim—whether OMB has the power and authority to order "a government-wide halt on trillions of dollars in grants, loans, and other forms of financial assistance"—does not raise ripeness concerns.  ECF No. 47, at 20 n.2.

Under the ripeness doctrine, courts conduct a two-pronged inquiry that evaluates (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration." *Andrade v. Lauer*, 729 F.2d 1475, 1480 (D.C. Cir. 1984) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). But when "a threatened injury is sufficiently 'imminent' to establish standing, the constitutional requirements of the ripeness doctrine will necessarily be satisfied." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1428 (D.C. Cir. 1996).

Plaintiffs have already established concrete, particularized, and non-speculative injuries—injuries that had devastating effects, persisted after the OMB Pause Memorandum was stayed, and loom over Plaintiffs to this day. In arguing to the contrary, Defendants ask the court to ignore the fact that agencies continued implementing OMB's freeze or that the District of Rhode Island had to enforce its TRO mere days after it was entered. In the instant litigation, the only reason that harm stopped was because of injunctive relief issued by this court—relief that Defendants insist is unnecessary. Defendants' ripeness arguments, like their mootness arguments, wholly disregard the factual circumstances of this case and its context.

## B.    Preliminary Injunction

While they differ in duration, temporary restraining orders and preliminary injunctions are subject to the same substantive legal standards. *See, e.g.*, *Singh v. Carter*, 168 F. Supp. 3d 216, 223 (D.D.C. 2016). Courts may either grant a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(c) or, in APA cases, may "issue all necessary and appropriate process to . . . preserve status or rights pending conclusion of the review proceedings" when doing so is "necessary to prevent irreparable injury." 5 U.S.C. § 705. Both provisions provide a mechanism

for issuing injunctive relief and operate under the same four-factor test. *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020).

To obtain a preliminary injunction, "the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

These four considerations are factors, not elements. "A district court must 'balance the strengths of the requesting party's arguments in each of the four required areas.'" *Id.* (quoting *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)). When a government entity is a party to the case, the third and fourth factors merge. *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016).

Prior to the Supreme Court's decision in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), courts in this Circuit tended to employ a "sliding scale" method in which "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). While the D.C. Circuit has considered abandoning the sliding-scale method for one that treats the substantial likelihood prong as "an independent, free-standing requirement," *id.* at 393, it has yet to decide one way or the other, *see Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022). At the very least, however, the plaintiff must present a "serious legal question on the merits." *Raimondo*, 40 F.4th at 726 (quoting *Sherley*, 644 F.3d at 398). Given the ambiguity with respect to the sliding-scale approach, the court will consider all factors and delve into their relative weight only if it would affect the outcome. *See Costa*, 456 F. Supp. 3d at 133.

1.      Likelihood of Success on the Merits

On the merits, Defendants largely repeat the same arguments they made at the TRO stage.
*See* ECF No. 47, at 14-16 (final agency action), 25-31 (arbitrary and capricious), 31-34 (statutory
authority), 34-36 (First Amendment).  The court begins by addressing OMB's guidance document,
which the parties discussed at length in their preliminary injunction briefing and at oral argument.
*See* ECF No. 47, at 20-25; ECF No. 49, at 4-6; Prelim. Inj. Hr'g, at 6:19-9:14, 29:21-32:24, *Nat'l
Council of Nonprofits*, No. 25-CV-239 (D.D.C. Feb. 20, 2025).  It then turns to final agency action,
followed by the substantive merits of Plaintiffs' three claims.

a.      *The role of the OMB Guidance*

Defendants spill considerable ink about OMB's issuance of a guidance document, ECF
No. 11-1 ("OMB Guidance Document"), which supposedly limited the scope of the OMB Pause
Memorandum, *see* ECF No. 47, at 20-25.  They assert that the original memorandum, when read in
tandem with the OMB Guidance Document, stops short of unlawful agency action.  *Id.* at 21 (noting
the OMB Guidance Document's statement that "the pause does not apply across-the-board" and
"is expressly limited to programs, projects, and activities implicated by the President's Executive
Orders").  This argument sounds persuasive in theory but clashes with how Defendants' directives
were actually written and implemented.

