**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL COUNCIL OF NONPROFITS, et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> OFFICE OF MANAGEMENT AND BUDGET, et al., <br><br> *Defendants.* | Case No. 25-cv-239 |

**PLAINTIFFS' REPLY IN SUPPORT OF
MOTION TO CLARIFY SCOPE OF PRELIMINARY INJUNCTION**

This Court has preliminarily enjoined Defendants from implementing, giving effect to, or reinstating under a different name the unilateral, non-individualized directives in OMB Memorandum M-25-13 with respect to the disbursement of Federal funds under all open awards. Because Defendants have applied a narrow construction to this injunction—at odds with both the text and animating principles of this Court's opinion—clarification is warranted to confirm that the injunction applies to federal funds that have been awarded, regardless of whether disbursement has begun. Defendants offer no substantive rationale to support their crabbed reading, and their procedural arguments are without basis.

### ARGUMENT

**I.   Plaintiffs filed a motion to clarify.**

As Plaintiffs made clear in their opening brief, they understand the Court's order "with respect to the disbursement of Federal funds under all open awards," ECF

1

No. 52, at 1, to encompass all federal financial assistance that has been awarded. Defendants chose to adopt a limiting construction of "open awards" in their notice to agencies, stating that "open awards" means those that have already been "partially disbursed." ECF No. 54-1, at 1. This parties' dispute, then, is over the proper interpretation of the order this Court has already entered. A motion for clarification—such as Plaintiffs filed—is the correct vehicle to ensure that all parties share the Court's understanding of its order.

Defendants, in arguing otherwise (at 8), suggest that there is no possible ambiguity, and therefore nothing to clarify. They base this view not on a refutation of the many points Plaintiffs made in their opening brief, but rather on an intimation that there is some sort of unwritten statute of limitations on asking for clarification. Defendants' argument, boiled down, is that because an opinion that is no longer in effect contained a single line that Defendants plucked out of context, and Plaintiffs did not raise a fuss then (over the precise contours of relief that would last only days more), they are forever barred from seeking relief.[1]  But Plaintiffs are not asking for

---

[1] It is ironic that Defendants suggest that Plaintiffs have waived their argument, when Defendants seek to rely (at 13–14 & n.2) for the first time on arguments that agency appeal processes or the Tucker Act are the proper remedies for Plaintiffs' claims. In any event, it is unclear why Defendants believe these remedies are relevant here. Defendants point to 24 C.F.R. § 578.35, which sets forth an appeal process regarding the CoC grants. But that section is clear that "who may appeal" is limited to entities that "believe they were denied the right to participate" in a CoC planning process; those that were denied funding or received less than they requested; those that received a lower score in their geographic area; and those that did not receive a certification of consistency. Unsurprisingly, none of these options appear to apply to grantees who were *awarded* grants, but have since had those awarded grants frozen at the behest of OMB on a non-individualized basis. As to the Tucker Act, it does not provide for jurisdiction for the APA claims at issue here. It is telling that Defendants believe that they have the authority to turn off the spigot of

clarification of that TRO opinion; they are asking for clarification of the preliminary injunction—an order that is currently operative, and will be for a much longer duration. Plaintiffs requested clarification a mere two business days after it became clear that Defendants are advancing a position that is inconsistent with that order and opinion.

Defendants further suggest (at 9–10, 11) that Plaintiffs have somehow conceded the limiting construction that Defendants have chosen to adopt. But the statements they cite only support Plaintiffs' position. Defendants are quite correct that, at the PI hearing, Plaintiffs reiterated that they seek relief for open awards, and not for NOFOs. That is still the case. As Plaintiffs explain in their opening brief, "open awards" should, properly understood, encompass awards that have been awarded—which are quite dissimilar from NOFOs, where no particular grantee has been selected, as the reliance interests are not comparable. Defendants do not offer any explanation to the contrary.[2]

Instead, Defendants fixate (at 5–6, 14–15) on Plaintiffs' statements at the preliminary injunction stage that the TRO had provided significant relief, as the

---

federal funding with one ill-conceived, two-page memorandum issued without notice—but that to get the funding turned back on, every single grantee in the United States should have to file an individual lawsuit to vindicate their rights. If Defendants' proposal were to bear out, it would result in precisely the Court supervision over every grant or contract that Defendants purport to fear.