As an initial matter, the language of the OMB Guidance Document appears to contradict
that of the original memorandum.  The guidance document sought to carve out numerous programs
and portray the initial command as much more limited, but the original memorandum mandated (in
bold typeface, no less) that all federal agencies "*must temporarily pause* all activities related to
[the] obligation or disbursement of all Federal financial assistance."  OMB Pause Memorandum.
It also required agencies to stop the "disbursement of Federal funds *under all open awards*."  *Id.*

(emphasis added). As the court explained previously, *supra* Part II.A.2.a, this language conveyed a clear directive to implement a blanket pause of federal financial assistance. That flatly contravenes the OMB Guidance Document's pronouncement that the pause "d[id] not apply across-the-board." OMB Guidance Document, at 1.

Furthermore, regardless of how Defendants would have *liked* their guidance to apply, that is a far cry from how it was administered in practice. As far as the parties and this court are aware, the guidance was issued at some point on January 28 (the same day the funding freeze was to take effect). Plaintiffs only received a copy of the guidance around 1:30 p.m., *see* ECF No. 11, at 2, and even Defendants did not know exactly when it was originally issued or distributed to federal agencies, Tr. of Prelim. Inj. Hr'g, at 25:5-9, *Nat'l Council of Nonprofits*, No. 25-CV-239 (Feb. 20, 2025). Under the most generous viewing of the case's chronology, agencies had maybe four hours (but probably fewer) to actualize the OMB Guidance Document. Clearly, that was not enough time.[9] Agencies still implemented the original memorandum as written. For example, despite the guidance's attempt to carve out "program[s] that provide[] direct benefits to individuals," OMB Guidance Document, at 1, financial assistance for such programs was still suspended, *see* ECF Nos. 24-5 ¶¶ 14-16; 27-1 ¶¶ 4-5. The guidance also exempted "[f]unds for small businesses" and "Head Start" payments, OMB Guidance Document, at 2, but those fell victim to the freeze, too, *see* ECF Nos. 24-3, at 74; 24-6. Defendants cannot rely on the OMB Guidance Document as a saving grace when it had virtually no effect on the ground.

---

[9] Indeed, some agencies froze funding portals and resources even *before* the OMB Guidance Document was issued. Those agencies were necessarily operating pursuant to the original OMB Pause Memorandum, not the subsequent guidance. *See, e.g.*, ECF Nos. 24-4 ¶ 8 (unable to access funding portal during the day on January 28, before Plaintiffs' complaint was filed around noon); 24-7 ¶ 13 (same); 24-8 ¶ 9 (unable to access fund portal as early as January 27).

This theme—that Plaintiffs are trying to enjoin a far-reaching version of the OMB Pause Memorandum that never existed—pervades all of Defendants' briefing and argument. *See* ECF No. 47, at 10 (mootness), 13 (causation), 20-25 (role of the OMB Guidance Document); 27 (arbitrary and capricious). But Defendants cannot take a memorandum that was drafted broadly, interpreted expansively, and implemented categorically and fault Plaintiffs for "overreading" that directive.

> b.    *Final agency action*

Defendants, now joined by Amicus, again dispute whether the OMB Pause Memorandum was final agency action. Like before, the court is unpersuaded.

Finality is a prerequisite to the judicial review of an APA claim. *See* 5 U.S.C. § 704. Agency actions, as a general matter, must be "circumscribed [and] discrete." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). *Final* agency action, in particular, "must mark the consummation of the agency's decisionmaking process" and determine "rights or obligations . . . from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks omitted) (first quoting *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948), then quoting *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). The APA does not, for example, allow a court to review an agency's "day-to-day operations." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990).