[2] In their efforts (at 9, 12 n.1) to rehabilitate their reliance on *Village of Bensenville v. Federal Aviation Administration*, 457 F.3d 52 (D.C. Cir. 2006), Defendants ignore the facts that in *Bensenville*—unlike here—the hopeful grant recipient had not even filed the requisite grant application, and the funds for the grant had not even been congressionally appropriated.

declarants at the TRO stage had since been able to draw on their open awards. These statements are true. But the fact that some of Plaintiffs' members did secure relief as a result of this Court's TRO does not mean that the same is necessarily true for every one of the more than 83,000 members Plaintiffs represent. *See* ECF No. 5-3 ¶ 2; ECF No.5-4 ¶ 1; ECF No. 5-5, ¶ 2. And Plaintiffs noted just that at the preliminary injunction stage. *E.g.* ECF No. 40, at 9 ("Since the Court's order, it appears that the freeze has mostly—*but not entirely*—thawed." (emphasis added)); ECF No. 49, at 11 n.4 (explaining that "it is far from clear that, even now, the rippling effects of the Freeze Order have stopped"); Tr. of Prelim. Inj. H'rg at 3 (noting that the "[u]nfreezing of funds" had been "imperfect and incomplete"). The time since then has only cast additional light on the problems caused by Defendants' actions first in carelessly and recklessly freezing federal financial assistance and now in seeking to limit the reach of the Court's order.

Defendants complain (at 12–13) that Plaintiffs seek to introduce new words into the Court's order. But the Court's order already encompasses the relief Plaintiffs seek. By its terms, it bars implementation of the "unilateral, non-individualized directives" in the Freeze Order "*with respect to* the disbursement of Federal funds under all open awards." ECF No. 52, at 1 (emphasis added). That language easily encompasses the ministerial steps that lead to the disbursement of federal funds that have already been awarded. The fact that Plaintiffs proposed some clarifying

4

language in response to Defendants' improperly narrowed interpretation of the order hardly means that they seek a modification.[3]

## II.  The motion to clarify should be granted.

As Plaintiffs have explained, the preliminary injunction analysis applies equally to grants that have been awarded but not disbursed as to other open grants. Because both the reasoning of the Court's decision and order and those documents' express terms—enjoining the continued implementation of "the unilateral, non-individualized directives in OMB Memorandum M-25-13 *with respect to* the disbursement of Federal funds *under all open awards*," ECF No. 52, at 1 (emphasis added)—apply to all activities (not just disbursement itself) concerning the disbursement of all open awards (not just open awards that have been partially disbursed), the Court should grant the requested motion to clarify.

Seeking to avoid that conclusion, Defendants suggest that, before Plaintiffs can ask the Court to clarify its order, Plaintiffs must submit additional evidence documenting additional harm beyond what is already in the record. But Defendants have identified no authority for that proposition; indeed, the only cases they cite (at

---

[3] Even if this Court were inclined to deem Plaintiffs' motion as one for modification—and it should not, because the Court's order, properly understood, already covers awards that have been granted—the motion should still be granted because, for the reasons already discussed, "the requested modification effectuates . . . the purpose behind the injunction." *New York v. Biden*, Case No. 20-2340, 2021 WL 7908124, at *2 (D.D.C. Aug. 23, 2021); *see also id.* ("modification is appropriate when enforcement without modification would be detrimental to the public interest") (internal quotation marks and citation omitted). Nor would modification require showing "a significant change either in factual conditions or in law" in these circumstances, *id.*, because it is Plaintiffs—not Defendants—who would be seeking the modification, *cf.* Fed. R. Civ. P. 60(b) (setting out conditions under which a court may "relieve a party" from a judgment or order).