Echoing points from their causation argument, Defendants claim that any instruction from OMB could not have been final because it was the individual agencies that carried out the funding freeze. To the extent this repeats the causation analysis, the court has already addressed it. *See supra* Part II.A.1.b.

Defendants and Amicus further accuse Plaintiffs of improperly advancing a "'broad programmatic attack' on an agency's operations" by targeting a policy "consisting [principally]

27

of . . . many individual actions." ECF No. 48, at 5 (second alteration in original) (first quoting *Norton*, 542 U.S. at 64, then quoting *Nat'l Wildlife Fed'n*, 497 U.S. at 892-93); *see* ECF No. 47, at 15-16. But Plaintiffs only challenge one specific act by OMB: ordering a nationwide pause on federal financial assistance. And, as explained, *supra* Part II.B.1.a, Defendants and Amicus cannot rely on a theoretical version or application of OMB's directives. The initial memorandum was drafted and interpreted broadly in accordance with its text, and what little clarity the guidance offered—if any—came far too late. As the court explained in its earlier opinion, the OMB Pause Memorandum issued a mandatory command to other federal agencies that produced legal consequences for Plaintiffs and others. *See* ECF No. 30, at 21-23.

### c. *Arbitrary and capricious*

Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). To pass muster, the agency "must examine the relevant data and articulate a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Agency action is generally deemed unlawful if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

The arbitrary-and-capricious review at this stage of the litigation remains largely unchanged from the court's earlier opinion.  The touchstone of this inquiry is rationality, and Defendants' actions flunk that test.  Defendants still cannot provide a reasonable explanation for why they needed to freeze *all* federal financial assistance in less than a day to "safeguard valuable taxpayer resources."  OMB Pause Memorandum, at 1.  Evaluating funding priorities can be done without needing to starve citizens or deny critical health services.  *See, e.g.*, ECF Nos. 24-4 ¶ 6; 24-11 ¶¶ 6-7.  The potential $3 trillion in financial assistance implicated by the freeze is a "breathtakingly large sum of money to suspend practically overnight."  ECF No. 30, at 24.  And "[r]ather than taking a measured approach to identify purportedly wasteful spending, Defendants cut the fuel supply to a vast, complicated, nationwide machine—seemingly without any consideration for the consequences of that decision."  *Id.*  Doing so was not—and could never be—rational, especially when the decision was made without grappling with its catastrophic effects or the logistical nightmare of its implementation.[10]  *See Bus. Roundtable v. Sec. & Exch. Comm'n*, 647 F.3d 1144, 1148 (D.C. Cir. 2011) (explaining that an agency's failure to "apprise itself . . . of the economic consequences" of potential action is "arbitrary and capricious and not in accordance with law" (quoting *Chamber of Com. of the U.S. v. Sec. & Exch. Comm'n*, 412 F.3d 133, 144 (D.C.

---

[10] Both Defendants and Amicus argue that "[t]emporary funding pauses are not an unusual exercise of executive authority."  ECF No. 48, at 6; *see* ECF No. 47, at 26-28, 30-31.  For support, they rely on President Biden's pause of funding to the southern border wall, Proclamation No. 10,142, *Termination of Emergency With Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction*, 86 Fed. Reg. 7225 (Jan. 20, 2021), and President Obama's thirty-day delay of Recovery Act funds, Mem. No. E9-6754, *Ensuring Responsible Spending of Recovery Act Funds*, 74 Fed. Reg. 12531 (Mar. 20, 2009).  Without passing judgment on the merits of any hypothetical challenges to those executive decrees, the court is unpersuaded that targeted pauses of funding for specific projects through an executive order are at all comparable OMB's nationwide suspension of *all* federal financial assistance.  Again, the court disagrees with Defendants' and Amicus's characterization of the pause in this case as "targeted" and "discrete" when the language of the memorandum applied to the "disbursement of all Federal funds under all open awards."  OMB Pause Memorandum, at 2.