15–16) relay—unremarkably—that to achieve a preliminary injunction (or stay) in the first place, plaintiffs must show irreparable harm. As this Court has twice concluded, Plaintiffs here have done so "easily." *See* ECF No. 30, at 26–28; ECF No. 51, at 35–37. Because a motion to clarify simply asks this Court to reiterate the contours of relief it has *already granted*, Plaintiffs need not make any additional factual showing.

Even if Plaintiffs did need to produce evidence of harm specifically related to the Continuum of Care (CoC) grants they highlight in their motion—and they do not—they have already done so in the form of a declaration from the NCN President and CEO detailing the irreparable harm that will befall NCN's members if awarded CoC funding is not disbursed. *See, e.g.*, ECF No. 56-1 ¶ 8 (noting that 129 households, including 82 children, could lose their housing). Defendants (at 15) brush this declaration away as hearsay—conveniently neglecting to note that, at the preliminary injunction stage, hearsay is permissible. *See Holiday CVS, LLC v. Holder*, 839 F. Supp. 2d 145, 155 (D.D.C.), *vacated and remanded on other grounds*, 493 F. App'x 108 (D.C. Cir. 2012).[4]

To the extent any doubt remains, Plaintiffs now concurrently submit further evidence of the irreparable harm caused by Defendants' erroneous reading of the

---

[4] In deeming the declaration hearsay, Defendants also fail to grapple with the fact that the declaration was explicitly based on the declarant's "personal knowledge and review of NCN business records." ECF No. 56-1 ¶ 2. *See United States v. Dynamic Visions, Inc.*, 282 F. Supp. 3d 257, 260 (D.D.C. 2017) (finding a declaration "competent, reliable, non-hearsay evidence from a witness who was personally involved in reviewing . . . business records"), *vacated and remanded on other grounds*, 971 F.3d 330 (D.C. Cir. 2020).

Court's order. As the attached declarations show, one of Plaintiffs' CoC members was awarded five CoC grant renewals on January 17, but has received no further communications about those awards since they were publicly announced. Ex. U ¶ 4. As that member explained, their organization has planned their 2025 budget in reliance on those awards, *id.* ¶ 5, and if they do not come through as promised, will have to lay off staff, diminishing the level of service the organization can offer, *id.* ¶ 6. These cuts will particularly affect the organization's permanent supportive housing program, which will lead to "more people . . . back in the cycle of street homelessness and shelters." *Id.* ¶ 8.

Another of Plaintiffs' CoC members was awarded two CoC grants on January 17, but they remain paused. *See* Ex. V ¶ 6. If the funding does not come through as promised, that member will have to close a program to match data with Medicaid to help enroll clients not receiving mainstream benefits. *Id.* ¶ 7. That member will also have to shutter a coordinated entry program that helps ensure people experiencing homelessness can access services in a much more streamlined way and allows communities to collectively prioritize referrals based on vulnerability. *Id.* ¶ 8. As that member explained, losing the two employees who run these programs—because HUD froze the funds it had awarded, and on which the member relied—would mean that the member "will not be able to provide services at the same level [they] currently do." *Id.* ¶ 9. And the freeze on CoC funding will have broader effects: it will result in the removal of individuals from permanent housing programs, which will overburden already inadequately funded shelters. *Id.* ¶ 13. Even now, the member

"still see[s] loss of life year after year due to exposure to the elements"; the freeze on CoC funding "will unequivocally lead to more deaths." *Id.* As the member explained: "Our clients have no options whatsoever. I can't even fathom what that is going to look like, but it will be absolutely devastating." *Id.* ¶ 12.

In disputing that the motion should be granted, Defendants also reprise (at 2, 13, 16) the refrain that clarification will require this Court to superintend individual agency decisions. But that is wrong and provides no basis for denial. As Plaintiffs have made clear (at 5, 10), the delay in CoC grants is merely an exemplar of the problem Defendants have created through their unduly crabbed interpretation of this Court's order—albeit a particularly significant and costly one, with devastating consequences for NCN's members. Plaintiffs do not ask this Court to superintend every decision regarding a grant by every agency. Indeed, the gravamen of Plaintiffs' complaint is that the agencies are *not* making individual decisions about each grant, but instead continuing to follow a sweeping directive from OMB that encompasses all federal financial assistance other than Medicare or Social Security. This motion concerns the interpretation of the Court's preliminary injunction that Defendants have adopted and instructed other agencies to follow. There is nothing unusual or objectionable about the Court clarifying its preliminary injunction order.