Cir. 2005))).  Defendants essentially adopted a "freeze first, ask questions later" approach that "entirely failed to consider [multiple] important aspect[s] of the problem."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.[11]

Defendants also ignored significant reliance interests.  Plaintiffs—who only challenge the pausing of already allocated funds—produced substantial evidence that numerous organizations need consistent disbursements of funds to even operate.  Missing a single payment could require immediate firings or the discontinuation of entire programs.  *See* ECF Nos. 24-4 ¶¶ 4, 6; 24-5 ¶ 13.  When an agency suddenly changes course, it must recognize "that longstanding policies may have engendered serious reliance interests that must be taken into account."  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (internal quotation marks omitted) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016)).  Defendants entirely failed to do so.

In the simplest terms, the freeze was ill-conceived from the beginning.  Defendants either wanted to pause up to $3 trillion in federal spending practically overnight, or they expected each federal agency to review every single one of its grants, loans, and funds for compliance in less than twenty-four hours.  The breadth of that command is almost unfathomable.  *See* ECF No. 30, at 17 ("[I]t is unclear whether twenty-four hours is sufficient time for an agency to independently review a single grant, let alone hundreds of thousands of them.").  Either way, Defendants' actions were

---

[11] Defendants repeatedly reference the memorandum's limitation that agencies only act "to the extent permissible under applicable law," OMB Pause Memorandum, at 2, but this does not save them.  First, the incantation of magic language cannot justify otherwise-illegal action.  Plaintiffs' entire complaint alleges that Defendants' instruction was unlawful to begin with.  Second, even assuming that this language applies does not change the arbitrary-and-capricious analysis.  Just because an agency *can* do something does not make it *rational* to do so.

irrational, imprudent, and precipitated a nationwide crisis.  Plaintiffs have therefore shown a likelihood of success on their arbitrary and capricious claim.

*d.    Excess of statutory authority*

Plaintiffs' second claim argues that Defendants dramatically overstepped the bounds of their legal authority in ordering a nationwide funding freeze.[12]  Agencies "are creatures of statute" and are therefore subject to the limits prescribed by Congress.  *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022) ("*OSHA*").  In other words, they "'literally ha[ve] no power to act' except to the extent Congress [has] authorized."  *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 912 (D.C. Cir. 2024) (first alteration in original) (quoting *Fed. Election Comm'n v. Ted Cruz for Senate*, 596 U.S. 289, 301 (2022)).  If an agency exceeds that power, the court must set aside its action under the APA.  *See* 5 U.S.C. § 706(2)(C).

OMB's organic statute is 31 U.S.C. § 503.  Within it, Defendants primarily rely on subsections (a)(2) and (a)(5), but neither appears to grant the expansive authority that OMB tried to exercise here.  Under subsection (a)(2), OMB may "[p]rovide overall direction and leadership to the executive branch on financial management matters by establishing financial management policies and requirements."  *Id.* § 503(a)(2).  But providing overall direction and establishing financial management policies do not clearly confer the power to halt all finances, full-stop, on a moment's notice.  Indeed, the structure and provisions of Section 503 strongly suggest that OMB

---

[12] As was the case at the TRO stage, a plaintiff who brings multiple claims only needs to show a likelihood of success on one of them to obtain injunctive relief.  *See Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 27 (D.D.C.), *appeal filed*, No. 24-7059 (D.C. Cir. 2024).  In the interest of being thorough, the court will address each of Plaintiffs' claims here.

occupies an oversight role. Defendants have not pointed to specific authority that allows it to unilaterally pull the plug on nearly all federal monetary flows.

Subsection (a)(5) further indicates that OMB's role is mainly supervisory, rather than directly active. That subsection permits OMB to "monitor the financial execution of the budget in relation to actual expenditures." *Id.* § 503(a)(5). Such language falls well short of actively deciding whether agencies "*must temporarily pause*" all federal financial assistance. Defendants cannot convincingly argue that "monitor" rises to that level of affirmative control. *See* Monitor, *The Oxford English Dictionary* (2d ed. 1989) (defining "monitor" as "to observe, supervise, or keep under review").