With respect to some CoC grants in particular, Defendants (at 11–12) make much of HUD regulations noting that certain conditions must be satisfied before a grant agreement is signed. But "the process of signing a grant agreement is fairly ministerial: it is not a negotiation about the amount awarded or the fact of the award

8

itself." Ex. W ¶ 8. Because the grant agreement process "is not intended to afford HUD a process to revisit its decision to award the grant[, a]warded renewals almost never fall through after the award is announced." *Id.* (This is particularly true for renewals, which usually do not have additional conditions that need to be met because their compliance was reviewed before the renewal was even awarded. *Id.*) And in any event, there are no conditions that a grantee needs to meet between the announcement of the award and the receipt of the individual award letter. *Id.* ¶ 6.

Defendants further suggest (at 3, 16) that the fault may lie with the grantees for failing to sign their grant agreements. This cannot be taken seriously. A significant part of the problem is that—because of the OMB-directed freeze still in place—grant agreements have not even been distributed to the awardees. *See* Ex. U ¶ 4; Ex. V ¶ 6; Ex. W ¶ 11. Yet Defendants contend (at 16) that any delay must not be related to the OMB Freeze Order because Plaintiffs' members were awarded grants on January 17, and had not received their first disbursement before the Freeze Order issued ten days later. This, too, reveals a fundamental misunderstanding of the typical timeline and process for CoC grant award disbursements. *See* Ex. W ¶ 6. In the ordinary course, grantees would not have received their first disbursement in ten days. *Id.* But the fact that grantees have heard only radio silence since January 17 is not in the ordinary course. *Id.* Pausing the steps necessary to begin disbursing CoC awards at precisely the same time the Freeze Order issued "would be a remarkable—and unfathomable—coincidence." ECF No. 51, at 13.[5]

---

[5] Although Defendants are incorrect about the CoC grants, this discussion is, in many ways, a sideshow. Plaintiffs understand that the Freeze Order is affecting not only

## CONCLUSION

For the foregoing reasons, the Court should clarify that the preliminary injunction's directive "with respect to the disbursement of all open awards" applies to federal financial assistance that has been awarded, and directing that Defendants clarify and reissue their notice to agencies accordingly.

Dated: March 10, 2025        Respectfully submitted,

/s/ *Jessica Anne Morton*

Jessica Anne Morton (DC Bar No. 1032316)
Kevin E. Friedl* (Admitted only in New York; practice supervised by DC Bar members)
Kaitlyn Golden (DC Bar No. 1034214)
Robin F. Thurston (DC Bar No. 1531399)
Skye L. Perryman (DC Bar No. 984573)
Will Bardwell* (DC Bar No. 90006120)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
jmorton@democracyforward.org
kfriedl@democracyforward.org
kgolden@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org
wbardwell@democracyforward.org.

*admitted *pro hac vice*

---

the Fiscal Year 2024 grants that were awarded on January 17, but also Fiscal Year 2023 grants where disbursement had not yet begun. *See* Ex. W ¶ 12. The clarification Plaintiffs seek does not depend on the facts as to any particular grant; the stark facts of the CoC timeline are merely one example of why clarification is so important. But the Court need not accept Defendants' efforts to move the analysis from the APA to the weeds of each grant program—and then suggest that it is Plaintiffs who dragged them there.

## CERTIFICATE OF SERVICE

On March 10, 2025, I caused the foregoing and accompanying declarations to be filed electronically via the Court's CM/ECF system, which provides electronic notice to all counsel of record.

Dated:  March 10, 2025                    /s/ *Jessica Anne Morton*
                                          Jessica Anne Morton