When an agency seeks to "exercise powers of vast economic and political significance," the "sheer scope of [an agency]'s claimed authority" can trigger heightened judicial scrutiny. *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (per curiam) (internal quotation marks omitted) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). In such situations, the court "expect[s] Congress to speak clearly" when conferring such authority. *OSHA*, 595 U.S. at 117 (quoting *Ala. Ass'n of Realtors*, 594 U.S. at 764). The Supreme Court has referred to this principle as the "major questions doctrine." *Id.* at 122 (Gorsuch, J., concurring). Based on the cases in which the Supreme Court has invoked the doctrine, this case easily qualifies. *See Ala. Ass'n of Realtors*, 594 U.S. at 764 (applying the doctrine where the Centers for Disease Control and Prevention implemented a nationwide eviction moratorium affecting up to 17 million tenants); *OSHA*, 595 U.S. at 117-18 (applying the doctrine where OSHA required all federal employees to obtain COVID-19 vaccinations).

"When an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,'" the court "typically greet[s] its

announcement with a measure of skepticism." *Util. Air Regul. Auth. Grp.*, 573 U.S. at 324 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).  Here, Defendants attempted to freeze as much as $3 trillion dollars—the sum total of "all activities related to [the] obligation or disbursement of all Federal financial assistance."  OMB Pause Memorandum, at 2. That is "no everyday exercise of federal power." *OSHA*, 595 U.S. at 117 (internal quotation marks omitted) (quoting *In re MCP No. 165, Occupational Safety & Health Admin.*, 20 F.4th 264, 272 (6th Cir. 2021) (Sutton, C.J., dissenting)).

The scope of power OMB seeks to claim is "breathtaking," and its ramifications are massive. *Ala. Ass'n of Realtors*, 594 U.S. at 764.  Because there is no clear statutory hook for this broad assertion of power, Plaintiffs are likely to succeed on the merits of this claim.

### e.    First Amendment

Plaintiffs' third claim alleges that Defendants are "threaten[ing] [the] continued receipt of federal financial assistance based explicitly on [the recipients'] exercise of their core First Amendment rights of speech and association."  ECF No. 40, at 26.  Defendants counter that the government may "selectively fund a program to encourage certain activities" without simultaneously "funding an alternative program [that] deal[s] with the problem in another way." ECF No. 47, at 34 (quoting *Rust v. Sullivan*, 500 U.S. 173, 193 (1991)).  Defendants are correct that the government "is not required to subsidize First Amendment rights," *Leathers v. Medlock*, 499 U.S. 439, 450 (1991), or "assist others in funding the expression of particular ideas," *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009).  And refusing to pay for certain speech generally does not inflict a First Amendment harm. *See Rust*, 500 U.S. at 193.

What is less clear, however, is whether the government may deliberately withhold funds that have already been earmarked for certain recipients based exclusively on the recipient's

viewpoints. *Rust* and similar decisions by the Supreme Court "are grounded in the notion that the 'Due Process Clauses generally confer no affirmative right to governmental aid.'" *J.D. v. Azar*, 925 F.3d 1291, 1327 (D.C. Cir. 2019) (quoting *Webster v. Reprod. Health Servs.*, 492 U.S. 490, 507 (1989)). But that calculus could change if individuals or organizations have already been awarded certain funds and grants—as is the case with Plaintiffs' members here. If Defendants were to unfreeze promised funds only to organizations expressing one view, but not to organizations expressing the opposite view, that could raise First Amendment concerns.

Additionally, the Supreme Court has held that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech[,] *even if he has no entitlement to that benefit*." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) ("*USAID*") (emphasis added) (quoting *Rumsfeld v. F. for Acad. & Institutional Rights*, 547 U.S. 47, 59 (2006)). It has also made clear that the government cannot "leverage funding to regulate speech *outside the contours* of the [funding] program itself." *Id.* at 214-15 (emphasis added). In other words, when the government exerts First Amendment pressures that have nothing to do with the actual financial assistance program, that can be a constitutional violation. Plaintiffs rely on that principle here. Defendants respond by arguing that the OMB Pause Memorandum is solely framed around "focusing taxpayer dollars" and "[t]he use of federal resources," rather than governing speech beyond the scope of federal financial assistance. ECF No. 47, at 34-35 (alteration in original) (citing OMB Pause Memorandum, at 1).

While the answer is not obvious at this early stage, Plaintiffs have shown some likelihood of success on their First Amendment claim. The Supreme Court has remarked that the line between proper subsidization and improper coercion "is hardly clear . . . because the definition of a particular program can always be manipulated to subsume the challenged condition." *USAID*, 570

U.S. at 215.  That said, the government "cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise." *Id.* (quoting *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 547 (2001)).  The OMB Pause Memorandum made several policy statements that are hostile to concepts like "Marxist equity," "transgenderism," and "woke gender ideology."  OMB Memorandum, at 2.  It also instructed federal agencies to pause all disbursements that could be connected to these ill-defined categories.  *Id.* There is no indication that expressing viewpoints on these issues (or being associated with them at all) is in any way tied to the "contours of the [funding] program[s] [themselves]."  *USAID*, 570 U.S. at 214-15.

The government "may not 'aim at the suppression of dangerous ideas'" or "manipulate[]" a subsidy "to have a coercive effect."  *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (brackets omitted) (first quoting *Regan v. Tax'n Without Representation of Wash.*, 461 U.S. 540, 550 (1983), then quoting *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 237 (1987) (Scalia, J., dissenting)).  By appearing to target specific recipients *because* they associate with certain ideas, Defendants may be crossing a constitutional line.

## 2.    Irreparable Harm

While irreparable injury is "a high standard," *England*, 454 F.3d at 297, the court's analysis of this factor remains unchanged from the TRO stage.  Defendants have not introduced arguments or evidence sufficient to undercut Plaintiffs' strong showing of irreparable harm.

To qualify for injunctive relief, the alleged injury "must be both certain and great," "actual and not theoretical," and "of such *imminence* that there is a 'clear and present' need for equitable relief."  *Id.* (quoting *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)).  It must also "be beyond remediation," meaning that "[t]he possibility [of] adequate

compensatory or other corrective relief . . . at a later date . . . weighs heavily against a claim of irreparable harm." *Id.* at 297-98 (quoting *Wis. Gas Co.*, 758 F.2d at 674).

Here, Plaintiffs have produced significant evidence that a pause on federal funding will "threaten[] the very existence of [their members'] business." *Wis. Gas Co.*, 758 F.2d at 674.   A freeze will not simply inconvenience them, it will devastate them.   The court recounts its findings from before, which still hold true today:

> If the freeze were to remain in effect [or recur], Plaintiffs' members will suffer "existential injuries" and some programs may "simply disappear." ECF No. 5-1, at 12. Their workers may be unable to pay for housing or food. ECF No. 24-4 ¶ 7 ("A lot of our staff live paycheck to paycheck, and if they can't get paid, then they are unable to pay rent or buy groceries."). Some have already been forced to "shutter [their] programs" just to make payroll. ECF No. 24-7 ¶¶ 20-21. And patients or customers that rely on their services may be denied care when it is most needed. ECF Nos. 24-4 ¶ 16; 24-5 ¶ 21. For some, these are harms for which "there can be no do over and no redress." *Newby*, 838 F.3d at 9 (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)); *see* ECF No. 24-4 ¶ 7 ("[I]f my Health Center loses physicians, dentist, or nurse practitioners, then it will be virtually impossible to recruit replacements to a rural Health System that is suddenly an unreliable source of income.").

ECF No. 30, at 27.

While funds have resumed flowing to some recipients, that does not erase the imminence or irreparability of what another pause would entail.   As at least one declarant explained, the resumption of funding "came in under the wire: had it been one day later, we would not have been able to make payroll on Friday, February 7." ECF No. 40-3 ¶ 4.   As discussed previously, all of these organizations rely on continued funding in order to keep their doors open.

The fact that organizations have been able to draw down funds in the immediate aftermath of the court's TRO means nothing if the spigot is shut off again.   The injunctive relief that Defendants fought so hard to deny is the only thing in this case holding potentially catastrophic

harm at bay.[13]  The court's previous order may have bought Plaintiffs a few additional weeks of funding, but they remain just as vulnerable as they were in the first week of February.  A single disbursement does not protect a recipient when the next disbursement is equally as vital.  Plaintiffs have easily shown irreparable harm.

### 3.    Balance of the Equities and the Public Interest

As is the case with irreparable harm, the balance of the equities and the public interest continue to weigh heavily in favor of injunctive relief.  "Plaintiffs paint[ed] a stark picture of nationwide panic in the wake of the funding freeze."  ECF No. 30, at 28.  Nonprofits and organizations across the country were left adrift as they scrambled to make sense of the memorandum and its effects.  *See* ECF Nos. 24-4, 24-5, 24-6, 24-7, 24-8, 24-9, 24-10, 24-11. Entire funding portals were taken offline with no rhyme or reason, generating significant confusion and fear.  *See* ECF Nos. 24-8 ¶¶ 8-9; 24-6 ¶ 15; 24-7 ¶ 13; 24-8 ¶ 9.  Many organizations had to resort to desperate measures just to stay operational.  The pause placed critical programs for children, the elderly, and everyone in between in serious jeopardy.  Because the public's interest in not having trillions of dollars arbitrarily frozen cannot be overstated, Plaintiffs have more than met their burden here.

---

[13] The court reiterates that the District of Rhode Island's TRO does not lessen the severity of the potential irreparable harm in this case.  This court has no control over the District of Rhode Island's decisions and a TRO in that case does "not block this court from entering a TRO of its own."  ECF No. 30, at 28 n.9; *see Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 60 (D.D.C. 2020) ("[C]ourts routinely grant follow-on injunctions against the Government, even in instances when an earlier nationwide injunction has already provided plaintiffs in the later action with their desired relief.") (collecting cases).

4.    Bond

Federal Rule of Civil Procedure 65(c) states that the court may issue a TRO or preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Here, Defendants ask the court to require Plaintiffs to "post a bond commensurate with the scope of the relief ordered." ECF No. 47, at 44-45. The court declines. Rule 65(c) "has been read to vest broad discretion in the district court to determine the appropriate amount of an injunction bond," *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999), "including the discretion to require no bond at all," *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (quoting *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012)). A bond "is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action." *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases); *cf. Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-CV-333, 2025 WL 573764, at *29 (D. Md. Feb. 21, 2025) (setting a nominal bond of zero dollars because granting the defendants' request "would essentially forestall [the] [p]laintiffs' access to judicial review"). In a case where the government is alleged to have unlawfully withheld trillions of dollars of previously committed funds to countless recipients, it would defy logic—and contravene the very basis of this opinion—to hold Plaintiffs hostage for the resulting harm. That is especially so when Defendants—OMB and its director—will personally face no monetary injury from the injunction.[14]

---

[14] The court also denies Defendants' request for an administrative stay pending appeal as premature. *Id.* at 45. If Defendants, after reviewing this opinion and its accompanying order, believe that a stay pending appeal is warranted, they may make a request consistent with Federal Rule of Appellate Procedure 8.

### III.    CONCLUSION

For the foregoing reasons, the court will enter a preliminary injunction.  A separate order will issue.

_____
LOREN L. ALIKHAN
United States District Judge

Date:   February 25, 2025